1       UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT TACOMA

3  _____

4                                    )
   EMILY TORJUSEN,                   ) 3:18-cv-05785-BHS
5                                    )
   Plaintiff,                        ) Tacoma, Washington
6                                    )
   v.                                ) March 7, 2022
7                                    )
   NATIONAL RAILROAD PASSENGER       ) Pretrial
8  CORPORATION d/b/a AMTRAK,         ) Conference
                                     )
9             Defendant.

10 _____

11            VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE BENJAMIN H. SETTLE
12           UNITED STATES DISTRICT JUDGE
   _____
13

14

15

16

17

18

19

20

21

22

23

24
        Proceedings stenographically reported and transcript
25          produced with computer-aided technology

```
 1
 2                       APPEARANCES
 3

 4

 5    For the Plaintiff:      ANTHONY S. PETRU
                              SCOTT H. LEVY
 6                            Hildebrand McLeod & Nelson LLP
                              350 Frank H. Ogawa Plaza
 7                            Fourth Floor
                              Oakland, California
 8
                              JOSEPH ANDREW GRUBE
 9                            Breneman Grube Orehoski PLLC
                              1200 Fifth Avenue
10                            Suite 625
                              Seattle, Washington
11

12    For the Defendant:      JOHN A. BONVENTRE
                              Landman Corsi Ballaine & Ford
13                            One Gateway Center
                              Fourth Floor
14                            Newark, New Jersey

15                            ANDREW GORDON YATES
                              Lane Powell, PC
16                            1420 Fifth Avenue
                              Suite 4200
17                            Seattle, Washington

18

19

20

21

22

23

24

25
```

```
 1                                  MORNING SESSION
 2                                  MARCH 7, 2022
 3          THE CLERK:  Good morning.  This is in Torjusen versus
 4     Amtrak, Cause No. C18-5785BHS.
 5        Counsel, please make an appearance for the record.
 6          MR. PETRU:  Anthony Petru on behalf of the plaintiff.
 7     I will change my name, change the identification.
 8          MR. LEVY:  Scott Levy on behalf of plaintiff.
 9          MR. GRUBE:  Joseph Grube on behalf of plaintiff.
10          MR. BONVENTRE:  John Bonventre on behalf of the
11     defendant.
12          MR. YATES:  Andrew Yates on behalf of defendant.
13          THE COURT:  Good morning.  That mic is working, is
14     it?  Can you hear?
15          MR. BONVENTRE:  Yes, Your Honor.
16          THE COURT:  We are working off the audio in the
17     courtroom and not off the computer.  That is why I asked.
18        Again, good morning, everyone.  This matter is a hearing
19     on the pretrial conference.  Trial is scheduled to begin the
20     29th of this month.  It will be an in-person trial.  That
21     moots Amtrak's objection to a Zoom trial.
22        I will talk about the procedures during trial here.
23     First, I want to take up the motions in limine.  The
24     plaintiff's first motion in limine is to preclude expert
25     testimony not disclosed.  That's unopposed and granted.
```

1      Second is to preclude reference to collateral source.

2   This issue has arisen in other Amtrak derailment cases in

3   this court.  Amtrak does not object to precluding evidence

4   regarding third-party compensation.  In prior cases, Amtrak

5   has admitted liability and has paid all known medical bills

6   of plaintiffs.  If that is the case here, or it intends to

7   pay but not all bills have been paid, then I have allowed, in

8   prior cases, for evidence regarding the payment of medical

9   bills.  Usually that is done, and it has been done more than

10  once through stipulation.  Is that what the parties intend to

11  do here?  Are there outstanding medical bills?

12      MR. PETRU:  Your Honor, this is Anthony Petru.  There

13  are some outstanding, unpaid medical bills.  If Amtrak

14  intends to see that those be paid, I would imagine we would

15  enter a stipulation just -- merely indicating the past bills

16  have been paid or been satisfied without going into any

17  further unnecessary detail.

18      THE COURT:  That's what we've done in the past.  It

19  does indicate they are paid by Amtrak in furtherance of their

20  admission of liability.

21      MR. PETRU:  Your Honor, we have an objection to that

22  because the fact that Amtrak has paid for it is irrelevant

23  and should be irrelevant to the jury.  There is no reason why

24  the jury needs to know who paid for it, other than Amtrak's

25  attempt to ingratiate themselves with the jury on behalf of

their benevolence.  If this (inaudible) in cases not properly brought forth to the jury, and this is one of them, that Amtrak paid it, than an insurance company paid it, or some third party paid it, or Ms. Torjusen's parents or she paid it.  It is irrelevant who paid it.  We are not seeking from the jury the reasonable value of those paid medical bills.

Our position is the stipulation should indicate that they have been paid, and there is no plausible relevant reason why the fact that Amtrak has or will pay those outstanding bills on the eve of trial is relevant.

MR. BONVENTRE:  Judge, on behalf of Amtrak, we would ask for the same stipulation that we have entered in all the prior trials.

THE COURT:  We will do that.  It may seem remote, but the jury, in making a determination as to award of damages, may have an idea that somehow or another they are supposed to pay for medical bills.  I don't see unfair prejudice at all. It is consistent with the admission of liability.  It makes that clear to the jury.  A case has not been made as to how plaintiff is somehow prejudiced by that.  The stipulation form that's been used in the past should be used in the future or in this case here.

No. 3, preclude reference to the time or manner of attorney retention.  That's unopposed and granted.

No. 4 is preclude location of attorney's law firm.

1    Unopposed and granted.

2        No. 5 is preclude reference to tax on recovery.  As to the

3    time of the filing of the Complaint, it is my understanding

4    plaintiff was a resident of the state of Washington, which

5    does not have an income tax.  I have, when asked for an

6    instruction on non-taxability of the award, given it.  I will

7    give it here unless somebody can show to me that there is

8    some tax liability possibility.

9            MR. PETRU:  I will try to keep my perfect batting

10   average in place here.  We do oppose that instruction.  If I

11   can share with the Court anecdotal experience.  I have

12   represented railroad workers in FELA cases.  This is my fifth

13   decade of doing it.  Every case that we have handled against

14   Amtrak, Santa Fe, Northern Pacific or any other railroad, the

15   fact that the FELA has been established by Congress as a

16   railroad employee's sole remedy in an FELA case is something

17   railroads insidiously tried to keep away from the jury

18   because they feel that the fact that the FELA is the sole

19   remedy for railroad employees somehow prejudices them, even

20   though it is true.

21       Similarly here, the tax effect on the award is correct

22   that the Court's position that the award will be pretaxed,

23   won't be taxed, won't be true, again, doesn't have any

24   relevance to the jury in terms of rendering its award.

25       Our position is that if they want to keep out in FELA

cases the fact the FELA is the sole remedy, the court permitted that because of potential prejudice, we think the tax consequences (inaudible) can have that same effect.  It should not be mentioned one way or the other.

THE COURT:  All right.  I hope we are not going to have argument on every one of my rulings here.  I am standing by my ruling.

You can have a member of a jury influence other jurors indicating that they think and understand this is taxable. It clears that up.  I think there is good authority for when requested, an instruction will be given on the non-taxability.

Moving on.  Preclude reference to absence of parties and witnesses.  That is unopposed and granted.

No. 7 is preclude reference to preexisting conditions. Preexisting medical conditions are admissible where evidence of prior medical conditions relate to a medical condition treated in connection with injuries sustained in the derailment.  Amtrak in its response argued that plaintiff has both prior and subsequent medical issues and that medical records are admissible in evidence.

I think actually in this pleading Amtrak indicated medical records are not admissible.  I am sure that was a typographical error.

The Court will reserve ruling on this because any evidence

1    of injury or health issues and the symptoms associated with

2    them must have some relevance to the medical conditions and

3    diagnoses arising from the derailment.

4         Amtrak in their response does not elaborate on the

5    connection that either the preexisting conditions or the

6    subsequent pedestrian accident had to the derailment

7    injuries.  It would be helpful to me before this is raised in

8    trial for you to just briefly describe in what way these

9    two -- the preexisting and the subsequent pedestrian

10   accident.

11        MR. YATES:  Yes, Your Honor.  I can address that.

12   Mr. Bonventre may have something to add.

13        The first one has to do with the (inaudible).  We

14   anticipate that the evidence plaintiff is going to present

15   will include evidence of physical and cognitive fatigue that

16   they will attempt to attribute to the derailment.  The fact

17   she was reporting the same, similar symptoms to her primary

18   care doctor long before the accident, we believe, is

19   relevant.

20        We also understand the evidence will include some ongoing

21   pain and subjective dysfunction with her sort of back and

22   neck area stemming from her clavicle fracture, which is

23   related to the derailment.  Being struck by a truck while

24   presenting for treatment for neck and back pain, things of

25   that nature, we also believe is relevant to the ongoing

1  physical sequelae we think she's going to present at trial.

2       MR. LEVY:  This is Scott Levy for plaintiff.

3  Plaintiff has no problem with the defendant looking into

4  those two particular issues, fatigue and back and neck pain.

5  There are no other preexisting conditions that have been

6  identified by defendant, and we would just keep it at those

7  two preexisting conditions.

8       THE COURT:  All right.  You have heard how the Court

9  views this.  You indicated that you recognize that there can

10 be some relevance here.  This is sort of conditionally

11 denied.  If something comes up during trial in which you feel

12 there has been some attempt to introduce some health care

13 information that has no relation, you can alert the Court and

14 we will take it up.

15     With regard to the medical records mentioned here, and it

16 comes up in other matters, this Court's position is that

17 medical records are generally not wholesale admitted into

18 evidence, but come through the examination of a health care

19 provider.

20     Plaintiff in its response to Amtrak's supplemental motion

21 seeks admission of medical records from Dr. Crossen.  Both

22 parties are -- I have looked at the pretrial order.  Both

23 parties are seeking the admission of medical records.  The

24 Court certainly will allow that.

25     My rulings in the past remain here.  I don't allow just a

1   dumping of medical records without some health care provider

2   providing information because that can be a 403 problem,

3   cause confusion with the jury, they are not medical experts

4   and so forth.  There are -- yet Amtrak has objected to some

5   of the medical records, however, in the pretrial order.

6   Maybe you can elaborate on the reason for the objection.

7          MR. YATES:  Your Honor, the only medical record that

8   I believe we have objected to is Dr. Crossen's untimely

9   expert report.  I believe we have stipulated to the records

10  the plaintiff identified in their exhibits and we also

11  proposed the same.  Separately, we will work with plaintiff

12  to have an identified universe of records for trial.

13     I think the Court has correctly identified that both

14  parties are seeking the admission of the records here, and in

15  their response to our motion on Dr. Crossen's report, they

16  acknowledge medical records are admissible, which they are.

17  Hopefully that answers Your Honor's questions.

18          THE COURT:  I think it does.  I was going to get to

19  Crossen at the end because it was the supplemental.

20     The Court's view with respect to Crossen, I am not sure

21  there is a dispute here, a report itself is not admissible.

22  He can provide testimony up to his last visit with plaintiff.

23  Rule 26 requires supplemental discovery production when there

24  are visits with health care providers after the end of

25  discovery because there is an ongoing obligation there.

1    Dr. Crossen will be allowed to testify concerning all of

2   his opinions.  The report itself, just as expert reports are

3   not admitted, his findings, observations and so forth will

4   all come through his testimony.

5    Does Amtrak have any additional problem with that?

6    MR. BONVENTRE:  Yes, Judge.  Our judgment of

7   Dr. Crossen is not that he happened to see her except for a

8   gap of years.  The report is really in the nature of a

9   medical expert report.  It is not in the nature of I saw the

10  patient and observed X, Y and Z.  It is in the nature of an

11  expert report served way beyond the close of discovery.

12  That's our objection, Your Honor.  Obviously, the report does

13  not come in, the (inaudible) with the Court.  The problem is

14  it is not just another visit in which Dr. Crossen comments on

15  his additional examination.  It is an absolute full-blown

16  expert report, which should be precluded.

17    THE COURT:  Did I not say it was not coming into

18  evidence, the report; did you not hear that?

19    MR. BONVENTRE:  I am talking about his opinion

20  generally reflected in the report, not the report itself.  I

21  agree with the Court on that.

22    THE COURT:  His opinions can come in with respect to

23  opinions formed during treatment.

24    MR. YATES:  Your Honor, may I briefly add a couple of

25  points?  I understand the Court's ruling with respect to the

admissibility of the report itself.  However, we are
concerned about at least a couple of items in that report
that Dr. Crossen apparently gleaned from his last interview
with the plaintiff.  I would point out, everything in the
last report was strictly evaluation because, by law, he is
not allowed to provide treatment to Ms. Torjusen while she's
in Cairo and he's in Oregon.  This is purely for evaluation.

Within that, he relates the content of the article which
Ms. Torjusen claims to have written about the Amtrak
derailment, including its causes and consequences.
Plaintiff, I think, has correctly acknowledged in their
response that none of that is admissible.  Dr. Crossen
shouldn't be allowed to put that in front of the jury by
testifying to what Ms. Torjusen told him.

Secondarily, there is reference in the report to
Ms. Torjusen going to the derailment site, drinking a number
of shots of vodka that corresponds to the fatalities in the
accident.  We also believe under 403 and hearsay and several
other reasons, that that testimony should not be admissible
consistent with the Court's ruling on these types of issues
in prior cases.

MR. PETRU:  This is Anthony Petru.  I am going to
ask -- Mr. Yates is making reference to matters I am not
familiar with in terms of the Court making rulings in prior
cases.  I don't know what he is talking about, so if I could

1   have some light on what that references so I can respond in

2   context.

3            THE COURT:  Let me say that I am not exactly sure

4   which particular rulings.  Each case and each evidentiary

5   issue stands on it own and will be ruled on on its own.

6       I do not find at this point that it is likely that I would

7   sustain an objection if there was evidence that she went back

8   to the scene of the accident and she drank and so forth.

9   This is part of her story, which she is permitted to tell.  I

10  don't see a 403 problem.  It is part of her experience.

11           MR. PETRU:  That satisfies what I was going to say.

12           THE COURT:  What the -- if a psychologist recounts

13  that same thing and that bears upon how he views her current

14  mental state and future needs and so forth, I think that is

15  going to be permitted.

16           MR. PETRU:  Thank you, Your Honor.

17           THE COURT:  No. 8 is preclude evidence of defendant's

18  good character.  I have already addressed the issue here with

19  respect to -- that there is not going to be evidence of

20  character, but there will be a stipulation with regard to the

21  payment of medical bills.  Again, assuming that all medical

22  bills have been paid.

23      No. 10 is preclude admission of medical records other than

24  through the health care providers.  I have already indicated

25  to you what my approach is to that.  The parties have already

1  stipulated here with respect to many medical records, and I

2  expect you can do some meeting and conferring and resolve.

3  Where they are unresolved, you can bring it to my attention

4  during trial that there is an issue of medical records.

5       Defendant's No. 1 is preclude evidence not produced in

6  discovery.  Plaintiff is arguing I should reserve ruling on

7  these.  I agree.  The plaintiffs have a motion similar to

8  this, which was unopposed and granted.  Having said that,

9  though, whether an opinion offered by an expert is beyond a

10 report is a matter that needs to be addressed when being

11 offered.  Opinions that are disclosed may have assumptions or

12 support opinions that formulate the general opinion.  The

13 Court just has to reserve ruling should an objection come up

14 that there is an opinion, for example, being expressed by

15 someone that was not supported in the record.  Although there

16 are no expert witnesses in this case, are there?  All the

17 so-called experts are just health care providers, treatment

18 providers.

19          MR. LEVY:  Correct, Your Honor.

20          THE COURT:  I will move on to No. 2.  Preclude

21 inflammatory questions, statements and arguments attempting

22 to disparage Amtrak.  I believe and agree this is too vague.

23 I will rule on any objections when made.  Of course, the need

24 to avoid these things applies to both parties.

25      Three, preclude cumulative fact witnesses.  I did not see

1   the list of lay witnesses as overly cumulative here.  There

2   should be some restraint in the two parents not providing

3   extensive testimony on the effects of this on their daughter

4   unless Amtrak impeaches the first to give testimony.  I am

5   not going to preclude one of the parents from testifying.  I

6   am just simply saying if you don't -- if you have the first

7   parent who gives extensive testimony, we don't need to have

8   total redundancy unless Amtrak is attempting to impeach that

9   first parent.

10      Then, the rescuer and the friend, I don't see either of

11  those as running afoul of 403.  The local rule provides

12  ordinarily a party shall be restricted to one expert on a

13  particular subject.  Again, we don't have experts here.  What

14  we do have is multiple psychologists or mental health

15  treatment providers here, and it seems to me there is the

16  potential for a lot of overlap and redundancy here.

17  Certainly, to the extent that each of these health care

18  providers are providing testimony concerning their treatment,

19  that certainly is very appropriate.

20      When talking about future needs and so forth, I just am

21  asking here for plaintiff's counsel to not have a lot of

22  repetitive testimony.  Usually it is good to put your best

23  health care provider on diagnoses and treatment and prognosis

24  and so forth first to -- and then as subsequent psychologists

25  are called to testify, again, there can be some exercise of

1    discretion here.

2       I don't know if I have helped anyone, but I think that

3    what we have here is multiple psychologists treating her over

4    different periods of time, and they will be allowed to

5    testify concerning that.

6            MR. LEVY:  Thank you.

7            THE COURT:  No. 4 is limit Kevin Jeffers' testimony

8    to photographs he took within the experience of helping

9    plaintiff at the scene.  I am going to reserve ruling on

10   this.  It would seem to me that certainly he is relevant to

11   the magnitude of the aftermath of this derailment.  He became

12   personally involved in helping plaintiff in this case.  I

13   would say that I don't think we should see more than roughly

14   20 minutes of testimony from him regarding all of that.

15   Certainly it is relevant to damages.

16      The photographs that he took, again, I would like a

17   stipulation or at least an agreement reached prior to the

18   first trial day on what photographs will be used to inform

19   the jury generally of this derailment in which liability has

20   been admitted and photographs depicting that.  Again, in

21   previous cases I have allowed, and encouraged really, a

22   stipulation to be reached with respect to the manner of the

23   derailment.  That is, the speed, the curve, speed limit, that

24   the train derailed and showing the aftermath.  These are --

25   this is relevant to her damages claim.  There is going to be

1    403 limitations on just how much.  I am just encouraging the

2    lawyers to work this out through stipulation and agree to

3    what photographs will be used.

4            MR. LEVY:  Your Honor, may I be heard on this one?

5            THE COURT:  Yes.

6            MR. LEVY:  This is Scott Levy for plaintiff.

7    Regarding Mr. Jeffers, plaintiff would like to talk to

8    Mr. Jeffers about why he was on the scene just to lay the

9    foundation for what he was doing there, and then describe how

10   it is that he came to find Ms. Torjusen and his interactions

11   with her.  I am a little concerned -- he had extensive

12   interactions with her, both initially when he found her and

13   stayed with her and assisted her, and then a short period of

14   time afterward when she was being triaged and there were

15   phone calls with Ms. Torjusen's family.  I believe -- I am a

16   little concerned that 20 minutes may be a little bit short to

17   be able to explore the full interactions between Mr. Jeffers

18   and Ms. Torjusen as well as kind of the background setting

19   and the context of what he was doing on the scene.

20           THE COURT:  That's fair for you to jump in and

21   express concern about the 20 minutes.  It may seem that is

22   somewhat arbitrary.  I am not inexperienced in terms of these

23   things.  I am not holding you to 20 minutes.  I threw that

24   out.  I don't want an extensive discussion about the -- all

25   the scene, all the different people.  At some point it

becomes a matter of 403 concern.  I am throwing this out so that Amtrak doesn't feel like it has to throw in an objection saying this is going too far.  I am certainly going to give you latitude with respect to that.  Twenty minutes may not be enough.  At some point, Amtrak may raise an objection and, of course, they do so at their peril because if I am not so persuaded, then it is just going to appear to the jury that Amtrak is trying to diminish the seriousness of the aftermath of that derailment.

I think I have said enough there.

MR. LEVY:  Thank you, Your Honor.

THE COURT:  No. 5 is limit the testimony of treating physicians to their diagnosis and treatment.  I am going to reserve ruling here.  There is presentation.  There is symptoms being called out.  There is diagnosis.  There is treatment plan prognosis.  These are all things we know are typical.  They are going to be allowed to do that.  Of course, they are not permitted to express opinions that weren't formed when treating -- arising from their treatment.

No. 6 is preclude plaintiff or witness from testifying about future medical expenses or wage loss.  There seems to be an agreement there is not a wage loss claim here.  I expect the treating health care providers are going to provide testimony concerning what they feel is needed in terms of future mental health treatment.

1      Setting aside for a moment the discounted to present value

2    issue, Amtrak, what is the basis for your objection for a

3    health care provider that offers testimony?  You don't need a

4    life care planner in order to indicate -- in fact, life care

5    planners, Amtrak doesn't have much regard for them, at least

6    based on my experience in the past, and they rely in their

7    reports on what they learn from the health care providers.

8    What would be the basis of an objection to one of the

9    psychologists testifying concerning her need for future

10   mental health counseling?

11         MR. BONVENTRE:  I will go first.  The issue is not --

12   the issue is a question of disclosure.  It is a question of

13   here we are three weeks from trial, and because we don't have

14   a life care planner or an expert report setting forth in

15   detail what it is allegedly the plaintiff is going to need in

16   terms of future treatment, we are left three weeks before

17   trial to completely guess what the witnesses are going to

18   say.  There has been zero disclosure on that issue.

19         MR. YATES:  That is correct, Your Honor.  In

20   Dr. Crossen's last actual treatment note from November of

21   2018, he ends by talking about how she has a group project

22   due in class.  There has been no disclosure beyond that

23   about -- there is nothing in there about any future treatment

24   needs whatsoever.  The content of his report is really more

25   importantly the label.  I would respectfully submit it is an

1  expert report because that is the first time where there is

2  any sort of possible suggestion of additional future

3  treatment going out into the future.

4        MR. PETRU:  Your Honor, if I may respond.

5        THE COURT:  Yes.

6        MR. PETRU:  There is no secret here that Ms. Torjusen

7  suffers from a combination of psychological, physical and

8  cognitive issues, all of which have been disclosed in the

9  medical records, all of which are available to defendant.

10 They are fully aware of them.  She has TBI, PTSD, adjustment

11 issues, as well as has been in and out of therapy over the

12 last four years or so.

13    I don't have all the medical records in front of me.  I am

14 not going to parse through them.  To suggest or imply that

15 Amtrak does not know or not expect that she will require and

16 would benefit -- more importantly, would benefit from

17 treatment prospectively is, I think, disingenuous.  I think

18 that is replete through all the records.  Dr. Crossen has

19 expressed the same need as others have in the past, that she

20 does need it.  I would suggest that assuming that they don't

21 know that is -- I am trying to be careful here.  That is not

22 reading the same medical records we are reading.  They know

23 that.  They know that.

24        MR. BONVENTRE:  I apologize.

25        MR. PETRU:  What we don't have here is a clear and

1   specific outline that in ten years or 15 years or 20 years,

2   she's going to need this or that or something else or need

3   access to the care.  If we had that kind of prospective

4   five-, ten-, 15-, 20-year plan to assume her life was going

5   to take a certain track, we would have it, but we don't.

6   What she is, is she's a damaged young lady who has been --

7   who has continuous damage who will need access to care.  I

8   expect that is what the testimony will be.

9       We might get to a point where it is not specifically

10  quantified.  I don't know exactly what the witnesses are

11  going to say.  We do know what their bills are.  We do know

12  what they have charged for an hour session or

13  neuropsychological evaluation.  Those are historic.  Those

14  are in the records.  Those will come forward.  It is up to

15  the jury to make a determination based on the evidence that

16  they are provided in terms of whether they believe that

17  Ms. Torjusen would benefit from future medical care.  The

18  elements are there for them.  I think under the law that is

19  all we need to do.  That is ultimately a jury determination.

20          THE COURT:  I don't want to take further argument on

21  this.  A treatment provider, we already went through,

22  provides diagnosis, treatment plan and prognosis.  I am sure

23  that Amtrak had the opportunity to take the deposition of

24  these health care providers and ask the question about what

25  are her future needs and so forth.  This falls within

1    opinions formed while treating, whether a health care

2    provider -- that also --

3          MR. BONVENTRE:  Can I be heard on this?  It is

4    literally trial by ambush.  It is not the defendant's job to

5    try to discern and guess what the plaintiff's expert is going

6    to say about future treatment.  Counsel just said he,

7    quote/unquote, expects.  Counsel doesn't even know what these

8    witnesses are going to say.  How is defendant possibly

9    supposed to prepare for cross-examination if plaintiff's

10   counsel, who is going to call the witness, doesn't even know

11   what they are going to say?  We are not on notice in any way,

12   shape or form about what any future treatment is going to be.

13   It is trial by ambush, and we object.

14         THE COURT:  You just explained why I think it is

15   going to be admissible.  Now, in any specific and particular

16   health care provider, you can move to strike testimony if you

17   think that testimony was inconsistent with what the medical

18   records would support in terms of their opinions about what

19   her needs are in the future and so forth.  As I said, it is

20   not trial by ambush.  I assume Amtrak is taking the

21   deposition of these health care providers.  Those are

22   standard questions to ask of a treatment provider when going

23   through the presentation, complaints, diagnosis, treatment

24   and prognosis.

25       We will have to wait and see what precisely comes out

1  there.  You can see my general ruling here is I am not going

2  to grant the motion to preclude speaking about future needs.

3      The quantification, that's a different question.  With

4  regard to the discount to present value, should they offer

5  testimony concerning their hourly rate and what might happen

6  in the future, typically, this discount to present value

7  comes from an economist.  Neither party has hired an

8  economist.  When there is no evidence with regard to discount

9  to present value, the jury doesn't get an instruction on it.

10     I might add, in my experience the difference between the

11  discount to present value and the present number is usually

12  very little difference because the conservative investment

13  rate of return is -- tracks very closely to the inflation

14  rate.

15     There is not going to be apparently an economist.  There

16  won't be an instruction, but that does not preclude evidence

17  coming in by itself about future medical expenses.

18     No. 7 is to preclude plaintiff's counsel from using

19  anchoring tactics in opening statement, closing argument.

20  Actually, I noted Amtrak characterizes it as "opening

21  argument."  Of course, it is supposed to be an opening

22  statement.  It seems to me this rule is honored more than it

23  is breached any more than it is in its observance.  I have

24  become in my old age more patient with lawyers who are

25  violating the rule because you can see a lot of argument

1  coming out in the opening statement.  But if it becomes too

2  significant and counsel for the other side objects and says:

3  This is argument, Your Honor.  I am going to say:  It is.

4  Your objection is sustained.

5      Let me finish.  With respect to the anchoring part, I have

6  not precluded anchoring.  I don't endorse those courts that

7  think it is improper.  I do not think it is improper.  It is

8  something that each side can do.  It is perfectly, in my

9  opinion, appropriate for counsel to make a suggestion to the

10  jury.  That's what it should be.  It is argument.  It should

11  be a suggestion.  So-called anchoring, this anchoring motion

12  is denied.

13      No. 8, preclude evidence of Amtrak's liability.  I have

14  already addressed this, I think, sufficiently, with what I

15  expect the parties to get together and do with regard to

16  photographs and stipulation.

17      Preclude media reports is No. 9 regarding the derailment

18  or the return to service.  As I have done in earlier cases, I

19  am going to reserve ruling on this.  As a general matter,

20  there are 402 and 403 concerns.  However, if some media

21  coverage has some influence on plaintiff's mental state of

22  any kind, it may pass both evidentiary rules, but I want to

23  know ahead of time if plaintiff intends to offer evidence of

24  media coverage, and I will take it up outside the presence of

25  the jury.

1    MR. PETRU:  If I may give the Court a heads up.

2  Ms. Torjusen is influenced by media reports of train

3  accidents, of this particular incident.  It has altered her

4  life so significantly.  We shared with counsel a school

5  project that she wrote analyzing it, criticizing the

6  incident, talking about it on a personal level.  Insofar as

7  the Court earlier said she has a story to tell, part of the

8  story is the impact that she has experienced when she sees

9  and reads and hears about train accidents, including media on

10  this particular incident.  In that context, it will be the

11  subject of examination.  I am giving the Court a heads up on

12  it.

13    THE COURT:  I expected from what I read that was

14  going to be the case here.  That's different from actually

15  having video from KING 5 TV or something like that.  And the

16  parties have already agreed that her, whatever it was,

17  28-page story and criticism of Amtrak was not going to come

18  in.  Again, if she wants to testify, she intends to testify

19  that she was watching the news the other night and there was

20  a derailment in the Midwest someplace and caused her to

21  suffer a lot of emotional harm, she found herself

22  uncontrollably crying, obviously I don't know what you are

23  going to be alluding to, I am using this as an example that's

24  relevant.

25    MR. PETRU:  That's my context, Your Honor.  Their

1   No. 11 is the exact same issue.  We will get to that.

2        THE COURT:  No. 10 is exclude reference to

3   congressional testimony of the FAST Act.  That is unopposed

4   and granted.

5     Exclude evidence of other derailments.  Same answer I just

6   gave here a moment ago.  If she becomes aware of some other

7   prior derailment or collision that caused her to suffer some

8   emotional reaction, she can testify to that.

9     No. 12, exclude reference to the NTSB report.  Plaintiff

10  is opposed to this.  It is not clear to me why.  I have

11  excluded it in every other case.

12       MR. PETRU:  There is a legal distinction between the

13  conclusions that are drawn by the report being precluded from

14  admission.  We understand.  We have handled railroad cases

15  for many years.  The distinction is the factual findings in

16  the NTSB report.  Based on our read of the section and case

17  law, which is cited in our brief, those factual findings are

18  admissible and can be admitted.

19       THE COURT:  Where liability has been admitted, you

20  are saying?  Where liability has been admitted into evidence,

21  the factual findings of the NTSB?

22       MR. PETRU:  I didn't mean to go that far.  I meant to

23  say the factual findings, if relevant, can be admitted.

24  Here, I think the Court's suggestion that we get together

25  with defendant and outline the facts, the speed, curve,

everything else that is contained within the report, we know

that, in the form of a stipulation and what the jury will

hear about the incident itself probably this renders this

motion in limine moot.  If we have an issue with agreeing

upon the facts the jury would hear, we might have to revisit

it.  I believe based on our read of some other transcripts of

the agreements, and Mr. Yates and Mr. Bonventre can correct

me if I am wrong, there was an agreement as to what would be

presented previously.  I think this will be moot.  I would

ask the Court just reserve in case we don't reach that

agreement.  I would like to see the language which was

reached previously, which we haven't seen yet.

MR. LEVY:  There are a couple of photographs that

were taken from the NTSB report.  That's primarily why we

objected to this particular MIL.

THE COURT:  I don't care what the source of the

photos of the aftermath of the derailment, NTSB or otherwise.

Yes, I agree that you can have some photographs.  You just

need to share them with Amtrak.  I assume they'll agree if it

is an accurate depiction of what was seen there immediately

after the accident.  I think we are fine here.  We are on the

same page.

No. 13 is preclude reference to fatalities in the

derailment.  I have precluded this in prior trials where it

has no particular relevance except that if slightly relevant,

1   there is no serious 403 problem.  On the other hand, if she's

2   testifying that she observed bodies that appeared to be

3   lifeless, that is part of her damages then she can testify to

4   that.  There is not going to be any evidence coming in that

5   says the number, independent of what she observed, because I

6   am concerned that it will run afoul of 403, even if it has

7   some minor relevance.

8           MR. PETRU:  If I may revisit.  The Court recognized

9   earlier, and that is that Ms. Torjusen has a habit of

10  visiting the scene of the incident on its anniversary.  She

11  drinks three shots of vodka in honor of the people who died.

12  You earlier indicated that is part of her experience and how

13  it impacts her.  In that context, I would ask the Court to

14  consider allowing that testimony, which is part of her

15  experience.

16          THE COURT:  If she said she saw someone she believed

17  was dead at the accident and she goes back and has a toast to

18  that person, I think it needs to be in that context.  Needs

19  to be in furtherance of what she personally observed.  Again,

20  I said it has some relevance, 403 becomes a problem.  I would

21  not sustain an objection if she testified that when she was

22  there, she saw a lifeless body over there and she knew -- I

23  guess, she learned -- if she says she learned, indeed, that

24  there were a couple of dead bodies there, she can -- she goes

25  back every year to toast, I will probably allow that.

1          MR. PETRU:  Thank you, Your Honor.

2          THE COURT:  It is directly relevant to her personal

3     story and experience.

4          MR. BONVENTRE:  Your Honor, I will address that at

5     the time of trial.

6          THE COURT:  You can.  I am just telling you what I am

7     likely to do and what is helpful.  I probably do more on

8     motions in limine -- we spent quite a bit of time here --

9     than most trial judges do.  They just say "granted" or

10    "denied."  I want the parties to have a good idea where I am

11    at on these things.

12         MR. BONVENTRE:  I appreciate it, Judge.  Thank you

13    very much.

14         THE COURT:  The supplemental -- well, 14 through 20,

15    those were all unopposed and granted.

16      Going to No. 15, that is Dr. Crossen.  I think that I have

17    addressed that already sufficiently.

18      The article that plaintiff wrote also is agreed to be

19    excluded, not offered.  That motion is granted.

20      That covers the motions in limine.

21      With regard to the trial, I think five days is what was

22    the advertised amount here of days that we need.  Does that

23    still sound right?  When I look at the number of witnesses,

24    which are all pretty much the same witnesses, it seems to me

25    that five days would clearly be enough time to have this case

1   presented to a jury.

2        MR. PETRU:  I like the Court's phrasing, I think that

3   is as advertised and that has not changed.

4        THE COURT:  Trial will start on a Tuesday at 9:00.

5   Our trial day consists of the hours between 9:00 and 4:30

6   with an hour and a half for lunch between 12:00 and 1:30,

7   mid-morning, mid-afternoon break of 15 minutes.  Those tend

8   to -- the morning break tends to come at around 10:30, the

9   afternoon around 3:00.  That can vary based on where we are

10  with a witness or whether I have an objection that has been

11  lodged and I want to take that up outside the presence of the

12  jury.  That is the general trial day.

13      I ask the parties to be sharing on the eve of each trial

14  day the witnesses who are expected to appear the following

15  day and the exhibits that will be expected to be presented.

16      With respect to the jury selection process, I have had

17  emailed out to you my voir dire questions.  The process

18  begins with -- again, this will be in person.  At the front

19  of the room will be an easel with a card on it that asks each

20  juror, in numerical sequence, to introduce themselves to one

21  another and to us by identifying where they live, what their

22  occupation is, who their family generally consists of, what

23  their personal interests are and hobbies.  And once they have

24  done that, and we will have -- we will probably have about 26

25  jurors typically, somewhere close to that.

1    After they introduce themselves, I will go through my

2    questions that I have there.  When I have completed that,

3    then each side will have 20 minutes to take up their

4    voir dire questions.  I have reviewed the voir dire questions

5    suggested.  I have no objection to those.

6    At the completion of counsel's voir dire, then I will take

7    up the excusing of jurors for cause.

8    We tried to eliminate before they get here where there are

9    hardships.  Invariably, there will be three or four people

10   who have indicated that they have a family member they have

11   to care for, they have a trip they bought tickets for, that

12   sort of thing.  I am generous with respect to allowing people

13   to assert hardship through some sort of conflict like I have

14   just described.  We should have plenty of jurors available to

15   us with 26 because there will be an eight-person jury.

16   The peremptory challenges are three to each side.  You

17   will exercise your peremptory challenges, and after you have

18   done so, share with the other side, which means that you may

19   end up finding that you have peremptorily challenged one or

20   more of the same prospective jurors.  I ask you to show it to

21   one another before it is handed up to the bench so I can ask

22   you if this is the jury you selected.

23   Any question about jury selection?

24        MR. LEVY:  No, Your Honor.

25        MR. BONVENTRE:  No, Your Honor.

1  THE COURT:  I believe I have covered all the matters

2  that I want.  The preliminary jury instructions are also

3  emailed out to you.  I incorporated a statement of the case

4  that the parties have agreed to.

5      Any --

6          MR. PETRU:  I do have a question for the Court.  I

7  believe that one or maybe -- maybe a couple three, I am not

8  sure of the exact number, of our witnesses might need to

9  testify by video conference.  I understand the Court has the

10 facility to do that with the jury.  Am I correct?

11         THE COURT:  We do.

12         MR. PETRU:  Good.  Okay.

13         MR. BONVENTRE:  Judge, I don't know if counsel is

14 done.

15         MR. PETRU:  Counsel is done, yes.

16         MR. BONVENTRE:  That was one of the issues that I was

17 going to raise over here from Amtrak, which is my

18 understanding is the plaintiff is currently in Egypt.  We

19 have requested the plaintiff appear for her trial live.  We

20 have grave concern about people hearing by video since COVID

21 is no longer an issue.  I think it is an extraordinary matter

22 for people not to appear live.  COVID was a reason.  We have

23 all done in the past medical witnesses in which we have done

24 video deps in which the lawyers were present with the

25 witnesses.  We would object to anyone being present via

1  video, and particularly object to the plaintiff.  Or can we

2  hear is the plaintiff going to be appearing at the trial

3  live?

4          MR. PETRU:  Plaintiff will be here live.  We will try

5  to reduce the number of witnesses who need to appear

6  remotely.  I believe the plaintiff has the right to do that

7  in certain circumstances.  We understand counsel's position.

8  Also with the individuals involved, try to make that as

9  limited as possible.

10          THE COURT:  Depositions are permissible where the

11  witness is unavailable.  Actually appearing usually comes by

12  way of stipulation.  Seems to me the plaintiff -- Amtrak is

13  not stipulating to plaintiff appearing through video

14  conferencing.

15          MR. PETRU:  Plaintiff will be live.  Plaintiff will

16  be live.

17          THE COURT:  I encourage -- especially with health

18  care providers and so forth, I encourage those to be worked

19  out to appear because pre-COVID that was routinely done in

20  order to save expenses and efficiency, and there is no -- it

21  works fine and we have the ability to do that here.  I will

22  ask the parties to work on that by way of agreement.  If

23  there is no agreement, take it up with me, relative to having

24  a conference call.

25          MR. PETRU:  Thank you, Your Honor.

```
1        THE COURT:  Anything else?

2        MR. PETRU:  I do have something else, Your Honor.

3   The Court moved the -- another case we have from this

4   particular derailment, Amanda Ularick, we got notice from the

5   Court that there was a trial date available on June 10th, I

6   believe, and nothing until the fall.  Because of our

7   schedules and counsels' schedules, we were the first date

8   after the fall that we were able to find was in February,

9   which I think we have locked in with the Court.

10      Is there any way -- without breaching attorney/client

11  communication, I must share the client was very frustrated by

12  a year-long delay in her getting resolution for her case, her

13  damages, her issues.  Is there any way the Court has

14  additional dates that have opened perhaps in July or August

15  that we might be able to work on with counsel?

16       THE COURT:  I don't believe there is any in July.  As

17  you well can imagine, with COVID, we had a lot of backed up

18  cases.  We have cases scheduled two and three deep and

19  probably even the one you are talking about there.  We --

20  Dara can talk with you about finding someplace sooner than

21  February, if possible.  Keep in mind, again, you are going --

22  any trial date set, you are going to be set with other

23  trials, and I generally go with the lowest number.

24       MR. PETRU:  I fully appreciate that.  Like the Court,

25  we have many cases.  O'Hare airport is calm compared to our
```

1   trial calendar these days.  I am sure the Court's is just as

2   perplexing and frustrating.  For an individual plaintiff who

3   is not familiar with the system and hasn't had these

4   experiences, on her behalf I told her I would bring it up

5   with you, and hopefully we'll be able to find another date.

6   We will talk to her.  Appreciate it.

7           THE COURT:  All right.  Amtrak, by the way, appears

8   prominently in my trial calendar.  They have showed up about

9   every other week.  Amtrak has demonstrated, along with

10  plaintiff, they do know how to settle cases.  Certainly this

11  case could settle between now and the trial date.  This

12  pretrial conference was earlier than normal before trial.

13      Are the parties way far apart that further mediation

14  might -- there is time for that?

15          MR. PETRU:  Your Honor, I don't think mediation -- we

16  have been around a long time negotiating with Amtrak.  We are

17  far apart.  We have shared with the claims representative

18  some of the perspectives that may not have been considered in

19  their evaluation.  If the case has a chance of settling, I

20  think it will happen directly between the parties.  I don't

21  think mediation will be of any help.

22          THE COURT:  All right.  Well, if there is nothing

23  else, we'll be in recess.  I have another hearing that I am

24  late for.

25          MR. PETRU:  Thank you, Your Honor.

1    (The proceedings adjourned.)

2

3

4                    C E R T I F I C A T E

5

6

7        I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9

10

11

12   /s/ Angela Nicolavo

13   ANGELA NICOLAVO
     COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25