```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                  )
     EMILY TORJUSEN,                ) 3:18-cv-05785-BHS
 5                                  )
     Plaintiff,                     ) Tacoma,
 6                                  ) Washington
     v.                             )
 7                                  ) March 30, 2022
     NATIONAL RAILROAD PASSENGER    )
 8   CORPORATION d/b/a AMTRAK,      ) Jury Trial
                                    )
 9              Defendant.          ) 9:00 a.m.

10   _____

11              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE BENJAMIN H. SETTLE
12              UNITED STATES DISTRICT JUDGE
     _____
13

14

15

16

17

18

19

20

21

22

23

24      Proceedings stenographically reported and transcript
25         produced with computer-aided technology
```

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

```
 1

 2                         APPEARANCES

 3

 4

 5     For the Plaintiff:    ANTHONY S. PETRU
                             SCOTT H. LEVY
 6                           Hildebrand McLeod & Nelson LLP
                             350 Frank H. Ogawa Plaza
 7                           Fourth Floor
                             Oakland, California
 8
                             JOSEPH ANDREW GRUBE
 9                           Breneman Grube Orehoski PLLC
                             1200 Fifth Avenue
10                           Suite 625
                             Seattle, Washington
11

12     For the Defendant:    JOHN A. BONVENTRE
                             Landman, Corsi Ballaine & Ford
13                           One Gateway Center
                             Fourth Floor
14                           Newark, New Jersey

15                           ANDREW GORDON YATES
                             Lane Powell, PC
16                           1420 Fifth Avenue
                             Suite 4200
17                           Seattle, Washington

18

19

20

21

22

23

24

25
```

1

2                          EXAMINATION INDEX

3    EXAMINATION OF:                                          PAGE

4     AARON FILLER        DIRECT EXAMINATION                    5
                          BY MR. PETRU
5                         CROSS-EXAMINATION                    39
                          BY MR. BONVENTRE
6                         REDIRECT EXAMINATION                 55
                          BY MR. PETRUA
7                         RECROSS-EXAMINATION                  58
                          BY MR. BONVENTRE.

8

      JOHN CROSSEN        DIRECT EXAMINATION                   61
9                         BY MR. PETRU
                          CROSS-EXAMINATION                    106
10                        BY MR. BONVENTRE
                          REDIRECT EXAMINATION                 129
11                        BY MR. PETRU
                          RECROSS EXAMINATION                  132
12                        BY MR. BONVENTRE
                          FURTHER REDIRECT EXAMINATION         133
13                        BY MR. PETRU
                          FURTHER RECROSS-EXAMINATION          133
14                        BY MR. BONVENTRE.

15    MEGHAN SPOHR        DIRECT EXAMINATION                   134
                          BY MR. PETRU
16                        CROSS-EXAMINATION                    159
                          BY MR. BONVENTRE
17                        REDIRECT EXAMINATION                 186
                          BY MR. PETRU

18

19

20

21

22

23

24

25

1

                                EXHIBIT INDEX
2

3    EXHIBITS ADMITTED                                          PAGE

4      Exhibit 7                                                 186

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                    MORNING SESSION

 2                                    MARCH 30, 2022

 3              THE COURT:  Good morning, everyone.  We are ready

 4     to proceed with the next witness, are we?

 5              MR. PETRU:  We are, your Honor.

 6              THE COURT:  Bring in the jury.

 7          (The following occurred in the presence of the jury.)

 8              THE COURT:  Everyone, please be seated.

 9          Mr. Petru, your next witness.

10              MR. PETRU:  Yes, your Honor.  We are going to

11     call Dr. Aaron Filler.

12              THE COURT:  Good morning, Jurors.  Did you have a

13     good evening, rested up, and ready to go?

14          Good morning, sir.  If you would step forward in

15     front of the bench here and raise your right hand, the

16     oath of witness will be administered.

17                          AARON FILLER,

18        having been sworn under oath, testified as follows:

19              THE COURT:  Thank you.  If you would please take

20     a seat here at the witness chair.

21                        DIRECT EXAMINATION

22     BY MR. PETRU:

23     Q.  Good morning.  Can you please explain to the jury

24     what you do for a living, Dr. Filler?

25     A.  So I'm a neurosurgeon.
```

Q.   Where did you receive your training?

A.   So I went to medical school at the University of
Chicago.  I did a Ph.D. at Harvard, and I did my
neurosurgery training at the University of Washington in
Seattle.

Q.   How long were you associated with the University of
Washington in Seattle?

A.   So it was an eight-year training program.

Q.   Eight year.  Where did you live during that time?

A.   So most of the time -- the majority of the time, I
lived in Seattle, Queen Anne, and then I spent another
couple of years in London.  We had a program -- exchange
program at the hospital outside London near Wimbledon,
where all the residents would go for a year.  For two
years, I did research there so I stayed additional time.

Q.   Can you please explain to the jury what neurosurgery
is?

A.   So there are three types of doctors that specialize
in the brain and nervous system.  We have neurologists,
who see people and mostly prescribe medicines or do EEGs,
electrical measurements of the brain.  You have
neuroradiologists, who specialize in imaging of the brain.
And you have neurosurgeons who do all of the above.  We
see patients, we interpret our images, and we do surgeries
or injections or a wide variety of treatments to fix

1  problems with the brain, spinal cord and nerves.

2  Q.   Do you have any special training or experience in the

3  area of neuroradiology?

4  A.   So I did a one-year additional fellowship after the

5  residency in neuroimaging, which was done in the UK.

6  Q.   In your practice, since you finished the additional

7  year, have you been involved in the analysis and the

8  development of neuroimaging of the brain?

9  A.   Yes.  When I was a resident here in Seattle, I

10  developed an idea of a new method of imaging the brain, an

11  advanced type of MRI which I worked on.  And this proved

12  to be successful.  And while I was in England in

13  particular, we completed all that work, did more finishing

14  work back in Seattle, and that is now a major new type of

15  imaging called DTI or diffusion tensor imaging that allows

16  us to see the internal structure of the brain.  It's

17  something that is in universal use all around the world.

18  It saves tens of thousands of lives per year.

19      I also developed a new type of imaging for nerves in

20  the body called MR neurography, which is also in worldwide

21  use which helps identify complex nerve problems.  So I

22  have been involved in that.

23      These were my original ideas, and then I developed

24  them, and then have been very involved in the clinical use

25  of that.  And so I currently write textbooks and do

1   teaching in neurosurgery about how to use the methods.

2   Q.    It has been suggested by counsel for Amtrak yesterday

3   that the test, the DTI test, has been rejected by, he

4   said, the Academy of Radiology.  Is it correct that the

5   DTI has been rejected and is not used and not relied upon?

6   A.    No.  I mean, it is a life-and-death precision study

7   that is used every day on numerous patients in every

8   hospital or neurosurgery that is done.  It is done for

9   any -- if anyone in the military suffers an injury.  It

10  has been mandatory over the past ten years.  It is

11  required after anyone in the military -- I am a former --

12  I was a lieutenant colonel, I was the commander of

13  neurosurgery based in Fort Lewis here and Madigan Army

14  Medical Center, so I certainly know that this is a

15  critical type of imaging used whenever anyone in the

16  military is harmed and is widely used as a high-precision

17  relied-on method in every hospital that does anything

18  neurosurgical, certainly in the world, and a vast number

19  of neurological specialists use it as well.

20  Q.    So rather than something that is not relied upon and

21  rejected, the U.S. military utilizes it whenever there is

22  an officer or enlisted man or woman who suffers a brain

23  injury?

24  A.    Right.

25  Q.    Potential brain injury.

1    A.   And if you look on Google, there is 156,000

2    publications using this to study for all different medical

3    problems.   Tens of thousands of first-ranked research

4    studies.   The idea of an organization called the Academy

5    of Radiology, which I don't think there is such an

6    organization, would say you can't use it, but all these

7    thousands of people die, interferes with the practice of

8    medicine around the world, that is a very remarkable thing

9    to say.

10   Q.   Has it been found to be successful in understanding

11   how the brain is affected by blunt trauma and using the

12   information to try to determine ways to treat patients who

13   suffer from TBIs?

14   A.   Yes.   I mean, the general medical use that goes back

15   to -- I invented this, the first one of these images in

16   1992.   But the widespread clinical use for guiding brain

17   surgery started in 2007.   The Chinese government

18   identified the technology, did this massive trial,

19   research in the University of Shanghai, which is their

20   Harvard, and showed it reduced the risk of death of during

21   brain surgery by 40 percent, reduced the risk of paralysis

22   by 60 percent.

23        So from that point, within a year, studies were

24   reproduced in Europe and the U.S., it became mandatory to

25   use DTI because you couldn't justify doing surgery, it was

1  double the risk of death and triple the risk of paralysis

2  because you didn't want to use the imaging method.  But

3  the military started doing it in 2013, not just for

4  guidance or treating brain tumors, but they started using

5  specifically this, the brain DTI for diagnosis and

6  treatment of everybody with a mild traumatic brain injury.

7      You hit your head, you have some symptoms, you are

8  dazed, you are confused, your behavior is off.  And we saw

9  this just recently, a year or two ago, when Iranians

10  bombed an air base in Iraq.  Everybody is fine, nobody got

11  injured, and then a few days later they said, oh, no,

12  there is all these head injuries.

13      What it was, they went to the soldiers who were

14  developing headache, nausea, confusion and memory loss and

15  did the DTI scans and found the injuries.  That is exactly

16  what happened.  That is consistent with this policy.  That

17  is why the military has made this mandatory for the

18  diagnosis of mild traumatic brain injury, which is exactly

19  what this is about.

20      So I really, you know, don't know how that position

21  that it isn't used is believable, where it comes from.

22  Q.  You indicated that you were involved in developing

23  the technology in, I think you said, 1992.  Where were you

24  working at the time that it was developed?

25  A.  The project started in Seattle, and then I had my

1    period of time where I was sent over to work at Atkinson

2    Rowan Hospital in Wimbledon which, by the way, is the same

3    hospital where Hatfield built the first CT scanner, built

4    it out of x-ray machines and did --  The first CT scan was

5    done there in that hospital in 1974.  And I was over there

6    doing just neurosurgery as a resident as -- we would have

7    our time over there.  But then I brought my research

8    project over there, and the first successful scans were

9    done there.  And then when I got back to the University of

10   Washington, I worked with some of my colleagues there.  We

11   took it even further and got the detailed brain imaging

12   working over the course of a year and filed a patent.

13   Q.   Who owned the patent?

14   A.   So the patent was owned by the State of Washington.

15   Q.   So the DTI technology that you helped develop

16   20-some-odd years ago, 30 years ago, now is in the

17   mainstream and the original patent was owned by The state

18   of Washington?

19            MR. BONVENTRE:  Objection.  Leading.

20            THE COURT:  I think he just summarized what was

21   testified to.  Objection overruled.

22   BY MR. PETRU:

23   Q.   Is that correct?

24   A.   Yes.

25   Q.   Now, you and I met a few years ago when you were

1    treating one of my clients, correct?

2    A.   Yes.

3    Q.   We don't need to go into that case.   That had to do

4    with a complex --

5            MR. BONVENTRE:   Objection, your Honor.

6    BY MR. PETRU:

7    Q.   How did we meet?

8            THE COURT:   The objection --

9            MR. PETRU:   I will withdraw the question, your

10   Honor.

11   BY MR. PETRU:

12   Q.   How did we meet?

13   A.   I helped take care of a young woman who was an

14   engineer on a train and the train was separating as she

15   was struggling to hold the train together, and suffered an

16   injury affecting the nerves, the brachial plexus nerves.

17   And I did imaging, treatments and injections for her to

18   fix up the nerve injuries she suffered.   And I ended up

19   testifying in the trial.

20   Q.   And that included surgery, twice?

21   A.   Yes.

22   Q.   And during that time, you told me when we were

23   visiting about this DTI process, correct?

24   A.   Yes.

25   Q.   And we asked you, after Dr. Scovel determined that

1    there was evidence of brain injury, to do a DTI evaluation

2    of her to determine whether or not --

3            MR. BONVENTRE:  Objection, your Honor.  Leading.

4            MR. PETRU:  I will withdraw, your Honor.  That's

5    fine.

6    BY MR. PETRU:

7    Q.  In your practice, do you have -- are you asked to

8    review or do DTIs after neurocognitive evaluations?

9    A.  Yes.  We get sent a lot of patients who have any sort

10   of brain injury, chemical exposure; it might be trauma,

11   where they need sort of the very advanced imaging

12   techniques.  And although the DTI imaging is available

13   pretty much, you know in terms of the machines, all the

14   MRI scanners virtually in the world now do this, but the

15   processing is time-consuming or specialized.  And so there

16   are maybe dozens or hundreds of specialists in analyzing

17   it when there might be 10,000 doctors that look at routine

18   MRIs.

19   Q.  When you say "processing," that is taking the

20   information that is derived from the scanning and using

21   the appropriate programs to analyze it?

22   A.  Yes.  And I think it is because we do a very thorough

23   analysis that --  You know, we get patients from out of

24   areas -- I live in LA -- for imaging analysis.

25   Q.  Let's get this out of the way.  Your clinic in LA,

1   how many doctors are there in the clinic?

2   A.   Well, that's really a private practice.  It is myself

3   and then my staff.

4   Q.   So for you to come here, you have to close down the

5   clinic essentially for the day?

6   A.   Yes.

7   Q.   And you have a flat rate you charge for a day when

8   you cannot be in your clinic?

9   A.   Yes.  We charge $15,000 for a full day away for

10  testimony.

11  Q.   And that's what you are charging us to be here?

12  A.   Yes.

13  Q.   You also prepared a PowerPoint to help explain the

14  analysis of what you did, correct?

15  A.   Yes.

16  Q.   I will be asking you questions about your opinions

17  and conclusions here.  Will all of your opinions be based

18  on a reasonable degree of medical certainty?

19  A.   Yes.

20  Q.   The first thing I would like to have you talk to the

21  jury about is how a blow to the head can result in a brain

22  injury.  There is an exhibit we have shared.  I will show

23  it to you just to identify it.  Have you seen this video?

24  A.   Yes, I have.

25  Q.   And does it accurately depict the effect on the brain

1   on a superficial level from a blunt trauma to the head?

2   A.   Yes.

3        MR. PETRU:   Your Honor, I would like to publish

4   demonstrative Exhibit 40 -- excuse me, 27 -- 40, please.

5        THE COURT:   27?

6        MR. PETRU:   40.   My mistake, your Honor.

7        THE COURT:   Any objection?

8        MR. BONVENTRE:   No objection.

9        THE COURT:   It may be published.

10  BY MR. PETRU:

11  Q.   It doesn't have any voice over, so if you can explain

12  what is happening as we look at the video, I would

13  appreciate it.

14  A.   What this really is covering -- there are two things

15  to understand behind what the video is showing.

16       Firstly, when the skull is impacted, the brain is

17  surrounded by fluid, and the skull starts to move before

18  the brain does, and then the skull goes and hits the

19  brain.   It is sitting there in fluid waiting, if you break

20  it down in time.   The skull gets hit, the skull hits the

21  brain.   The brain is then driven across and actually hits

22  the other side of the skull.   So it can be injured both on

23  the impacting side and the opposite side.   So the

24  contrecoup, the coup contrecoup, the hit and the counter

25  hit.   So there is often a pair of injuries.   And the brain

1   does go through --

2   Q.   I paused it here.   What do we see here?

3   A.   This is distinguishing two areas of the brain.   The

4   gray matter is the outer surface that has all the tiny

5   neuron cells that connect with each other, all the

6   connections that sort of make decisions and pass things

7   around and organize information.

8       And then the white matter are the long sort of

9   telegraph wires or connections between parts of the brain,

10  so that part of the brain goes about deciding to move your

11  arm or hand, and then it sends a signal down a long wire

12  to your spinal cord to actually help make your arm move.

13  Both of those areas can be injured.

14      That is one aspect of the fact -- and you see a

15  couple of dark areas in the center, those long linear dark

16  areas.   Those are fluid-filled ventricles, as they are

17  called.   It goes to the point that the brain actually gets

18  distorted or twisted when it is impacted, because it is

19  not just a solid, you know, rubbery sphere.   Some

20  structures are stiff, some are mobile, some can tolerate

21  some bending, some can't.   So you get sort of

22  characteristic patterns of injury depending on where the

23  impact comes from.

24      These are -- have certain specific effects on

25  function.   So the brain is not completely uniform, when

1    part of it generates speech, when part understands speech,

2    and another part interprets incoming images.  In the back

3    of the brain, we have the sort of movie screen.

4         All these different functions, movement, all of our

5    emotional life, anger, irritability, depression, all these

6    things -- although some things we know have psychiatric

7    causes, events in your life.  On the other hand, we also

8    know that injuries can actually impact and break something

9    or bruise something in the brain that results in that same

10   kind of symptom.  You have an injury to a particular

11   location, it will cause depression; an injury to a

12   different location may cause problems with calculation.

13   They each have their place and can be injured in a brain

14   injury.

15        Now, I think the next part in here goes into the even

16   finer detail of what happens in an injury.  So we have

17   these cell bodies, which have the connections that reach

18   out, hundreds of different connections with neighboring

19   neurons.  And then that long set of like train cars there,

20   that's an axon that connects from one place to another.

21   The little separate segments are cells that wrap around

22   the axon, wrap around the nerve extension, and have

23   insulation in them.

24        So when the insulation gets bruised, the signal

25   doesn't transfer very well across the bruise.  It's like

breaking the insulation off a wire causing shorts.

And so this is the kind of thing that DTI shows very well, is when the insulation is impaired and the neuron isn't cut, it isn't necessarily severed, it is just not functioning well.  That's one of the fantastic things about this type of imaging is we can see when there has been an impairment that slows or alters signal transmission.  And some of these will then -- will gradually repair themselves, just to really restore the lining, and then the nerve connection will start working again.  But this is the type of thing -- injuries in the white matter -- that the DTI tract images, as we call them, are particularly good at detecting.

And then we have another measure you will hear us mention called FA or fractional anisotropy, and it looks at these kind of partial injuries in the white matter tracts, the long connections.

Q.   I meant to ask you earlier, when you were working on developing the patents and working with the legal system, did you do anything to allow yourself to better understand the legal system and the whole work around patents?

A.   Well, a few years ago, I actually went to law school because we had a lot of litigation about the patents. Basically, we had a lot of major corporations, Siemens, GE, Phillips, Hitachi, Toshiba commenced -- technology was

1    in urgent demand.  And I think they did the right thing by

2    rushing out the technology around the world.  But then we

3    had a duty to the State of Washington to make them pay for

4    their share of the use of the invention.  And that's where

5    I was involved with that.  And so I got a JD to help with

6    the attorneys working in that process.

7    Q.   As I indicated earlier, you prepared a PowerPoint to

8    help explain your findings with regard to Emily Torjusen,

9    correct?

10   A.   Yes.

11   Q.   It is Exhibit 40.

12            THE COURT:  Your Honor, I would like to publish

13   it and go through it with Dr. Filler.

14   A.   So --

15            THE COURT:  Just a moment.  Exhibit 40.

16            MR. BONVENTRE:  No objection other than the first

17   slide, Judge, the wording in the first slide.  I will

18   withdraw it.  No objection.

19            THE COURT:  I thought Exhibit 40 was the exhibit

20   I had been watching?

21            MR. PETRU:  Your Honor, my dyslexia.  This is

22   Exhibit 41, the PowerPoint.  You are correct.

23            THE COURT:  It may be published.

24            MR. PETRU:  40 is the video, 41 is the

25   PowerPoint.  I apologize.

1    BY MR. PETRU:

2    Q.   You prepared this to help explain what you did, what

3    the analysis is, fair?

4    A.   Yes.

5    Q.   Go to the next slide.

6    A.   We talked about this earlier.  Actually, if you can

7    go back for a second.  That image there, the black and

8    white image is that very first tractogram.  At the time

9    just before we did it, we didn't even know if it was

10   possible to make an image of one of those long white

11   matter tracts.  Once the data was in there, you pick a

12   starting point, and it is a mathematical algorithm that

13   actually tracks along and follows the neurotract, and it

14   worked.  And the one on the left is a modern tractogram

15   that shows the internal structure of the brain.

16   Q.   The left was the very first version, like V1?

17   A.   Yeah.

18   Q.   And the right is the contemporary version, how far it

19   has come?

20   A.   Yes.

21   Q.   The first one was like the mathematical formula

22   worked, eureka, we are able to track the nerve --

23              MR. BONVENTRE:  Objection, your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  Yes.

BY MR. PETRU:

Q.   Can you explain the second slide?  We talked about that earlier --  It is self-explanatory.

     What do we see in the third slide?

A.   So this comes to this question:  What is a concussion?  Is this some highly technical definition?  This is a paper from 1799 about a concussion.

     A man fell from his horse in London, hit the back of his head, the doctor has been called, he finds the guy. He is vomiting.  He is confused.  He starts to get better later in the article, and then the patient dies.

     The family allows the doctor to then do an autopsy and study the brain injury.  And that's kind of how far this came along.

     But the word "concussion," it is very general, you hit your head and there are symptoms.  That hasn't changed very much.  Now we can actually go in and see what exactly has been injured.

Q.   Next slide.

A.   And so this is a biomechanical analysis of the brain. Because now that we can see the injuries, we can see, wow, a person gets hit in the front of the head, certain places get damaged, other parts seem to come through without damage.  And so this is part of a large number of studies being done that look at the way in which the brain deforms

1    and bends and twists when it is impacted, and why certain

2    structures seem to get damaged more than others.

3         As we will see in this case, and very commonly, an

4    impact in the front of the head results in the person

5    being angry and irritable all the time.  Why is that?  So

6    this helps us understand why that happens.

7    Q.   Next slide.

8    A.   In addition to just linear impacts, also rotational

9    impacts, a twist or torque in the impact also is something

10   that causes the brain to start to flow and swirl.

11        The brain has some internal dividers in it.  One

12   important one in this case is called the falx cerebri.  It

13   is sort of a leathery stiff membrane right down the center

14   that partially divides the left and right side.  And when

15   the brain moves suddenly sideways or twists, the brain

16   actually hits up against the edge of the stiff membrane,

17   an extension of the skull, and causes some injuries.

18   Q.   Next slide.

19   A.   So this scan just -- to sort out the terms that we

20   hear, this compares a head CT on the left, such as was

21   developed, as I said, at our hospital in Wimbeldon in

22   1974.  And the CT scan is the one where you go in now and

23   it is fast, it is like seconds.  It is more like a ring.

24        The brain MRIs, when you go in the big tube, usually

25   it shows a lot more detail.  You are in this scanner for

```
 1   20 minutes while this complex image develops with lots of

 2   views.

 3       The brain DTI image shown on the right side here is a

 4   more elaborate brain MRI.  The colors -- for instance, if

 5   you look at the little green area pointing upwards,

 6   between the left and right side there is a subtle

 7   difference.  One is a little thicker on the other side.

 8       You really don't get that looking at the brain MRI of

 9   the same person.  There is probably over one hundred times

10   as much information stored in the image when a brain DTI

11   is done.  It is a very advanced MRI, and we bring out a

12   lot of these details by the analysis.

13   Q.  Dr. Filler, is it typical, even now when somebody is

14   involved in an accident and they are getting triaged at

15   the hospital, that the hospital would do a CT scan rather

16   than a DTI initially?

17   A.  Right.  Because with the brain DTI, someone might be

18   inside a tube scanner for 20, 30 minutes.  And right after

19   the head injury, they would rather get a quick image.  And

20   what the head CT is very good at is showing has there been

21   a hemorrhage, is there blood, do we need to do surgery

22   right now.  It doesn't show subtle injuries that will

23   affect thought processes and emotion over time.

24   Q.  So it is appropriate in the ER just to see if there

25   is some emergent situation that needs surgery, but not to
```

1  detect whether there is brain injury?

2  A.   Yes, it is used for that emergent question, do we

3  need to do something, do we need to do an operation to

4  save the person's life or stop progression of the

5  hemorrhage.

6  Q.   In your experience, if you can, what percentage of

7  people who do have MTBIs have normal CT scans or CT scans

8  that are read by emergency room doctors as being normal,

9  who actually do have a TBI that is not detected?

10  A.   So people going to the emergency room with a head --

11  have hit their head, they might have had loss of

12  consciousness.  Even when -- we classify a mild traumatic

13  brain injury, mild TBI, based on they didn't go in for --

14  go into a coma longer than hours.  Maybe just out for a

15  second, or not even a loss of consciousness at all.

16      So if you look at all those people who didn't have a

17  coma, a lot of them do have hemorrhages, blood, they need

18  surgery.  Probably greater than 95 percent of people with

19  concussions who will end up with long-term post-concussion

20  symptoms, will have a normal CT when they first come in.

21  There is no brain hemorrhage.  All the injuries are in

22  this tissue of the brain without any bleeding of the

23  brain.

24  Q.   What do we see here?  This actually is from

25  Emily Torjusen's scan, correct?

1    **A.   Yes.   So this is a tractogram image looking from the**

2    **right side, lateral view of Emily Torjusen's brain DTI**

3    **image showing the tracts.**

4         **What you see here, the red arrow is pointing at an**

5    **area that is abnormal.   Further off to your left, you see**

6    **those blue verticals reaching up.   And in the back, green**

7    **extensions reaching out towards the surface.   And the very**

8    **front, you see the green lines reaching out towards the**

9    **surface.**

10        **But there is an area there, which the red arrow**

11   **points to, where we don't see those extensions reaching**

12   **up.   That is a particular area when that happens -- I can**

13   **explain it -- this is where you get this excess anger and**

14   **irritability.   And it is very common.**

15        **What has happened here in a head injury is that that**

16   **part of the brain is particularly sensitive about being**

17   **impacted against that dividing membrane, the falx cerebri,**

18   **and you get this injury.**

19        **And it is a part of the brain that has what we call**

20   **executive function.   Here, for instance, the drive -- the**

21   **emotion to anger comes up out of a deep part of the brain**

22   **called the amygdala.   It throws up into the frontal lobe.**

23   **It is the frontal lobe's job to shut it down, no, suppress**

24   **it, suppress it, okay, I am going to let some anger out.**

25        **When that gets injured, that person finds that**

1    emotion is let out and they fail to suppress or control

2    properly.

3         That area has two other functions, which when you

4    think about it as an executive control area, it makes more

5    sense.  One of them is being able to multitask, which is

6    allow different tasks to come to the surface of thought

7    and to go back and forth between things.  Another issue is

8    being able to navigate from place to place.  And these are

9    just high-level executive functions, and control of

10   emotions is one of them that happens to be centered at

11   this location.

12   Q.  The next slide is another image of Ms. Torjusen's

13   brain?

14   A.  Yes.  Here the brain is positioned so the person is

15   looking down.  It is just because the right and left side

16   are set up so that it will be in the standard medical

17   fashion.  The arrow tips are pointing to a green structure

18   that is running from the top to the bottom of the image.

19   And you will see it is thicker on your left side and thin

20   on the right.

21        And this injury, which is also up against the falx

22   cerebri there, a midline injury, just behind where we were

23   looking at the other injury just a minute ago.  When this

24   is injured, it results in depression, anxiety and

25   post-traumatic stress disorder.

1    So this is a mechanical location which, when you hit

2    it, all of a sudden the person who didn't have a lot of

3    anxiety, didn't have depression, didn't have PTSD,

4    suddenly they have it because of an injury.  And actually,

5    interestingly enough, with some modern treatments, it is

6    increasingly possible to repair it, and then the symptom

7    goes away.  So it's not because of, you know, something

8    that happened early in your life, a family stress,

9    whatever, emotional background, it's because of an injury

10   that results in this depression, anxiety and

11   post-traumatic stress disorder.

12   Q.   How do you know -- how do you as a neuroscientist

13   know that an injury to the supracallosal cingulum results

14   in depression, anxiety and PTSD while an injury to the

15   frontal lobe tracts results in increased anger,

16   irritability and problems with multitasking?  How do you

17   correlate the consequence of an injury to a specific area

18   to the radiology?

19   A.   Well, this is -- this has been a fascinating thing in

20   neuroscience.  A lot of these things, the functions to

21   different regions of the brain have been known for more

22   than 200 years.  So a classic -- the first one was this

23   Dr. Broca, he had a number of patients that lost the

24   ability to speak.  They otherwise seemed to be fine, but

25   they couldn't make any words.  He had a number of them he

1    collected up who died and cut up their brains and found

2    they all had this particular spot injured in the brain.

3         Another doctor found -- had collected up patients

4    that could speak but couldn't understand anything said to

5    them.  And when they died, he cut up their brains -- this

6    is in the 1800s -- and found a spot in the temporal lobe,

7    which we call Wernicke's area.  Others found connections

8    between the two.

9         Bit by bit, over 200 years, we learned all the

10   different functions of the brain -- many of the functions

11   of the brain from injuries, people had an injury and then

12   maybe died, like that 1799 case, and you could see what

13   caused a symptom.

14        But then --- and so a lot was known about all this in

15   1990 when I was developing the technology.  But this put

16   it all in hyperspeed, because now every injured person --

17   we don't have to have people die and cut up the brain and

18   find major injuries, we can study these.  So that is why

19   there are 150,000 research reports.

20        The government has spent billions funding thousands

21   and thousands of studies.  Not investigating if DTI works,

22   but using DTI to study injuries of all types, so now we

23   know with tremendous precision what each of these

24   different parts of the brain do and what happens when they

25   are injured.

1    So these are -- and when you look at it, when you
2  talk about, for instance, 100,000 research studies, most
3  of them involved 20 to 100 patients or 200 patients.  So
4  that 100,000 research studies involved studies on 10
5  million people.  That's just the research.  And then
6  clinical use into 100,000,000 people.  So this is a vast
7  project of neuroscience in the world now that has led to
8  this kind of understanding.
9  Q.   Next image.
10 A.   This is a blowup of that issue, the injury in Emily
11 Torjusen to the left supracallosal cingulum that results
12 in some emotional disorders.
13 Q.   Next, you refer to an article here from Brain Injury.
14 A.   This is one of many papers that deals with
15 post-concussion syndrome.  So with a concussion, a lot of
16 people, the concussion clears up.  A lot of them, it is
17 that white matter, the lining that is rubbed off.  It will
18 grow back.  And then over the course of a year --
19 sometimes faster, sometimes that long -- once the
20 connection restores, once the lining is rebuilt, the nerve
21 kicks back into normal function and people recover, and
22 you can get a complete recovery.
23     Now, in that -- for instance, that can happen in
24 95 percent of people with a concussion by the time a year
25 has gone by.

1      When we talk about post-concussive syndrome, so maybe

2  you had a concussion and you were dazed and confused, and

3  then a few weeks later you are all better.  A football

4  player goes back to play in high school, or you are out of

5  school for a few weeks or off your job for a period of a

6  month or two and you get better.  But they don't all get

7  better.

8      This is looking at the incidence of these

9  post-concussive syndromes and the fact that DTI is very

10 effective for identifying exactly the parts of the brain

11 that have not repaired.  Because when these parts repair

12 the abnormality that you see on the DTI, it goes away, it

13 becomes normal.

14 Q.  Clinically, Dr. Filler, if Ms. Torjusen continues to

15 have issues with depression, anxiety, PTSD, increased

16 anger, irritability, and problems with multitasking, would

17 that be consistent with a conclusion that those areas of

18 the brain that were damaged in this train wreck still

19 remain damaged to some degree?

20 A.  Yes.  And I have personal experience with hundreds

21 and hundreds of patients.  You know, it is not like a

22 radiologist.  I see the patients, I examine them, I talk

23 to them.  Usually our initial phone conversations --

24 whether it is now telemedicine or preferably in person --

25 take an hour or two.  So I know hundreds and hundreds of

1  patients, and I know what their brain injuries look like,

2  their patterns of recovery.  This is what you would expect

3  to see in someone like Emily Torjusen.

4  Q.  Four and a half years after the incident, would it be

5  consistent that the persistent symptoms indicate that she

6  will have these problems to some degree for the rest of

7  her life?

8  A.  It is clear that once someone is a year out and has

9  not recovered, there is a high probability they have a

10  lasting injury.  We also understand now that people can go

11  on and progress to get worse with time --

12          MR. BONVENTRE:  Objection, your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  It is like we hear about CTE, or

15  chronic traumatic encephalopathy, football players,

16  Bennett Omalu, who I know, is a neuropathologist who made

17  a lot of discoveries in that area.

18      So, yeah, they can persist, they can get worse, they

19  can improve.  DTI lets us get a window on that and also

20  now shows us we have methods to treat and fix the ones

21  that don't get better.

22  BY MR. PETRU:

23  Q.  It doesn't mean that everyone who has long-term,

24  four-and-a-half-year symptoms with brain injury will get

25  better?

```
1    A.   Right.   We can help with some.   It is a developing

2    area.

3    Q.   Next article here is the same issue, Persistent

4    Post-Concussive Syndrome is Well Known to Result in FA DTI

5    Abnormalities?

6    A.   Right.   This is showing -- this is part of that vast

7    literature using DTI to study these persistent

8    post-concussive syndromes, understands where the harms

9    are.   This is, you know, just a huge area of neuroscience.

10   Q.   I am going to embarrass myself.   FA DTI is fractional

11   anisotropy?

12   A.   Yes.   This is one of the specific types of

13   measurement that we do.   So on the one hand, just like

14   looking at a chest x-ray, you look at it and see, or a

15   bone image, or you are looking at Ms. Torjusen's clavicle,

16   we see a broken clavicle, we look at the tractogram and

17   say, oh, this is narrow, this is interrupted.

18        We also have this ability to go in and select little

19   tiny areas and measure this property called fractional

20   anisotropy.   What DTI is really doing is it is allowing us

21   to see the direction in which neurons, the axons are

22   traveling in every little voxel.   A voxel is a

23   three-dimensional pixel of the brain image.

24        It's a statement that if the FA is high, nearly 1.0,

25   that all the little axons, thousands of them in a little
```

1   image voxel are all kind of headed in the same direction

2   and seem to be pretty uniform.

3       The opposite would be zero, a voxel that has just

4   like water in it, because the water is diffusing in all

5   different directions.

6       We know for certain -- every different part of the

7   brain -- what the typical measure, the typical

8   directionality or uniform directionality should be.  And

9   so you can make these FA measurements, so these little

10  small volumes that are probably the size of a pea or

11  smaller that we measure.  You can even do quite small, and

12  can make a specific statement and say, well, the

13  fractional anisotropy at this location is -- let's say it

14  is .32.  We know the typical average for this location is

15  .56.  The standard deviation, the amount of variability,

16  and you come and say, well, on a statistically significant

17  basis, the fractional anisotropy in, for instance, the

18  hippocampus in this location is below what it should be in

19  the normal.

20      You can say it is an abnormal fractional anisotropy.

21  There it is.  And the person has the symptom of impaired

22  attention and memory formation that comes from a

23  hippocampal injury.  It is that level of detail, and FA is

24  the measure of it.

25  Q.   The next slide, you really talked about already, and

1    that is the DTI is standardized and used in many, many

2    different applications.  You talked about the number of

3    articles, the scientific publications already.  What do we

4    see in this slide here?

5    A.   That little red box marker there is showing an area

6    where that -- the frontal lobe tracts are impaired.

7    Q.   This isn't Emily?

8    A.   Yeah, this is not Emily.

9    Q.   The same with these, as well?

10   A.   Right.  This just shows -- some different views of

11   where you see a narrowing of a tract, the top left of the

12   A here, this is from an old paper from years ago, showing

13   how a narrowing will be seen, the difference between the

14   right and left side.

15        The LUF and RUF off to the left of the image, where

16   one is narrowed out, and finding out, wow, that person has

17   a functional deficit that matches that tract that helped

18   us learn, yeah, these really show us where the injury is

19   that causes these symptoms.

20   Q.   Speaking of papers, I won't do -- your CV is thick.

21   You have published many, many papers, books, book

22   articles, appeared on multiple different programs

23   explaining, teaching DTI, these processes over the last 30

24   years, correct?

25   A.   Yes.

Q.   The white matter issue, we kind of talked about this
with the coup contrecoup?

A.   This shows you can use different scanners with the
same person and get different results showing what part is
normal, abnormal.  This is an example showing an ROI or
region I have selected to measure.

     This is an example, again, of small areas, regions of
interest that we measure to assess for the presence of
injury.

     This is some of the internal tracts inside the brain
that do specific tasks with emotion and memory formation
we can see.

     And this is kind of a report that is from -- this is
Emily here, showing where we have a table on the right of
a number of different locations that are measured.  We
have a numerical fractional anisotropy.  We have a
standard deviation -- a statistical term -- and if the
measure is two standard deviations different from the
normal, then we can say the part we measured is abnormal
on a statistically significant basis, absolutely.

     So it is a very quantitative, scientific way of using
this image to measure and study all these tiny parts of a
person's brain to understand exactly the injury.  The
tract is very nice.  It gives you an overall picture.

     And the other thing about this is -- the ROI is

1    looking at one spot.  The way I like to explain --

2    Q.   "ROI" is region of interest?

3    A.   Region of interest.

4         What I like to explain about tracts is, for instance,

5    let's say it is 1861 and you have a single telegraph wire

6    from New York to San Francisco, and that's the only

7    connection between the East and West Coast, and it is

8    99.999 percent perfect, but somewhere in Southern Wyoming,

9    there is a little break in it about three millimeters,

10   someone chopped it.  Now there is no communication between

11   the East and West Coast.  It is out.

12        You might say, well, why focus on that one spot?  I

13   mean, 99.99 percent of this telegraph wire is perfect.

14   Why do you focus on that little spot that is broken?

15   Because that's the spot that shuts down the communication.

16        So the tractogram lets us see, because the algorithm

17   is traveling along and hits a spot it can't get through,

18   so then we can come and measure the ROI at that spot and

19   say, yeah, that is the damaged spot, how did it get

20   damaged?  Let's follow that spot.

21   Q.   Dr. Filler, I didn't see anywhere in your report

22   anything to indicate that Emily Torjusen was damaged in

23   the area of language, anything that would indicate that

24   she couldn't write, anything that indicated that she

25   couldn't learn or do well at school; is that accurate?

A.   Right.  She was fortunate to some degree in that her
injuries were limited to certain parts of the brain.  She
didn't have any injuries that I could see in the speech
function apparatus, and some of the major -- most of the
major cognitive areas were intact or unaffected.

     It was really this issue in the frontal lobe and in
the supracallosal cingulum and the hippocampus, which she
has been able to overcome some of it, but I think
particularly the emotional component abnormalities
continue to be a big problem.

Q.   Would the fact that Ms. Torjusen has been able to
graduate from the University of Washington with three
majors, with a GPA -- in five years with a GPA of 3.6 or
so indicate that she doesn't have brain damage?

A.   Well, it indicates that her -- the critical
intellectual capabilities for doing her schoolwork are
intact or adequately recovered, but she still has injuries
affecting emotional behavior primarily.

Q.   So it is not an indication that she doesn't have
brain injury, it is just an indication that those areas
haven't been permanently affected?

A.   Yes.

Q.   We talked about the hippocampus, memory formation.
All right.  In your report -- first of all, when you did
your report, did you have or rely on any outside source,

1    x-rays, CT scans, other than what you did through your

2    services, Dr. Scovel's neuropsychological assessment, or

3    were you looking at the films and just reporting what the

4    films showed based on your study?

5    A.   We had the referral from Dr. Spohr, a neurologist.

6    She mentioned a number of the symptoms --

7    Q.   Dr. Spohr?  Dr. Spohr is the GP.

8    A.   I'm sorry.  Meghan Spohr, who had some description of

9    some of the symptoms.

10   Q.   But you didn't have the neuropsychological report?

11   A.   No, I don't think so.

12   Q.   Would the fact that the neuropsychological report in

13   March of 2018, and your report in, I believe it was July

14   of 2018, are similar in terms of their findings in terms

15   of brain function, does that make sense to you?

16            MR. BONVENTRE:  Objection, your Honor.

17            THE COURT:  Overruled.

18            THE WITNESS:  No.  I think that these are both

19   ways of evaluating a person.  You know, these are

20   objective, underlying facts, and two different physicians

21   using two different methods are still going to find the

22   same problem.

23   BY MR. PETRU:

24   Q.   Same person, just looking at it in different ways?

25   A.   Yes.

1           MR. PETRU:  Thank you.  Those are all the

2   questions I have.

3           MR. BONVENTRE:  May I proceed, your Honor?

4           THE COURT:  Yes.

5                   CROSS-EXAMINATION

6   BY MR. BONVENTRE:

7   Q.   Good morning, Doctor.

8   A.   Good morning.

9   Q.   Doctor, I speak quickly from time to time.  Tell me

10  if I speak too quickly.  All right, sir?

11  A.   I will.

12  Q.   Now, you just said that the patient was referred to

13  you by Dr. Spohr; is that correct?

14  A.   Yeah.  There is a referral note from Dr. Spohr, yeah.

15  Q.   Do you know whose idea it was for Ms. Torjusen to see

16  you, Dr. Spohr's or someone else's?

17  A.   Well, it certainly could have come from the attorney,

18  because they were familiar that we did the advanced

19  imaging.

20  Q.   Doctor, you know that in fact it was Mr. Petru who

21  referred the patient to you; isn't that correct?

22  A.   I'm not sure.  But if you say so.

23  Q.   So as you sit here, you didn't know, when you first

24  saw Ms. Torjusen, that she had a lawyer at the time?  You

25  didn't realize that?

1    A.   Well, that's just the way our office works.  I see

2    the images and the clinical information.  So I don't

3    always see the referral detail.

4    Q.   I have a question.  Where did your office send the

5    report to when you finished it?

6    A.   We would have sent it to Dr. Spohr, and I think

7    certainly it would have been sent to an attorney's office

8    if they requested it, and the patient approved.

9    Q.   This information that you provided is so important

10   and vital and essential for the main doctor treating the

11   plaintiff, I assume you would make sure that Dr. Spohr

12   actually got a copy of this report, since it is so

13   important, so vital, so informative?  Did you make sure

14   that Dr. Spohr got a copy of this report?

15           MR. PETRU:  Objection, your Honor.

16   Argumentative.

17           THE WITNESS:  Yeah, so --

18           THE COURT:  Overruled.

19           THE WITNESS:  I mean, my office sends

20   correspondence.  I don't get involved in correspondence,

21   so I don't know personally.

22   BY MR. BONVENTRE:

23   Q.   As you sit here, do you know whether in fact

24   Dr. Spohr got the report?

25   A.   No, I don't.

1  Q.  So you don't know if, for example, the main doctor

2  treating the plaintiff didn't get the report for over two

3  years, this very vital, important, essential report?

4  A.  Right.  I mean, we send it out to the -- as far as I

5  now, it goes to the referring doctor.  I don't know if

6  there is a problem of, you know, them not receiving it.

7  Q.  Well, when you called Dr. Spohr upon looking and

8  issuing your report to talk to her about the report back

9  in July of 2018, how did that discussion go?

10 A.  I don't think I spoke with her.

11 Q.  So let me get this straight.  You did this report

12 that is so important, so vital, so essential, you didn't

13 immediately pick up the phone and call the internist who

14 is primarily responsible for treating the patient; is that

15 correct?

16 A.  Well, what we usually do --

17 Q.  Did you call up the doctor who is treating the

18 patient immediately upon getting this vital, essential,

19 important report?

20 A.  No, I didn't call the doctor.

21 Q.  And to this day, you have never spoken to Dr. Spohr,

22 correct?

23 A.  That's correct.

24 Q.  And to this day, you have never spoken to anyone who

25 is treating and seeing the patient, correct?

```
 1    A.   That's correct.
 2    Q.   The purpose of this report was not to help
 3    Ms. Torjusen, it was to help this lawsuit; isn't that
 4    correct?
 5    A.   No, the purpose is to help the patient.  I can tell
 6    you --
 7    Q.   So could --
 8    A.   If I can answer --
 9    Q.   Could you tell me yes or no --
10              THE COURT:  Just a moment.
11              MR. PETRU:  Objection, your Honor.
12              THE COURT:  You are talking over each other.  Let
13    him finish.
14              MR. BONVENTRE:  Yes, sir.
15              THE WITNESS:  As a neurosurgeon, I order images
16    all the time for my patients.  I will say I have never had
17    a radiologist call me to tell me the details of the
18    report.  It's just not the standard.
19    BY MR. BONVENTRE:
20    Q.   Let me repeat:  The purpose of this report was to
21    help in this lawsuit, it was not to help the patient;
22    isn't that correct?
23    A.   No.  I mean, it is to help her get treatment.
24    Q.   So what treatment did she get as a direct result of
25    your report?
```

1  A.   Well, as of 2018, there wasn't too much that could be

2  done.  We are trying to look and see the status.  More

3  recently, we have an array of treatments, particularly

4  over the past few months, that have been developing.  We

5  are reaching out to patients to see if they have

6  persistent symptoms.

7  Q.   My question was:  What, if anything, did any of the

8  healthcare providers who actually have seen the plaintiff,

9  what effect -- let me withdraw that.  I have an even more

10 basic question.  How many times did you speak to

11 Emily Torjusen?

12 A.   I didn't have a direct call with her.

13 Q.   When you say you "didn't have a direct call," is that

14 another way of saying you never spoke to her?

15 A.   That's right.

16 Q.   So to this day, you have never spoken to

17 Emily Torjusen to find out what her symptoms are, correct?

18 A.   That's correct.

19 Q.   And by the way, since you said that these things on

20 this report repair -- can repair themselves, when you

21 redid the report most recently, how did that go?  How was

22 the repair?

23 A.   It had to be reimaged to look at the repair.

24 Q.   How did the reimaging go?  I'm sure you are here to

25 tell us what exactly --

```
 1              MR. PETRU:  Objection, your Honor.  Form of the
 2    question.
 3              THE COURT:  You need to be less argumentative.
 4              MR. BONVENTRE:  Yes, your Honor.
 5    BY MR. BONVENTRE:
 6    Q.   How did the reimaging go?
 7              MR. PETRU:  Objection.  Assumes facts.
 8              THE WITNESS:  I don't know.  She could have been
 9    reimaged by another physician.
10    BY MR. BONVENTRE:
11    Q.   Did you reimage her?
12    A.   I did not.
13    Q.   You don't know, as you sit here, you cannot advise
14    the jury to what extent there has been repair and things
15    that you were talking about, correct?
16    A.   That's correct.
17    Q.   Now, Dr. Filler, this is not the first time you have
18    ever been in a courtroom, correct, sir?
19    A.   That's correct.
20    Q.   You have testified, I believe -- I read in some of
21    your depositions, you have testified in excess of 600
22    times; is that correct?
23    A.   I would say that is depositions over 25 years, yeah.
24    Q.   600 times?  How many times?
25    A.   In the courtroom, I would say it's about 60 or 80
```

```
1  over 25 years.
2  Q.  So you have testified in a courtroom about 80 times;
3  is that correct?
4  A.  Yes.
5  Q.  And you have testified in a deposition about 600, 700
6  times?
7  A.  Yes.
8  Q.  And you are also an attorney; is that correct?
9  A.  Yes.
10 Q.  You spend about what, 30, 35 percent of your time as
11 an attorney?
12 A.  No.  I mean, 9:00 to 5:00, five-days-a-week,
13 twelve-hours-a-day, six-days-a-week, I am a neurosurgeon.
14 I mean, I do some work, you know, evenings or weekends.  I
15 am very busy clinically as a neurosurgeon basically.
16 Q.  You are very busy testifying for lawyers, too,
17 Doctor; isn't that correct?
18 A.  Yeah.  There is certainly something every month, a
19 deposition; every few months, a trial.
20 Q.  There is certainly more than every month or so, a
21 deposition, if you have done about 800 of them?
22 A.  Over 25 years, if you really think about it -- and
23 that's pretty much evenly distributed.  I didn't say 800.
24 Whatever you saw, I might have said 500.  And I think
25 that's probably more accurate.  A lot of it is just as a
```

```
 1   treating physician.  As a testifying expert, it is
 2   probably more like 150 over 25 years.  When you look at
 3   that, you know, it is not -- perhaps it's the way you
 4   would like it to sound.
 5   Q.   You advertise to lawyers that you are available to
 6   testify, correct?
 7   A.   Yeah, I have an online notice that says we can do
 8   expert witness work in neurological imaging.
 9   Q.   You have multiple advertisements out for your
10   services as an expert, correct?
11   A.   I'm not sure about that.  The only one I know of is a
12   SEAK directory.
13   Q.   In the SEAK one, it indicates right now that in the
14   last four years alone, as an expert witness you have given
15   250 depositions; isn't that correct?  Just the last four
16   years alone, correct, sir?
17   A.   That's probably correct, yeah.
18   Q.   So the reality is, you have given a lot -- you have
19   probably given close to a thousand depositions, if you
20   have given just 250 in the past four years?
21   A.   It has really accelerated.  I didn't do much of this
22   for many years.  I have slowed it down quite a bit.  When
23   I was at UCLA in the '90s to early 2000, I was doing more
24   of this, and then as we got busy, I did less and less.
25   Probably over the last four years with all the interest in
```

1   DTI, there is an increased number of them, particularly

2   over the pandemic period.  It was very difficult to get

3   surgeries in.  Like Cedars-Sinai, for instance, pretty

4   much closed the operating rooms for most of the year.  So

5   a lot more of the percentage of my time was spent with

6   imaging patients.

7   Q.  And you also give talks to lawyers and advise about

8   your availability to testify, correct, sir?

9   A.  Well, I have only once done a CLE talk.  So mostly I

10  talk at medical meetings.  I don't know what you are

11  speaking of.

12  Q.  Did you testify under oath previously that you have

13  given CLE talks to lawyers?

14  A.  Yes, I did.  It was part of a medical meeting, but we

15  had a CLE session.  I was the past president of the

16  Society for Brain Mapping and Therapeutics.  In our

17  meeting in Miami about four years ago, we decided to offer

18  both combined CME and CLE to -- so for both doctors and

19  attorneys about DTI.

20  Q.  Now, are you associated with something called the

21  Texas Brain Institute?

22  A.  Yes.

23  Q.  And do you advertise on the website of the Texas

24  Brain Institute that you are available as a subject matter

25  expert for automobile accidents, slip and falls, sports

1  injuries?

2  A.  Yes.

3  Q.  And do you testify that you will provide, quote,

4  compelling visual evidence; is that correct?

5  A.  Yes.  We do both defense and plaintiff work --

6  Q.  Whoever is going to pay you, you will do it for,

7  right?

8  A.  It is more a matter of taking care of -- providing

9  the information relevant to -- service.  You know, that's

10  a service that we are all obligated -- what doctors are

11  supposed to do is help the courts and help juries

12  understand the case.  And the fact is that sometimes

13  defense attorneys retain experts, sometimes plaintiff

14  attorneys retain experts.  Usually, both sides do.  So I

15  have a mix of those kinds of work.

16  Q.  So this is just a service you are doing for the good

17  of the court?

18  A.  That's the idea is -- just as you are, sir.

19  Q.  Well, let's talk about how much you are charging for

20  this service for the good of the court that you are doing.

21  How much did you charge for the test itself that was

22  requested by counsel?

23  A.  I would suspect that was probably in the range of 4

24  or $5,000.

25  Q.  Well, do you have your billing records there, sir?

1   **A.**   No, I don't.

2   **Q.**   And you said for today, you are charging $15,000?

3   **A.**   Yes.

4   **Q.**   So we are up to about $20,000.  And you took a plane.

5   Do I understand you charge a thousand dollars every time

6   you fly a plane for a lawyer?

7   **A.**   No.  We just charge whatever the cost of the flight

8   is.

9   **Q.**   Have you testified in multiple depositions that you

10   charged $1,000 if you have to fly by plane and $1,500 if

11   you have to go by car?

12   **A.**   That's our fee schedule.  That's the -- but we

13   usually just bill the actual costs.

14   **Q.**   So your fee schedule actually says if you have to go

15   by car, it is $1,500, and if I go by plane, it is a

16   thousand dollars, right?

17   **A.**   Though we don't usually actually charge for car

18   travel.  It is more a matter of the time out of the office

19   that is the issue.

20   **Q.**   And did you ever meet with or speak with counsel?

21   **A.**   I have spoken with counsel.

22   **Q.**   And is that free or do you charge for that?

23   **A.**   We usually bill for time spent, yeah.

24   **Q.**   And your rate is $1,500 an hour?

25   **A.**   No.  I think -- for talking with an attorney, it

```
 1    might be $500 an hour.
 2    Q.   Doctor, does your fee schedule say it is $1,500?
 3    A.   I would have to look at that.  There might be
 4    different versions of it.
 5    Q.   All told, how much time did you spend speaking with
 6    counsel?
 7    A.   I would say less than an hour, I think.
 8    Q.   How much time did you spend on the PowerPoint?
 9    That's your PowerPoint, correct, sir?
10    A.   Yes.
11    Q.   Is that part of the visual services you provide?
12    A.   Yes.  A lot of it is stuff that is used, you know --
13    it is not particularly to do with Emily.  So for an
14    individual case, I will put the relevant images in.  It
15    might have been an hour or so.
16    Q.   In fact, very few of those slides that were shown
17    were actually Emily's, correct?
18    A.   Right.  The purpose is to explain the technology, as
19    well as to show the critical findings, you know, for an
20    individual patient, which I think that short slide
21    presentation does.
22    Q.   And you have a law firm, correct, sir?
23    A.   Yes.
24    Q.   And you actually advertise or indicate on your law
25    firm website that you are also available for testifying as
```

1   an expert in personal injury lawsuits; is that correct?

2   A.   Yes.

3   Q.   You advertise on your medical websites and on your

4   legal websites that you are available to testify for

5   lawyers, like you are doing here today, correct?

6   A.   Yes.

7   Q.   So you have been doing this for -- since 1996, I

8   believe?  That's what you have testified to previously,

9   correct, sir?

10  A.   Right.  I used to do expert witness testimony, as I

11  say, when I was at UCLA.  And then for years, it was

12  pretty much what we call percipient, basically it was my

13  patient.  And then for the past five years or so, we

14  resumed doing expert as well.

15  Q.   And I believe you testified under oath previously

16  that you have made millions of dollars testifying --

17  A.   No, I absolutely have not said that.  That is not

18  true.

19  Q.   You haven't made millions of dollars?

20  A.   No.  I mean -- no.  Testifying?  No.

21  Q.   Let me get this straight.  Have you testified under

22  oath that for depositions, you have made -- testifying

23  between 80 and $100,000 per year?  That's your average?

24  Have you said that under oath?

25  A.   Well, when you say "made," essentially -- remember,

1  we could be losing money on that, because we might

2  normally have been seeing and treating patients.  There

3  might have been a number of injections, ten patients being

4  imaged.

5      I think what you are thinking of -- like if you have

6  an academic doctor who has a salary, and if you pay him,

7  he gets extra money.  I am a solo practice, a doctor, with

8  a number of employees, rents, equipment costs.  Our normal

9  income in a day might be $20,000, or $30,000, which is not

10  coming to me, it is paying salaries, nurse practitioners,

11  MR techs, rent, as I said, equipment maintenance.

12      I am on a pretty much fixed salary myself.  So I

13  don't get -- I must say certainly those are incomes into

14  the medical practice.

15  Q.  The companies that you own, your practice makes

16  millions of dollars?

17  A.  Well, "makes" usually implies profit.

18  Q.  Doctor, I am --

19  A.  You are talking about the billing for services that

20  are paid for.  I think overall our practice is not very

21  profitable compared to most neurosurgical practices.  Yes,

22  we bill for the time.  So we have income from those.  I

23  wouldn't say it is profits.  You make it sound like I

24  personally made millions, which is not true.

25  Q.  I know, Doctor.  It must be very tough living on

1    $15,000 a day testifying?

2    A.   I don't live on that.

3         MR. PETRU:  Objection, argumentative.

4         THE COURT:  Sustained.

5    BY MR. BONVENTRE:

6    Q.   Doctor, does your practice make millions and millions

7    of dollars doing this kind of work?

8    A.   In the sense that --

9         THE COURT:  Please do not talk over each other.

10   Doctor, that applies to you, as well.

11   BY MR. BONVENTRE:

12   Q.   Doctor, there are neurosurgeons actually in Tacoma

13   and in Seattle, Washington.  Correct?

14   A.   Yes.

15   Q.   There are neurosurgeons a lot closer to where

16   Emily Torjusen grew up, and where this courthouse is than

17   you, correct?

18   A.   Yes.

19   Q.   Lots of them, correct?

20   A.   Yes.

21   Q.   And there is lots of neurosurgeons and neurologists

22   and neuroradiologists in Washington and Oregon, another

23   closer state, correct?

24   A.   Yes.

25   Q.   You flew up from Southern California, correct, sir?

1  A.   Yes.

2  Q.   Doctor, your testimony today was based on the images

3  that you took of Ms. Torjusen, correct?

4  A.   Yes.

5  Q.   And you have not taken any additional images since

6  back in 19 -- 2018, excuse me, 2018, correct, sir?

7  A.   Correct.

8  Q.   And since you haven't spoken with Ms. Torjusen, you

9  don't know how she is currently doing, correct?

10  A.   That's correct.

11  Q.   And actually, since you have never spoken with

12  Ms. Torjusen, you don't know how she is doing from her own

13  words, correct?

14  A.   That's correct.

15  Q.   And you never looked at the medical records from her

16  treating doctors, correct?

17  A.   That's correct.

18  Q.   Would you tell us all the things you have done?  Did

19  you tell this jury all of the things you have done to help

20  Emily Torjusen?

21  A.   Well, in this case we were asked to perform and

22  interpret a DTI scan, which I did.

23          MR. BONVENTRE:  I have nothing further.  Thank

24  you.

25

```
 1                    REDIRECT EXAMINATION

 2    BY MR. PETRU:

 3    Q.   Dr. Filler, you have testified in other courtrooms,

 4    federal courtrooms, state courtrooms around the country,

 5    haven't you?

 6    A.   Yes.

 7    Q.   Have you ever had a vigorous cross-examination where

 8    not one question was asked of you about your findings?

 9    A.   Occasionally.

10    Q.   This wasn't the first time an attorney asked you

11    questions about getting paid and your services and other

12    actions rather than what you did in this case?

13    A.   That's correct.

14    Q.   With regard to the other neurosurgeons,

15    neuroradiologists in the Seattle and Tacoma area, could

16    Amtrak -- if anything that you testified to, anything that

17    you did with regard to Emily Torjusen's brain injury was

18    inaccurate, could Amtrak have gotten a neuroradiologist?

19              MR. BONVENTRE:   Objection.

20    BY MR. PETRU:

21    Q.   Or neurosurgeon to do their own analysis to determine

22    whether it is accurate?

23              THE COURT:   Overruled.

24              THE WITNESS:   Yes.  Certainly, if they have

25    something they are specifically concerned about on the
```

1   medical front, you know, substance, they will have an

2   expert, and I will respond to any questions.  I suspect

3   they didn't have anybody who had any questions or objected

4   to what our findings were.

5   BY MR. PETRU:

6   Q.  And if Amtrak wanted to know what happened to

7   Emily Torjusen's brain, they could have hired you to do

8   the exact same thing you did in this case, and you could

9   have explained to Amtrak, their lawyers, their claims

10  representatives, exactly what happened to Emily Torjusen's

11  brain, correct?

12          MR. BONVENTRE:  Objection.

13          THE COURT:  Overruled.

14  BY MR. PETRU:

15  Q.  And they chose not to, correct?

16  A.  Often we get defense requests like that, insurance

17  companies ask us to see the patient and let them know, was

18  there an injury, because if there is, we want to take care

19  of the person.  That often happens.

20  Q.  Is that because traumatic brain injuries used to be

21  referred to as the "hidden injury," and if you can't see

22  it, you stick your head in the sand and pretend it doesn't

23  exist?

24          MR. BONVENTRE:  Objection.

25          THE COURT:  Sustained.

BY MR. PETRU:

Q.   Let me rephrase the question.  Is DTI imaging

important because we can now see what happens to

somebody's brain when they have a TBI, and before you

couldn't?

MR. BONVENTRE:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  So in medicine, you know, we like

to be able to see exactly what is wrong so we can best

target treatments.  In law, there is an interest of the

court in just trying to say did an injury occur.  So I

think the report placed those roles of showing, well, here

is the injuries, now we can understand the objective

facts.

BY MR. PETRU:

Q.   Let me back up just a little bit.  As a neurosurgeon

and neuroradiologist, when you are asked to interpret a

DTI, such as Emily Torjusen's, did you do the exact same

thing in this case you do in every other situation,

whether it is a lawsuit, whether it is another doctor

asking you to do a DTI, was it the exact same process?

A.   Yeah, the process is the same.

Q.   And had Amtrak wanted to know, they could have asked

you directly?

A.   Yes.

1      MR. PETRU:  Thank you.  That's all the questions

2  I have.

3                    RECROSS-EXAMINATION

4  BY MR. BONVENTRE:

5  Q.   I have a few questions.  You just told the jury that

6  the purpose of this test is so the doctor can, quote, best

7  target treatment for the patient.  Can you tell me all the

8  things you did to ensure that the doctors who were

9  treating her had this report so they can best target the

10  treatment?  Tell us all the things you did.

11      MR. PETRU:  Your Honor, beyond the scope.  Asked

12  and answered.

13      THE COURT:  Overruled.

14      THE WITNESS:  Generally, in medicine an imaging

15  physician -- this is my role in this case -- prepares a

16  report, and the report can become the basis for treatment.

17  The fact is, in head injuries, until very recently,

18  literally in the past few months, we really didn't have

19  repairs for this type of thing.  So now we are in the

20  process of going back over time to reach out to people.

21      But the important thing was to show what is the

22  injury.  And we certainly encourage seeing and doing

23  follow-ups with patients, we encourage follow-up imaging.

24  I think those are all helpful.  But I don't necessarily

25  control, you know, all of the interactions of the patients

```
1   and physicians.  But usually the imaging is an important

2   step.

3   BY MR. BONVENTRE:

4   Q.  Well, Doctor, your report said Dr. Spohr referred

5   you.  And your office didn't even send a copy of the

6   report to Dr. Spohr --

7              MR. PETRU:  Beyond the scope, your Honor.

8              MR. BONVENTRE:  Withdrawn.  No further questions.

9              MR. PETRU:  Nothing further, your Honor.

10             THE COURT:  Thank you.  You may be excused.

11        We will take our morning recess at this time.  Please

12   do not discuss the case and we will resume in 15 minutes.

13             (At this time, the jury exited the courtroom.)

14             THE COURT:  I want to say something about leading

15   questions, especially when they are experts.  It is

16   actually helpful to the jury for a lawyer in laying

17   foundation to ask questions that are technically leading.

18   I don't like leading questions that go to ultimate issues,

19   and I will sustain those.  I recognize that I am not

20   always consistent.  But if the question basically could

21   say was the light red or not as opposed to was the light

22   red is not particularly important to me.

23        I will try to, as the trial goes along -- and I

24   believe I mentioned this at the pretrial conference, I

25   usually do, but I may not have.
```

1    MR. BONVENTRE:  Your Honor, you actually

2  mentioned it in regards to trial as well.  I try not to

3  object a lot, Judge.  I was objecting to mainly what I

4  viewed as summarizing testimony.  I understand what the

5  Court's position is, and I appreciate it, Judge.  Thank

6  you.

7    THE COURT:  The other thing is I would like you,

8  Mr. Bonventre, to stay a little closer to the podium.  I

9  am not going to require you to stand entirely behind it,

10  but a little bit closer would be appreciated.

11    We will be back in 15 minutes.

12    (Recessed.)

13    THE COURT:  I think we are successful in getting

14  the Zoom connection.  That's going to be your next

15  witness.  We can bring in the jury; is that right?

16    MR. PETRU:  Yes.  Since we are on record, I want

17  to thank the IT department for doing a great job.

18    THE COURT:  They do a great job.  We have been

19  through two years of COVID and had a lot of virtual

20  trials.  Now, we are sort of hybrid.  It is a new

21  challenge.

22    MR. PETRU:  We have been using, off the iPhones,

23  FaceTime for years for witnesses too far to travel.  It

24  plugs into the system and works pretty well.

25    THE COURT:  We did, too, pre-COVID.  We changed

 1    our platform over to Zoom.  Let's bring in the jury.

 2            THE CLERK:  Mr. Crossen, can you hear the Judge?

 3            THE WITNESS:  Yes, I can, just fine.

 4            THE CLERK:  Great.  Thank you.

 5        (The following occurred in the presence of the jury.)

 6            THE COURT:  Everyone, please be seated.  You are

 7    going to call your next witness.

 8            MR. PETRU:  Yes, your Honor.  At this time, I

 9    would like to call Dr. John Crossen to the virtual stand.

10            THE COURT:  All right.  You should be able to see

11    him on the screen.  Also, we have here to usher this

12    through Tony Duck, who is our guru from IT, as we have

13    been doing a lot of virtual testimony and even full trials

14    until the COVID numbers were reduced to the point where we

15    could resume having in-person jury trials, as we are doing

16    here.

17        So, sir, if you would raise your right hand, please,

18    the oath of witness will be administered.

19                        JOHN CROSSEN,

20      having been sworn under oath, testified as follows:

21            THE COURT:  All right.  Jurors, you are all

22    viewing correctly?  I see everyone nodding.  You may

23    proceed.

24

25

```
 1                    DIRECT EXAMINATION
 2   BY MR. PETRU:
 3   Q.   Good morning, Dr. Crossen.
 4   A.   Good morning.
 5   Q.   Would you please share with the jury what you do for
 6   a living?
 7   A.   I'm a licensed psychologist, and I do therapy with
 8   individuals and couples, and I do evaluations for people
 9   that are referred to me for evaluation.
10   Q.   In this case, with regard to Ms. Torjusen, I
11   understand you saw her and evaluated her initially in
12   August 2018; is that correct?
13   A.   That's correct.
14   Q.   And administered a number of psychological tests, and
15   followed that up with several therapeutic visits, correct?
16   A.   That's right.  Five therapy visits with her.
17   Q.   And then you saw her again in 2021, and essentially
18   repeated the evaluation that you had done in 2018,
19   correct?
20   A.   That's correct.
21   Q.   In 2018, when you saw her initially -- first of all,
22   where is your practice?
23   A.   It's in Portland, Oregon.
24   Q.   In 2018 when you saw her initially, a recollection is
25   that she was looking for a therapist and we found you and
```

1  asked you to visit with her and see whether you would take

2  her case, correct?

3  A.   That's correct.

4  Q.   And prior to that time, you and I or anybody at my

5  firm, we didn't know you, had never worked with you; in

6  fact, we didn't even see you until after the evaluation

7  and the work was done initially, correct?

8  A.   That's correct.

9  Q.   Can you share with the jury your educational

10  background?

11  A.   Yes.  I have a Ph.D. in psychology from the

12  University of New Mexico.  My specialization was in

13  clinical psychology.  My minor, or should I say areas of

14  emphasis were in neurobiology and learning and memory.

15  Q.   What is neurobiology?

16  A.   The relationship of the central nervous system to

17  behavior.

18  Q.   In addition to your Ph.D. from New Mexico in 1985,

19  you have a master's from Western Michigan in 1975,

20  correct?

21  A.   Correct.  I worked in the lab for my master's area

22  doing research on operating conditioning and classical

23  conditioning, and my master's thesis was involving

24  analyzing ways that various strong tendencies of behavior

25  could be disrupted with the signal of a reward that was

1  previously given when a light signal would come on.  I

2  researched the interplay of classical conditioning, which

3  is also known as the Pavlovian conditioning, to the

4  general public and operant conditioning, which is the

5  reinforcement paradigm that is known to the general

6  public.

7  Q.   Neurobiologically, how does that equate to, for

8  example, work with adults in psychology, work that you do

9  now?

10  A.   It really helped me understand that you can help

11  people -- well, not people, but the theory is that --

12  because I only worked in the laboratory with animals, but

13  the extension would be some curiosity about how to remain

14  positive with people in order to get them to slow down

15  what they are doing and pay attention to something else.

16  Q.   After you got your Ph.D. from New Mexico in 1985, you

17  came back to Oregon -- you came to Oregon where you were a

18  resident and eventually chief resident on the medical --

19  in medical psychology at OHSU, correct?

20  A.   That's correct.  I did an internship here, and then I

21  did two years as the chief resident.  And then I went on

22  to being appointed to the faculty and the medical staff.

23  And I remained there until I retired from there in 2016.

24  During that time, I was also appointed to the medical

25  staff at the VA in Portland, and participated in some

1   research and clinical activities there for probably close

2   to ten years, until retirement again.  And I still remain

3   on -- they call it the clinical staff at Oregon Health and

4   Science University, and work with the family residents --

5   the family medicine residency program conducting groups to

6   help the doctors develop more empathy for their patients

7   and to understand their own reactions to their patients.

8   Q.   While working with the VA, did you have frequent and

9   regular involvement with patients who had PTSD or

10  traumatic brain injuries, or both?

11  A.   Both, yes.

12  Q.   During your years through OHSU, did you have

13  involvement with evaluating and treating students?

14  A.   Yes, I did.  I developed a relationship during my

15  residency and faculty years with the student health

16  service.  They hired me to work there in about, if memory

17  serves me right, 1999.  Right around there, 2000.  And I

18  eventually became the head of the behavioral service

19  program for the student health service at OHSU, where we

20  serve medical students, graduate students, undergraduate

21  students in some specialty areas of health services and so

22  forth.

23  Q.   As the head of student health services with medical

24  students and other folks, did you periodically treat --

25  evaluate and treat students who had problems associated

1    with TBI or PTSD who nonetheless were able to continue

2    being students?

3    A.   Yes.

4    Q.   Does the fact that somebody can be a student and do

5    well academically indicate that they do not have problems

6    with PTSD or TBI?

7    A.   Not at all.

8    Q.   What do you mean "not at all"?

9    A.   PTSD is something, TBI is something that intrudes on

10   people's lives no matter what they are doing.  These kind

11   of things -- disorders -- mental disorders occur in the

12   course of everyday life, and everyday life can involve

13   working, it can involve going to school, and people are

14   able sometimes to continue doing those things and

15   sometimes not.

16   Q.   Can they continue doing those things and excel and

17   still have problems with TBI or PTSD?

18   A.   Absolutely.  I have had long experience doing that

19   kind of rehabilitation work.  While I was at Oregon Health

20   and Science University, I was invited to participate for

21   about ten years with the community reentry service of the

22   Legacy Health System.  It was a part of their

23   rehabilitation program for brain injury that focused on

24   helping people make that last transition into everyday

25   life after being in the hospital and being in treatment

1   programs and outpatient services, and helping them to make

2   that transition into everyday life with whatever deficits

3   they might have been having and helping them to develop

4   strategies to work with those deficits as successfully as

5   possible, and resume what areas of life they could resume

6   in a normal way, being parents, being wives, being

7   husbands, being workers and so forth.

8   Q.   What is your normal and customary standard practice,

9   if you will, when you encounter a patient for the first

10  time?  Do you go through a normal protocol?

11  A.   Yes.  Depending on what they would present with, the

12  problem they had, I would have a focus on either doing a

13  personality assessment -- we would focus on their

14  personality and social functioning.  Interviewing is

15  always a core part of it.  Getting information about their

16  childhood, their adult history, getting some information

17  about their health history, and information about the

18  onset of the problem that they had and at the time their

19  assessment, and developing a protocol of tests to zero in

20  in an objective way to measure their distress and their

21  functioning and their abilities.  And that is very

22  relevant to the assessment question.

23  Q.   In your reports, I will just go through the list of

24  headlines, if you will.  In both reports you at first just

25  have identification, Emily Torjusen, her birthday, service

date when you saw her, a blurb about why she was there,
and then a section showing the evaluation procedures of
the tests that you employed to evaluate her, a section
called "history of presenting problem," a section called
"background information," a section called "health
history," a section called "behavioral observations," a
section called "review of medical records," and then in
the first report, at least, you went to the individual
tests that you administered, discussed the results of
those tests, and ended up with your summary, impression
and recommendations, correct?

A.   That's correct.

Q.   Can you share, without reading the whole thing, the
salient points that you got from the history of the
presenting problem when you saw her in 2018?

A.   The problem, as she presented, was that she was on
the inaugural run of the Amtrak route heading south from
Washington to Oregon, and that she was with a friend, and
that there was a crash, and that she was rescued from that
crash.  And as time went on, what she said is that she
really believed her personality came through the worst,
and she felt she was changed forever.

     She acknowledged that she didn't control her anger
very well, that she would be impulsive and talking
without -- couldn't restrain herself or modulate her

1   emotions around friends, and people were noticing this.

2      She said that she was impatient, found it difficult

3   to be nice to people, was rude and couldn't make herself

4   behave conventionally in a calm way.

5      She knows that she had problems in tense situations,

6   that her behavior would escalate in negative ways.  She

7   felt that she -- relationships with other people were

8   affected adversely.  She said it shook her whole faith in

9   human beings.  She lost all faith in God and couldn't

10   imagine if there was any reason to believe anything

11   anymore.

12   Q.  I'm sorry.  If I can ask you a favor.  The microphone

13   that you have there is very sensitive, and we can hear the

14   papers shuffle.

15   A.  Sorry.  Thank you.

16   Q.  Sure.  I interrupted you.  But let me ask this:

17   Based on your original initial interview with her, did you

18   determine that you should use some test modalities to help

19   evaluate her?

20   A.  Yes, I did.  It seemed to me from the things she was

21   presenting and from the history that she had, that it was

22   very likely that she might have PTSD, which is called

23   post-traumatic stress disorder.  So in planning to do

24   therapy with her, I administered several tests that would

25   help me see --

1   Q.   I'm sorry.  Excuse me.  You determined that you

2   needed to administer several tests.  I put on the screen

3   here from your initial report the evaluation procedures,

4   the tests that you would use.  To put them on the record,

5   it was clinical interviewing, review of medical records,

6   which is the discussion -- and I believe you had

7   Dr. Scovel's neuropsychological report --

8   A.   Yes.

9   Q.   And then you administered six tests:  the symptom

10  checklist revised, the SCL; the structured inventory of

11  malingered symptoms, or SIMS; the trauma symptom inventory

12  revised, the TSI; the Novaco anger scale and provocation

13  inventory, or the NAS-PI; the trauma recovery scale; and

14  the aversive childhood experiences scale, correct?

15  A.   Correct.

16  Q.   And when you saw her again in 2021, did you utilize

17  the same tests to evaluate her three years later?

18  A.   Yes.  The idea was that she was interested in

19  resuming therapy.  And so it seemed most appropriate

20  during the passage of that time how she might be the same

21  and how she might be different, and the problems that

22  she -- challenges that she was facing.  So I used the same

23  protocol.

24  Q.   I probably will -- let me just get this out of the

25  way.  When you evaluated her in 2018, when you evaluated

1   her in 2021, when you saw her in the half dozen or so

2   sessions in the fall of 2018, were all of the conclusions

3   and your opinions based on a reasonable degree of

4   psychological certainty?

5   A.   Yes.

6   Q.   And will all of the opinions you express today

7   similarly be on a reasonable degree of psychological

8   probability?

9   A.   Yes.

10  Q.   What I would like to go through are the tests or the

11  evaluations -- the tools that you used, and have you share

12  with the jury what you found in 2018, and then share with

13  the jury what you found in 2021.  Okay?

14  A.   I will go through them test by test in order.  Would

15  that make sense?

16  Q.   Yeah.  I might even ask a question once in a while.

17  That's my job.  We will start with the SCL90 in 2018.

18  First of all, what is the SLC, what does it do?

19  A.   It's a measure that has been developed and researched

20  for well over 35 or 40 years.  The R stands for the

21  revision, because it was reformed.  It is 90 items.

22  That's why it's called the SCL90.  The "SCL" stands for

23  symptom checklist.  So it is the symptom checklist of 90

24  items revised.

25       And it covers various common presenting problems

```
 1    involving health concerns, involving difficulties with
 2    concentrating and thinking, anxiety, all kinds of anxiety,
 3    generalized and phobic anxiety, depression, mistrust of
 4    other people.  Covers social isolation problems, and also
 5    problems with extreme concerns about mental and physical
 6    well-being.
 7        So it is a broad screen test that has less than 100
 8    items, that is useful for getting a sense of what kind of
 9    problems a person might have, groups of problems so you
10    can look within that group of depression and see what
11    symptoms might be the most troublesome for them.  And that
12    is true for all of the scales on the SCL90R.
13    Q.  What did you find based on your evaluation of the
14    results on the SLC90 in 2018, relative to Emily Torjusen?
15    A.  Well, compared to women in the population at large,
16    which would be called the normative comparison group, her
17    distress about severe mental and physical problems, about
18    problems with concentrating and focusing her attention and
19    maintaining it, her problems with being overly sensitive
20    in relationships, and her problems with trust in
21    relationships were all higher than 98 out of 100 people in
22    that normative group -- women in that normative group.
23    Q.  As a psychologist, what does that mean to you?
24    A.  That means it is an extreme problem.  Higher than 98
25    out of 100 we call the 98th percentile.  So of all -- if
```

1    there was 1,000 people in that group, she would have been

2    higher than 980 of them in relating her distress.

3    Q.   Is that --

4    A.   It would be 98 out of 100.

5    Q.   Is that an indication of extreme or very high

6    distress?

7    A.   Definitely.  And on the other scales, all of the

8    other scales were higher than the 85th percentile.  So

9    higher than 85 out of 100.  I used the 85th percentile,

10   roughly, as a way of saying, when we measure this it is

11   higher than two standard deviations beyond what is normal.

12   And that's a technical way of measuring on the tests that

13   we use, whether it is IQ tests or personality tests.  We

14   start with saying where is this person in relation to the

15   average.

16       And when you are at the 85th percentile, you are

17   really high.  You are higher than 85 out of 100.  When you

18   are at the 98th percentile, you are even higher than that.

19   The scores for being high are set at the 85th percentile,

20   and really extreme at the 98th percentile.

21   Q.   In 2021 you readministered the SLC90, correct?

22   A.   Correct.

23   Q.   And what were the results in 2021?

24   A.   Well, she still had very high distress, but it was a

25   little bit different then.  What was the same was her

1    problems with concentrating, keeping her attention focused
2    were still at the 98th percentile.  Also noted was her
3    anger management problems were higher, at the 98th
4    percentile.  Previously, they had only been at the 85th.
5    I shouldn't say "only," they were at the 85th, which is
6    high.
7    Q.  So the disinhibition or anger management, that became
8    more problematic with time, particularly compared with
9    some of the other modalities -- with some of the other
10   areas?
11   A.  Yes.  It became worse.  It went from being bad to
12   worse.
13   Q.  Have you seen that before in patients who have both
14   PTSD and TBIs?
15   A.  It is common to see changes over time, and especially
16   over time when people's lives change, because as we spoke
17   about at the beginning of my testimony, traumatic events
18   occur at a certain point in a person's life.  We think of
19   the trauma as being what happens inside the person after
20   an event occurs.  So the train wreck was the event.  We
21   think of the trauma as being what is inside the person,
22   and that can change over time as a person faces new
23   challenges in life.
24       It is especially common with young people who are in
25   either the adolescent or post-adolescent phase and are

1    building a life for themselves.  They find that life

2    doesn't really get easier as you get older, that life gets

3    more challenging, and the trauma is still there

4    interfering with meeting those challenges.

5         It is kind of like trying to rebuild your airplane

6    while you are flying it.  If you can think of a metaphor

7    for a human being, trying to build their life and adapt to

8    how they are living it when you are trying to behave

9    differently than they were before, dealing with this

10   difficulty.

11   Q.   I'm sorry.  So one of the salient features that I

12   hear you testifying to is that not only is the consequence

13   of a brain injury and the traumatic event important, but

14   the fact that Emily was just 20 years old when she

15   suffered these insults affects her formatively and can

16   have a greater significance because of where she is

17   developmentally?

18            MR. BONVENTRE:  Objection.

19            THE COURT:  Sustained.

20   BY MR. PETRU:

21   Q.   I have to re-ask the question.  The fact that she is

22   20 years old, does that have a significance in terms of

23   the potential affect of brain injury and PTSD when the

24   traumatic event occurs?

25   A.   Yes.

Q.   Any other observations in 2021 with regard to the SLC90?

A.   Yes.  The depression scale was also higher than it had been.  It was at the 98th percentile, which is an increase from where it was previously, around the 85th percentile or so.  Also, the concern with her physical well-being, with general anxiety symptoms, and with mistrust was still high.  It was still at the 85th percentile, well beyond what we would consider the normal range.  We would consider the normal range to be less than the 85th percentile, approximately.

Q.   And any other noteworthy observations in 2021 on the SLC90?

A.   No.  I think that covers it, in terms of the groups of symptoms was very high.

Q.   The next -- at least in my notes, the next area that you tested in 2018 was the SIMS.  What does the SIMS do, and what was the result in 2018 on the SIMS?

A.   The SIMS is a way of measuring complaints people have about their lives, in other words, their symptoms they are endorsing.  Sometimes people -- what they did to establish what is normal was study people who had various disorders. Those would include various neurological impairments, depression, problems -- let me think of some of the other ones that we see on there.  Excuse me for a second.  I

1    don't want to rattle the papers here.  Language

2    impairments, psychotic problems, problems with memory.  We

3    have ways to see what people in those groups generally

4    would say they endorsed, and items they just didn't

5    endorse as much.  And so the SIMS is designed to say how

6    unusual are the symptoms someone is endorsing compared to

7    people in these various groups.

8    Q.   If I understand it, rather than the SLC, which

9    compares to all women as a norm, now you are comparing

10   Ms. Torjusen's symptomology and the impact of the symptoms

11   compared to other people who have PTSD or TBIs or other

12   psychological problems associated with trauma, fair?

13   A.   Well, we don't have a comparison group for PTSD.  So

14   that's part of my interpretive judgment as a psychologist

15   is to say how might this look, what do we know about PTSD,

16   and what do we know about this SIMS test that will help us

17   look at her problems.  And also we do have the measures of

18   what people show when they have memory disorders and

19   neurologic impairments.

20        So it was close enough for me to say this is one of

21   the better measures available for someone that has her

22   kinds of problems and we'll see how unusual -- how many

23   unusual items she endorses versus people that don't have

24   these problems.

25   Q.   What was the result of the SIMS exam?

A.   About 17 problems, which is higher than the cutoff
score of 14.   Largely that was due to her having more in
the area of neurologic impairment and more in the area of
memory impairment.   Her scores in those areas were five,
and the cutoff score was about two.

     So what we are instructed to do in using this test is
to look at the items that they endorse and see if we can
understand better why these atypical items might have been
endorsed.   In her case, it seemed pretty clear that she
was having problems with her mood, problems with her
feelings, not being able to express them very well, and
problems with sleep and low energy, and some problems with
eating, appetite.

     These to me didn't seem like they were flagrantly
bizarre symptoms.   They seemed to be meaningful given her
history.   I was able to say she does have some extreme
problems.   We already knew that from the SCL90.   And on
the SIMS we could see, yeah, they are extreme.   She is
really saying that she has a lot of these problems that
maybe most people that have these problems with memory or
neurologic impairments don't complain about.   It was a
signal to me that these were probably still very acute
problems for her.   She is in the four months after the
injury stage, and in comparison to the normative groups
where they had well-established diagnoses for

1  long-standing disorders, she was probably still adjusting

2  to the trauma that was within her, that was activating all

3  these symptoms.

4  Q.   Just to clarify, you saw her eight months after the

5  injury.  The injury was in December of 2017?

6  A.   I'm sorry.  That's correct.  Yeah.

7  Q.   As a result, did you conclude that the symptoms that

8  she was experiencing, her expression of the symptoms were

9  genuine, legitimate?

10  A.   Yes.  That the extreme distress she was experiencing

11  was a legitimate distress, not a fake distress.

12  Q.   In 2021, you also administered the SIMS.  What was

13  your conclusion from 2021?

14  A.   In 2021, she no longer exceeded the cutoff scores --

15  her overall cutoff score.  But in one area she did, and

16  that was in the memory area.  The cutoff score is two, and

17  her score was three.  You know, I think that was something

18  that I -- she was highly aware of, highly bothered by it,

19  and it did not seem to me that it was a sign of faking

20  anything.

21  Q.   Did you ever get the impression that Emily Torjusen

22  ever faked anything?

23  A.   No.  When we talk about faking, we are talking about

24  malingering, where someone is presenting themselves in a

25  different way than they really are in order to get

1    something.  That never seemed to be warranted based on the

2    assessment that I did and the information I had.  And I

3    usually get this information whenever I do an assessment

4    of someone with PTSD.  In her case, I could say this is

5    not somebody that is malingering, this is real distress.

6    Q.   The next test was the NAS-PI, NAS-PI.  What was that

7    and what were the results?

8    A.   It is called the Novaco anger scale.  Novaco is the

9    author of that anger scale.  He is still active as a

10   clinician and a researcher.  The NAS stands for Novaco

11   anger scale.  The PI is an addition to that scale that he

12   put in when he revised it.  The original thing was

13   developed about 40 years ago, and the PI was added I think

14   about 25 years ago.  PI stands for provocation inventory.

15   And that's an additional part of the test he put on there

16   to see what kinds of situations might be the ones that

17   would be most problematic in this anger management problem

18   for an individual.

19   Q.   What was the result of the NAS-PI in 2018?

20   A.   Her total score was higher than the 98th percentile.

21   We talked about what that 98th percentile means.  Also,

22   her score was considered valid.  It has an internal

23   validity way of looking at problems.  "Valid" means that

24   the test is measuring what it is intended to measure, that

25   it is not measuring something like an exaggeration or a

1    misunderstanding of the items or something like that.

2    It's a way of -- when we talk about validity, we mean in

3    everyday language that the test is measuring what we

4    intended to measure.

5        Her results are that the anger overall was -- when

6    you consider all the dimensions of it, was above the 98th

7    percentile.  In particular, the areas of the cognitive

8    part of anger where you get ruminating and you get madder

9    and madder in your mind as you think about it more and

10   more, that was higher than 98th percentile.  And also the

11   physical arousal, the sense of emotion of just getting

12   overwhelmed, was also at the 98th percentile.  Both of

13   them are very high.

14   Q.   Would that be consistent with reports of Emily

15   finding herself on a bus or a plane and just crying just

16   out of nowhere?  Would that be consistent with those

17   findings?

18           MR. BONVENTRE:  Objection.

19           THE COURT:  Overruled.

20   BY MR. PETRU:

21   Q.   You can answer.

22   A.   I didn't hear.  Should I answer that?

23   Q.   Yes.

24   A.   Yes, it would be consistent with that.

25   Q.   And then you retested her in 2021 on the NAS-PI.

1    Were the results the same or different than 2018?

2    A.   They were a little different.  Her total score was

3    still at the 98th percentile.  The cognitive score, where

4    we talk about somebody ruminating and getting more and

5    more upset when they think about it, was less.  It was at

6    the 86th percentile.  It was still above what we consider

7    normal, but not as extreme as it had been.  Her arousal

8    level, the sense of just feeling physically and

9    emotionally overwhelmed, was still at the 96th percentile,

10   so very short -- very close to 98.

11        And there was another dimension that had been lower

12   before.  It was the behavioral dimension, which means

13   acting out the anger, not just feeling it, but how you

14   behave, and that had risen to the 95th percentile.  There

15   was strong indications that managing her anger in the

16   second evaluation was even more problematic for her than

17   it had been in the three years previously.

18   Q.   Would that also be consistent with findings of

19   disinhibition, disregulation?

20   A.   Yes, exactly.

21   Q.   The next test is the ACE, which is the --

22   A.   I'm sorry.  Are you able to see me?

23   Q.   Yes.

24   A.   My screen went blank there.  I'm not sure why that

25   is.

Q.   The next is the aversive childhood experiences scale,
the ACE.  Did you find anything above the scale in the
ACE?
A.   No.  The ACE is a measure of childhood trauma.  A
large study by the Kaiser foundation was shown to be
predictive of subsequent physical health and mental health
problems if the score was higher than the cutoff.  And the
cutoff score is four.  Her score was three.  So there is a
degree of vulnerability there, but not an extreme
vulnerability.
Q.   That degree of vulnerability, might that make her
more susceptible to the ill effects of TBI and PTSD than
somebody who might have been in a two, for example?
A.   Well, if it was four or higher, I would definitely
say yes.  It's three, so it is kind of a borderline score.
It would be clinically, in treating her, not very wise to
ignore that and say she is a person with a score of zero.
It is closer to four than it is to zero.  So I think there
is a moderate degree of vulnerability there compared to
the normal population of women.
Q.   And people who are more vulnerable -- will people who
are more vulnerable or potentially more vulnerable have a
worse outcome or potentially have a worse outcome with
PTSD or TBI than someone who is less vulnerable?  In other
words, is vulnerability a factor in how severe the damage

1    is from the trauma?

2    A.   It definitely is shown to be that way for PTSD, and

3    the research studies that are foundational for the

4    diagnosis in the American Mental Health System I would

5    imagine the same thing would be true for TBI.

6              MR. BONVENTRE:  Objection.

7              THE COURT:  Basis?

8              MR. BONVENTRE:  "I imagine."

9              THE COURT:  Overruled.

10             THE WITNESS:  That would be my judgment.  And I

11   would say that would be to a reasonable degree of medical

12   or psychological probability.  I would base that -- my

13   opinion -- I am a Fellow of the National Academy of

14   Clinical Neuropsychology, which recognizes my competence

15   in research in clinical work with brain injury situations.

16   I think I would have -- I think -- I just want to bring

17   that credential into the open so I am speaking from a

18   point of having specialty skills in this area.

19   BY MR. PETRU:

20   Q.   Thank you, Dr. Crossen, for the enlightenment.

21        The TSI is the next test that you administered to

22   Ms.  Torjusen.  The TSI is the trauma symptom inventory

23   revised.  I just blew that.  No, I didn't blow that.  What

24   did you find on the TSI?

25   A.   The TSI is really specifically designed to consider

dimensions of PTSD.  Her initial scores were elevated to a fairly extreme level in several areas.  Her general health concerns were at the 96th percentile.  Her reported behaviors that would be in the range of what is called sexual dysfunction were at the 90th percentile.  Her lack of self-awareness and seeing herself fully and accurately was at the 95th percentile.  That's something that we see often in traumatic -- in post-traumatic stress disorder, where people have a narrow focus, looking quite a bit at their problems and deficits and seeing themselves as sometimes even to the point of being worthless.

     She also reported that she was very anxious.  And so that was at the 87th percentile, again above normal.  She had many intrusive experiences, which means things popping into her mind that she didn't want, that were unwelcome, and now she is thinking about something she doesn't want to be thinking about, and she can't get rid of it, and that's a very big problem with people with PTSD.

Q.   Okay.  You got there.  So intrusive thoughts, daytime intrusive thoughts, nocturnal images, such as nightmares, are those hallmarks of PTSD?

A.   Yes, they are.

Q.   And does she suffer from them?

A.   She was at the 86th percentile in 2018, and she continued to have problems with that ongoing.  They were

1    not quite as severe in 2021.

2         But the other thing that was severe, above normal,

3    two areas in 2018, were tension reduction behaviors, just

4    things that you do to calm yourself down because you just

5    find yourself tense all the time.  There are a variety of

6    things that people do that way.  I think an example would

7    be chewing your fingernails or trying to get out of a

8    situation, or changing the subject, or various things to

9    just try to reduce the tension that is building up.

10         And then her anger problem was at the 85th percentile

11   measured on the TSI.  So that's a different measurement

12   set of items than the other tests.  But we are seeing

13   anger as above normal in multiple tests with her in 2018,

14   on the SCL90, the NAS-PI, and on the TRS, and the TSI-2,

15   so some of these are validating across different measures,

16   which is something we do when we give multiple tests to

17   see is this just, you know, an artifact of the way the

18   words were -- the patterns were presented and worded on

19   one test, or is this something that is going to be seen as

20   different.  Researchers and clinicians create tests to

21   measure different parts of psychological functioning.

22   Q.  All of which point to and support your endorsement of

23   a diagnosis of PTSD in 2018, and again in 2021, correct?

24   A.  Correct, yes.

25   Q.  Excuse me.  The TRS -- TRS, trauma recovery scale, I

1   think it is --

2   A.   Yes.

3   Q.   What is the trauma recovery scale, how does she do in

4   2018, how does she do in 2021?

5   A.   It's a scale that has ten items on it.  They are

6   measured on a rating scale of one to ten.  These are items

7   that relate to how someone is dealing with the trauma that

8   is inside them as they are trying to recover from the

9   events that happened that caused this within them.  And

10  her problems were very, very difficult for her in 2018 in

11  several areas.

12       In these areas her rating -- her ability to deal

13  effectively with these things was rated zero to one, about

14  as low as it could be for nightmares or avoidance of

15  situations, or having supportive relationships, or being

16  able to deal with spontaneity in situations without

17  needing to control the whole thing, or concentration

18  problems, and for hope.  She was just about hopeless at

19  that point that she could manage this kind of thing that

20  was going on in her.

21       Her overall score was quite low.  It was about 45, I

22  guess.

23  Q.   What does that mean?

24  A.   Well, it's really low.  I think if you are below 70,

25  I think it is considered to be very problematic.  And 70

1    is already something where you would say, gee, if you are

2    not at ten for hopefulness and feeling safe and being able

3    to be spontaneous, boy, what's up with that?  What's the

4    difficulty?  I would imagine -- we don't have norms for

5    people on this that are as extensive as like the SCL90.

6    But if someone was in the 70 range, I certainly would say

7    they would be a candidate for therapy.

8    Q.   In 2021, what did you find on the TRS?

9    A.   It was still at 45.  The items that were problematic

10   for her were a little bit different.  Her need to control

11   the environment was still very intense, at the level of

12   zero.  Her problems with concentration were still very

13   difficult, and they were rated at one.  The avoidance

14   problems were still extremely difficult.  They were rated

15   at two.  The problems with recognizing, you know, her own

16   distress and actually controlling her own memories about

17   it were still problematic at the level of three.  So

18   overall score was 45 again, an overall score showing a lot

19   of difficulty recovering from the trauma that was within

20   her.

21   Q.   Do you believe that Ms. Torjusen could benefit from

22   psychotherapy?

23   A.   Well, that was the conclusion that I came to when I

24   evaluated her in 2021 and talked with her about that.  I

25   would recommend that.  I knew she had some experiences

 1   trying it and it didn't go well.  I asked her what didn't

 2   seem to go well, and she explained that.  I said, you

 3   know, I think that might be somebody that really wasn't

 4   used to working with people that had trauma.  By looking

 5   for a therapist that would be what we call trauma

 6   informed, she would have -- she would find better rapport

 7   and feel better understood and heard so that she could

 8   feel safe enough to do things we need to do to cope

 9   effectively with PTSD.

10   Q.  Dr. Crossen, in your -- I didn't do the math, but in

11   20, 30 years of evaluating and treating students and

12   veterans and other folks who have PTSD and brain injury,

13   and have some semblance of physical injury, have you found

14   that there is a recalcitrance or reluctance or difficulty

15   that such patients have in getting or following through

16   with therapy?

17   A.  Absolutely.  This is very -- I would say more common

18   than not, if I was going to look at all the different

19   problems, those would be two, PTSD and brain injury, where

20   there is a reluctance to deal with the problems through

21   therapy, where I would say in my experience the most

22   common disorders where you see that.

23   Q.  So more frequently than not people have difficulty

24   with therapy and don't follow through with the therapy

25   because of the myriad of problems they have; is that fair?

1    A.   That is fair to say.  That is my experience, yes.

2    Q.   Demonstrative exhibit, Exhibit 39, if the magic

3    works.

4            THE COURT:  Is there any objection to this

5    demonstrative exhibit?

6            MR. BONVENTRE:  No objection.

7            THE COURT:  It may be published.

8    BY MR. PETRU:

9    Q.   Dr. Crossen, what do we see here?

10   A.   Well, it's a visual way of presenting a theory of how

11   people are affected by problems that they might have that

12   are psychological.

13   Q.   In the middle there is the cognitive.  That would be

14   brain function, emotional, which would be PTSD, anxiety,

15   depression; physical would be physical injuries, fair?

16   A.   Correct.  Actually, I was going to say this actually

17   would be something useful for considering even medical

18   problems that weren't psychological problems, because the

19   point of this diagram, the heart of it, where you see the

20   overlapping circles, is that a human being is going to be

21   affected by how their body feels to them, by how their

22   thought process is working for them, and by how they are

23   managing their feelings, and these things relate.  You can

24   often under stress have a headache.  That would be that

25   overlap between emotional and physical.  You can sometimes

1   have an overlap between emotional and cognitive when you

2   are depressed and you are thinking about all the things

3   that are wrong in your life.  You can even have, in more

4   severe cases of depression or anxiety, you can have a

5   change in physical functioning where sleep can be affected

6   or avoidance happens and people physically don't go

7   certain places or do certain things because of their

8   overwhelming emotion and cognitive difficulties.  You can

9   see how anger management would also be seen in all three

10   dimensions, where you might ruminate and get more and more

11   upset as you think about things.  And you might feel more

12   overwhelmed, and that feeling of being overwhelmed can

13   burst over into a physical outburst, you know, shouting at

14   somebody or losing control, or physically leaving a

15   situation or just abruptly leaving and walking off in a

16   way that is not really calm.  If you were managing it

17   well, you might walk away calmly.

18       So the physical dimension can be an indication of how

19   well you are doing or how difficult the challenge is for

20   you.  The same with cognitive and emotional.  These are

21   the areas that are really the bigger areas I was

22   evaluating with the tests that I just described to you.

23   Q.   Would it be fair to summarize that because

24   Ms. Torjusen has both emotional diagnoses, PTSD, anxiety,

25   depression, some cognitive findings with regard to

1    disinhibition, some concentration issues, as well as

2    lingering shoulder soreness periodically from the

3    incident, that one or two of those could set off the third

4    and become kind of a moving target, if you will?

5              MR. BONVENTRE:  Objection.

6              THE COURT:  Sustained.

7    BY MR. PETRU:

8    Q.   Doctor, can you share with us how Ms. Torjusen's

9    emotional diagnoses could impact her cognitive and

10   physical problems?

11   A.   Sure.  I think you can see that heavily from the TSI,

12   is a good way of seeing it, because it affects -- measures

13   relationships, it measures physical concerns, sexual

14   concerns, it measures relationship attachments, it

15   measures anger outbursts.  And all of these things have

16   physical, cognitive and emotional dimensions.  And her

17   functioning is very high in all of these areas, very, very

18   high in terms of distress level.  Her concerns about

19   physical functioning are somewhat less now, but they can

20   pop up again for her.  The indications of sexual

21   dysfunction are way decreased, and considered not even

22   problematic.  But there is also social concerns, not

23   dysfunction, but who am I, how do I want to relate to

24   people, who do I want to relate to with intimacy, what is

25   intimacy, what is going on with that.  We also see that in

1    her insecure attachments and her difficulty with anger.

2         So all of these areas definitely relate.  And you can

3    see in the outer boxes, the self-image and meaning, she

4    has continued problems feeling worthless.  She has

5    problems in managing effective social relationships and

6    difficulties coping at work.  She doesn't have a lot of

7    fun, so that's the recreational problem.  Financially, she

8    seems to be making a living.  Good for her.  But money

9    can't buy you happiness, like the old saying goes.

10        There is a lot of distress that she carries inside of

11   her psychologically that's seen in observable physical

12   behavior, in her emotional life as she presents it, and in

13   the way she thinks about things, and also in her ability

14   to concentrate, stay focused on things.

15   Q.   You saw her five or six times.  I can count them up

16   here on my notes.

17   A.   I had five sessions with her after the initial

18   assessment.

19   Q.   Without going through each individual session, is it

20   fair that they were focused on a particular issue,

21   something she was grappling with at the time?

22   A.   We met for five sessions, which I would consider

23   early sessions.  It was trying to establish rapport with

24   her, trying to figure out what were the challenges that

25   she was facing so that we could -- I could be in touch

1  with her reality, and also keeping in mind what findings I

2  had from the assessment that would help me -- help guide

3  me as a therapist about what we might want to work on,

4  that we might be able to help her with, and things I might

5  watch her progress on things to see what kind of things

6  she could manage better on her own, because she was

7  trying.  She was trying to live a normal life of a student

8  abroad, which is complicated.

9      There was nothing about her that made me think she

10  was faking that she was having a hard time.  She was

11  struggling to do the best she could.

12  Q.  The sessions that you had with her, she was abroad --

13  when you saw her initially, was she still in town, was she

14  local?

15  A.  She was when we first met.  We had an assessment

16  session, and that was in person.  I think we did that on a

17  couple of occasions so I could do some interviewing on one

18  day and do testing on another day, build a little bit of

19  face-to-face rapport, because moving into long distance,

20  online therapy, you know, I knew we needed to build a

21  face-to-face foundation if we could.

22  Q.  This was even before COVID when therapy became

23  entirely online or virtual?

24  A.  That's right.  This was before then, right.

25  Q.  Do you know why after the five sessions she didn't

1  continue?

2  A.   Not exactly.  She just thought she didn't want to

3  keep coming anymore.  She had a hard time articulating

4  that, which is not uncommon.  She was clear that it wasn't

5  that she didn't like me or that she didn't feel it was a

6  good effort that we were making, but she just felt like

7  she had other things she needed to be focused on, and

8  there were certain areas she was doing better, and so I

9  just need to be going out and living my life now.  I don't

10 want to really be taking out time to do these therapy

11 sessions.

12 Q.   Have you found in the past that therapy sessions can

13 trigger or rekindle some of the issues associated with

14 PTSD for somebody after a period of time, where going back

15 and talking to a therapist and knowing that the genesis of

16 the issue was trauma and there are lingering effects of

17 the trauma, and you get retraumatized just by going to

18 therapy?

19 A.   That is a possibility.  It didn't seem to be that

20 case for her.  It seemed more that maybe the therapy we

21 did sort of took the edge off enough that she just

22 thought, you know, I am just going to go ahead with things

23 and see how I can do.

24 Q.   Have you found in your practice that patients who

25 have TBIs and PTSD with persistent symptoms four and a

```
 1   half years after the original trauma are more prone to

 2   have difficulties the rest of their life than those who

 3   recover more quickly?

 4           MR. BONVENTRE:  Objection.

 5           THE COURT:  Overruled.

 6   BY MR. PETRU:

 7   Q.  You can answer.

 8   A.  Oh, can I answer?  Okay.  Well, you know, it is

 9   unusual -- to work with somebody over a period of five

10   years with PTSD is a bit unusual.  I do see people who

11   have had PTSD that I didn't start working with them when

12   the diagnosis was made and the events occurred, and they

13   still have problems years later.  It is not uncommon for

14   PTSD symptoms to persist for years, and certainly TBI

15   symptoms can persist for years as well.

16   Q.  You diagnosed her with PTSD?

17   A.  Yes.

18   Q.  And in your last report you actually went through the

19   specific criteria from the DSM.  What is the DSM?

20           THE COURT:  Let's take our noon break at this

21   time.

22           MR. PETRU:  Doctor, we are going to take a break

23   with you.  We will get back a little before 1:30 to make

24   sure the connection is good.

25           THE WITNESS:  Good.  Should I sign off and sign
```

1    on later, that would probably be the best thing.

2           MR. PETRU:  Should we sign off and sign on or

3    just leave it on?

4           THE CLERK:  It would probably be best if you mute

5    yourself, and turn off the video camera.

6           MR. PETRU:  Did you hear that?  Mute yourself,

7    turn off the video, but leave the connection on.

8           THE WITNESS:  I might have a problem with this,

9    because I can't see my screen right now.  So I can't mute

10   and I can't stop my video.  I can't do anything because I

11   can't see any buttons on here to work with.

12          MR. PETRU:  Can you just leave the room?

13          THE CLERK:  If that is the case, you might have

14   to sign off and sign back on again, and we might have to

15   reconnect you anyway.  It should work when we connect you.

16   We will test you at 1:20.

17          THE WITNESS:  That sounds good.  I will try to

18   sign back in about 1:15, if that's okay.

19          THE CLERK:  That's great.

20          MR. PETRU:  Thank you, your Honor.

21          THE COURT:  All right.  We are going to take our

22   noon recess.  Return at 1:30, and do not discuss the case.

23       (At this time, the jury exited the courtroom.)

24          THE COURT:  We will see everyone at 1:30.

25       (Recessed.)

```
 1                                    AFTERNOON SESSION
 2                                    MARCH 30, 2022
 3            THE COURT:  All right.  We've got him back.  We
 4    are ready to go.  Let's bring in the jury.
 5            (The following occurred in the presence of the jury.)
 6            THE COURT:  All right.  Everyone, please be
 7    seated.  We are a little bit later starting.  I like to
 8    blame -- whenever I'm late getting started again, I like
 9    to blame it on the fact that this was a train station
10    once, and trains, as you know, are notoriously slow, but
11    not necessarily Amtrak.  Amtrak, I'm sure, runs on time.
12            MR. BONVENTRE:  Always.
13            THE COURT:  I'm taking responsibility, certainly
14    not either of the parties here, for our late start.
15         Let's resume.
16            MR. PETRU:  That's really refreshing, because I'm
17    always the reason for a delay.
18    BY MR. PETRU:
19    Q.  Dr. Crossen, welcome back.  I see you got all dressed
20    up and put on a coat.
21    A.  I think I had it on earlier.  Maybe it wasn't so
22    apparent.  Over the lunch break, I noticed someone else in
23    the courtroom had the same kind of tie.
24    Q.  Welcome back.  I don't have much more for you.
25            I want to go to the last report, the 2021 report.  In
```

```
 1    it you have a section you had titled "summary impressions
 2    and recommendations."  In the first paragraph of it, I
 3    think as you did back in 2018, you go through the actual
 4    Statistical and Diagnostic Manual definition of PTSD.  I
 5    know that's your diagnosis.  But for the jury's benefit,
 6    can you read the criteria as set forth by the committee
 7    that kind of defined what PTSD is?
 8    A.   Sure.   Sure.   This is an international disease
 9    classification manual.  Her condition meets the following
10    criteria for PTSD:  Because the event was, number one,
11    life threatening, and the symptoms have been present in
12    other areas of her functioning.  Number two,
13    reexperiencing the original stressful experience through
14    repeated disturbing and unwanted memories, repeated
15    disturbing dreams, feeling very upset when reminded of it,
16    meaning the accident.  And three, avoidant patterns
17    involving internally trying not to remember or think about
18    the event, and avoiding external stimuli that are
19    concrete, symbolic reminders of the experience.  Four,
20    negative changes in cognition and mood manifested by
21    strong negative beliefs about trusting others, safety in
22    the world, or defects in herself as a person.  And, five,
23    marked alterations in arousal and reactivity involving
24    irritable, angry outbursts, difficulty concentrating, and
25    sleeping problems.
```

1      And I say that these adverse changes in her
2    personality and behavior were identified during clinical
3    interviewing and in her response to the tests
4    administered.
5    Q.   Are the findings consistent with the history that you
6    gleaned from her regarding the crash in December 2017 and
7    the effect it had on her?
8    A.   Yes.
9    Q.   You then go on and write -- and I am going to have
10   you explain this -- persisting disturbances of emotional
11   regulation and cognitive functioning can persist after
12   traumatic brain injury and might play a role in
13   exacerbating her PTSD.
14       We had that diagram up earlier which had the
15   cognition and emotion overlapping.  Is that what you were
16   referring to here, there is interplay or potential
17   interplay between brain injury -- emotional disturbance,
18   brain injury, and PTSD?
19   A.   Yes, all three areas.  "Physical" meaning the brain,
20   and then "emotional" meaning her personality changes, and
21   "cognitive" meaning the changes as just referred to above
22   in cognition, that involved changing -- beliefs where it
23   is difficult to trust others, to feel safe in the world,
24   and see herself as a worthwhile person.  Those are all
25   cognitive aspects.

1   Q.   In the next paragraph you write:   Based on her

2   previous examination, her history of therapy since the

3   accident, and the findings of the present evaluation,

4   several clinical recommendations are suggested for

5   consideration.   Her symptoms of Part D and E seem to be

6   the most prominent and problematic at this point in her

7   life.

8       D is what you listed as 4 before, negative changes in

9   cognition and mood, manifested by strong negative beliefs

10  about trusting others, safety in the world, or defects in

11  herself as a person.   And E is marked alterations in

12  arousal and reactivity involving irritable, angry

13  outbursts, difficulty concentrating, and sleeping

14  problems.

15      Then you --

16  A.   Right.   In my report, they are labeled as D and E,

17  and presenting them now I numbered them, calling them 4

18  and 5.

19  Q.   You wrote specifically:   "The complexity of endeavors

20  and challenges in her life have been increasing

21  substantively since the time of our previous evaluation in

22  2018, as she was beginning her undergraduate studies.

23  From this point of view, the burden PTSD has been placing

24  on her functioning in areas of life emerging in importance

25  is likely magnified.   There is very high risk that this

```
 1   will persist and continue to significantly limit her
 2   functioning."
 3        Did I read that correctly?
 4             MR. BONVENTRE:  Objection, your Honor.
 5             THE WITNESS:  Yes, you did.
 6             THE COURT:  Just a moment.  Just a moment,
 7   Doctor.
 8             MR. BONVENTRE:  He is leading the witness now,
 9   Judge.
10             THE COURT:  He is.  And he is doing it from the
11   report.  You could do it by asking him to refer to the
12   report, and he read it --
13             MR. BONVENTRE:  I will withdraw it, Judge.
14   BY MR. PETRU:
15   Q.  I read that so -- if I could just back up just a
16   little bit.  You wrote:  "From this point of view, the
17   burden PTSD has been placing on her functioning in areas
18   of life emerging in importance is likely magnified.  There
19   is very high risk that this will persist and continue to
20   significantly limit her functioning."
21        Now, Doctor, that's your opinion to a reasonable
22   degree of psychological probability, correct?
23   A.  Yes.
24   Q.  And is it your opinion that because of the nature of
25   her overall condition that she will continue to have
```

1  significant limiting in her functioning as a consequence

2  of the trauma she suffered?

3  A.   Yes.

4  Q.   On the next page you write -- I will read what you

5  wrote and then ask you a question.  You said:  "She may

6  feel some caution about considering future therapy.  This

7  would be understandable given her perception of limited

8  benefits from her previous therapy and the evident

9  worsening of distress in some areas of her PTSD," e.g.,

10  parts C and D noted above.

11      C is avoidant patterns involving internally not

12  trying to remember or think about the event, and avoiding

13  external stimuli that are concrete or symbolic reminders

14  of the experience.

15      And D, we read before, is the negative changes in

16  cognition and mood manifested by strong negative beliefs

17  about trusting others, safety in the world, or defects in

18  herself as a person.

19      Can you explain how the strong showings in C and D,

20  as indicated, would understandably impact or limit her

21  participation in the therapy?

22  A.   Well, the avoidant pattern would come into play

23  because doing therapy would assume because the foundation

24  of the therapy is going to be effective, that she would

25  progressively face these internally disturbing thoughts

1  and feelings and external stimuli that are symbolic or

2  concrete reminders of the experience.

3      To overcome those avoidant patterns, which are a

4  symptom of anxiety, our therapeutic process requires

5  exposure to those stimuli, internal and external.  And the

6  exposure needs to be done in a safe, trusting therapeutic

7  environment.

8  Q.  Were you finished?

9  A.  She would have to overcome the avoidance to actually

10  get into that environment.

11      Part D comes into play because you have to trust a

12  therapist to be willing to get yourself into therapy.  But

13  negative changes in cognition and mood involve strong

14  beliefs that she can't really trust others, and it is not

15  safe to do that, and that there is something wrong with

16  her as a person.

17      These are things that -- you have to get through

18  these areas of internal trauma and resistance in order to

19  get yourself into therapy, and she has had some therapy

20  more recently after what I did that she found to be

21  discordant with trust.  The therapist tried to have her

22  think that she was really doing something positive when

23  she thought she was doing something negative, that she was

24  relating what happened in the course of her trying to deal

25  with this trauma.  So she didn't want to see that

1    therapist anymore.  I think the therapist probably didn't

2    understand --

3              MR. BONVENTRE:  Objection, your Honor.

4              THE WITNESS:  -- they hypothesized --

5              THE COURT:  There has been an objection.

6              MR. BONVENTRE:  How would he know what other

7    therapists did or didn't understand?

8              THE COURT:  A healthcare provider can, in

9    providing testimony about treatment, indicate if there had

10   been communication with another physician, but we haven't

11   had that foundation laid.

12       While we are interrupting here, there is some

13   background noise occurring here.  I don't know whether

14   that is a result of anything at your end.

15             MR. PETRU:  I think it is the papers again, your

16   Honor.

17       Dr. Crossen, if you could be careful not to move

18   papers.  Your microphone is very sensitive to paper, I

19   guess.

20             THE WITNESS:  I'm sorry.  Okay.

21   BY MR. PETRU:

22   Q.  We will move on to a related question.  The jury in

23   this case has heard from Dr. Aaron Filler describing

24   discrete and specific injury to Ms. Torjusen's brain,

25   consistent with the findings of a mild traumatic brain

page

injury, specifically in areas of disregulation, anger.  My

question is:  Does the fact that there has been a finding

of a discrete injury to the brain in the area that is also

known to associate with PTSD make it more difficult for

therapy to have a significant benefit?

A.   Yes.  And I would like to explain.

Q.   Please.

A.   I am assuming that this was some measurement that was

done sometime in the past.  But what we get in our

behavioral patterns is habits.  And even if that area of

the brain is helping now, which I don't know if it is or

not, but even if it is, the habit of avoidance and not

trusting can still be there, kind of like you can still

have a limp even after your leg heals, and your behavior

can still have a pattern of avoidance even after the need

for it is gone.

          MR. PETRU:  Thank you, Dr. Crossen.  Those are

all the questions I have.

                    CROSS-EXAMINATION

BY MR. BONVENTRE:

Q.   Good afternoon, Dr. Crossen.

A.   Hello.

Q.   Doctor, did you ever get a copy of that report from

Dr. Filler?

A.   I'm not sure.  Is that something that was done during

1    that time that I was doing therapy with --

2    Q.   Do you know who Dr. Filler is?

3    A.   I'm not sure if I know -- is he the one that assessed

4    the brain function?

5    Q.   Did you ever see a report from Dr. Filler?

6    A.   I'm going to look in my folder and see.

7    Q.   Let me ask you this question before you do that, so

8    we can save some time here.  Is there any reference in

9    your reports of your review of a report from a Dr. Filler?

10   A.   I'm going to look at my first report and tell you the

11   answer to that.

12   Q.   Thank you.

13   A.   I don't see a reference to it in the medical records

14   that I reviewed, no.

15   Q.   Thank you.  Dr. Crossen, I am going to ask you some

16   questions this afternoon, and if you have difficulty

17   hearing me, please tell me, sir, and I will be happy to

18   rephrase the question.  All right, sir?

19   A.   Thank you.

20   Q.   Dr. Crossen, you are a psychologist, correct, sir?

21   A.   Yes.

22   Q.   And you saw Ms. Torjusen at the request of her

23   attorney, correct?

24   A.   Correct.

25   Q.   So you knew when you first saw her it was for

1    purposes of her lawsuit, correct?

2    A.   Correct.

3    Q.   And, in fact, when you saw her a second time after

4    therapy, when you recently saw her, that was also at the

5    request of her attorneys, correct?

6    A.   It was at her request.

7    Q.   So she hadn't seen you for three years when she

8    suddenly knocked on your door and said:  Can you examine

9    me again?  Is that what you're saying?

10   A.   I am saying I got an email from her.

11   Q.   So you last saw her on November 30th of 2018,

12   correct?

13   A.   Correct.

14   Q.   And then magically she sent you an email, sir, a

15   couple of months ago that she wanted you to take another

16   examination of her, correct?

17             MR. PETRU:  Object to the form of the question.

18             THE COURT:  Sustained.

19   BY MR. BONVENTRE:

20   Q.   I'm sorry.

21        Then out of the blue she calls you and asks you to do

22   another examination?

23             MR. PETRU:  Object to the form of the question.

24             THE COURT:  Sustained.

25

```
 1    BY MR. BONVENTRE:
 2    Q.   She calls you three years later and asks you to do an
 3    examination, correct?
 4    A.   The thing I think that is not correct is this
 5    "magic," "just in the last month."
 6    Q.   Doctor, did she call you after three years?
 7    A.   She wanted to see me again for different -- it is not
 8    magic.
 9    Q.   Doctor, did you --
10            THE COURT:  Just a moment.  I want to remind you
11    not to speak over the attorney, and Mr. Bonventre will try
12    not to speak over you.
13    BY MR. BONVENTRE:
14    Q.   There was a gap of three years between when you first
15    saw her and when you see her again, correct?
16    A.   Correct.
17    Q.   And she told you about her trial, correct?
18    A.   Yes.
19    Q.   And so you understood that you were seeing her for
20    purposes of this trial, correct?
21    A.   No.
22    Q.   Okay.  So you thought it was a mere coincidence that
23    you were just seeing her on the eve of her trial?  Is that
24    your interpretation, sir?
25    A.   No.
```

1    Q.   Anyway -- so you drafted a report, your first

2    evaluation, on August 16th of 2018, correct, sir?

3    A.   That's right.

4    Q.   Who did you send that report to?

5    A.   Sent that to the referring attorney from the

6    Hildebrand law firm.  I think it was Carol Bosch.

7    Q.   You did not send that report to any of her -- to her

8    physician, correct?

9    A.   I did not, no.

10   Q.   Because, again, the purpose of that report was for

11   purposes of litigation; isn't that correct?

12           MR. PETRU:  Objection.  Argumentative.  No

13   foundation.

14           THE WITNESS:  No, it is not.

15           THE COURT:  Doctor, just a minute.  There was an

16   objection lodged.  Overruled.

17       Now you may answer.

18           THE WITNESS:  It was for the purpose of therapy.

19   BY MR. BONVENTRE:

20   Q.   So do you normally send lawyers reports about your

21   patients for purposes of therapy?

22   A.   Yes, when they make that referral.

23   Q.   But you don't send it to the doctor, who is actually

24   treating the patient?

25   A.   If it's requested to go to the doctor, if I receive a

1  request from the doctor.  In this case, I don't have

2  records of receiving such a request.

3  Q.  Well, do you know if the doctor ever even knew the

4  patient was seeing you?

5  A.  Which doctor are you speaking about?

6  Q.  Do you know who her main treating doctor is?

7  A.  She has a primary care doctor.

8  Q.  And what is that doctor's name?

9  A.  I don't think I know it right off the top of my head.

10  It has changed over time, because she has been seen in

11  different -- by different healthcare providers in

12  different cities.

13  Q.  So you don't --

14  A.  My knowledge -- go ahead.

15  Q.  So you don't know the name of her primary care

16  physician, and you certainly never spoke to her primary

17  care physician, correct?

18  A.  I have not spoken to the primary care physician.  I

19  can't remember if I know the name or not.

20  Q.  So the purpose of the visit on August 16th of 2018,

21  sir, was to, among other things, quote, develop an initial

22  plan of therapy?  Is that what you wrote down there, sir?

23  A.  Excuse me.  I didn't follow.  Did you say the initial

24  report?

25  Q.  In your initial report on 8/16/2018, yes?

1    A.   Yes, that's right.

2    Q.   It was to develop an initial plan of therapy; is that

3    correct?

4    A.   That's correct.

5    Q.   Just so I'm clear, Ms. Torjusen's lawyer was asking

6    you to have a treatment plan set up for his client; is

7    that correct?

8    A.   Yes.  It wasn't his client -- her client -- it was

9    Carol Bosch, who is a judge now.

10   Q.   In any event -- and you were hopeful to establish

11   psychotherapy with the plaintiff, correct?

12   A.   That's a possibility.  I was hopeful, yes.

13   Q.   You were aware that she was going to the University

14   of Washington; is that correct?

15   A.   That's correct.

16   Q.   And you indicated, sir, in your report of 8/16/2018

17   that you didn't know what her GPA was, correct?

18   A.   Correct.

19   Q.   And you would have liked to have that information to

20   see how she was doing in school, correct?

21   A.   It would be helpful.

22   Q.   Okay.  Do you know as you stand here today what her

23   GPA in school was?

24   A.   I think it is a B-plus average.

25   Q.   You think it is a B-plus average; is that correct,

1    like a 2.8, 3.0, something like that?

2             MR. PETRU:  Objection, your Honor.

3             THE WITNESS:  It would be more like a 3.5.

4    BY MR. BONVENTRE:

5    Q.   A B-plus is a 3.5?

6    A.   A 4.0 is an A; a 3 is a B; a 2 is a C.  That's the

7    way I have always graded.  I have taught college quite a

8    bit.

9    Q.   Have you looked at her transcripts, sir?

10   A.   I still haven't seen it.  I relied on her report.

11   Q.   Did she tell you she was a good student, a fair

12   student?  What did she say?

13   A.   She said she was trying her best.  When I first saw

14   her in therapy, she wasn't certain how good of a student

15   she would be.  It was difficult for her.

16   Q.   How about later on when you saw her, did she tell you

17   how she actually did in school?  For example, did she tell

18   you whether she made the dean's list or not?  Did she tell

19   you in certain semesters she had a 3.9?  Did she tell you

20   any of that information?

21   A.   She told me she was doing well in school and got good

22   grades.

23   Q.   So you had indicated something about knowing physical

24   complaints.  I am looking at your first report, sir, of

25   August 16, 2018.  And it is correct that that report says

1   nothing about the plaintiff having headaches, dizziness,

2   balance problems or light sensitivity, correct?

3   A.   It says that in part of the report, but I think she

4   reported those things in the questionnaires.

5   Q.   Is there anything in your report that I have that you

6   sent to counsel that indicates anything about headaches,

7   light sensitivity, dizziness or balance problems?   Is

8   there anything in your report that says that?

9   A.   Not literally, not in those words.   But it covers her

10  health -- multiple health concerns.

11  Q.   In fact, nowhere in any of the reports or treatment

12  records, Doctor, do you say anything about headaches,

13  dizziness, balance problems or light sensitivity, isn't

14  that correct, in none of these reports?

15  A.   Well, I don't agree with you I didn't say anything

16  about it.   She did endorse those things on her

17  questionnaires.

18  Q.   But you didn't put it in your reports?

19  A.   I didn't put those specific symptoms in the report,

20  no.

21  Q.   Now, Doctor, you did something called a SIMS

22  assessment, SIMS, sir?

23  A.   Yes, sir.

24  Q.   And a SIMS assessment is something you do -- do you

25  do that in every case?

1    **A.**   I do it in cases where there is some litigation, yes.

2    **Q.**   And the reason you do it in cases in which there is

3    litigation is because the DSM, which you were talking

4    about, actually specifically really requires you to do

5    something like that; is that correct?

6    **A.**   No.  It doesn't require that.

7    **Q.**   Does the DSM discuss the diagnosis -- specific

8    diagnosis called malingering, sir?

9    **A.**   Yes, it does.

10   **Q.**   And the DSM does say that malingering is something

11   that should be looked into or be concerned about if the

12   patient is referred to you by a lawyer, correct?

13   **A.**   I'm not sure if it says that or not, but it would be

14   wise if it did.

15   **Q.**   It also talks about if there is litigation involved,

16   correct?

17   **A.**   Usually, if there is a lawyer, there is litigation.

18   We live in a country where there is litigation, and there

19   is always two sides.

20   **Q.**   Now, I'm just trying to understand your

21   interpretation of the SIMS test, sir.  It assesses

22   atypical and infrequent responses.  What it really

23   assesses, sir, is whether there are signs of malingering,

24   correct?

25   **A.**   No.

```
 1    Q.   Is it assessing whether or not there is malingering,
 2    sir?
 3    A.   It's not assessing whether or not.  It is one way of
 4    measuring.  There is no specific test that we rely on only
 5    to establish malingering.
 6    Q.   But is that --
 7    A.   All the literature on malingering for at least the
 8    last 20 years is that we need multiple sources of
 9    information.
10    Q.   But is the SIMS test one of the ways in which you
11    assess malingering?
12    A.   It is a part of it, yes.
13    Q.   And just so the jury understands -- and I know you
14    don't believe the plaintiff was malingering, but just so
15    the jury understands, malingering is the exaggeration of
16    physical or psychological symptoms, correct?
17    A.   That's part of the definition, yes.
18    Q.   And it could be for purposes, among other things, for
19    financial gain in a lawsuit, correct?
20    A.   Could be.
21    Q.   So that's something that you are conscious of when
22    you are sent a patient by an attorney, correct?
23    A.   Yes.
24    Q.   And, in fact, you had results there in the SIMS
25    assessment which could be interpreted to be consistent
```

1   with exaggeration of symptoms, correct?

2          MR. PETRU:  Objection, vague.  By whom?

3          MR. BONVENTRE:  By the plaintiff.

4          THE COURT:  Overruled.

5       You may answer, Doctor.

6          THE WITNESS:  Okay.  What's the question again?

7   BY MR. BONVENTRE:

8   Q.  The SIMS test, which you administered on August 16th

9   of 2018, sir, was consistent -- there was some signs

10  consistent with malingering or consistent with an

11  exaggeration of symptoms; isn't that correct, sir?

12         MR. PETRU:  Objection.  Compound.

13         THE COURT:  Sustained.

14  BY MR. BONVENTRE:

15  Q.  Or how about:  Was it consistent with an exaggeration

16  of symptoms?

17  A.   I testified earlier that the results that I got when

18  I followed the manual for the SIMS said if you get results

19  that are higher than the threshold, you should follow up

20  and find out more about that to see if there is an

21  explanation that would be other than malingering.

22  Q.  My question, sir, was --

23         MR. PETRU:  Excuse me, your Honor.

24         MR. BONVENTRE:  I am not getting an answer to my

25  question, respectfully.

```
 1            THE WITNESS:  I am trying.  You keep interrupting
 2   me.
 3            MR. PETRU:  That's my objection.
 4            THE COURT:  You are.
 5            MR. BONVENTRE:  I apologize, Your Honor.
 6            THE COURT:  It is a little more difficult because
 7   we are doing this electronically.
 8            MR. PETRU:  Can the witness be allowed to finish
 9   his answer?
10            THE COURT:  Do you wish to finish your answer or
11   would you like the question redirected.
12            THE WITNESS:  I can finish what I was saying.  I
13   would be glad to clarify if you want more clarification.
14       When I follow the manual of the SIMS, and it says if
15   you find, you know, items that are beyond the threshold,
16   you should understand those items by talking with and
17   investigating further with the person who endorsed the
18   items about what they -- and in that case see what they
19   meant rather than interpret them algorithmically like you
20   are some kind of IT machine, that if it is over the
21   threshold, therefore it must be malingering.
22   BY MR. BONVENTRE:
23   Q.  Dr. Crossen, I ask if you could respectfully answer
24   my question.  Were there responses in the SIMS test that
25   are consistent with the exaggeration of symptoms?
```

1    A.   No, I don't consider them exaggeration of symptoms.

2    Q.   Were there -- were there responses --

3    A.   I--

4    Q.   Can I ask another question, sir?  Were there

5    responses above the threshold of what is to be expected?

6    A.   Yes.

7    Q.   Thank you.

8         At the end of your first report, dated August 16th of

9    2018, am I correct that you indicated, quote, "I am

10   optimistic that her symptoms should continue to resolve

11   with therapy"; is that what you said?

12   A.   Yes.

13   Q.   So as of August 16th, 2018, you were optimistic that

14   with some therapy her symptoms would, quote/unquote,

15   resolve, correct?

16   A.   Correct.

17   Q.   Now, sir, did you, in fact, see Ms. Torjusen

18   thereafter for a couple of therapy sessions?  Correct?

19   A.   Yes.

20   Q.   Do I understand that some of them, sir, were done

21   remotely?

22   A.   All of them.

23   Q.   All of them.  Okay.  So after the initial visit, the

24   therapy sessions were done remotely, correct?

25   A.   Correct.

```
 1   Q.   And where was it, your understanding, that
 2   Ms. Torjusen was at the time?
 3   A.   In the south of France.
 4   Q.   So she was in the French Riviera while you were in
 5   your office conducting therapy sessions?
 6           MR. PETRU:  Objection, your Honor.
 7           THE WITNESS:  No, that's not correct.
 8           THE COURT:  The objection?
 9           MR. PETRU:  She was in school.  Counsel is
10   mischaracterizing where she was and what she was doing.
11           THE COURT:  Overruled.
12   BY MR. BONVENTRE:
13   Q.   You can answer, Dr. Crossen.
14   A.   It was in her apartment in a city near Nice, as I
15   understand it, and she was not on the French Riviera, as I
16   understand the French Riviera to be the beaches.
17   Q.   Well, you later on during one of your sessions talked
18   about her time spent at the beaches, correct?
19   A.   Yes.
20   Q.   You indicated that she -- that as your sessions, your
21   five sessions went on, she was starting to be, in your
22   words, quote, "able to do more things that she had been
23   avoiding," correct?
24   A.   Yes.
25   Q.   And one of those things she was able to do, which you
```

1  specifically point out, was she was able to go on trains,

2  correct?

3  A.  Correct.

4  Q.  In fact, she was going on a lot of trains.  It was

5  the main part of her transportation, correct?

6  A.  I don't know what you mean by "main part of her

7  transportation."

8  Q.  Did she frequently ride trains and public

9  transportation while she was in Europe?

10  A.  I'm not sure what you mean by "frequently."

11  Q.  Did she do it more than once during the year she was

12  in France?

13  A.  My understanding is yes.

14  Q.  Did she do it more than twice when she was in France?

15  A.  I don't know if there was more than twice in the time

16  that I was doing therapy with her.  But I think it was

17  more than twice by the time I saw her last year.

18  Q.  Did she tell you at one point that she went swimming

19  on the coast and she was going for a shipwreck?  Do you

20  remember that one?

21  A.  No, I don't remember that.

22  Q.  Could you check your note of November 9th of 2018?

23  A.  Okay.

24  Q.  Do you see that, Doctor?

25  A.  No, I'm not finding it.

Q.   I'm sorry.  November 9th, 2018, right in the middle
of the page, she went for a swim to see a wreck on the
coast?

A.   Oh, I'm looking at the wrong date.  I'm sorry.  It's
me.  While riding trains, she continues to experience the
same ongoing psychological distress.  I'm not -- oh, here
it is.  And then she went for a swim on the coast and
recognized a student and made friends with him.

Q.   She went to see a wreck on the coast, correct?

A.   Yes.  I don't know that that means she swam to the
wreck.  I'm not sure what you mean by that.

Q.   Never mind, Doctor.

A.   That's not what this was.  Whether she was going
under water --

Q.   Doctor, we will move on to another question.

     On November 15th -- could you go to your report on
November 15th?

A.   Yes.

Q.   And at the bottom it said she was planning a trip to
Paris.  Do you see that?

A.   Yes.

Q.   And she was hoping also to plan a trip to Bosnia and
Croatia by train and bus.  Do you see that?

A.   Yes.

Q.   And that she was looking forward to seeing the coast,

1    the national park with waterfalls, and Roman ruins.  Do

2    you see that?

3    A.   Yes.

4    Q.   The last time you saw her for therapy, Doctor, was

5    November 30th of 2018, correct?

6    A.   Correct.

7    Q.   And you indicated that she was building more

8    confidence in herself as the year proceeded, correct, sir?

9    A.   Yes.

10    Q.   Just so it is clear, Doctor, you didn't

11    discontinue -- you didn't discharge her, she discharged

12    herself, correct, after that?

13    A.   That's correct.

14    Q.   And did she discharge herself because she didn't

15    think you were helping or did she discharge herself

16    because she didn't think she needed to see you anymore?

17          MR. PETRU:  Objection.

18    BY MR. BONVENTRE:

19    Q.   Or some other reason?

20          MR. PETRU:  Objection.  Speculation.

21          THE COURT:  Overruled.

22    BY MR. BONVENTRE:

23    Q.   Doctor, did she discharge you because she didn't

24    think you were helping her?

25    A.   That's not my understanding, no.

1    Q.   Okay.  She discharged you because she didn't think

2    she needed to see you anymore?  I believe that's what you

3    said on direct, correct?

4    A.   I think what I said on direct was that she thought

5    she could manage on her own, and she would like to give it

6    a try.

7    Q.   Okay.  So you don't see her again for literally

8    almost three years, correct?

9    A.   Correct.

10   Q.   And she comes back and you say she requests a

11   psychological evaluation in November, correct, on

12   November 8th of 2021?

13   A.   Oh, the opening sentence says that she expressed

14   interest in consultation to assess her current functioning

15   about college following her earlier therapy.  And when I

16   talked with her, she said that she wanted to know whether

17   she -- my recommendations about any further therapy.

18   Q.   So this is after a three-year absence she wants to

19   consult with you again, correct?

20   A.   Correct.

21   Q.   But she did tell you that her trial was coming up,

22   correct?

23   A.   I think she probably did, sure.

24   Q.   And she did ask you to send a letter -- a report to

25   her attorney, correct?

1    **A.    Correct.**

2    **Q.    And you sent the report to an attorney, but not to**

3    **the plaintiff's doctor, correct?**

4    **A.    I was not requested to do that, no.  And it is not**

5    **common to send reports to doctors unless the patient**

6    **requests that, and then would request it be sent to their**

7    **doctor, or the doctor would say:  Can you request that for**

8    **me.  This is just normal stuff for everyday therapy.  This**

9    **was not just something that happens in a law case.**

10   **Q.    Let me ask you this:  It is normal to send reports to**

11   **the patient's lawyer, but not the patient's doctor; is**

12   **that what you are saying?**

13   **A.    No.  I said it is not normal to send a report to the**

14   **patient's doctor unless it is requested.**

15   **Q.    Of course, it is correct that the doctor can't**

16   **request the report if the doctor doesn't know you are**

17   **seeing the patient, correct?**

18   **A.    That's correct.  That is very common.  It is just**

19   **standard, the way therapy is done.  That may be a surprise**

20   **to you as an attorney, but to me as a psychologist and**

21   **therapist, that's the way things are.**

22   **Q.    So she told you that she had graduated from the**

23   **University of Washington with a triple major, correct?**

24   **A.    Correct.**

25   **Q.    And the major was in political science, emphasizing**

1  economics, international studies of the Middle East, and

2  near eastern languages and civilization, correct?

3  A.   Correct.

4  Q.   She told you that at the start of June of 2021, she

5  left the United States again and was going to go to

6  Romania for a month, correct?

7  A.   Correct.

8  Q.   And then she was going to move permanently to Cairo,

9  Egypt, correct?

10 A.   Correct.

11 Q.   And she also told you that she was working --

12 A.   I'm not sure what you mean by "permanently."  I don't

13 think she said that.  I think you might have put that into

14 your own interpretation.

15 Q.   Well, she didn't indicate a time when she was

16 returning.  She was going to live in Cairo, Egypt,

17 correct, sir?

18 A.   As a 24-year-old woman she said, yes, that's what she

19 was going to do next.  That's what her plan was.

20 Q.   Do you know if that's where she is living now?

21 A.   At this moment, unless there has been a change, I

22 think that's what she is doing.  But I don't know at the

23 moment.

24 Q.   Okay.  She also told you that she was working full

25 time as a CEO for a start-up company, correct?

```
 1    A.   Correct.
 2    Q.   And that she was -- had six people who were reporting
 3    to her, correct?
 4    A.   Correct.
 5    Q.   And that she was writing articles and editing other
 6    articles of other people, correct?
 7    A.   Correct.
 8    Q.   Now, Doctor, by the way, did you have atypical
 9    responses once again on that SIMS exam?
10    A.   Yes.
11    Q.   But you didn't think it was malingering or had
12    anything to do with the lawsuit, correct?
13    A.   From what I understood what those items were, to me
14    they were very valid considering her condition and they
15    would not be atypical for her condition.  Keep in mind,
16    her condition is PTSD, and the SIMS is not normed on
17    people who have PTSD.  So there is an amount of
18    interpretation that needs to be professionally applied
19    there to see what do these items really mean.  Like I
20    said, it is not an algorithm, it is a clinical judgment
21    tool.
22    Q.   And that interpretation is done by you, correct?
23    A.   Of course.  I am writing the report, I'm responsible
24    for the interpretation.
25    Q.   The report that is going to a lawyer involved in a
```

1  lawsuit, correct?

2  A.   Correct.

3  Q.   Now, you were justifiably incredibly impressed with

4  what Ms. Torjusen had been accomplishing, correct?

5  A.   I was quite impressed.

6  Q.   Yes.  It is quite impressive what her accomplishments

7  have been through college and through the present time,

8  isn't that correct, sir?  In terms of her grades, in terms

9  of her writing, in terms of her employment, in terms of

10  all those things, her traveling, it is incredibly

11  impressive what she has done, correct?

12  A.   I wouldn't say incredibly impressive about the

13  travel, because she has expressed that travel is very

14  uncomfortable for her.  I wouldn't say that these are

15  unmixed achievements.  They take a toll on her.  It is

16  hard for her to do what she is doing.

17  Q.   It would be hard for any 24-year-old to do what she

18  has been doing, isn't that correct?  I mean, what she is

19  doing is pretty extraordinary.  It would be hard for

20  anyone at that age -- at any age -- to do all the various

21  things that she has accomplished; isn't that fair to say?

22  A.   All of the various things, I think she is doing

23  really great in her school and work.  I don't think she is

24  doing well in her emotional life, her social life, and in

25  her ability to do those work skills without cognitive

1    discomfort and emotional discomfort.

2    Q.   Did you indicate that she has shown great

3    skillfulness in managing to complete a rigorous academic

4    program and do multiple -- multiple highly responsible

5    jobs, correct?

6    A.   Correct.

7    Q.   And then you close the report by indicating again,

8    like you did with the first report, that you have optimism

9    for Emily's potential further recovery, correct?

10   A.   Yes, with therapy.

11            MR. BONVENTRE:   Thank you, Doctor.

12            THE WITNESS:   You are certainly welcome.

13                     REDIRECT EXAMINATION

14   BY MR. PETRU:

15   Q.   Dr. Crossen, you think therapy can help?

16   A.   I do.

17   Q.   Not a cure-all, right?

18   A.   Not in this case, no.

19   Q.   The rule of completeness, if you can turn to the

20   October 26th, 2018 report from your visit with her.

21   Counsel touched on this.  I want to ask you a couple of

22   questions.  This is when she is doing very well in school,

23   apparently.  Are you there?

24   A.   I am just about there.  The 6th of October.

25   Q.   26th.

1   **A.**   Oh, 26th.  I'm sorry.  I am turning these pages

2   slowly.   I don't want to create that noise that is so

3   bothersome to everybody.

4   **Q.**   I appreciate your sensitivity.  I really do.

5   **A.**   You know, it has been brought up a couple of times,

6   and I am a little shy about it.  Okay.  I've got the

7   report, the update.

8   **Q.**   There is a paragraph called "assessment."  In the

9   middle of that paragraph she is talking about something in

10  school while she was in France.  And there is a sentence

11  that became -- that starts "she became angry."  Can you

12  please read what you wrote on October 26th, 2018?

13  **A.**   Well, the context is that they were doing a project.

14  It was difficult trying to get the approval of a teacher

15  she felt was mean to her.  That was her own feeling about

16  it.  And she took it as a sign that the teacher was mean

17  to her to make her tougher, almost like a coach might yell

18  at their players.

19  **Q.**   And then you wrote she became -- can you read that,

20  please, slowly?

21  **A.**   "She became angry when the other students were

22  announced as the winners.  She thought the result was

23  fraudulent, yelled a profanity, and walked out.  She cried

24  later when she met with the teacher who blamed her for her

25  prickly reaction and refused to stop the meeting."

```
 1    Q.   Is that a person who is succeeding without any

 2    problems?

 3    A.   No.

 4    Q.   Can you please read the next section under "plan"

 5    slowly in its entirety?

 6    A.   "When we talked about her current symptoms from the

 7    train wreck in April, she said there was no way around

 8    taking trains in Europe.  She recounted being negatively

 9    triggered emotionally by the high speed, sudden noises,

10    and dark tunnels.  She cannot avoid the experience and the

11    memories it evokes.  She copes with a chip on her

12    shoulder.  We plan to meet again in one week."

13    Q.   Can you now turn to your November 9th, 2018, report?

14    A.   I'm there.

15    Q.   I think you read this in response to one of counsel's

16    questions.  This is less than a month later.  In the

17    "objective" section you wrote, quote, "While riding

18    trains, she continues to experience the same ongoing

19    psychological distress."  Did I read that correctly?

20    A.   Absolutely correct.

21              MR. PETRU:  Thank you.  Those are all the

22    questions I have.

23              MR. BONVENTRE:  I have one or two very quick

24    ones.

25
```

```
 1                    RECROSS EXAMINATION
 2   BY MR. BONVENTRE:
 3   Q.   That very powerful discussion about how upset
 4   Ms. Torjusen became when some teacher didn't like her
 5   project or something like that, do you remember you just
 6   talked about that like three seconds ago?
 7   A.   Yes.
 8   Q.   On October 26th of 2018?
 9   A.   Correct.
10   Q.   Was that since the Amtrak accident or did that occur
11   when she was in high school?
12   A.   I didn't hear -- I don't understand your question.
13   Q.   Could you look at October 26th of 2018.
14   A.   Yes.
15   Q.   And you talked about someone else was declared a
16   winner, and someone was mad, and the teacher was mad at
17   her.  Do you remember that?
18   A.   Yes.
19   Q.   You took that as a sign that she wasn't doing
20   perfect.  Remember?  You just answered that question for
21   counsel, do you remember?
22   A.   Yes.
23   Q.   When did that happen?  Look at your first sentence in
24   that paragraph.
25   A.   Yes.
```

1    Q.   Did that happen when she was in high school?

2    A.   Yes.

3            MR. BONVENTRE:  Thank you.  Nothing further.

4                FURTHER REDIRECT EXAMINATION

5    BY MR. PETRU:

6    Q.   Did Ms. Torjusen relate similar experiences she had

7    with teachers and students while she was in college during

8    the sessions with you?

9    A.   Yes.

10           MR. PETRU:  Thank you.  Those are all the

11   questions I have.

12               FURTHER RECROSS-EXAMINATION

13   BY MR. BONVENTRE:

14   Q.   Apparently, she was having these problems before the

15   train accident, correct?

16   A.   You are too far away from the microphone.

17           MR. BONVENTRE:  I withdraw the question, Judge.

18           THE COURT:  Thank you, Doctor.  You are excused.

19           THE WITNESS:  You're welcome.  Thank you.

20           MR. PETRU:  We will go to a live witness at this

21   point.

22           THE COURT:  Call your next witness.

23           MR. PETRU:  I would like to call Dr. Meghan

24   Spohr.

25           THE COURT:  If you would step up to the bench,

```
 1    hold up your right hand, the oath of witness will be
 2    administered.
 3
 4                        MEGHAN SPOHR,
 5       having been sworn under oath, testified as follows:
 6            THE COURT:  Thank you.  Please have a seat here
 7    at the witness chair.
 8                     DIRECT EXAMINATION
 9    BY MR. PETRU:
10    Q.   Good afternoon, Dr. Spohr.
11    A.   Good afternoon.
12    Q.   What kind of medical practice do you have?
13    A.   I work in outpatient medicine.
14    Q.   Describe the practice, if you will, please.
15    A.   In the last about 15 years, I have seen a range of
16    and age of patients from birth until death.  I do internal
17    medicine and pediatrics and carry board certifications in
18    both.
19    Q.   Where did you go to medical school?
20    A.   University of Kansas.
21    Q.   And where did you do your residency?
22    A.   University of Michigan.
23    Q.   When did you first meet Emily Torjusen?
24    A.   Exact date --
25    Q.   We don't need the exact date.
```

1    A.   Over -- I would say over eight years ago.

2    Q.   Your deposition and medical records indicate it was

3    2008.

4    A.   Okay.

5    Q.   Is that consistent with your best recollection?

6    A.   Yes, it is.

7    Q.   She was about eleven years old?

8    A.   Yes.

9    Q.   From the time that she was eleven, did you continue

10   seeing her as a pediatric patient?

11   A.   I did.

12   Q.   And did you continue into her early adult years?

13   A.   I did.

14   Q.   The records that we have indicated that you saw her

15   on December 22nd of 2017.

16   A.   That is correct.

17   Q.   And you are in a unique position as a professional

18   who knew her both before and after the incident, the

19   crash -- train crash?

20   A.   That's correct.

21   Q.   I will ask you questions about your diagnosis,

22   treatment.  Will all of your answers be to a reasonable

23   degree of medical probability?

24   A.   Yes, they will.

25   Q.   Let's start off kind of at the end.  Can you share

1   with the jury, please, your observations of Emily before

2   the incident, comparing them to your observations of her

3   afterwards?

4   A.   When I saw Emily as a pediatrician for well-child

5   visits and for various complaints, it always struck me

6   that Emily was fairly reticent, shy, not really much of a

7   complain -- didn't really complain much.

8        When I saw Emily after her accident, most recently

9   the last two years, she was anxious, definitely not

10  reticent, tended to blurt things out, had a hard time

11  stopping talking sometimes.  Didn't really seem -- there

12  was a marked difference.

13  Q.   As a result of the train accident, did you formulate

14  any opinions or conclusions from your position as an

15  internal medicine doctor and pediatrician as to what

16  injuries Emily sustained as a consequence of the train

17  accident?

18  A.   I thought her complaints and behavior were very

19  consistent with post-traumatic stress disorder, as well as

20  post-concussive syndrome as a direct result of the

21  concussion with loss of consciousness due to a traumatic

22  brain injury sustained in the crash.

23  Q.   What are the bases for that opinion -- those

24  opinions?

25  A.   Mainly observations and diagnostic testing, as well

1  as my knowledge as to post-concussive syndrome, as well as

2  PTSD, and complaints that the patient, Emily, brought up,

3  as well as my observations.

4  Q.  Your knowledge and understanding of post-concussive

5  syndrome and PTSD, how did you gain knowledge or

6  understanding of those two conditions?

7  A.  Both from reading and treating patients.

8  Q.  Something as a general practitioner, as an internal

9  medical specialist, and as a pediatrician you are trained

10  to look for signs or symptoms consistent with those two

11  diagnoses?

12  A.  Yes, we are.  We do a lot of, especially in

13  pediatrics, concussion treatment.

14  Q.  You responded that you formed these opinions based on

15  both talking to Emily and observing her.  Let's start with

16  the observing her.  What sort of observations have you

17  made of Emily that help inform your decision or your

18  diagnoses?

19  A.  I would say more particularly Emily was never an

20  anxious person before the incident.  So she showed signs

21  of anxiety, as well as expressed that that was a problem.

22  She complained of trouble concentrating.  And I saw her

23  for years.  She didn't have trouble with school, was never

24  diagnosed with any attention deficit disorder, and all of

25  a sudden she is having trouble concentrating, getting

1   schoolwork done, just actually with activities of daily

2   living, organizing her life.  So that's what I would say I

3   would be observing.

4   Q.   Did you -- with regard to the issues that you just

5   described, did you prescribe for her any medications?

6   A.   I did.

7   Q.   What did you prescribe?

8   A.   The first medication I prescribed was a medicine that

9   helps people concentrate that is used frequently in

10  patients who have trouble concentrating with

11  post-concussion syndrome, but also with attention deficit

12  disorder called Concerta.  The second medication I

13  prescribed was a medicine to help deal with anxiety, which

14  was Citalopram.  The third medicine I prescribed was

15  another medicine specifically for PTSD, although it can be

16  used for anxiety, which is called Buspar.

17  Q.   From time to time, did she take those medications

18  from your understanding?

19  A.   To my understanding, she did.

20  Q.   Did she at times report she couldn't take them for

21  various reasons?

22  A.   Yes, she did.

23  Q.   And what were those?

24  A.   One of them was that she was traveling overseas and

25  wasn't sure that the medicine was permitted in other

1   countries.  Initially, she actually was hoping not to have

2   to take medications, so she didn't want anything for it.

3   But after trying without it, then she agreed to try the

4   medication.  So those are the two reasons I think she

5   expressed to me.

6   Q.  Did you ever experience any emotional disregulation

7   or emotional lability with Emily since the accident?

8   A.  Yes.  There was a visit I believe second from the

9   last in 2020 where she definitely had emotional

10  disregulation.  She seemed quite upset, got red in the

11  face, cursed a little bit, which is not at all like Emily,

12  during the visit.  So, yes.

13  Q.  Did she cry?

14  A.  Yes.

15  Q.  I would like to go through your visits with her

16  starting with the first one post-incident, December 22nd,

17  2017.  In it, what did you report in terms relative to the

18  train accident?  I know your records have other nonrelated

19  medical issues, so we are not going to go through any of

20  those.  But relative to the crash, what were your

21  observations on December 22nd of 2017?

22  A.  Her arm was in a sling due to a clavicular fracture.

23  She had several lacerations, some of which had stitches

24  and required removal.  And she had some light sensitivity

25  and had complained of a headache.

1    Q.   What is the significance of light sensitivity?

2    A.   It goes with headache.   Headache or concussion.

3    Common symptom.

4    Q.   You reported that she had a consistent headache at

5    that time?

6    A.   Yes.

7    Q.   What was the significance of the fact that the

8    headache was consistent?

9    A.   It's just common if you have a significant enough

10   concussion to have your head hurt for a long period of

11   time.

12   Q.   By the way, have you had patients who have had

13   concussions -- combination of concussions and PTSD before?

14   A.   Yes, I have.

15   Q.   Have you had patients who have had concussion and

16   PTSD who got better?

17   A.   Yes.

18   Q.   Have you had patients who have had concussion and

19   PTSD who have not?

20   A.   Yes, I have.

21   Q.   You noted -- and because of the electronic medical

22   records, I wasn't quite sure when you wrote this.   But at

23   one point you said, "So far no complaints of concentrating

24   yet."   What did you mean by that?   I think that was on the

25   first visit.

1  **A.**  It's common -- I have noted, and also in the

2  literature, that patients who get concussions do have

3  trouble with concentration.  So I would like to preface

4  and like to at least put this in chart notes.  Sometimes

5  insurance plans don't like to cover medication for

6  concentration, i.e., Concerta, especially if the

7  individual does not have a diagnosis of attention deficit

8  disorder maybe before the age of 18.  So I like to keep --

9  to at least put it in my records whether or not that is a

10  complaint.  It is something that I am not surprised if I

11  hear.

12  **Q.**  Did you expect that based on her symptomology and

13  your observations Emily might be at risk for developing

14  concentration problems?

15  **A.**  I did, because she -- she had a pretty significant

16  head injury and lost consciousness.  And she was trying to

17  go to college.  So I was suspicious it might happen.

18  **Q.**  And did that inform your plan where you wrote, quote,

19  "It would not be unusual to have trouble with

20  concentration and chronic headache for a couple of months

21  with post-concussion syndrome"?

22  **A.**  Yes.

23  **Q.**  And when did you write that, if you remember?

24  **A.**  That was, I believe, in 2017, 12/22.

25  **Q.**  And did you, in fact, based on your subsequent

1    history and discussions with Emily, find that she did

2    develop problems with concentration, and she did have

3    persistent headaches for a couple of months, if not

4    longer?

5    A.   Yes, she complained of that.

6    Q.   Did you discuss with Emily the anticipated problems

7    that you saw that she might have with school as a result

8    of her head injury and PTSD

9    A.   Yes, we did discuss that.

10   Q.   Actually -- let me back up a little bit.  Initially,

11   was your primary focus in this regard on the concussion

12   and the sequelae of the concussion rather than focusing on

13   PTSD early on?

14   A.   Right.  The focus was primarily on concussion.

15   Q.   What did you tell her, what did you do relative to

16   your anticipated problems that she would have with school?

17   A.   So we talked a little bit about medication, which

18   should be in the record, about gabapentin that I use

19   sometimes for the head pain because analgesics don't work

20   that well, and we wanted to avoid any sort of significant

21   narcotics.

22       I also talked about medications to help her with

23   concentration, and talking to her college about perhaps

24   getting accommodation if she had trouble with her classes.

25   It is -- you know, it is hard to concentrate when your

1    head hurts or you have trouble concentrating.

2    Q.   And did you write such a letter for her?

3    A.   I did.

4    Q.   I believe it is an exhibit.  I don't have it right in

5    front of me.  As part of your practice, do you communicate

6    with patients periodically through phone messages or

7    emails or similar text correspondence?

8    A.   Yes, we do.

9    Q.   Did you receive a communication from Emily on

10   January 14th, 2018, regarding her condition?

11   A.   I did.

12   Q.   Do you have that in front of you?

13   A.   I do.

14   Q.   Can you get that?

15   A.   It may be a minute here.  Okay.

16   Q.   Can you read what she wrote to you on that date?

17   A.   I'm reading through the deposition.  Sorry.  This is

18   a lot of pages here.  Okay.  I have one from later.  She

19   said -- I don't have the exact -- sorry.

20   Q.   Let me help you.  I've got it.  January 14th, 2018:

21   "I'm having trouble focusing in class and when reading my

22   books.  I keep getting up and doing other things or my

23   mind just wanders.  Overall the headaches are pretty

24   manageable, though sometimes I get big mood swings, but I

25   am having trouble waking up in the mornings.  Is there

1   anything I can do to try to fix these?"  That's the end of
2   message.
3   A.   Yes.
4   Q.   Did you respond to her?
5   A.   I did, and suggested she try Concerta that we had
6   talked about in December.
7   Q.   Can you go ahead and read what you wrote to her or do
8   you want me to do that, too?
9   A.   Yeah, if you could.  I have the next one, but not
10  this one.
11  Q.   All right.  On the 17th you wrote:  "Hi, Emily.  You
12  can try taking medication for attention deficit
13  disorder/trouble cont, attention deficit disorder if the
14  headaches were okay.  It is pretty typical of someone with
15  a concussion and can take months to go away.  Sometimes
16  this medication is helpful and sometimes it is not.  I
17  would be happy to call some of these medications, Concerta
18  or Adderall, in for you if you would like to try."
19       Did I read that --
20  A.   You did.
21  Q.   Is that consistent with your memory?
22  A.   That's correct.
23  Q.   In March of 2020, I believe timed during a break when
24  she was going to come back from school, you had some
25  discussion with her mother, correct?

1    A.   Yes.

2    Q.   And you knew her mother?

3    A.   I did.

4    Q.   And what was the interaction with her mother about in

5    March of 2018?

6    A.   Wanted to have neuropsych testing --

7    neuropsychological testing, because she was having

8    difficulty with concentration at school and wanted to

9    see -- get concrete data as to what could be wrong.

10   Q.   Neurological -- is neuropsychological testing

11   something that you order periodically on behalf of your

12   patients?

13   A.   I do.

14   Q.   Did you have any quarrel or disagreement or concerns

15   about Patty Torjusen, Emily's mom, making that request on

16   Emily's behalf to you?

17   A.   No, I did not.

18   Q.   To whom was she referred?

19   A.   Initially, she had requested an individual in

20   Seattle, but I think she was home on spring break, and

21   Scovel Psychological in Vancouver had openings and so she

22   was referred there.

23   Q.   Are you familiar with Scovel Psychological in

24   Vancouver?

25   A.   I am.

1    Q.   And have you made referrals directly to Scovel

2    Psychological in the past?

3    A.   Yes, frequently.

4    Q.   And did you in this case?

5    A.   Yes, I did.

6    Q.   Did you at some point receive the report from Scovel

7    Psychological?

8    A.   I did.

9    Q.   What did that inform you of?  What reaction did you

10   have when you got that and reviewed it, Dr. Scovel's

11   report?  We will be hearing from her soon.

12   A.   It seemed consistent with post-concussive syndrome

13   and difficulty with concentration, which is -- a definite

14   concentration deficit, is what they noticed.

15   Q.   Did you get directly involved in Emily's

16   psychological care at that time?

17   A.   No, I did not.

18   Q.   Is that something that you do or don't do or it

19   depends?

20   A.   It depends.

21   Q.   You -- I didn't establish this.  Where are your

22   offices?

23   A.   In Vancouver.

24   Q.   And where was Emily at this time?

25   A.   Seattle.

1    Q.   Does that create some issues for you and problems

2    with referral and treatment?

3    A.   Yes, it did.

4    Q.   Do you have other patients who are peds that you saw

5    and became young adults and went off to school and you are

6    trying to figure out what to do for them from tens or

7    hundreds or thousands of miles away?

8    A.   Yeah, we make a lot of referrals to other states.

9    Q.   I believe the records indicate you next saw her on

10   July 16th, 2018, correct?

11   A.   Um-hum.

12   Q.   Do you have that in front of you?

13   A.   I do.

14   Q.   When you saw her on July 16th of 2018, what were her

15   subjective complaints?

16   A.   Sorry.  Let me get through my papers here.  I believe

17   she was complaining that her headache had improved, but

18   she still had issues with concentration.

19   Q.   Do you have them in front of you?

20   A.   No.  Here we go.  Yes.

21   Q.   I have notes where you noted that she had anxiety

22   associated with PTSD, headaches --

23           MR. BONVENTRE:  Objection, your Honor.

24           THE WITNESS:  I've got it.

25

```
 1   BY MR. PETRU:
 2   Q.   Thank you.
 3   A.   Do you want me to read --
 4   Q.   What were the subjective complaints at that time?
 5   A.   Anxiety.  She didn't feel that anxiety was bad enough
 6   that it required medication.  She had some issues
 7   consistent with post-concussive syndrome still because she
 8   had a lot of difficulty concentrating, but remarked that
 9   Concerta was helpful when she took it during her last
10   semester, although school was still very difficult.  She
11   was planning to go abroad, so she is not sure if she can
12   continue taking the medication, so she was concerned about
13   that.  She was noting that her headaches had improved.
14   And that she was having some issues with memory --
15   short-term memory, such as she went to workout the other
16   day and forgot that she left clothes in her car, as an
17   example.  So those were her complaints.
18   Q.   Did she report any sleep problems and nightmares at
19   that time?
20   A.   Yes.  She did complain that she occasionally had
21   difficulty sleeping with nightmares.
22   Q.   And did she report depressive symptoms?
23   A.   She did report some.  There is a typo on this that
24   says she does have noted depression -- some noted
25   depressive symptoms, is what that's supposed to say.
```

1    Although it does say she has no depressive symptoms.

2    Q.   So the answer is she did have depressive symptoms?

3    A.   Yes.

4    Q.   Did she report difficulty multitasking?

5    A.   Yes.

6    Q.   And as you said, you discussed with her medications

7    or possible medications she may or may not be able to take

8    to France?

9    A.   Right.  Specifically stimulants.  Oftentimes

10   stimulants in other countries are not accepted.

11   Q.   And then she is off and she is studying in France,

12   and as the jury has understood or will understand, she was

13   in France, and then Egypt for the better part of 2018 and

14   into 2019, and then she came by and saw the office in

15   September of 2019 for a routine physical examination,

16   correct?

17   A.   Yes.

18   Q.   And in that I noted that there was occasional

19   references to twinges in shoulder and collarbone.  Did I

20   read that correctly?

21   A.   Yes.

22   Q.   What significance did that have, that year and a

23   half -- actually closer to two years post-incident she

24   still had some twinges in the shoulder and the collarbone?

25   A.   Those probably directly related to the clavicle

1   fracture.  Most of the time you don't fix clavicle

2   fractures.  You just let them heal on their own, which

3   unfortunately they don't always heal exactly like they are

4   supposed to and cause some ligament damage.  It is not

5   necessarily unusual that it continued to bother her.

6   Q.   That didn't surprise you that two years later or so

7   she still had complaints in that area?

8   A.   No.  Hum-um.

9        THE COURT:  We will take our afternoon recess at

10  this point.  Fifteen minutes.  Please do not discuss the

11  case.

12       (At this time, the jury exited the courtroom.)

13       THE COURT:  You can step down.  Return in 15.

14       (Recessed.)

15       THE COURT:  You may resume your seat, and we will

16  bring in the jury.

17       (The following occurred in the presence of the jury.)

18       THE COURT:  Everyone, please be seated.

19  Mr. Petru, you can resume.

20       MR. PETRU:  Thank you, your Honor.

21  BY MR. PETRU:

22  Q.   Dr. Spohr, home stretch.  We will let you get out and

23  drive for a while.  We last spoke of the September 23rd,

24  2019 interaction.  I would like to go to October 9th,

25  2020.  Let me know when you have that in front of you.

1    A.    I do.

2    Q.    What occurred on that day?

3    A.    The patient came in for a physical.

4    Q.    And while there, did you speak to her about problems

5    she was having associated with the sequelae of the train

6    wreck?

7    A.    I did.

8    Q.    And what did she report?

9    A.    She said that she actually was having trouble with

10   stress, difficulty paying attention, as well as she had

11   noted a personality change.  She said she was -- she was

12   losing all of her contact with her friends.  She tends to

13   blurt out things without thinking about it, and afterwards

14   think, why did I say that?  That had led to a lot of

15   misunderstandings and loss of friendships.

16         She also had trouble, she mentioned, controlling her

17   life, as well, just organizational wise, and that had led

18   to a lot of increased stress and anxiety and decreased

19   enjoyment in doing things.  She asked for some names of

20   counselors that she might be able to get through her

21   insurance, and wasn't able to get in.

22         This was during the pandemic, and trying to get --

23   when the pandemic was at its height, and it was difficult

24   to get a counselor.  And she was having a hard time doing

25   so.

1    She was having a hard time -- like she really enjoyed

2  her job, but getting there and getting motivated, she

3  would sit in her car and cry.  Once she actually went in

4  to do her job, she was fine with it, but it was the

5  getting there that was hard.

6    She didn't have a lot of headaches still.  She missed

7  a whole semester of college.  She said she has just not

8  been able to keep up, not being able to concentrate.

9    And she had mentioned to me that because she was

10 living in Seattle, she had seen some providers up there

11 and had been prescribed some antidepressants, and that it

12 didn't really seem to work for her, at least the ones she

13 had been prescribed.

14    She wasn't talking to her father, with whom she had a

15 good relationship before this, but did mention she had a

16 relationship with her mother and her sister.

17         THE COURT:  If you would, when reading just go a

18 little slower so our court reporter can pick it up.  Thank

19 you.

20         THE WITNESS:  I apologize.

21 BY MR. PETRU:

22 Q.  Did you list a diagnosis with regard to the train

23 incident on that day?

24 A.  Yes.  I listed a diagnosis of PTSD, as well as

25 post-concussive syndrome.  Along with the PTSD, I thought

1   she had more depression than sometimes you might see with

2   strictly a diagnosis of PTSD, and recommended medication.

3   Q.   Did you write "major depressive disorder"?

4   A.   Not on that visit, no, I did not.

5   Q.   You prescribed -- or indicated a prescription for

6   Xanax, Buspar, Lexapro and wanted her to see a counselor

7   if she could, correct?

8   A.   Yeah.  The Lexapro was something she had been

9   prescribed through providers in Seattle.  And that was one

10  of the ones she had mentioned didn't work for her.  So I

11  had prescribed Citalopram and Buspar at that time.

12  Q.   We know she saw a counselor at the end of 2020 into

13  2021, Donna Johns.  Did you facilitate her seeing

14  Dr. Johns, or was that someone she was able to find

15  through different sources?

16  A.   That was able -- that was somebody she was able to

17  find through alternative sources.  One of the things, to

18  clarify, in medicine that we don't typically do, insurance

19  allows patients to get their own counselors.  It is

20  difficult to actually make a referral and have someone go.

21  That is not -- we can make a recommendation, but it is not

22  referral based.

23  Q.   Did you find in October 2020, least we forget, that

24  was our seventh month, eighth month of COVID, as a

25  practitioner, did you find that patients were having a

1   hard time finding counselors at that time?

2   A.   Extremely.

3   Q.   You next had an encounter with her May 17th of 2021,

4   correct?

5   A.   That's correct.

6   Q.   And what happened on that occasion?

7   A.   She was in the office for follow-up.  Some of the

8   issues were not related to --

9   Q.   I am just asking about issues related to the train

10  crash.

11  A.   She specifically said her headaches she continued to

12  have infrequently, but she wasn't someone who had

13  headaches before.  But she wasn't having consistent

14  headaches.

15  Q.   She was having headaches but not as consistent as she

16  had back in December of '17?

17  A.   Yes, of 2017.  Yes.  She still had trouble

18  concentrating, she mentioned.  And she did feel that the

19  Citalopram was useful for the PTSD and depressive

20  symptoms.

21  Q.   I asked you earlier about Dr. Scovel's report.  You

22  got that sometime after Dr. Scovel did the initial report

23  back in 2018.  Did you also get -- and I believe our

24  office sent it to you, Dr. Filler's report?

25  A.   I did.

1    Q.  And did Dr. Filler's report -- first of all, had you

2    already made a diagnosis of PTSD and post-concussive

3    syndrome before you got Dr. Filler's report?

4    A.  Yes.

5    Q.  Was it consistent with or inconsistent with the

6    findings in his report?  Were they consistent or

7    inconsistent with your findings?

8    A.  Entirely consistent.

9    Q.  I have a note here.  This is from a discussion that

10   we had I believe in your deposition about the effect of

11   appointments or somebody trying to keep appointments who

12   has the kind of anxiety Emily has exhibited.  What

13   problems does that create?

14   A.  People with PTSD and chronic anxiety or depression

15   with more anxious features have more anxiety about more

16   appointments.  So the more that gets layered on them, the

17   more they are required to do, the idea of going into an

18   unfamiliar place causes more anxiety, which then they tend

19   to avoid.  So you have to be somewhat limited and careful

20   in what you target.  Too many appointments and they won't

21   go at all.

22   Q.  Thank you.  I think you said in your deposition, you

23   used the term "a huge incidence of noncompliance if there

24   is overload"?

25   A.  Yes.

1  Q.   What do you mean by that?

2  A.   The number of patients who stop their medication, who

3  stop following up with providers, who don't come in, is

4  significant.

5  Q.   Let me unpack that a little bit.  Is it significant

6  in specific populations, whether they are adolescents or

7  young adults or older adults?  Is there a correlation

8  between age, the nature of the injuries, the noncompliance

9  because of the nature of the injuries?  I guess those are

10  all questions, and you can take whichever ones you want.

11  A.   Well, older patients tend to come in more.  They are

12  retired.  And then younger patients tend to have a feeling

13  of, I can just get over it more so than older patients do.

14  Also, quite honestly, older patients like the doctor more,

15  just in general.  I am older, so --

16  Q.   No, you're not.  I will be the judge of that.

17       With regard to therapists and patients such as Emily,

18  not in terms of coming to see you as a PCP, but in terms

19  of seeing a psychologist or psychiatrist, does an increase

20  of appointments in that realm also trigger this high

21  incidence of noncompliance based on your experience?

22            MR. BONVENTRE:  Objection.

23            THE WITNESS:  Do I go ahead and answer?

24            MR. BONVENTRE:  I will withdraw.

25            THE COURT:  The objection is overruled.

1          THE WITNESS:  If I understand the question

2    correctly, yes, they tend not to go to counseling.

3    BY MR. PETRU:

4    Q.   You indicated in your deposition that you believe

5    that Emily could benefit from a wide variety of therapies

6    and counseling if she can get to a point where she can do

7    it.  Fair?

8    A.   Yes.

9    Q.   What are the different modalities that you offered in

10   your deposition?

11   A.   Well, I mentioned cognitive behavioral therapy as an

12   option, just having a counselor to offload.  So regular

13   counseling.  Cognitive behavioral therapy, I thought she

14   would benefit from.  I also thought she would benefit from

15   ongoing medication.  But she was doing fairly well on the

16   options that we had done, so I didn't at that point feel

17   that psychiatry was indicated.

18   Q.   You also indicated occupational therapy.  What is

19   that?

20   A.   Yeah.  Sometimes occupational therapy can help people

21   with post-concussive syndromes and PTSD with

22   organizational, with life skills, with -- sometimes even

23   we have an occupational therapist that works a little bit

24   with vestibular therapy, which helps a little bit post

25   concussion -- when they specifically have vision issues or

1    dizziness or ongoing headaches.

2    Q.   Do you work with speech/language pathologists, as

3    well?

4    A.   We do.

5    Q.   Would speech/language pathology be an appropriate

6    area if Emily had the ability and -- the ability to get to

7    appointments and see appointments if there is an SLP?

8    Would that be of help?

9    A.   I didn't think in Emily's case it would, no.

10   Q.   Why not?

11   A.   She didn't seem to have -- it wasn't the speech, it

12   was controlling the speech.  It was more impulse control.

13   It was more inappropriate social behavior, saying things

14   that she should -- we think when we see somebody, but we

15   don't say because it is rude.  That is not going to get

16   better with speech therapy.  Speech therapy helps people

17   post-concussion when they stutter or they have

18   word-finding difficulties, of which I have seen, but Emily

19   was not one of them.

20   Q.   She has excellent word skills, correct?

21   A.   Yes.

22   Q.   That part of her brain was not affected?

23   A.   No.

24   Q.   When you last saw her, did she still exhibit signs

25   and symptoms consistent with your initial findings back on

1   December 2017?

2   **A.   She did.**

3   **Q.   Based on the time that had passed, four and a half**

4   **years or so -- four years when you last saw her, did you**

5   **expect that she would have significant difficulties going**

6   **forward based on the chronicity of her problems?**

7   **A.   Yeah, I did.**

8            MR. PETRU:  Thank you.  Those are all the

9   questions I have.

10                       CROSS-EXAMINATION

11  BY MR. BONVENTRE:

12  **Q.   Good afternoon, Doctor.  How are you?**

13  **A.   Good.  Thank you.**

14  **Q.   Thank you for coming in.  Just one quick question**

15  **before we start, what semester of college were you told**

16  **that she missed?**

17  **A.   She just said she missed a semester of college.  As**

18  **an MD, I am not going to ask specifically as far as**

19  **education is concerned, so I don't know.  I don't know if**

20  **she didn't complete that semester completely or if she**

21  **missed the whole semester, and I didn't clarify.**

22  **Q.   I'm not saying that you should have.  My question is:**

23  **Do you know if, in fact, she did miss a semester of**

24  **college?**

25  **A.   I do not.**

1  Q.  Doctor, you're at the Vancouver clinic; is that

2  correct?

3  A.  Yes, it is.

4  Q.  And the Vancouver -- you're not the only doctor,

5  obviously, at the Vancouver clinic, correct?

6  A.  No.

7  Q.  There are doctors in different departments, as well?

8  A.  Yes, there are.

9  Q.  So there is an orthopedic department?

10  A.  Yes, there is.

11  Q.  And Ms. Torjusen was actually seen on a couple of

12  occasions in the orthopedic department, correct?

13  A.  She was.

14  Q.  And you had those records -- as the internist and the

15  primary care physician, you have the records in front of

16  you?

17  A.  I do not have those records in front of me.

18  Q.  So you didn't bring the records with you from the

19  visits that she has had post-accident when she saw the

20  orthopedist?

21  A.  I brought the records with me, my records, not other

22  people's records.  I was not told to do so.

23  Q.  You are aware that she was treated at the Vancouver

24  clinic for physical injuries early on that she sustained,

25  correct?

```
 1    A.    Yes.

 2    Q.    Did you review those records?

 3    A.    Yes.

 4    Q.    Although you don't have them with you now, you did

 5    review them.  Were you aware -- I take that back.  You

 6    were aware, Doctor, that histories were taken every time

 7    she came to the Vancouver clinic, and a physical exam was

 8    done every time she came to the clinic, and a review of

 9    systems was done every time she came to the clinic,

10    correct?

11    A.    Yes.

12    Q.    And a "review of systems" is what is bothering you;

13    is that fair to say?

14    A.    Within reason, yes.

15    Q.    And a physical exam is you do a physical exam, and

16    there is a form that is part of the records basically from

17    head to toe so to speak; is that correct?

18    A.    Yes.

19    Q.    And it includes neurological, how the patient is

20    doing neurologically, and it includes how is the patient

21    doing psychologically, psychiatrically, correct?

22    A.    Within reason, yes.

23    Q.    Well, it is not a question within reason.  That's the

24    form.  The form says "neurologic," and the doctor fills

25    something out based on his or her exam, and the form says
```

1    "psychiatric," and the doctor fills something out based on

2    his or her exam?

3            MR. PETRU:  Objection.  Speculation.

4            THE COURT:  Overruled.

5            THE WITNESS:  Yes.  But that is dependent on the

6    various difference.  I agree with you.  I just wanted to

7    clarify that sometimes emphasis is put on different parts,

8    depending on which clinic you're at.  For example,

9    orthopedics doesn't care as much about psychiatric issues.

10   They get -- for example, you go to urgent care, they get

11   the height wrong a lot of times.  Yes, within reason.

12   Yes, I agree with you.

13   BY MR. BONVENTRE:

14   Q.  Are you saying that, Doctor, because you are fully

15   aware that when she went to the orthopedic wings

16   throughout her four years after the accident, on each and

17   every occasion the neurological exam was normal and the

18   psychiatric exam was normal?

19   A.  No.

20           MR. PETRU:  Objection.  Assumes facts not in

21   evidence.

22   BY MR. BONVENTRE:

23   Q.  Is that in fact what happened, Doctor, that the

24   neurological exam was normal every time and the

25   psychiatric was normal every time?

```
 1              MR. PETRU:  Objection.  Assumes facts not in
 2   evidence.
 3              MR. BONVENTRE:  I'm asking.
 4              THE COURT:  Ask one question at a time.
 5   BY MR. BONVENTRE:
 6   Q.   Is it correct that the neurological exam was normal?
 7              MR. PETRU:  Objection.  Assumes facts.
 8              THE COURT:  You can lay a foundation.
 9   BY MR. BONVENTRE:
10   Q.   Neurological examinations were done each and every
11   time the patient came into the clinic, correct?
12   A.   No.
13   Q.   Okay.  Did doctors indicate each and every time the
14   patient came to the clinic that they had, in fact, done a
15   neurological exam, and they gave a response as to what it
16   was?
17              MR. PETRU:  Objection.  Assumes facts.
18              THE COURT:  She indicated she reviewed the
19   medical records.  The objection is overruled.
20              THE WITNESS:  I don't remember the records, so I
21   can't state for sure.  But as far as I recall, the
22   neurologic exam was not abnormal as stated in those
23   records.
24   BY MR. BONVENTRE:
25   Q.   And each time those other doctors saw the patient
```

1  they wrote "alert and oriented," "mood normal," and things

2  like that.  Do you recall that, sir -- Doctor?

3        MR. PETRU:  Objection.  Assumes facts.

4        MR. BONVENTRE:  I am asking if she reviewed the

5  records.

6        THE COURT:  Overruled.

7        THE WITNESS:  I don't remember that one way or

8  the other, honestly.

9  BY MR. BONVENTRE:

10  Q.  It would be fair to say that multiple x-rays were

11  taken of the pelvis and the clavicle and the shoulder, and

12  all of those x-rays -- each and every one of them -- were

13  negative with the exception of the clavicle, correct?

14  A.  That's correct.

15  Q.  And it also would be fair to say that the clavicle

16  had what doctors call a minimally displaced fracture,

17  correct?

18  A.  That's correct.

19  Q.  And a minimally displaced fracture, Doctor, means

20  that the bones are very close, they are not far apart; is

21  that fair to say?

22  A.  Yeah, that's fair to say.

23  Q.  And that is a good prognosis for healing when the

24  bones are very close and nondisplaced; is that fair to

25  say?

```
 1    A.   That's fair to say.
 2    Q.   And in fact, the only treatment that Emily had for
 3    the clavicle was she wore a sling for a couple of weeks,
 4    correct?
 5    A.   That's correct.
 6    Q.   And then the clavicle healed, correct?
 7    A.   That's correct.
 8    Q.   And she had x-ray of her left shoulder, and that was
 9    completely normal, correct?
10    A.   That's correct.
11    Q.   The reality was, after a short period of time, you
12    were not treating her for any physical injuries; isn't
13    that correct?
14    A.   That's correct.
15    Q.   The first time you saw Emily post accident, after the
16    derailment, Doctor, was it the 31st, or was it the 22nd?
17    A.   It was the 22nd.
18    Q.   Was there a full record made of the 22nd, or was it
19    an abbreviated record in reference to you, Doctor?
20    A.   I'm sorry.  I don't understand.
21    Q.   Yeah, because it is a lousy question, that's why you
22    don't understand.
23         On the 31st, you have notes of your treatment, on
24    December 31st of 2017, correct, Doctor?
25    A.   No.  That's -- it's actually from the 22nd.  That's
```

1    the problem with Epic.

2    Q.   That's what I am asking.

3    A.   Yes.

4    Q.   So what I am reading as the 31st and only a partial

5    entry of the 22nd, is all of the 22nd?

6    A.   That's all of the 22nd, yes.

7    Q.   Thank you for clearing that up, Doctor.  I appreciate

8    that.

9         So you saw the plaintiff for the first time four days

10   after the accident -- four or five days after the

11   accident?

12   A.   Yes.

13   Q.   And prior to that, you hadn't seen the plaintiff for

14   about -- I think it was about a year and a half; is that

15   fair to say?

16   A.   Yeah, that's fair to say.

17   Q.   And I think, generally speaking, you were seeing her

18   prior to the incident when she was younger, you were

19   seeing her every year and a half, two years; is that fair

20   to say?

21   A.   That's fair to say.  She didn't come in often, no.

22   Q.   So I'm going to go to the notation, if you could,

23   that's in my thing; it says the 31st.  It is actually

24   December 22nd, 2017, correct?

25   A.   That's correct.

1   Q.   So this is a few days after the incident, correct?

2   A.   That's correct.

3   Q.   And you noted that she had abrasions on the forehead,

4   which required three stitches, remember?

5   A.   Yes, I do.

6   Q.   And is it correct that -- did you remove the stitches

7   at that time?

8   A.   I did.

9   Q.   And some of them were already dissolving by that

10   time, correct?

11   A.   Yes, they were.

12   Q.   And you were aware that she had had multiple CT scans

13   while she was in the hospital, correct?

14   A.   Yes.

15   Q.   Had you ever reviewed the hospital records that she

16   had gone to for the accident?

17   A.   Yes.

18   Q.   So you were aware she had multiple CT scans and

19   x-rays, including a CT scan of the head and all the CT

20   scans, all the x-rays were all negative with the exception

21   of the minimally displaced clavicle, correct?

22   A.   Yes.

23   Q.   And in fact, Doctor, you wrote in here, quote, "She

24   had a bit of bruising but was otherwise lucky other than a

25   broken clavicle."  Do you see that?

```
 1   A.   Yes.
 2   Q.   And in addition, she did not request pain pills,
 3   correct?
 4   A.   Correct.
 5   Q.   So four days after the accident, she is not
 6   requesting any pain pills, correct?
 7   A.   Correct.
 8   Q.   And you indicated that she had, in your words, a
 9   fairly consistent headache, but not yet concentration
10   issues, correct?
11   A.   Correct.
12   Q.   And there was nothing surprising about the fact that
13   she had headaches since she had a concussion, correct?
14   A.   Correct.
15   Q.   We don't -- you don't know how long Ms. Torjusen lost
16   consciousness, if at all; is that correct?
17   A.   I wasn't there so I wouldn't know if she lost
18   consciousness.  The records from the outside hospital said
19   she did, and the patient said she did.
20   Q.   All right.  But you don't know the length of time?
21   A.   No.
22   Q.   Now, she indicated to you that she had some mild
23   dizziness -- occasional mild dizziness and nausea, but
24   this was improving, correct?
25   A.   Correct.
```

1    Q.   You recommended Tylenol and Advil, correct?

2    A.   Correct.

3    Q.   If needed, correct?

4    A.   Correct.

5    Q.   And you told her at the time that considering that

6    she had had the concussion, it would be possible or not

7    unusual that she might have symptoms from the concussion

8    from a few weeks to a few months, correct?

9    A.   Actually, I said a couple of months.  It doesn't say

10   anything about weeks.  A couple of months.

11   Q.   I'm sorry.  A couple of months.  And that is sort of

12   the normal course of the type of concussion she had,

13   correct, is a couple of months?

14   A.   Yes.

15   Q.   At that time, you did not refer Ms. Torjusen to a

16   neurologist, correct?

17   A.   No.

18   Q.   And a neurologist would be the subspecialty from

19   internal medicine.  You are an internist, correct?

20   A.   That's correct.

21   Q.   And internal medicine -- I am hearing my father --

22   internal medicine covers everything?

23   A.   That's correct.

24   Q.   But there is a subspecialty, neurology, that would

25   deal with injuries, including injuries such as a

1   concussion, correct?

2   A.   Actually, no, not correct.  May I qualify?

3   Q.   Of course.

4   A.   So, yes, neurologists tend to deal with brain

5   functions, nerves, head, yes.  In our area, neurologists

6   do not, as a general rule, see patients with concussion.

7   Q.   Okay.  Would internists?

8   A.   Yes.

9   Q.   Regardless, after the four days after Ms. Torjusen

10  got out of the hospital, you did not refer her to anyone

11  at that point?

12  A.   No.

13  Q.   And, in fact, I believe you testified in your

14  deposition that if you thought it was medically necessary

15  for you to refer her to anyone, you would have done it,

16  correct?

17  A.   Yes.

18  Q.   So you did not think it was medically necessary to

19  refer her to anyone; is that fair to say?

20  A.   At that time, yes.

21  Q.   Well, you never referred her to another doctor; isn't

22  that correct?

23  A.   That's correct.

24  Q.   So you never thought it was medically necessary to

25  refer her to another physician, correct?

1  A.   No.  No.

2  Q.   You just said you would have if you thought it was

3  medically necessary, and you also said you never did?

4  A.   Um-hum.

5  Q.   Is that correct?

6  A.   That's correct, because she had already seen one.

7  Q.   She had seen another physician or she had seen a

8  therapist?

9  A.   The neuropsychological testing.  If you want to

10 clarify, would I have sent her to another physician?  No.

11 Other medical services?  Yes, if she hadn't sought out the

12 care herself.

13 Q.   I want to talk about that.  Did the patient -- did

14 this individual come to you and say:  I want a

15 neuropsychological exam?

16 A.   No, she did not.

17 Q.   I mean, would it be fair to say most individuals --

18 most lay people aren't really familiar with what a

19 neuropsychologist is; is that fair to say?  Most of your

20 patients, would that be fair, Doctor?

21 A.   That would be fair.

22 Q.   Do you know where she got the idea of asking for a

23 referral to a neuropsychologist?

24 A.   I got the impression it was from her mother.

25 Q.   Do you know where her mother -- do you have any

```
 1    impression as to where her mom would have gotten the idea
 2    that she needed to see a neuropsychologist?
 3    A.   I do not.
 4    Q.   Now, you wrote a letter -- you had anticipated, look,
 5    you might have some problems with concentration, I
 6    recommend I write a letter to your college, correct?
 7    A.   If she needed it, yes.
 8    Q.   If she needed it.  So you weren't even sure she
 9    needed it at that point?
10    A.   No.
11    Q.   But you wrote a letter anyway, correct?
12    A.   Yes.
13    Q.   And you only wrote the one letter.  In the course of
14    the four years, you never renewed it, never sent another
15    letter?
16    A.   That's correct.
17    Q.   I apologize.  I am confused.  Did you give her a
18    prescription after that first visit?
19    A.   I did not.
20    Q.   Just so the jury understands, four days after the
21    accident there is no referrals and no prescriptions and no
22    other treatment actually recommended at that point,
23    correct?
24    A.   Recommended at that point, yes.
25    Q.   Now, the next time you see Ms. Torjusen is seven and
```

1  a half months later, correct?

2  A.   That's correct.

3  Q.   And that would have been on July 16th, 2018, correct,

4  Doctor?

5  A.   Yes.

6  Q.   So as far as you know, the patient goes seven and a

7  half months post-derailment without seeing another

8  physician; is that correct?

9  A.   That's correct.

10  Q.   And there was a specific reason why you saw her on

11  that visit, it's because -- excuse me, Doctor -- she

12  wanted a checkup because she was going to France, correct?

13  A.   Yes.

14  Q.   So she came to you specifically because "I'm going to

15  France so can I have a check up"; is that fair to say?

16  A.   And also to discuss some issues, yes.

17  Q.   And your understanding is that she was going to

18  France for a semester abroad, correct?

19  A.   That's correct.

20  Q.   At that point, there was a discussion about anxiety,

21  but she said she did not think -- she, Ms. Torjusen -- at

22  this point, seven months after the accident, said she

23  didn't think she needed medication for the anxiety, that

24  she was managing it herself, correct?

25  A.   That's correct.

1   Q.   So you didn't prescribe her anything for the anxiety,

2   correct?

3   A.   I did not.

4   Q.   And the main post-concussive symptom she was having,

5   she was having some problems concentrating, she said; is

6   that correct?

7   A.   That's correct.

8   Q.   Had you prescribed something at that point for the

9   concentration?

10  A.   Yes.

11  Q.   That's the Concentra (sic)?

12  A.   Concerta.

13  Q.   Concerta.  I apologize.  I take it you saw it as a

14  very positive sign that Ms. Torjusen now, seven months

15  after the incident, was going to go by herself away and

16  study in another country?

17  A.   I didn't really consider it a positive or negative

18  sign.

19  Q.   Certainly for a young individual to study abroad in

20  another country by themselves, that can cause some

21  anxiety, can't it?

22  A.   Yes.  I would say yes.

23  Q.   Anyway, you certainly had no objections to her going

24  to another country by herself to study, correct?  You had

25  no objections?

1  **A.**   Yeah, no objections at all.

2  **Q.**   By the way, she told you that she would be -- that

3  her headaches had improved actually, correct?

4  **A.**   Yes.

5  **Q.**   And in fact -- am I wrong, Doctor, I don't see

6  anything in your examination review of systems that she

7  was having any dizziness, any light sensitivity, any

8  balance problems; is that correct?

9  **A.**   That's correct.

10  **Q.**   So she was having -- in fact, I think she said -- and

11  she had no depressive symptoms, correct?

12  **A.**   That's correct.

13  **Q.**   And infrequent headaches, correct?

14  **A.**   Um-hum.

15  **Q.**   No visual changes, correct?

16  **A.**   Correct.

17  **Q.**   She said she complained about some mild back pain; is

18  that correct?

19  **A.**   That's correct.

20  **Q.**   And you said you didn't think it was related to the

21  accident, correct?

22  **A.**   Yes.

23  **Q.**   Now, she also discussed with you something that her

24  lawyers were suggesting, correct?

25  **A.**   Yes.

Q.  So at that visit, your patient told you that her

lawyer thought it would be a good idea to get a DTI,

correct?

A.  That's correct.

Q.  Does that happen frequently that you have patients

coming in getting treatment recommendations from their

attorneys?

A.  Actually, yes, it does.

Q.  It happens all the time?

A.  Yes.

Q.  You didn't order the DTI?

A.  I did not.

Q.  You had no interest in getting a DTI and would never

have ordered it yourself, correct?

A.  Well, no.  I actually find them very interesting, but

I could never get insurance to cover it.

Q.  Doctor, did you testify under oath in your deposition

that you never would have ordered it?

A.  That's correct.

Q.  And, in fact, you didn't get the report of the DTI

until two and a half years after it was conducted,

correct?

A.  That's correct.

Q.  And it would have had absolutely no value to you in

your treatment of the plaintiff, correct?

```
 1    A.   Well, it confirmed some things I observed.  So I did
 2    find it valuable.
 3    Q.   Well, did you testify it would have absolutely no
 4    value?  Did you testify under oath it had no value to you
 5    in your treatment of the plaintiff?
 6    A.   True.
 7    Q.   Did you say that under oath?
 8    A.   Yes.
 9    Q.   By the way, the evidence of the memory problem she
10    was having, she said she forgot her clothes in the car?
11    A.   Yes.
12    Q.   You did a physical examination that day and it was
13    completely normal, correct?
14    A.   Yes.
15    Q.   And the lawyers sent you the forms to fill out to get
16    the DTI, which you did not order, correct?
17    A.   That's correct.
18    Q.   Did you -- again, I am a little confused with the way
19    the chart -- and I apologize.  Was medication ordered on
20    that visit?
21            MR. PETRU:  Which visit are we on now?
22    BY MR. BONVENTRE:
23    Q.   I'm sorry.  July 16th, 2018.  Sorry.
24    A.   No.  Because the patient -- there is a phone call
25    from the patient.  I can read it if it is interesting or
```

1   if you want it, that she wanted medication for

2   concentration, but she found out from the consulate in

3   France that it was -- they need -- they advised anyone

4   taking medication to France should have the note for the

5   prescription from the doctor.  Adderall, for example, was

6   illegal.  Those prescriptions were problematic in France.

7   Q.  So she spent time in France -- in fact, do you know

8   where she went after France, by the way?

9   A.  I do not.

10  Q.  So you are not aware that every year in France or

11  eight months or nine months, she then spent four or five

12  months in Cairo, you are not aware of that?

13  A.  No.  I am, yes.

14  Q.  So within a year or so after the accident, she was

15  able to go to France for a year by herself and then to

16  Cairo, Egypt by herself for four or five months, correct?

17  A.  Yes.

18  Q.  And apparently she was able to do that without

19  Concerta?

20  A.  Stimulant medication, yes.

21  Q.  Now, Doctor, you next saw her over a year later on

22  September 23rd, 2019?

23  A.  That's correct.

24  Q.  And she told you that she, quote, was traveling a

25  lot, correct?

```
1    A.   Yes.
2    Q.   And she discussed some intestinal issues at that
3    time, which we don't need to talk about.  But she did
4    discuss that?
5    A.   Correct.
6    Q.   And you did a physical examination, correct?
7    A.   Correct.
8    Q.   And I believe once again your physical examination
9    was completely normal, correct?
10   A.   Yes.
11   Q.   And the -- in the part where it does the physical
12   exam, the form, like every visit there, it says "psych,"
13   you say "alert and oriented, normal affect," correct?
14   A.   Correct.
15   Q.   What is an affect?
16   A.   How someone presents themselves.
17   Q.   So there was nothing about the way she presented
18   herself that you put down at all in that note on September
19   23rd of 2019, correct?
20   A.   That's correct.
21   Q.   Do you know a John Randalls, a Dr. John Randalls?
22   A.   Yes.
23   Q.   And he is another doctor at the Vancouver clinic?
24   A.   Gastroenterology.
25   Q.   You are aware that he saw the patient on May 14th of
```

```
 1    2020, correct?
 2    A.   I actually am not aware.
 3    Q.   You are not aware.  So you don't remember what he
 4    wrote down in terms of his examination?
 5    A.   I do not remember, no.
 6    Q.   Could you go to -- could you go to the entry for
 7    August 26th of 2020?  Do you see that note, Doctor?
 8    A.   I do.
 9    Q.   Was the patient at your office on August 26th of 2000
10    (sic)?
11    A.   No, she was not.
12    Q.   You did have -- I don't know, would you call it a
13    consultation on that day?
14    A.   Yes.
15    Q.   But the consultation wasn't with a doctor, it was
16    with Ms. Torjusen's attorneys, correct?
17    A.   Correct.
18    Q.   And they called you up, correct?
19    A.   Correct.
20    Q.   And basically asked you if you would be willing to
21    testify, correct?
22    A.   Actually, per my records, it was just talking about
23    her issues.
24    Q.   Could you look at the next page?
25    A.   Okay.
```

1    Q.   Did they ask you if you would testify?

2    A.   Yes, they did.

3    Q.   Before that, going back to the earlier page, Doctor,

4    if you would.

5    A.   Sure.

6    Q.   They advise you -- they advise you what the patient's

7    symptoms were, correct?

8    A.   I'm sorry.

9    Q.   Do you see "attorney for plaintiff patient," and then

10   they said "lost friends."  Do you see that, "lost

11   friends"?

12         MR. PETRU:  It doesn't say --

13   BY MR. BONVENTRE:

14   Q.   "Has lost friends."  That's what it says.

15   A.   Yes, it does say that.  But I didn't -- I don't know

16   if they said that or we were just talking in general.  I

17   didn't document --

18   Q.   Is there any other place in your medical records

19   prior to that visit where you indicate in any way, shape,

20   or form that Ms. Torjusen has, quote, lost friends?

21   A.   No, there is not.

22   Q.   So you got that information from the attorneys,

23   correct?

24   A.   At that point, yes.

25   Q.   And they asked you -- they asked you if you would

1    testify regarding the differences between her personality

2    now and before, correct?

3    A.   Correct.

4    Q.   And is it fair to say that up to this point, there

5    was nothing in your records that indicated that there was

6    a difference in her personality, other than you are

7    indicating she was obviously anxious, correct?

8    A.   Correct.

9    Q.   On that date, did you say to the plaintiff's lawyers,

10   gee, before I'm going to testify or find out how she is

11   doing, I need to examine her again?

12   A.   Yes, I did.

13   Q.   You did say that.  When was the next time you saw

14   her?

15   A.   It was later that year.

16   Q.   Was it the 21st?  No?

17   A.   No.

18           MR. PETRU:  October 9th.

19           THE WITNESS:  Yes, it was the October 9th visit.

20   BY MR. BONVENTRE:

21   Q.   October 9th.  Okay.  Hold on one second, Doctor.

22   Just so I understand it, Doctor, on October 9th, the

23   patient now -- this is when the patient -- when you wrote

24   down that the patient missed a whole semester of college?

25   A.   When I wrote down that the patient told me, yes.

1  Q.  But you don't know if it is accurate or not?

2  A.  I do not.

3  Q.  So you did a review of systems on that date, correct,

4  on October 9th of 2020?

5  A.  Correct.

6  Q.  And the only thing you put down was that she, quote,

7  has infrequent headaches, correct?

8  A.  Correct.

9  Q.  The review of systems otherwise was completely

10  normal, correct?

11  A.  Correct.

12  Q.  And then you also did a physical examination on that

13  date, correct?

14  A.  Correct.

15  Q.  And that physical examination was totally and

16  completely normal, correct?

17  A.  Yes.

18  Q.  And on this date you, quote, did a trial of -- is it

19  Buspar?

20  A.  Buspar.

21  Q.  Citalopram?

22  A.  Citalopram.

23  Q.  I apologize.  Is that the first time, now three years

24  after this accident, that you prescribed this medication?

25  A.  That I prescribed that, yes.

1    Q.   Do you know if she took it after you prescribed it?

2    A.   She said she did.

3    Q.   Did she have a tendency not to -- you would make

4    suggestions and she wouldn't always follow them; is that

5    fair to say?

6    A.   Not -- no, not any different than any other patient.

7    Q.   A lot of your patients don't follow --

8    A.   Yep.

9    Q.   Okay.  You saw the patient again, and for the last

10   time, on May 17, 2021, correct?

11   A.   Correct.

12   Q.   So on the last time, just so the jury understands,

13   the last time you saw Ms. Torjusen was seven or eight

14   months ago, correct?

15   A.   That's correct.

16   Q.   And she told you at the time that she was planning to

17   move to Cairo, correct?

18   A.   I don't think move.  She was planning to go back to

19   Cairo.

20   Q.   Okay.  Do you know where she lives right now, Doctor?

21   A.   I do not.

22   Q.   So you don't know that she is actually living in

23   Cairo?

24   A.   I don't.

25   Q.   Do you know what she is doing -- do you know what she

1   is doing in terms of her employment?

2   A.   I do not.

3   Q.   Do you know how she did in school at the UW?

4   A.   I don't have her grades, no.

5   Q.   Do you have any sense, she did great, she did lousy?

6   A.   The only thing I have is that she was frustrated.

7   She mentioned like, for example, took Arabic in France and

8   had a hard time of it.

9   Q.   That semester she took Arabic in France, her GPA, do

10  you know if it was 3.7, 3.9?

11  A.   I have no idea.

12  Q.   In any event, the last time you saw her was about

13  eight months ago, correct?

14  A.   That's correct.

15  Q.   And she told you that the headaches have gotten

16  better?

17  A.   That's correct.

18  Q.   And that she plans to go to Egypt, correct?

19  A.   Correct.

20  Q.   And you did a physical examination, correct?

21  A.   Correct.

22  Q.   And your physical examination was, once again,

23  completely normal, correct?

24  A.   That's correct.

25  Q.   And you noted that she was alert and oriented and had

1   a normal affect, correct?

2   A.   Correct.

3            MR. BONVENTRE:  I think that may be it, Doctor.

4   That's all I have, Doctor.  Thank you very much for your

5   time.  I appreciate it.

6       I would like to move into evidence Plaintiff's

7   Exhibit 7, which is the letter that Dr. Spohr wrote that

8   has been referenced.  I don't want to publish it now, but

9   I would like to move it into evidence.

10           THE COURT:  Any objection to 7?

11           MR. BONVENTRE:  No objection.

12           THE COURT:  It is admitted.  It may be published.

13       (Exhibit No. 7 admitted.)

14           MR. BONVENTRE:  We will publish it later.

15                      REDIRECT EXAMINATION

16  BY MR. PETRU:

17  Q.   It is always interesting when an attorney meets with

18  a physician -- a treating physician to get some

19  information to find out what's going on and it becomes a

20  big deal.

21           MR. BONVENTRE:  I object, your Honor.

22           MR. PETRU:  It was a big deal, counsel.  You just

23  mentioned it.

24           MR. BONVENTRE:  I assume we are supposed to have

25  questions, your Honor.

```
 1              THE COURT:  Overruled.  You may proceed.
 2   BY MR. PETRU:
 3   Q.   Did you welcome seeing Emily again to catch up with
 4   her, find out what was going on?
 5   A.   Absolutely.
 6   Q.   Did anything about the conversation that Mr. Levy and
 7   I had with you change or alter any of the opinions or
 8   conclusions that you generated in your care for Emily from
 9   December 18th, 2017, to the present time?
10   A.   No.
11   Q.   Did any of the questions that counsel asked you alter
12   any of the opinions or conclusions that you expressed
13   during your direct examination?
14   A.   No.
15   Q.   I would like to just correct a couple of things.  If
16   you can go to your December 22nd note.  Tell me when
17   you're there.
18   A.   Yep.
19   Q.   Under the "subjective" section, counsel asked you
20   whether you gave her any pain pills.  Can you please read
21   on the second page, first line, the complete sentence,
22   beginning with "she has"?
23   A.   "She has pain pills and is not requesting anything
24   additional."
25   Q.   So she had pain pills.  She had pain pills from the
```

```
 1    hospital.  They were functional and she didn't ask for any
 2    additional pain pills, correct?
 3    A.   Correct.
 4              MR. BONVENTRE:  Objection, your Honor.
 5              THE COURT:  Overruled.
 6              MR. PETRU:  Those are all the questions I have.
 7              MR. BONVENTRE:  No questions, your Honor.
 8              THE COURT:  All right.  Thank you, Doctor.  You
 9    may step down.
10              MR. PETRU:  Your Honor, we have another witness
11    who is standing by remotely.  We can begin if we can get
12    the connection set up.
13              THE COURT:  How much time --
14              THE CLERK:  My computer is down.
15              MR. PETRU:  Apparently, the Judge does not have
16    total control here.
17              THE COURT:  You don't have another live witness?
18              MR. PETRU:  We don't have another live witness.
19              THE COURT:  We are going to take an early break
20    here for the day and ask you to return here tomorrow at
21    9:00.  Please do not discuss the case.  We will get the
22    technical problems solved, I'm sure.
23         (At this time, the jury exited the courtroom.)
24              THE COURT:  All right.  Tomorrow then the
25    witnesses are going to be --
```

1          MR. PETRU:  Dr. Scovel first up, remotely.   We

2    will have Patty Torjusen.  I'm not sure of the order.

3    Patty Torjusen live.  Daniel Healy remotely.

4    Unfortunately, Dr. Johns who is available -- she is the

5    one who is in the hospital -- remotely, and Emily

6    Torjusen.

7          THE COURT:  All right.  We might finish testimony

8    tomorrow?

9          MR. PETRU:  If I can control everything, yes.

10   But I can't.

11         THE COURT:  In any case, let's plan on a brief

12   conference on final instructions tomorrow at noon.  We

13   will say 1:15.

14         MR. PETRU:  That is brief.

15         THE COURT:  Well, I don't know that we have a lot

16   of disputes to take up.

17         MR. BONVENTRE:  I'm sorry, Judge.  Before you

18   leave, can I raise one quick issue?  I don't want to

19   sandbag counsel.  I want to raise it tonight.  Dr. Johns

20   is, I believe, another psychologist, therapist.

21         MR. PETRU:  Yes.

22         MR. BONVENTRE:  We have already had multiple

23   doctors talk about PTSD.  We are going to have Dr. Scovel

24   as well.  The court rules talk about duplication.  My

25   sense is the Court has already indicated you are going to

1    allow Dr. Johns to testify, but I would ask there not be a

2    lot of duplication of what has already been said, and

3    further what is going to be said tomorrow with Dr. Scovel.

4            THE COURT:  Of course, I did say that.  Where

5    there is cross-examination challenging conclusions and

6    findings of existing doctors, rather than have it be

7    rebuttal, I think it is appropriate.  I do think there

8    doesn't need to be going over a lot of the same ground.

9            MR. PETRU:  I agree, your Honor.  We have the

10   burden of proof.  Counsel has not stipulated that she has

11   PTSD or a traumatic brain injury, so we have to prove

12   that.  If they would stipulate to that -- I think it is

13   obvious, but if they stipulate to it, we don't have to do

14   it, but they haven't.

15           THE COURT:  All right.  We will see you in the

16   morning at 9:00.

17           MR. BONVENTRE:  Thank you, your Honor.  Have a

18   good evening.

19       (Recessed.)

20

21

22

23

24

25

1

2                            C E R T I F I C A T E

3

4

5      I certify that the foregoing is a correct transcript from

6      the record of proceedings in the above-entitled matter.

7

8

9

10     /s/ Barry Fanning

11     BARRY FANNING
       COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25