```
1              UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

3  _____

4                               )
   EMILY TORJUSEN,               ) 3:18-cv-05785-BHS
5                               )
   Plaintiff,                    ) Tacoma,
6                               ) Washington
   v.                            )
7                               ) March 31, 2022
   NATIONAL RAILROAD PASSENGER   )
8  CORPORATION d/b/a AMTRAK,     ) Jury Trial
                                 )
9          Defendant.            ) 9:00 a.m.

10 _____

11           VERBATIM REPORT OF PROCEEDINGS
       BEFORE THE HONORABLE BENJAMIN H. SETTLE
12            UNITED STATES DISTRICT JUDGE
   _____

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings stenographically reported and transcript
25       produced with computer-aided technology
```

```
 1

 2                          APPEARANCES

 3

 4

 5    For the Plaintiff:     ANTHONY S. PETRU
                             SCOTT H. LEVY
 6                           Hildebrand McLeod & Nelson LLP
                             350 Frank H. Ogawa Plaza
 7                           Fourth Floor
                             Oakland, California
 8
                             JOSEPH ANDREW GRUBE
 9                           Breneman Grube Orehoski PLLC
                             1200 Fifth Avenue
10                           Suite 625
                             Seattle, Washington
11

12    For the Defendant:     JOHN A. BONVENTRE
                             Landman, Corsi Ballaine & Ford
13                           One Gateway Center
                             Fourth Floor
14                           Newark, New Jersey

15                           ANDREW GORDON YATES
                             Lane Powell, PC
16                           1420 Fifth Avenue
                             Suite 4200
17                           Seattle, Washington

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2

 3    EXAMINATION OF:                                        PAGE

 4      ELIZABETH SCOVEL    DIRECT EXAMINATION                  5
                            BY MR. PETRU
 5                          CROSS-EXAMINATION                  44
                            BY MR. BONVENTRE
 6                          REDIRECT EXAMINATION               70
                            BY MR. PETRU
 7
        DANIEL HEALLY       DIRECT EXAMINATION                 80
 8                          BY MR. LEVY
                            CROSS-EXAMINATION                  96
 9                          BY MR. YATES

10      PATTY TORJUSEN      DIRECT EXAMINATION                 99
                            BY MR. LEVY
11                          CROSS-EXAMINATION                 126
                            BY MR. BONVENTRE
12
        EMILY TORJUSEN      DIRECT EXAMINATION                130
13                          BY MR. PETRU

14

15

16                         EXHIBIT INDEX

17
      EXHIBITS ADMITTED                                      PAGE
18
        (None Admitted)
19

20

21

22

23

24

25
```

```
 1                                    MORNING SESSION
 2                                    MARCH 31, 2022
 3              THE COURT:  Good morning, everyone.  Are we ready
 4    to bring in the jury?  Our next witness is already logged
 5    in.
 6              MR. YATES:  Your Honor, may I just get
 7    Mr. Bonventre?  He is in the hall.
 8              THE COURT:  Yes.
 9              MR. PETRU:  I object.
10              MR. BONVENTRE:  Good morning, your Honor.
11              THE COURT:  Good morning, Mr. Bonventre.
12          (The following occurred in the presence of the jury.)
13              THE COURT:  Good morning, Jurors.  We are ready
14    to begin.  I hope you had a restful evening.
15         Your next witness, Mr. Petru.
16              MR. PETRU:  Good morning, your Honor.  Our next
17    witness is Dr. Elizabeth Scovel.
18              THE COURT:  All right.
19              MR. PETRU:  Dr. Scovel, if you could activate
20    your video, please.  If you can hear me, if you could
21    start the video.
22              THE CLERK:  Dr. Scovel, can you hear us?
23              THE WITNESS:  Yes, I can.
24              THE CLERK:  Sorry.  You were muted.  You can
25    activate your video now.
```

1          THE COURT:  Good morning, Dr. Scovel.

2          THE WITNESS:  Good morning.

3          THE COURT:  If you would raise your right hand,

4    the oath of witness will be administered.

5       We have lost your video again.

6          MR. PETRU:  I have it, your Honor.

7          THE COURT:  All right.  I was looking at the

8    computer screen in front of you, but it is not showing.

9    She is there.

10      If you would raise your right hand, the oath of

11   witness will be administered.

12                      ELIZABETH SCOVEL,

13     having been sworn under oath, testified as follows:

14          THE COURT:  Thank you, you may proceed.

15                   DIRECT EXAMINATION

16   BY MR. PETRU:

17   Q.  Good morning, Dr. Scovel.  Thank you for making

18   yourself available.

19   A.  Good morning.

20   Q.  Because we are doing this by video conference, and

21   also because we should be doing it in court in any event,

22   let's be sure to allow the questions to finish before you

23   answer, and we will afford you the same opportunity to

24   finish your answer before we ask a question, so we can go

25   slow so the court reporter can get everything down.  All

1    right?

2    A.   All right.

3    Q.   What is your profession?

4    A.   I am trained in -- my Ph.D. is in clinical

5    psychology.  I have specialized training in clinical

6    neuropsychology.  My profession is as a clinical

7    neuropsychologist in private practice.

8    Q.   And what is it that a clinical neuropsychologist in

9    private practice does, by and large?

10   A.   Predominantly, what I do as a neuropsychologist is I

11   assess children and adults in terms of what they term

12   brain behavior relationships.  So how the brain processes

13   information, would be very simple.  And then also to

14   understand the emotional components of what might be

15   driving certain disorders.

16   Q.   Brain function and emotional disorders that may or

17   may not affect the brain and behaviors; is that fair?

18   A.   Yes.

19   Q.   In order for you to do this, you said you had a

20   doctorate.  Where and when did you get your doctorate?

21   A.   I have a doctoral degree, Ph.D., from the California

22   School of Professional Psychology.  That was obtained in,

23   I believe, 1997.  I completed what was called the

24   predoctoral internship.

25   Q.   You have a master's degree, as well.  Your

1    dissertation was -- I believe it was titled "The Influence

2    of Depression on Verbal Memory Function in Patients with

3    Temporal Lobe Epilepsy"?

4    A.   Yes.

5    Q.   Can you break that down for the jury in lay terms,

6    what exactly it was that means and what you were looking

7    at?

8    A.   Yes.  I was at the University of California

9    San Francisco in the Department of Neurology, and I was

10   using archival data of over -- I believe my patient number

11   was over 100.  And what I was looking at was preoperative

12   and two encounters operative at three months and one year

13   to ascertain whether or not A resectioning of patients'

14   temporal lobes, given which hemisphere that surgery

15   occurred, would have AN influence on their verbal memory

16   scores.

17   Q.   Is that because certain parts of the brain control

18   certain functions and you wanted to see the correlation

19   between treatment in those parts and function?

20   A.   Yes.  I was also looking at how the influence of

21   mood, depression, for example, was affected, affecting

22   verbal memory.

23   Q.   With regard to the opinions and conclusions that you

24   expressed in your two reports regarding Emily Torjusen, is

25   the experience that you had, in particular the experience

1    in your dissertation, does it help inform you about the

2    correlation between brain injury and certain behaviors?

3    A.   Yes.

4    Q.   Where is your practice?

5    A.   Vancouver, Washington.

6    Q.   The jury knows from prior testimonies that you have

7    seen her, I believe, two times, first in March of 2018,

8    and then again in June of 2020, correct?

9    A.   Yes.  I actually saw her the day prior to her

10   evaluation in 2018, so there were three encounters.

11   Q.   Okay.  And what is the normal protocol that you

12   follow when you have been asked to evaluate the sequelae,

13   the problems associated with somebody who has been

14   involved in an accident where there is a concern about

15   cognitive function, emotional function, et cetera?  What

16   do you normally do?

17   A.   So before I actually see a patient, there is a

18   process of medical records and other ancillary relevant

19   materials that are gathered by my office staff.  And I

20   sometimes -- well, I review some of those that will be

21   most relevant during the clinical interview.  There is

22   also an inventory from my office that is sent out that is

23   very detailed in nature that asks a variety of questions

24   or tries to anticipate what a person is struggling with,

25   and it will allow them to share information -- detailed

1    information that I will have data at the time of the

2    clinical interview.

3         Then the patient comes in, sometimes with a family

4    member or significant person in their life.  They are

5    brought to the clinical interview, and I meet with them

6    for about an hour and a half and get further clarity on

7    their disposition and how I can be most helpful.

8    Q.   Once you have done the clinical interview, what do

9    you do next in terms of organizing or planning for

10   whatever testing you want to have administered?

11   A.   So I then write up some form of documentation about

12   the clinical interview, and I also figure out which

13   measures will be most useful and what I believe the

14   individual can handle in terms of the test experience.

15   Q.   Before we go further, I just want to get this out of

16   the way.  You will share with us your diagnosis, your

17   professional opinions, your prognoses.  Will all of your

18   opinions and conclusions be made to a reasonable degree of

19   neuropsychological probability?

20   A.   Yes.

21   Q.   With regard to Emily Torjusen, after you met with her

22   on, I guess it was the day before, on March 14th, 2018,

23   what did you determine the tools -- the proper tools would

24   be to help do an evaluation of her brain function?

25   A.   I am getting that document out, if that's okay.

Q.   Sure.  Feel free to look at your notes and charts,
anything you have.

A.   Would you repeat that once again?  You wanted the
list of measures?

Q.   I have them in front of me.  We can make this easier
rather than you searching for it.

     You ended up administering to her from your first
report something called the Behavior Rating Inventory of
Executive Function, that's called a BRIEF; the Continuous
Auditory test of attention, the CATA; the Conners'
Continuous Performance Test; the Finger Oscillation Test
or the FOT; the Rey-Osterrieth Complex Figure Test -- they
all have acronyms -- the RCFT; the Symptom Assessment 45
Questionnaire, the SA45; Trail Making Test A and B, the
TMTA and the TMTB, the Wechsler Adult Intelligence Scale
IV, or WAIS-IV; the Wechsler Memory Scale, or the WMS-IV;
the Wisconsin Card Sorting Test, WCST; as well as your
clinical interview and record review.

     My questions are with regard to the tests that you
chose.  Why did you select this battery of tests?  What
were you looking for?

A.   Well, I am going to flip to the reason for referral
because that will -- that always helps inform how I select
tests.

     Just in brief, the purpose of testing was challenges

1  to concentration, memory, it says balance, left-sided

2  weakness and irritability.

3       Shall we refer to these measures using the acronyms?

4  Would that be appropriate?

5  Q.  Any way you want.  We don't have to go through each

6  individual test, and go through why you chose each test.

7  I think that would be redundant and take some time.

8       What generally were you looking for through the

9  testing?  Let me back up a little bit.  In

10 neuropsychology, you don't look inside the brain with

11 scanning technology, such as DTI, you don't do sample

12 testing where you do a pathology test, something like

13 that, you want to see the brain's function without being

14 invasive, fair?

15 A.  Correct.

16 Q.  And are these tests designed to be able to evaluate

17 the brain's function in a way without being invasive?

18 A.  Yes.

19 Q.  How were the tests -- not any individual test, but

20 generally how were these tests designed?

21 A.  Most of the tests that I use are normed on large

22 populations of people.  So they have the physical

23 robustness, and they are -- many of them are objective

24 measures that are normed on using the normal curve.

25 Q.  Can you -- I'm sorry.  I violated my own rule.  Go

1   ahead.

2   **A.**   So we can make assumptions given how a person

3   performs based on where they fall on that bell curve.

4   **Q.**   And when you say "bell curve" and "normed," you are

5   looking -- the tests look at large populations of people

6   who were screened for mental health, other issues, to try

7   to determine what, quote, "normal" would be for somebody

8   with a certain level of intelligence, for example, for a

9   certain age, things like that?

10  **A.**   Correct.

11  **Q.**   And then by giving these battery of tests, you find

12  out whether somebody can perform consistently across norms

13  on different tests consistent with their age, gender,

14  experience, education, or whether there are areas where

15  they fall off?

16  **A.**   That's right.

17  **Q.**   Or, conversely, might be superior?

18  **A.**   Right.  On either side of the average.

19  **Q.**   Is it important to administer multiple and different

20  tests, although you might be looking at some of the same

21  properties or some of the same functions?

22  **A.**   That's very important.

23  **Q.**   Why?

24  **A.**   Well, you want to see congruency in findings, and be

25  able to explain, if findings are not congruent, why is

that.

Q.   How are the tests administered?  What is the -- what

does it look like if you are a fly on the wall watching

somebody go through this battery of nine or ten tests?

A.   The battery of tests typically takes anywhere from

three to five hours, of which the person is allowed to

have breaks that are appropriate.  Some of the tests are

timed, and the memory tests need to be given in a certain

fashion so that so much time has elapsed to go back to the

measure to test for, for example, delayed memory.

      Many of the tests are like what we call

paper-and-pencil instruments.  Some of them are just

asking this patient a lot of different questions.

Q.   And to be clear, when Emily Torjusen was tested in

March 2018, there was some areas of her brain function

that were undamaged, that performed not just to norm but

in some areas that were exceptional, correct?

A.   Yes.

Q.   But there were some areas where there was clear signs

of damage or functional problems, fair?

A.   That was my opinion.

Q.   Let's start with -- I don't know that I'm going to go

through every one of them, but I do want to start with

intellectual functioning.  You did an evaluation of

Emily Torjusen's intellectual functioning.  What were the

1    results?  And you don't have to read it, but if you could

2    summarize the results of your evaluation of intellectual

3    function.

4    A.   Um-hum.  She was administered one of what we call the

5    gold standards of neuropsychological testing, the WAIS-IV.

6    The full scale IV, which is the amalgamation of all of her

7    (inaudible).  There are four indices of the WAIS-IV, in

8    general.  The full scale IV is an amalgamation of the four

9    indices that encompass verbal comprehension, conceptual

10   reasoning, working memory and processing speed.

11   Q.   Go ahead.

12   A.   She scored 109, which is at the upper cusp of the

13   average range.

14   Q.   Which indicates that she is smart, correct?  What we

15   would generally call smart?

16   A.   I would say Emily is -- I would consider her smart.

17   Q.   In what areas did you find that there was a deficit

18   which you believe was caused by the train wreck in

19   December 2017?

20   A.   I'm looking at each of these in the summary of

21   findings.  I am looking at my first report.  I'm looking

22   at each of these in the summary of findings.  Given that

23   -- I just want to be accurate here.

24   Q.   Please.

25   A.   So the working memory index, which is, as I explained

1   a moment ago, is a component of the full scale score.  She

2   fell in the average range, but her processing speed, which

3   is also a component of that full scale score, fell in the

4   low average or 23rd percentile.  So I would say her

5   processing speed was lower than I would have expected.

6       She also seemed to have some problems with

7   visual/spatial constructural processing.

8   Q.  Can you explain to the jury what that is?

9   A.  Yes.  That is a very important component of

10  information processing that allows humans to make sense of

11  the spatial relationships that they encounter.  It allows,

12  for example, for good driving ability, being able to

13  utilize a map to make one's way around a grocery store in

14  a sensical manner.

15  Q.  Would it affect somebody who is impaired?  Would that

16  cause them to get lost, for example, and lose their

17  bearings periodically?

18  A.  Yes.

19  Q.  In addition to -- in the "speed of mental processing"

20  section, I am looking at the report, you noted on the TMT,

21  which is the Trail Making, I believe, A, noted extremely

22  impaired abilities in processing speed, less than the

23  tenth percentile.  Is that concerning?

24  A.  Yes.

25  Q.  Why?

```
 1   A.   That is concerning, especially because that's a
 2   fairly easy task.
 3   Q.   In the speed of motor processing, you found that her
 4   performance pattern on the FOT utilizing her right
 5   dominant hand was well below normal limits, less than a
 6   2.5 standard deviation.  You wrote "her performance using
 7   her left nondominant hand was found to be within normal
 8   limits."  Right hand corresponds to the left side of the
 9   brain, left hand corresponds to the right side of the
10   brain, correct?
11   A.   Right.  That's correct.
12   Q.   And her performance -- you indicated this performance
13   pattern may implicate left hemispheric dysfunction.  So
14   that would mean the left side of her head as opposed to
15   the right side, correct?
16   A.   Um-hum.  Yes.
17   Q.   If she had a gash on her forehead above her left eye
18   and then on top of the head, would that correspond to an
19   area of the brain that would influence or affect
20   processing speed on this test using the right hand?
21   A.   It could.
22   Q.   You found that her language skills were in the 59th
23   percentile, in the superior range, correct?
24   A.   I did.
25   Q.   Does that mean that the brain injury that she had
```

1    didn't affect her ability to comprehend words or to write,

2    but affected other -- she could write, but because

3    processing speed was affected it might take her longer,

4    she would struggle with it; is that a fair conclusion?

5    A.   Right.  For example, if she is being examined at a

6    high level, like what I imagine some of her course work at

7    the University of Washington entails, where she is asked

8    during a final examination or a mid-term to provide

9    written responses to a statement or a question the

10   professor is asking of the students, even though I believe

11   Emily would most likely be able to answer the questions

12   with her high verbal acumen that we know she has, given

13   her testing, she may take much longer to provide that same

14   response and, therefore, not do as well on the exam,

15   potentially, because she wouldn't have finished.

16   Q.   Or, conversely, if she is given dispensation to take

17   more time, she could do it if she has additional time?

18   A.   Yes.

19   Q.   Were you aware that Dr. Spohr, her primary care

20   physician, wrote a "to whom it may concern" letter to the

21   University of Washington asking for dispensation so she

22   could have more time?

23   A.   I was aware when I met with Emily in June of 2020,

24   she told me she had been given that dispensation.

25   Q.   Would that be consistent with a brain injury that

1  would affect the speed with which she could do things, but

2  not her ability to do them given the time?

3  A.  Yes, in terms of her language processing.

4  Q.  In your conclusion from 2018, you note:  "In

5  consideration of the findings of empirical testing

6  measures used for this evaluation, it appears that

7  Ms. Torjusen struggles with tasks that require elements of

8  visual and auditory attention, memory and processing

9  speed."  Is that essentially what you just told us the

10  test results showed?

11  A.  Yes.  I didn't speak yet to her attention or her

12  memory, but, yes.

13  Q.  Let's go ahead and do that.  I'm not guiding the ship

14  very well.  Let's talk about memory and attention before

15  we go to the next sentence there.  Tell us about her

16  memory issues, please.

17  A.  So using another robust measure, it's called the

18  Wechsler Memory Scale, the fourth edition, is what I used;

19  there are different indices.  Would you like me to break

20  them down?

21  Q.  Sure, if you think that would help the jury

22  understand the problem she was having with memory at the

23  time.

24  A.  Okay.  I am going to a different part of the report

25  that really breaks that down very easily.  Her auditory

1    memory was tested at average, 45th percentile ranking.

2    Her visual memory was average, at the 30th percentile.

3    Her visual working memory was low average, 16th

4    percentile.   Immediate memory was average, at 50th

5    percentile, and delayed memory was average at 25 -- 25th

6    percentile.

7    Q.   Would you have expected, based on her acumen and her

8    overall IQ evaluation, that those scores of low average at

9    the 16th percentile with working memory, delayed memory at

10   only the 25th percentile, visual memory at the 45th

11   percentile, would have been higher prior to the -- prior

12   to her brain injury?

13   A.   I would have expected them to be higher.

14   Q.   And what ramifications do these declines in visual,

15   immediate and -- visual, visual working and delayed memory

16   have on her?

17   A.   Well, my understanding of Emily is that she was

18   engaged in complex pursuits, both with her education and

19   also her professional aspirations.   I would say they would

20   have a significant impact.

21        I also think on an emotional level they have an

22   impact, in that it would be very -- kind of demoralizing

23   to feel like you were not able to function as high as you

24   had previously.

25   Q.   In the "memory and learning" section of your report,

1   you write at the last sentence:  "The WCST," another test,

2   "no evidence of a problem with learning was evinced."

3   Does that mean that she is capable of learning, but it is

4   a struggle for her to get there?

5   A.   On the WCST, the way that is evaluated, there is an

6   indices built into the measure that shows what we call a

7   learning curve.  Since I wrote that statement, most likely

8   Emily's learning curve was positive, meaning that as

9   she -- as the duration of the measure was ensuing, she

10  became more efficient at understanding how to do the

11  measure.  So it would be a positive learning curve --

12  Q.   So she can learn?

13  A.   Yes, she can learn.  But getting to your point, would

14  she have more challenge, she has the ability to learn, but

15  would it require more energy and more diligence and

16  more -- possibly finding alternatives to assist her?  Most

17  likely she would need those -- that support.

18  Q.   If she needs alternatives, other tools to help her,

19  then how does the -- how do your findings in attention and

20  concentration, the other area that we hadn't talked about

21  earlier, how do the deficits in attention and

22  concentration impact her learning and her overall

23  function?

24  A.   Well, attention is a very important component of the

25  ability to make sense of our world, and specifically to be

1  able to learn and obtain information.  Specifically, the

2  findings from this evaluation pointed out that she had

3  challenges with auditory attention, so maintaining her

4  attention throughout a task.

5  Q.  Did that correlate with her clinical interview where

6  she indicated that she has difficulty, for example, in

7  studying, where she would start a subject, go get

8  distracted, clean the house, do something else, do a

9  different subject, not be able to sustain the focus over a

10  length of time?

11  A.  Yes.  I remember at least during one of the

12  encounters feeling as though she had told me that she was

13  having trouble with a lot of the reading material she had

14  to digest for her classes, and that it was very exhausting

15  for her.  I think that's a component of it, having enough

16  ability to maintain focus, maintain concentration,

17  especially when acquiring more complex information.

18  Q.  We will talk about the emotional side in a second.

19  Actually, we will talk about it now.  Does the difficulty

20  in concentration, the fact that it may take her longer and

21  she has to struggle more to learn what she otherwise would

22  have learned more rapidly, does that play a role in the

23  emotional sequelae of both brain injury and PTSD, anxiety

24  and depression?

25  A.  I would say so.

1   Q.   How so?

2   A.   Well, I think that if somebody is struggling in terms

3   of their mood, whether it is things like depression,

4   anxiety, certainly trauma that a person may be undergoing

5   due to, you know, a significant life experience --

6   threatening life experience, that that is going to impact

7   how they are able to process, especially complex

8   information.

9   Q.   Going back to the conclusion.  You wrote, after the

10  sentence we read earlier referencing visual and auditory

11  attention, memory and processing speed, the next sentence

12  is:  "Although Ms. Torjusen is endowed with high cognitive

13  reserve and intellectual ability, it is believed that the

14  consequences of the 12/18/17 accident correlates with

15  impingements to important realms of cognitive functions,

16  making it more effortful for Ms. Torjusen to process

17  information at premorbid levels."

18       What are premorbid levels?

19  A.   How she was functioning in her case prior to the

20  train derailment.  So how her functioning was previously.

21  Q.   That's on the cognitive side.  Your next sentence

22  says, as well:  "Another element of testing revealed that

23  Ms. Torjusen's high degree of generalized distress in

24  multiple areas pertaining to her mental health as evinced

25  through her personality and emotional assessment as part

1     of this neuropsychological evaluation."

2         What were the findings in terms of the personality

3     and emotional assessment testing that you did?

4     A.    She was exhibiting significant levels of clinical

5     depression, symptoms of obsessive-compulsive tendencies.

6     She was very somatically focused, so focused on

7     manifestations related to her body and her health.  Phobic

8     anxiety.  She was more hostile.  She was more -- in her

9     interpersonal relationships, she was more sensitive and

10    volatile.  She was paranoid.  Her thought processes were

11    kind of skewed, not to the extreme where one would think

12    she was schizophrenic, for example, but just in the

13    context of not thinking clearly.

14    Q.    In your -- I'm sorry.  In your clinical experience,

15    have you treated and evaluated patients such as

16    Emily Torjusen, who were young, who have had both brain

17    injury and exposure to a life-threatening event like the

18    train crash, who have a diagnosis of PTSD, have you seen

19    that combination before?

20    A.    I can't think offhand of somebody, but I'm sure in my

21    20-plus years of practice I have seen that.

22    Q.    Does the combination of those factors -- is it

23    consistent with findings of depression,

24    obsessive-compulsive tendencies, somatization, phobic

25    anxiety, hostility, interpersonal sensitivity, paranoia,

1    and the difficulty thinking clearly that you described?

2    A.   Yes.  And on this particular measure, the SA45, what

3    we find is when somebody is scoring very high on the

4    different clinical symptoms indexes, for example, the

5    depression, obsessive-compulsive tendencies, somatization,

6    when there is a lot of elevation of these -- all of these

7    scales, that is a note of what I like to term generalized

8    distress.  They are almost so vulnerable and very consumed

9    by their -- how they sense themselves in the world.

10   Q.   Based on Ms. Torjusen's age, I think she was 20 years

11   old when you saw her, the fact that she had been an

12   otherwise healthy, active college student who was doing

13   fine, thank you very much, who suffered this trauma and

14   then had all these changes, does it surprise you at all

15   that she endorsed the level of distress and anxiety that

16   was revealed on the SA45?

17   A.   It's not surprising.

18   Q.   Your report goes on and you write:  "The aggregate

19   components of this evaluation reveal a strong connection

20   between reported symptoms, test findings, and what the

21   literature informs about concussion."

22        Does that mean that there is literature that talks

23   about concussions and what to expect; you did testing of

24   her to find out how her brain functions, and she reported

25   the symptoms and her experiences, and it all jibed

1   together?

2   A.   Yes.   I thought that there was -- I was not surprised

3   with the pattern of data that I found as it related to how

4   she had subjectively reported what were her struggles, in

5   addition to literature, that I was aware of.

6   Q.   You wrote:  "Post-concussion syndrome is a complex

7   disorder that can last for weeks or sometimes months after

8   the injury.  A concussion is a mild traumatic brain injury

9   that does not necessarily involve the loss of

10  consciousness."

11       When there is a loss of consciousness, is that a

12  factor -- a relevant factor to consider with regard to the

13  severity with regard to the concussion and the effects?

14  A.   It can be in the sense of certainly somebody loses

15  consciousness, we can make people -- physicians and

16  clinical professionals make assumptions that there is more

17  significant damage.

18  Q.   So the loss --

19  A.   As well --

20  Q.   I'm sorry.  The loss of consciousness is relevant?

21  A.   It is relevant.  And it is also relevant in terms of

22  the duration that a person may be unconscious.  But it

23  doesn't -- in terms of post-concussive syndrome, it

24  doesn't mean that there wasn't serious effects, you know,

25  of somebody losing consciousness.

1    Q.   Here, she was unconscious, but we don't know exactly

2    how long, nobody had a stopwatch on it.   Is that your

3    understanding?

4    A.   Right.   Yes.

5    Q.   I'm sorry.   You go on to say that:   "Research

6    indicates that most people recover after a concussion,

7    some last months, however, sometimes symptoms can persist

8    for a year or more."

9         Dr. Scovel, isn't it correct that sometimes the

10   result of a TBI can last permanently, forever, to some

11   degree or another?

12   A.   Yes.

13   Q.   Is it concerning that Emily Torjusen still

14   experiences symptoms associated with the TBI four and a

15   half years after this horrific accident?

16           MR. BONVENTRE:   Objection.   Lacks foundation from

17   this witness.

18           MR. PETRU:   I will rephrase, your Honor.

19   BY MR. PETRU:

20   Q.   Assuming that Ms. Torjusen still suffers some of the

21   symptoms that you have described here with regard to brain

22   function, is it concerning that four and a half years

23   after the incident she still suffers these symptoms

24   associated with a TBI with regard to the prognosis?

25   A.   I would say yes, it is not surprising.

1   Q.   Why is it not surprising?

2   A.   Well, there is a percentage of people that do not

3   seem to recover well.  Unfortunately, Emily might fall

4   into that classification.

5   Q.   What is the percentage -- what is that percentage?

6   A.   Um-hum.

7   Q.   What is that percentage?

8           MR. BONVENTRE:  Judge, I object to that category.

9   I object to "might."  I object to that answer.

10          MR. PETRU:  I will rephrase.  I will make it

11  clear.

12  BY MR. PETRU:

13  Q.   Dr. Scovel, based on everything you have learned

14  about Emily Torjusen, your evaluations in 2018 and 2020,

15  do you believe to a reasonable degree of

16  neuropsychological probability that Emily Torjusen does

17  fall into that minority who will continue to suffer beyond

18  years?

19  A.   I think it is probable.

20  Q.   And what is the percentage of people who have TBI who

21  suffer indefinitely?

22  A.   In the literature that I am familiar with, the

23  research provides a statistic of 10 to 25ish percent.

24  Q.   That would be the minority, but on a bell curve that

25  is the unfortunate few?

```
 1    A.   Correct.  And it also -- I think one can imagine that
 2    given how a person lives, right, how they are working
 3    to -- for example, are they able to get adequate rest?
 4    Are they taking good care of themselves?  Are they -- if
 5    they have a complex job, let's say, are they taking
 6    breaks?  Are they being mindful of their need given this
 7    injury to step back and relax or do things that are going
 8    to assist them to be healthier.
 9    Q.   Would that involve not just being mindful but
10    actually having the control, the ability to control those
11    factors?
12    A.   It could.  I'm thinking of things such as sleep.  One
13    doesn't always have, for example, control over their sleep
14    state.
15    Q.   You go on to indicate that sometimes symptoms --
16    excuse me --   Identified symptoms often include:
17    headaches, dizziness, fatigue, irritability -- we will
18    talk about that after the 2020 evaluation -- anxiety --
19    the same, 2020 -- insomnia, loss of concentration and
20    memory, ringing in the ears, blurry vision, noise and
21    light sensitivity.  And you indicate the goal for
22    treatment after concussion is to effectively manage
23    symptoms.  That's more easily said than done frequently,
24    is it not?
25    A.   It is, especially as a college student, I would
```

1    think.

2    Q.   What was your diagnostic impression in March of 2018?

3    A.   I gave her a mood disorder, due to a known

4    physiological condition.   What I meant by that indirectly

5    was the concussion.   I gave her a diagnosis of

6    post-concussive syndrome.   And then there is a V code that

7    supports the post-concussive syndrome.   In Emily's case,

8    the railway train incident.

9    Q.   And you also had two rule outs.   First of all, what

10   is a "rule out"?   What does that mean when you include in

11   a diagnostic impression a "rule out"?

12   A.   A "rule out" is something that you as a clinician are

13   thinking as possibilities, diagnostic possibilities, but

14   that you still have -- you don't have enough information

15   to definitively make those diagnoses.

16   Q.   And at the time you saw her in March of 2018, early

17   on, you were concerned about PTSD and ADHD, correct?

18   A.   Correct.

19   Q.   You recommend that she should benefit from therapy,

20   correct?

21   A.   I did -- I did later.   In this report, I don't have

22   recommendations.

23   Q.   I thought I saw above the "diagnostic impression":

24   "Hopefully with conscious adherence to sound health

25   practices, good sleep hygiene, rehab treatment and medical

1    compliance, Ms. Torjusen may fully recover from the

2    detrimental consequences of this experience.  Weekly

3    psychological counseling may also support her during this

4    challenging period."  So it is kind of in the body, but it

5    wasn't a clear recommendation.

6    A.   And where was that?

7    Q.   That is right above your "diagnostic impression."

8    A.   Um-hum, sometimes I do that.  Instead of stating them

9    numerically in a recommendation section, I put them in

10   that format.  So, yes.

11   Q.   I spent last night going over this again to make sure

12   I could find things.  You saw her again in 2020?

13   A.   Yes.

14   Q.   When you saw her in 2020, you also had received by

15   then the DTI report from Dr. Filler, correct?

16   A.   I'm not sure where that came from.  But, yes, I

17   reviewed a DTI report.

18   Q.   You didn't know it was Dr. Filler's, but you got the

19   DTI report?

20   A.   Yes, I did.

21   Q.   And what is -- in your work as a clinical

22   neuropsychologist, what is the value of a DTI report on

23   a --

24            MR. BONVENTRE:   Sorry.  I apologize.  Objection,

25   your Honor.

1          THE COURT:  Basis?

2          MR. BONVENTRE:  We went over that with Dr. Filler

3  extensively.

4          THE COURT:  I will allow a certain amount here of

5  this witness --

6          MR. PETRU:  I think I understand.

7  BY MR. PETRU:

8  Q.  I am not asking you to explain what a DTI does,

9  what -- the technique, the history of DTIs, the detail of

10  what's found.  I am asking you, as a clinical

11  neuropsychologist, what benefit or what information do you

12  glean from a DTI when you have a patient who has been

13  examined with that high level technology?

14  A.  Well, in this case, in Emily's case, it was very

15  important, because at times the neuroimaging, whether it

16  is DTI, MRI, CT, it will substantiate what you are

17  seeing -- what I am seeing as a neuropsychologist

18  clinically.

19  Q.  And did the neuroimaging, the DTI imaging with all

20  its component parts, did you find it to be contradictory

21  or consistent with all of the findings that you had made

22  back in 2018?

23  A.  Very consistent.  Very congruent.

24  Q.  In addition to it being very consistent and very

25  congruent with your findings in 2018, was it also

1    consistent and congruent with your findings in 2020?

2    A.   I found in 2020 that she was having -- her cognitive

3    abilities were not as dysfunctional as in 2018.

4    Q.   There had been some improvements?

5    A.   Yes.  But in general, I felt that there still was

6    quite a lot of congruency.

7    Q.   Let's go to your 2020 evaluation.  Rather than go

8    through -- let me jump through a couple of these things.

9    In language, the language skills, the area that she was at

10   the 95th percentile back in 2018, she is now scoring at

11   the 99th percentile, meaning that that part of her brain

12   was not damaged and is functioning at an exceptionally

13   high level, correct?

14   A.   Yes.

15   Q.   I think you described it as the very superior range?

16   A.   Um-hum.

17   Q.   In attention/concentration, you make note of

18   something called the Brown ADD scales.  What are the Brown

19   ADD scales?

20   A.   That is a subjective inventory that I like to use to

21   get a sense of an individual's own experience of their

22   attention and their capabilities.

23   Q.   What was Ms. Torjusen's self-assessment of her

24   attention deficit abilities?  I can't even ask the

25   question correctly, and it's only morning.  Did it reveal

1   that she experienced difficulties with attention and

2   focus?

3   A.   It did.

4   Q.   How so?

5   A.   I am going to go into the report and speak directly

6   about that measure, if you would like.

7   Q.   Sure.  I can't help you because I haven't highlighted

8   it.

9   A.   There are these different clusters on the Brown

10  attention deficit disorder scale.  The clusters are

11  activation, attention, effort, affect, memory, and then

12  there is a total score.  And in all but one of those

13  clusters, she was having difficulties.

14  Q.   Earlier you talked about norms, about how these tests

15  are based on an evaluation of a wide swath of people

16  within a certain demographic, and the norms will inform

17  you as to whether somebody is functioning at an average

18  level.  And I understand that some of the

19  attention/concentration testing that you administered in

20  2020, she scored at an average level statistically, but

21  her perception of her abilities was greatly reduced as

22  revealed in the Brown ADD.  Is that a fair summary of what

23  you found with regard to her attention and concentration?

24  A.   Yes.

25  Q.   Does that mean Emily Torjusen, although at the time

```
1    the testing revealed her attention to be average for
2    her -- I was going to say it sucked.  That is probably not
3    the right word to use.  But for her, it was frustrating
4    and disappointing.
5            MR. BONVENTRE:  Objection.  Leading.
6            THE COURT:  Sustained.
7    BY MR. PETRU:
8    Q.   How does that inform you that the ADD scale showed
9    that she perceived significant impairments in many spheres
10   of attention processing while the normative scores were
11   more average?
12   A.   I often actually find that in my patients that come
13   to me with attention problems, their subjective experience
14   is that they are having more problems than sometimes the
15   objective data.  In Emily's case, I think -- a higher
16   functioning individual, as I have come to understand her,
17   and I think those that are higher functioning can be more
18   self aware and also have higher standards for themselves,
19   and they are also involved in more complex life pursuits.
20   So the impingement on something like their attentional
21   abilities are going to be perceived as greater.
22   Q.   And if their limitations in terms of attention and
23   concentration is perceived as greater, how does that
24   impact their emotional state, the PTSD, anxiety,
25   depression, that area, that realm?
```

 1    A.   I think it can be triggering.  I also think it can be

 2    very frustrating, especially with somebody that may have,

 3    we were talking about earlier, slower processing speed,

 4    that that can -- in a complex work, educational, or social

 5    situation, that can be very frustrating.

 6    Q.   And with regard to that and the -- looking at the

 7    same page, with regard to the visuospatial, constructional

 8    processing, and speed of mental processing, both of those

 9    metrics were still reduced in 2020, correct?

10    A.   She scored -- yes, her visuospatial processing on a

11    variety of measures, the WAIS-IV block design, and the

12    RCFT, which is asking a person to copy a complex figure,

13    she scored in the low average range on that measure.

14    Q.   What about the speed of mental processing in 2020?

15    On the TMTA, you denoted:  "Extremely impaired abilities

16    in processing speeds, less than the tenth percentile."

17    A.   Right.

18    Q.   What does that mean?

19    A.   That when she was asked to perform on that measure,

20    the TMTA, which is a fairly -- it is often used in

21    neuropsychology, and on that pretty simple measure, where

22    you are asked to connect numbers in a sequential order,

23    she was unable to do it very rapidly.

24    Q.   Indicating that there was reduced processing speed in

25    that area?

1   **A.   Yes.**

2   **Q.   With regard to the personality and emotional**

3   **assessment in 2020, you -- it looks like virtually the**

4   **same list as before, the SA45 continued to suggest**

5   **challenges with obsessive-compulsive tendencies,**

6   **hostility, interpersonal sensitivity, paranoia and**

7   **psychoticism, the same thing you talked about before.  And**

8   **then you added to that:  "Her BDI endorsements revealed**

9   **moderate degree of clinical depression.  Her BAI**

10  **endorsements indicated a moderate level of anxiety."**

11      **What does that mean?  What does all that mean to you?**

12  **A.   The BDI-II stands for Beck Depression Inventory,**

13  **second edition, that is a very common measure used in**

14  **neuropsychological and psychological assessments.  And**

15  **that was showing that on -- her symptom endorsement was**

16  **such that she was elevated to a moderate degree.**

17      **Out of 60 endorsements -- I don't know how many.  I**

18  **would have to look specifically at how she scored.  So she**

19  **got an 18 out of 63 points, where she endorsed in the**

20  **positive direction.  That indicates a moderate degree --**

21  **excuse me.  I was looking at the BAI.**

22      **She scored -- excuse me -- total score of 20 out of**

23  **63.  That indicates moderate clinical depression.**

24  **Q.   You also utilized a tool called the TOMM, T-O-M-M.**

25  **What is the TOMM?  Why do you use it?  What did it show?**

A.   I had a sense for this evaluation, even though I did

the evaluation for medical purposes, that it might be

important for Emily down the road to have documentation as

to whether or not she may be feigning more symptoms than

she actually had, or in our jargon we call it faking bad.

So being more symptomatic than you actually are, which is

a -- we also call that malingering.  So I administered the

TOMM, and she had no indication of malingering.

Q.   Indicating that the symptoms that she expressed, the

test results that you got, are real and genuine and

reflect what is going on with her?

A.   Yes.  And it shows that she was providing at the time

of the evaluation the best effort that she could possibly

provide.

Q.   In your summary in 2020 you note that:

"Neuropsychologically, the test data illustrates that

Ms. Torjusen has probably regained many of her cognitive

abilities since the accident from 12/17.  However, it is

likely that residual elements of slower mental processing

speed and mild problems with visuospatial relationships

may exist and remain.  More pronounced at this time,

Ms. Torjusen appears to be struggling with psychological

and emotional elements as a reaction to and possibly due

to current psychosocial stressors regarding her present

situation."  And then you go ahead and provide your

1    diagnostic impressions.

2        First of all, are the psychological and emotional

3    elements that she was experiencing in 2020 resultant from

4    the train accident in 2017?

5    A.   What I understood about Emily historically, what she

6    was reporting, was that she really didn't have these kinds

7    of struggles prior to the accident, and that subsequent to

8    the accident, she continued to have these struggles

9    emotionally.

10   Q.   So it is your opinion that the problems that she

11   presented emotionally in 2020 were caused by the accident,

12   correct?

13   A.   I wouldn't use the word "cause."  I would say they

14   most certainly correlate.  There is a lot of evidence to

15   support that they correlate with what happened to her in

16   December of 2017.

17   Q.   What do you mean by "correlate"?  What does that

18   mean?

19   A.   There is a causal relationship.

20   Q.   So there is a causal relationship between the train

21   wreck and the psychological and emotional findings in

22   2020, correct?

23   A.   (Witness nodding head in an affirmative manner.)

24   Q.   Your diagnosis in 2020, was what?

25   A.   Major depressive disorder.  So in 2018 -- I didn't --

1   when Emily came to me, she was not very disclosing of what

2   had occurred regarding the accident.  And I think that

3   that was probably due to what I came to understand was

4   probably post-traumatic stress disorder, that she was

5   avoiding kind of re-experiencing that.  So I felt more

6   definitive that she most likely had, instead of a mood

7   disorder due to a physiological condition, that she had

8   major depressive disorder.  So there was that.  There was

9   the anxiety disorder.  I diagnosed her with post-traumatic

10  stress disorder.  I continued the diagnosis of

11  post-concussive syndrome.  And then the V code.

12  Q.   I'm sorry.  And then the V code.

13       The diagnosis of major depressive disorder you

14  identified as recurrent, meaning that it was ongoing or

15  continuous?

16  A.   Yes.

17  Q.   Rather than one snapshot in time?

18  A.   Right.  Because I had seen that she had struggled

19  with depression two years prior during her initial

20  evaluation.

21  Q.   She reported, amongst other symptoms when you saw her

22  in 2020, that she still continues to experience headaches,

23  nausea and balance problems.  What is the significance of

24  her representation to you that in 2020 she still had

25  problems with headache, nausea and balance?

```
 1    A.   Well, it could be post-concussive symptoms.   Most
 2    likely they would -- in that I always do a medical review
 3    of somebody's record, and there wasn't anything from her
 4    medical record to substantiate problems with those things.
 5    Q.   Let me ask you about that.   Does the fact that Emily
 6    was 20 years old when this crash happened, and she
 7    suffered the TBI at the age of 20, does that impact the
 8    nature or the severity of her experience at that age in
 9    her life at that time?
10    A.   I would say that as a 20-year-old, her brain is still
11    developing.   In addition to she is trying at 20 to acquire
12    knowledge and skills to assist her in her professional,
13    social and other life pursuits.   Can you ask your question
14    again?
15    Q.   Yes.   Because she is 20, because she is going to
16    school, trying to gain information, developing life
17    pursuits, does the fact that she is at that point in her
18    life when she was involved in this crash and suffered the
19    brain injury, does that work together symbiotically to
20    make it worse or have a greater effect on her than it
21    might at some other time in life?
22              MR. BONVENTRE:   I will object, your Honor.
23    Leading.
24              THE COURT:   Overruled.
25    BY MR. PETRU:
```

1    Q.   You can answer.

2    A.   I believe so, in that she is actively trying to

3    acquire and gain and build upon who she is as a person.

4    Her being is more dynamic than somebody that, let's say --

5    I am just throwing out an age; it is irrelevant -- but

6    somebody that is further along in their profession, had

7    some stability in terms of their social existence, their

8    professional existence.  Emily, as a young person, is

9    still encountering lots of elements, trying to gain

10   understanding of who she is as a person.

11   Q.   As a -- I'm sorry.  Go ahead.

12   A.   There is likelihood she will be more impacted as a

13   20-year-old versus a 40-year-old, let's say.

14   Q.   Or a 60-something-year-old.

15        Does the fact that she suffered this TBI and the

16   PTSD, and continues to experience symptomology from both,

17   put her at risk for further or more profound problems if

18   she is concussed again, if she has another injury or

19   accident or something happens and her head gets hit?

20   A.   Yes.

21   Q.   How so?

22   A.   Research -- well, research shows the more -- the

23   cumulative effects of subsequent injury can be very

24   impactful.

25   Q.   So she needs to be alert and attentive to avoid any

1   situation where she might be impacted?

2   A.   Yes.

3   Q.   Forever?

4   A.   Yes.

5   Q.   When you saw her in 2020, she reported to you

6   interpersonal struggles with friends, losing friends.  She

7   explained to you she had been living abroad in Egypt and

8   France and had at times experienced feelings of sadness,

9   often crying on public transportation.  What is the

10  significance of her experiencing sadness and having

11  emotional issues when riding public transportation?  How

12  does that tie together here?

13  A.   She is extremely emotionally impacted when she takes

14  any form of public transportation given what her

15  experience -- being a passenger on the Amtrak train and

16  having experienced an accident that she did.  There is

17  that trauma --

18  Q.   I'm sorry.  I missed the last part because I was

19  talking.  Say it again.

20  A.   It brings back a lot of trauma, reignites the trauma

21  that she suffered.  And I also think, if I may say, there

22  might be some level of emotional disregulation, where she

23  doesn't have as great a control over her emotional self

24  because of the incident.

25  Q.   Is that consistent with your experience treating

1   others who have had post-concussive or TBI symptoms?

2   A.   Yes.   Any form of brain injury.   But, yes.

3   Q.   And it was specifically consistent with the area of

4   the brain where the DTI found there to be damage, correct?

5   A.   Right.   The frontal area of the brain is primarily

6   responsible for that.

7   Q.   What effect does the fact that Ms. Torjusen has

8   difficulty with emotional regulation have on how you would

9   expect she conducts her life?   How does that impact

10   somebody like her?

11   A.   I think it might make her more inhibited to engage in

12   certain pursuits.

13   Q.   Why would she be inhibited to engage in certain

14   pursuits?

15   A.   Well, I think she will want to avoid certain

16   experiences, certain opportunities perhaps.

17   Q.   Is living -- is living a life in a world where you

18   avoid opportunities, avoid things that might otherwise

19   bring you pleasure or joy, something that is difficult for

20   an individual?

21   A.   Right.   I think she may not feel confident in

22   handling herself in some professional relationships and

23   social relationships.   She may avoid attending conferences

24   or other educational opportunities.   Her whole path --

25   life path may be altered.

```
 1            MR. PETRU:  Thank you.  Those are all the
 2   questions that I have.
 3            THE COURT:  I think we can take the morning
 4   recess at this point, 15 minutes.
 5         Jurors, 15 minutes.  Please do not discuss the case.
 6         (At this time, the jury exited the courtroom.)
 7         (Recessed.)
 8            THE COURT:  We will bring in the jury.  With
 9   respect to jury instructions, I talked about a conference
10   at 1:15.  I think I will postpone that.  We will go a
11   while.  I don't, frankly, see a lot of issues.  We might
12   as well wait until the trial is close to completion to
13   make sure they conform to the evidence.
14            MR. PETRU:  Thank you, your Honor.
15            MR. BONVENTRE:  Thank you.
16         (The following occurred in the presence of the jury.)
17            THE COURT:  Everyone, please be seated.  We will
18   get Dr. Scovel back on -- video back on and sound.  And we
19   have her.
20            MR. BONVENTRE:  May I proceed?
21            THE COURT:  You may.
22                      CROSS-EXAMINATION
23   BY MR. BONVENTRE:
24   Q.  Good morning, Dr. Scovel.
25   A.  Good morning.
```

1    Q.   If you cannot hear me or if I mumble or if I speak

2    too quickly, please tell me, Doctor.  Okay?

3    A.   Okay.

4    Q.   Doctor, you were mentioning a few minutes ago at some

5    point during direct examination, that Emily -- that it was

6    significant or it was important that Emily might be able

7    to do well in school if she got a little extra time.  Do

8    you remember that?

9    A.   Yes, I do remember that.

10   Q.   And there was a discussion of a letter from her

11   primary care physician, Dr. Spohr, regarding giving her a

12   little extra time, correct?  Do you remember that?

13   A.   I believe what Mr. Petru had said is Dr. Spohr had

14   been asked to write a letter on Emily's behalf to the

15   University of Washington to give her some form of

16   dispensation.

17   Q.   Right.  And you said that was consistent with what

18   Emily -- Ms. Torjusen was saying to you in your findings

19   of March of 2018, correct?

20   A.   That she was experiencing having the need for more

21   time?

22   Q.   Correct.  That was consistent -- her need for more

23   time was consistent with your findings, correct?

24   A.   In 2018?

25   Q.   In 2018, correct.

```
 1   A.   Um --

 2   Q.   You have to say "yes" or "no," Doctor.

 3   A.   I want to be honest.  So I want to look at the

 4   report.

 5   Q.   Thank you, Doctor.

 6   A.   Her speed of mental processing was impaired, we will

 7   call it, yes.  So that would be consistent with that need.

 8   Q.   So therefore it would be consistent with improvement

 9   if she didn't need the letter of dispensation after one

10   quarter and was able to do extraordinarily well without

11   extra time; isn't that correct?

12   A.   I can't really speak to why she would have done --

13   been doing well.  I would need to know -- have more

14   information about that.

15   Q.   Well, I want you to assume that the letter of

16   dispensation, Doctor, was for one quarter, and thereafter,

17   without that letter of dispensation, she made the dean's

18   list every single quarter.  Okay.  So that means --

19   Doctor, it sounds like therefore she was making marked

20   improvement shortly after she saw you; isn't that correct?

21   A.   I don't think just improvement can be based on

22   processing speed.  I am thinking about my own educational

23   pursuits and processing speed, and some courses are not as

24   important.  For example --

25   Q.   Do you know what courses she was taking?
```

1   **A.**   At what point in time?

2   **Q.**   At any point in time in her career in college, did

3   you become aware of what were the courses that she was

4   taking, whether they were easy courses, difficult courses,

5   sophisticated courses?  Are you aware?

6   **A.**   In 2018, she did tell me what those courses were, I

7   believe.

8   **Q.**   And the courses that she told you were pretty

9   challenging courses, correct, Doctor?

10   **A.**   It's hard for me to go back four years and know what

11   courses she was taking.  Can you tell me what those

12   courses were?

13   **Q.**   Certainly.  Do you know if she was taking courses in

14   Arabic, for example?

15   **A.**   I am trying to find in my report that place.  But I

16   believe -- that's not a surprise to me.  I believe, yes.

17   **Q.**   And courses in international studies; do you recall

18   that?

19   **A.**   I would imagine that she was taking those sorts of

20   courses, because she was getting her degree in

21   international studies.

22   **Q.**   So her ability to take complex courses like that

23   without an additional dispensation, like she had for the

24   one quarter, that is significant to you as a

25   neuropsychologist, correct?

1    A.   Specifically, if I may, she was taking Arabic,

2    political science and two international relations courses.

3    Q.   It doesn't sound like an easy course study, does it,

4    Doctor?

5    A.   Not -- it might be easy for some people.  It's a

6    rigorous -- I think what you are trying to ask, is it a

7    rigorous course of study?

8    Q.   Correct.

9    A.   I would say in general, yes.

10   Q.   And the fact that she was able to do that, and do

11   extraordinarily well, that should be part of your

12   analysis, that's a positive finding, correct?

13   A.   I am thinking that these courses, from my own

14   knowledge of what is required with political science and

15   certainly international relations, that entails a lot of

16   writing, probably a lot of analysis like that.  So those

17   sorts of courses would not necessarily be as affected by

18   processing speed, if that's what you're asking.

19   Q.   Just so the jury understands, Doctor, it was

20   significant that she needed a dispensation for one

21   quarter, but it is not significant that she didn't need a

22   dispensation for the rest of her college career; is that

23   what you are saying?

24           MR. PETRU:  Objection.  Argumentative.

25           THE COURT:  Sustained.

```
 1    BY MR. BONVENTRE:
 2    Q.   Doctor, is it significant for the remainder of her
 3    college career she did not need extra time to do
 4    extraordinarily well at college?  Is that significant to
 5    you as a neuropsychologist?
 6              MR. PETRU:  Same objection.  Foundation,
 7    speculation.
 8              THE COURT:  Sustained.
 9    BY MR. BONVENTRE:
10    Q.   Did you ask -- did you ever look at her transcript --
11    Emily's transcript?
12    A.   I did not.
13    Q.   You were aware, because it is in your records, she
14    had three majors, Doctor, correct?
15    A.   I believe so.  I was aware of two.
16    Q.   Doctor, did you indicate in your records that she had
17    three majors?
18    A.   Did I indicate?
19    Q.   Yes, that her majors were political economy,
20    international studies, and near eastern languages?
21    A.   May I ask where you are looking?
22    Q.   Yes.  On your report of 2020.
23              MR. PETRU:  Which page, counsel?
24    BY MR. BONVENTRE:
25    Q.   Page 3 of your report.
```

1    A.   Yes.   My understanding of what I wrote doesn't mean

2    that those are majors.

3    Q.   Well, I want you to assume there has been testimony

4    in the case that she graduated -- Ms. Torjusen graduated

5    with three majors in those areas.   Okay, Doctor?

6    A.   Okay.

7    Q.   The fact that she was able to graduate with those

8    three majors with dispensation for only one quarter and

9    get extraordinarily high grades, is that relevant and

10   significant to you as a neuropsychologist?

11   A.   I think that is -- says something remarkable about

12   her, yes.

13   Q.   And could it in fact say something about her

14   improvement since you saw her initially in March of 2018?

15   A.   Yes.   As I stated in my 2020 report, that I believed

16   she was doing better cognitively relative to 2018 when I

17   saw her.

18   Q.   Actually, Doctor, you testified in a deposition in

19   this case, correct, Doctor?

20   A.   I did.

21   Q.   And you described her improvement from 2018 to 2020

22   as, quote, significant, correct?

23   A.   Yes.   I remember using that.

24   Q.   So the jury understands, when you saw her two years

25   later, her improvement was significant, correct?

```
 1    A.   Yes.  On a cognitive level.

 2    Q.   And in fact -- let me go back to that.  When you

 3    first saw -- actually, let me ask another thing.  You

 4    indicated that someone like -- someone with Emily's

 5    diagnosis might be, quote, "inhibited to engage in certain

 6    pursuits and experiences."  Is that what you said?

 7    A.   During my testimony today?

 8    Q.   Yes, Doctor.

 9    A.   Yes.

10    Q.   Were you just saying that in general or are you

11    saying -- is it your position that Ms. Torjusen has, in

12    fact, inhibited -- been inhibited in engaging in pursuits

13    and experiences?

14    A.   You are coming across in a little bit of a mumbled

15    way.

16    Q.   I'm sure I am.  Were you making that statement in

17    general or were you saying that Ms. Torjusen has limited

18    her pursuits and experiences?

19    A.   I was doing both.  I was speaking generally.  We were

20    talking about, I believe, at that point in time her

21    psychological/emotional condition.  And so I was --

22    Q.   Go ahead.

23    A.   With somebody that has anxiety, depression and

24    post-traumatic stress disorder, but also, you know, Emily,

25    with those disorders.
```

1  Q.   What do you know about Ms. Torjusen's pursuits and

2  experiences that she has engaged in at her age?  Could you

3  tell me what you know -- what her pursuits and experiences

4  have been?

5          MR. PETRU:  Objection.  Vague.

6          THE COURT:  Overruled.

7          THE WITNESS:  After the 2020 evaluation, I had a

8  phone conversation with Emily.  She was residing in Egypt

9  at that time, I believe Cairo --

10  BY MR. BONVENTRE:

11  Q.   Could I interrupt you for a second?  Do you find

12  someone at that young age --

13          MR. PETRU:  Excuse me, your Honor.  If the

14  witness would be allowed to answer the question which was

15  posed without interruption.

16          THE COURT:  It's a concern.  It's important not

17  to speak over a witness and give the witness an

18  opportunity to fully answer.

19  BY MR. BONVENTRE:

20  Q.   My apologies.  Please continue, Doctor.

21  A.   Would you ask your question again?

22          MR. BONVENTRE:  Can I rephrase the question, your

23  Honor, if it's okay?

24          THE COURT:  You may.

25  BY MR. BONVENTRE:

```
 1    Q.   Are you aware that since you initially saw
 2    Ms. Torjusen in 2018, she has traveled to France, Paris,
 3    Europe, Cairo, Italy and Romania?  Are you aware of that?
 4    A.   I wasn't aware that she traveled to Italy and
 5    Romania.
 6    Q.   Okay.  How many people of Emily's age do you know
 7    have experienced that level of travel by her age?
 8            MR. PETRU:  Objection.  Relevance.
 9            THE COURT:  Sustained.
10            MR. BONVENTRE:  Judge, it is about the life
11    experiences.
12            THE COURT:  Sustained.
13    BY MR. BONVENTRE:
14    Q.   Have you ever seen Ms. Torjusen's LinkedIn page?
15    A.   No.
16    Q.   Are you aware in any way, shape or form of the
17    multiple employment and voluntary activities and
18    organizations that she has been involved in?
19    A.   Some of those related to her employment.
20    Q.   Let me just ask this a simpler way.  Would her actual
21    life experiences that she has been living, all right, in
22    terms of her traveling, her jobs, her organizations, her
23    volunteering, her writing, would these things be
24    significant as to whether or not she is inhibiting herself
25    in her life's pursuits and experiences?
```

```
 1              MR. PETRU:  Objection.  Compound.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I think a person like Emily has a

 4   lot of abilities, just innately.  She has a lot of drive

 5   to pursue these things.  I don't find it that surprising.

 6   Somebody that goes to the University of Washington and

 7   is -- probably from the get-go when she was a freshman, I

 8   would imagine, started taking coursework in Arabic.  I

 9   know that was very important to her.  And she struck me as

10   a person that has a lot of desire to travel and to engage

11   in those sorts of pursuits.  So it doesn't surprise me.

12       I do think that somebody that has those drives to do

13   that may find themselves compromised, given Emily's

14   experience that she has had regarding the accident.

15   BY MR. BONVENTRE:

16   Q.  Doctor, would it be fair to say that you would need

17   to know what her life experiences have been and what her

18   actual pursuits have been before you could tell a jury

19   that they have been in any way inhibited?

20   A.  Well, I know that she has been inhibited.  We only

21   had a brief conversation when she was living in Cairo.

22   But she told me she was actually having such a struggle on

23   public transportation that she was thinking of relocating

24   where she was residing so that she could be closer or

25   wouldn't have to take the public transportation that she
```

```
 1   was taking to her employment situation.

 2   Q.   Okay.  Doctor, that wasn't my question.

 3   A.   All of that is she is inhibited.

 4   Q.   Doctor --

 5             THE COURT:  Just a moment.  You are talking over

 6   the witness who is giving an answer.

 7        You may proceed.

 8             THE WITNESS:  My definition of inhibited, that

 9   would be an example of how I define inhibition.

10   BY MR. BONVENTRE:

11   Q.   Would that definition also include what Ms. Torjusen

12   was doing in terms of traveling, writing, employment,

13   organizations and things like that?

14   A.   I don't know -- you know, your line of questioning is

15   difficult for me, because I don't know what she would have

16   been doing had she not been -- had this experience.

17   Q.   So how do you know she is inhibited -- excuse me.  I

18   apologize.

19             MR. PETRU:  Your Honor, if the witness could be

20   allowed to finish her answer before another question is

21   asked, or an interruption.

22             THE COURT:  I have admonished --

23             MR. BONVENTRE:  I apologize, Judge.  There is a

24   delay sometimes, and I don't know if the Doctor is

25   finished.
```

1              THE COURT:  You can pause long enough to find

2      out.

3              MR. BONVENTRE:  Yes, sir.

4              THE WITNESS:  Speaking to your question about

5      whether or not I would describe her as inhibited.  In that

6      situation, I would describe her as inhibited.  I am not

7      familiar with these other pursuits that she is having.  I

8      am glad that she is able to have those experiences, but we

9      can't -- in my mind, we can't know what else she would be

10     accomplishing and pursuing had she not been -- had this

11     experience.

12     BY MR. BONVENTRE:

13     Q.  Well, you don't know that one way or the -- you don't

14     know one way or the other, is that fair to say, Doctor?

15     A.  When I last saw Emily and then when I followed up

16     with her on the phone after that, it sounded, at least

17     what she was conveying, that she was having some

18     experience -- she was reluctant to engage in certain

19     things because of the trauma she had suffered.

20     Q.  When you first saw --

21     A.  I am forming my opinion based upon what I know and

22     understand about her.

23     Q.  When you first saw the plaintiff on March 14th of

24     2018, you received some medical records, correct?

25     A.  Yes.

1    Q.   Where did you get those medical records from?

2    A.   Did you say where?

3    Q.   Where.  Who sent you the medical records?

4    A.   I'm looking at what I reviewed, and that will inform

5    me of that.  Your question was where did I get those

6    records?

7    Q.   Yes.  Who sent them to you?

8    A.   I would have to go into her file.  Probably all of

9    the medical providers that she was interacting with.

10   There was a hospital record probably from the accident.

11   Q.   Tell the jury where you got the medical records from.

12   A.   Can I explain how my office operates in terms of

13   medical records?

14   Q.   Certainly.  Do you know if you got them from one

15   particular source or did your office go out and get

16   medical records from a bunch of sources?

17   A.   Probably anything that seemed relevant for the

18   evaluation, my secretary contacted those organizations to

19   get the medical records.

20   Q.   Do you have your file in front of you, Doctor?

21   A.   We are talking about the 2018 evaluation?

22   Q.   Yes, Doctor.

23   A.   Okay.  I have it.

24   Q.   Are you able to ascertain -- I don't want to belabor

25   this point, Doctor.  I will move on.  Do you know how you

```
 1   got the medical records?  If you don't know, that's fine,
 2   I will move on.
 3   A.   My secretary requested records from Providence Health
 4   Services.  These were the hospital records.  We had notes
 5   from Dr. Spohr, Meghan Spohr, the primary care physician.
 6   I have lab reports.  I have something called WSP.  I'm not
 7   sure what that stands for.  Providence Saint Pete's
 8   Hospital.
 9              MR. BONVENTRE:  Judge, can I speed this up and
10   interrupt for one second?
11   BY MR. BONVENTRE:
12   Q.   Doctor, I'm curious, did you get the records directly
13   from the healthcare providers?
14   A.   Yes.
15   Q.   Fine.  Thank you.
16   A.   From the healthcare providers' office.
17   Q.   Thank you.  I appreciate it.  That's what I was
18   looking for.
19        Now, could we go to Page 3 of your -- there is the
20   testing report, the neuropsychological testing report,
21   dated 3/15/18.
22   A.   Okay.
23   Q.   And in that report, Doctor, you indicate that usually
24   a concussion -- by the way, a mild traumatic brain injury,
25   that's another word for a concussion, correct?
```

```
 1    A.   Correct.

 2    Q.   And you said that usually the symptoms last for up to

 3    three months or so, correct?

 4    A.   Yes.   The research says -- much of the research says

 5    that most of the time symptoms remit at that point.

 6    Q.   And you said, though, sometimes they can persist for

 7    a year or so, correct?

 8    A.   Yes.

 9    Q.   And you had indicated on the next paragraph that you

10    were hopeful --

11              MR. PETRU:   Excuse me, your Honor.   Counsel

12    misread that.

13              MR. BONVENTRE:   She just adopted what I said,

14    Judge.

15              MR. PETRU:   Counsel misread it.

16              THE COURT:   I don't understand your concern.

17              MR. PETRU:   The report says "a year or more."   It

18    doesn't say "a year or so.

19              THE COURT:   Do you want to redirect the question?

20              MR. BONVENTRE:   Not really.   I will if the Court

21    wants me to.

22    BY MR. BONVENTRE:

23    Q.   Is it approximately a year, give or take, that

24    problems can persist?

25    A.   Are you asking me now?
```

1    Q.   Yes, Doctor.

2    A.   That is directed at me?

3    Q.   Yes.  They can persist for a year, even longer than a

4    year, correct?

5    A.   Correct.

6    Q.   Thank you.  But you were hopeful in that very first

7    visit there would be a full recovery if she had therapy,

8    correct?

9    A.   What do you mean by "therapy"?

10   Q.   What did you mean by it when you said you were

11   hopeful she would have a full recovery?  Did you indicate

12   that in your report?

13   A.   I said, "Hopefully with conscientious adherence to

14   sound medical -- sound health practices, rehabilitative

15   treatment and medical compliance she may -- Ms. Torjusen

16   may fully recover from the detrimental consequences."

17   Q.   Okay.  Thank you.  Now, could you go to your

18   examination in June of 2020.

19   A.   Okay.

20   Q.   Just so I understand it, you redid the tests that you

21   had done in 2018; you redid them in 2020, correct?

22   A.   Many of them.

23   Q.   Excuse me.  In fact, you found she had made

24   significant progress, correct?

25   A.   Not in all spheres, but some.

1    Q.  Did you testify under oath in this case that her

2    progress and her improvement were, quote, significant,

3    unquote?

4              MR. PETRU:  Asked and answered.

5              THE COURT:  Sustained.

6    BY MR. BONVENTRE:

7    Q.  I would like to go over some of those tests, okay, if

8    we could, Doctor.

9    A.  Sure.  Um-hum.

10   Q.  So in the intellectual functioning, again,

11   Ms. Torjusen scored very high, correct?

12   A.  She scored -- her full scale was the same --

13   Q.  So there was no --

14   A.  -- as 2018.

15   Q.  Now, executive functioning, we have heard a lot

16   about executive functioning.  You said, and I quote,

17   "There is no evidence of impingement to executive

18   functioning," correct?

19   A.  Where are you reading, if I may ask?

20   Q.  Under the section that says "executive functioning."

21   A.  I can't -- I did find it.  Impingements is one

22   measure.

23   Q.  That wasn't my question.  Doctor, did you say, and I

24   quote:  "There is no evidence of impingement to executive

25   functioning"; did you say that in your report?

1   **A.**   I see where you are reading from now.  I was implying

2   given the results of the WCST, that it did not show

3   impingement to executive functioning.

4   **Q.**   Respectfully, Doctor, I am not asking if you were

5   implying.  In your report did you say, and I quote, "There

6   was no evidence of impingement to executive functioning"?

7   **A.**   That is the sentence that follows the measure of the

8   WCST.  So that sentence is linked to what I said in the

9   previous sentence.

10   **Q.**   Okay.  The next sentence after that said, "She,"

11   quote, "demonstrated no problems to executive processing."

12   Did I read that correctly?

13   **A.**   On the TOL, Tower of London.

14   **Q.**   Did I read that correctly, Doctor?

15   **A.**   On that particular measure, she showed no deficits.

16   **Q.**   And the next section is memory and learning, correct?

17   **A.**   It is.

18   **Q.**   And you said, quote, "No evidence of a problem with

19   learning," is that correct, "was evinced"?  Did I read

20   that accurately?

21   **A.**   On the WCST.

22   **Q.**   And she had -- her auditory memory index was high

23   average, correct?

24   **A.**   Yes.  Um-hum.

25   **Q.**   And working memory index was average, correct?

1  A.   Correct.

2  Q.   And then, Doctor, the very next paragraph you

3  indicated that, quote, "These findings reveal marked

4  improvement or relative stability in her memory

5  constructs," correct?

6  A.   Yes.  I did a direct comparative analysis between the

7  prior setting and the 2020 setting.

8  Q.   And so in 2020 there was, quote, "marked

9  improvement," correct?

10 A.   Or relative stability.  So in some areas, there was

11 relative stability.  There wasn't further deficit.  So it

12 was either improved or the same statistically.

13 Q.   And then on the next paragraph you said, "Current

14 objective attentional psychometrics revealed no gross

15 impairment to attention, and denotes improvement in this

16 domain," correct?

17 A.   Yes, compared to the 2018 setting.

18 Q.   Not only compared to the 2018, but the test itself

19 showed no impairment to attention, correct?

20 A.   The objective measures, yes.

21 Q.   Well, you did the test because you wanted an

22 objective measure, correct?

23 A.   I wanted an objective measure, yes.

24 Q.   Thank you.  There was also improvement in mental

25 processing speed, correct?

1    **A.**   Looking at her WAIS-IV processing speed index, on

2    that measure, yes, but not on the other measure, the TMTA,

3    she was still impaired.

4    **Q.**   But you did indicate in your report there is

5    improvement in mental processing speed, correct?

6    **A.**   So the way I write my reports is when I make a

7    statement like that in the summary, it relates to the

8    measure I was just talking about.

9    **Q.**   And with respect --

10   **A.**   It has to do with the WAIS-IV processing speed index.

11   **Q.**   And there was marked improvement?

12   **A.**   Yes.  Well, there was some improvement.

13   **Q.**   Now, at the time that the plaintiff was seeing you in

14   2020, she advised you she was not taking any medications,

15   correct?

16   **A.**   I believe -- I believe that was my understanding.  I

17   would have to look in the body of the report.

18   **Q.**   If you look, Doctor, on Page 3, the one, two, fourth

19   paragraph down, the very last sentence of that paragraph.

20   **A.**   The key findings?

21   **Q.**   Do you see where it says, "Ms. Torjusen has a primary

22   medical history"; do you see that?

23   **A.**   Okay.  Yes.

24   **Q.**   The very last sentence, does it indicate that she is

25   not taking any medication?

1    A.   Yes.   Um-hum.   That's correct.

2    Q.   By the way, you indicated that she does not -- in

3    that report, that she does not meet the criteria for ADHD,

4    correct?

5    A.   In my opinion, she did not exhibit the symptoms that

6    would warrant that diagnosis.

7    Q.   That is further demonstration of her marked

8    improvement, correct?

9            MR. PETRU:   Sorry.   What was the question?

10   BY MR. BONVENTRE:

11   Q.   That's further demonstration of her marked

12   improvement, correct?

13   A.   Well, in 2018, I was undecided about whether or not

14   she had those symptoms of ADHD, to be quite clear.   That's

15   why I put it as a rule out.

16   Q.   So you indicated that your findings were improvement

17   in memory constructs, language ability, memory processing

18   speed and motor dexterity, correct?

19   A.   You are looking now at the 2020 report?

20   Q.   Yes, Doctor.

21   A.   Where are you reading from?

22   Q.   The key findings -- the same page, the key findings

23   of this neuropsychological evaluation, Doctor.

24   A.   Okay.

25   Q.   Did I read that correctly, that she has improvements

1  in memory constructs, language ability, mental processing

2  speed and motor dexterity?

3  A.  Yes.  But if I was to write this report again I

4  probably wouldn't have included the mental processing

5  speed, because there was some ambiguity in her testing.

6  Q.  But when you did write the report, prior to

7  testifying here today, you indicated that there was

8  improvement in mental processing speeds; is that correct?

9  A.  I did write that.

10  Q.  Okay.  And in fact, what you indicated was she -- the

11  only real problem she had was the residual elements of

12  some slightly slower mental processing speed, correct?

13  A.  There is a lot in this report.  So if you can direct

14  my attention to where exactly you are reading from.

15  Q.  In summary, at the very end, Doctor, at the very end

16  of that page on page --

17  A.  Okay.  Can you restate your question, please?

18  Q.  Yes.  Did you indicate -- I will rephrase the

19  question, Doctor, okay?  I will rephrase it.  Is that

20  okay?

21  A.  I see the sentence that you are referring to now.

22  Q.  Did I read it accurately?

23  A.  "However, it is likely that residual elements of

24  slower mental processing speed and mild problems with

25  visual/spatial relationships may exist and remain."

1   Q.   Right.  You indicated that "she had regained many of

2   her cognitive abilities," correct?

3   A.   It seems -- based upon prior -- the prior evaluation,

4   yes.

5   Q.   And, Doctor, we talked a minute ago about -- you

6   indicated in 2018 you thought with appropriate treatment

7   and health and all that stuff, you thought she could fully

8   recover?  Do you remember you said that a couple of

9   minutes ago?

10          MR. PETRU:  Misstates the testimony, your Honor.

11          THE COURT:  Just a moment.  I have an objection.

12   The objection is overruled.

13          MR. BONVENTRE:  Thank you, your Honor.

14          THE WITNESS:  I felt that it was a possibility,

15   yes.

16   BY MR. BONVENTRE:

17   Q.   That she could, quote, "fully recover," you said that

18   in 2018, correct?

19   A.   I did.

20   Q.   And at your deposition, following your testing in

21   2020, you said under oath you thought her prognosis was

22   even better now after 2020, correct?

23   A.   Compared to 2018 when I saw her, her cognitive

24   abilities had improved.

25   Q.   That wasn't my question.  Did you testify under oath

 1   that the prognosis in 2020 was even better than the

 2   prognosis in 2018?

 3   A.   I don't know about prognosis.

 4   Q.   Doctor, do you recall testifying at a deposition?

 5   A.   Yes.

 6            MR. BONVENTRE:  Just one moment, your Honor, to

 7   get to the point.  I apologize.

 8   BY MR. BONVENTRE:

 9   Q.   Doctor, did you indicate in your deposition in 2020

10   that your prognosis for her was better than when you saw

11   her in 2018?  Do you recall saying that?

12   A.   I am looking at the definition -- excuse me.  I am

13   looking at the deposition.

14            THE COURT:  If you -- excuse me.  I'm sorry.

15   Would you refer to the page number and the date of the

16   deposition.

17            MR. BONVENTRE:  Yes.  Absolutely, your Honor.

18   BY MR. BONVENTRE:

19   Q.   You were deposed, Doctor, on November 19th, 2020,

20   correct?

21   A.   Yes.

22   Q.   And on Page 57 and 58 you were asked about your

23   prognosis; do you recall that?

24   A.   Give me time to get that.

25   Q.   Please.

**A.**   Okay.  At the bottom I was asked, "And what is your

prognosis for Ms. Torjusen?"  Is that what you are

referring to?

**Q.**   Yes.

**A.**   "Following the June 2020 evaluation."

**Q.**   And did you indicate that your prognosis for her was

better than when you saw her in 2018?

**A.**   Yes.

**Q.**   And in 2018 --

**A.**   I saw --

**Q.**   And in 2018 you thought she could fully recover,

correct?

          MR. PETRU:  Objection.  Misstates the testimony.

          THE WITNESS:  I was hopeful.

BY MR. BONVENTRE:

**Q.**   Hopeful.  Thank you.

**A.**   And I -- I would like to give a little more detail,

if I may.

**Q.**   Okay.  Certainly.  Go ahead.

**A.**   In 2018, I had been given the referral from

Dr. Spohr's office to do a medical evaluation.  And in my

report, I like to conclude after I -- in my conclusions,

my last paragraph, I like to provide information to the

patient that they can do -- that will benefit -- be

beneficial to them.  And I like to -- in Ms. Torjusen's

```
 1    case, as a 20-year-old, I wanted to give her some hope
 2    that if she was to conduct herself in certain ways that
 3    she might improve.  That's what that, hopefully, was all
 4    about.
 5    Q.  You didn't say "improve," you said "fully recover,"
 6    correct?
 7    A.  I said fully recover or something else.  I don't have
 8    that in front of me right now.
 9    Q.  Were you lying to the patient when you said that?
10         MR. PETRU:  Objection.  Argumentative, your
11    Honor.
12         THE COURT:  Sustained.
13         MR. BONVENTRE:  I have nothing further.
14                   REDIRECT EXAMINATION
15    BY MR. PETRU:
16    Q.  Dr. Scovel, as part of your work, from what I
17    understand, you administer a series of tests.  And as a
18    neuropsychologist, you don't just look at one test result
19    and draw a conclusion from it, you have to have some
20    concordance or congruence from several different tests,
21    batteries, correct?
22    A.  Yes, that lends strength to your evaluation.
23    Q.  And is it appropriate or inappropriate to take things
24    out of context and draw conclusions on them without
25    considering the whole?
```

```
 1                 MR. BONVENTRE:  Objection.  Argumentative.

 2                 THE COURT:  Overruled.

 3                 THE WITNESS:  Yes, it is important to look at the

 4       entirety, and if there is incongruence to try to

 5       understand why that might be.

 6       BY MR. PETRU:

 7       Q.  Can you -- do you have your deposition there, still?

 8       A.  I do, but it is a little jumbled.  But I do have it

 9       in front of me.

10       Q.  Counsel asked you about the testimony you gave about

11       prognosis in the deposition.  And that was the bottom of

12       Page 57.  The question is, "What is your prognosis for

13       Ms. Torjusen following the June 2020 evaluation?"  Can you

14       please read the entirety of your answer slowly.  People

15       read fast.

16       A.  Yes.  I wrote -- or I said in the deposition, "My

17       prognosis for her is better than when I saw her in 2018,

18       because I saw improvement on most of her measures.  But it

19       is hard to be definitive because there is still some

20       outstanding issues.  And in a small, around ten to

21       25 percent of people with post-concussive syndrome they --

22       they, for whatever reason, do not show significant

23       improvement longitudinally.  So I don't know if

24       Ms. Torjusen will fit into that classification."

25       Q.  And now, a year and a half afterwards, if she still
```

 1   has some of the symptomology, is it your opinion that

 2   unfortunately she probably does fit into that

 3   classification?

 4              MR. BONVENTRE:  Objection.

 5              THE COURT:  Sustained.

 6   BY MR. PETRU:

 7   Q.  Assuming that she has ongoing symptomology, do you

 8   have an opinion as to whether or not, unfortunately, she

 9   fits into the classification?

10              MR. BONVENTRE:  Objection.

11              THE COURT:  Overruled.

12   BY MR. PETRU:

13   Q.  You can answer.

14   A.  I believe that there is a probability that she might

15   fit into that classification.

16              MR. PETRU:  Your Honor, I would like to admit

17   Exhibit 5 and Exhibit 6, which are the two reports, rather

18   than go through and parse out all of the areas in

19   cross-examination.

20              MR. BONVENTRE:  Objection, your Honor, for

21   reasons we have discussed before.

22              THE COURT:  Was this a stipulated exhibit?

23              MR. PETRU:  No.  Demonstrative only.

24              THE COURT:  Denied.

25              MR. PETRU:  Let me use it demonstratively.

1   Apparently, I am incorrect.  There was a stipulation to

2   the first report.

3           MR. YATES:  No, I don't believe so.  It's not

4   stipulated.  It is clearly her report.

5   BY MR. PETRU:

6   Q.  I will do it this way --

7           THE COURT:  If you have a hard copy, you can use

8   the ELMO --

9           MR. PETRU:  I will do it this way.  She will be

10  able to see it.  That might be a little easier.

11  BY MR. PETRU:

12  Q.  All right.  This is all from the second report.

13  Counsel read a portion of executive functioning.  First of

14  all, is this your second report, dated June 2nd and 4th,

15  2020?

16  A.  Yes, it is.

17  Q.  With regard to executive functioning, you explain in

18  response to counsel's questions that there was more than

19  one measure that were used for executive functioning.  One

20  of the majors was the TMT, another one was the WCST, and

21  the third one was the TOL, correct?

22  A.  Correct.

23  Q.  And in your answer to counsel you tried to explain

24  that the sentences that he read needed to be read in

25  context.  On the TMTB, the results placed her, meaning

1   Emily Torjusen, in the extremely impaired range,

2   explaining that that was because -- the test was completed

3   in 94 seconds, or less than the 10th percentile, correct?

4   A.   Right.   Correct.

5   Q.   In contrast, the WCST she was able to complete the

6   task within the average levels and, hence, on that test

7   there was no impingement to executive functioning.  And on

8   the TOL, she further demonstrated no problems in executive

9   functioning.

10      So you can't take the description of one of the test

11   results and apply it to all of them if it doesn't apply,

12   correct?

13   A.   That's right.

14   Q.   That would be unfair and inappropriate, correct?

15   A.   Well, it would not be accurate.

16   Q.   It wouldn't be accurate.  Similarly -- sorry to do

17   this.  But at the end of this I was going too fast.  The

18   last sentence was, "Compared to the previous evaluation,

19   there was no apparent difference in" -- we have to go to

20   the next page -- "performance measures of executive

21   function.  However, it is relevant to point out that

22   slower processing speed probably affected both her current

23   and former TMTB performance," correct?

24   A.   Correct.

25   Q.   Context matters?

1          MR. BONVENTRE:  Objection.  Is that a question,

2     Judge?

3     BY MR. PETRU:

4     Q.   Does context matter?

5     A.   Yes.  There is a lot of nuance and subtlety in an

6     evaluation such as this.

7     Q.   Counsel asked you questions about attention and

8     concentration.  Again, there is more than one scale for

9     attention and concentration.  One is the CATA and the

10    CPT-3.  But in the middle, there is the subjective

11    endorsements on the Brown ADD scales, which found that

12    Ms. Torjusen believes she has significant impairments in

13    many spheres of attention processing.  You can't ignore

14    that to the exclusion of the rest, can you?

15          MR. BONVENTRE:  Compound and leading, your Honor.

16    Objection.

17          THE COURT:  Leading.  Sustained.

18    BY MR. PETRU:

19    Q.   Can you exclude one part and ignore the rest?  Can

20    you exclude one part and only comment on the others?  Is

21    that appropriate?

22    A.   No.  A competent neuropsychologist would never do

23    that.

24    Q.   On processing speed, counsel asked you questions

25    about processing speed.  Let's take a look at what

1   actually was there.  Ms. Torjusen's score on the TMTA

2   denoted extremely impaired abilities in processing speed,

3   less than 10 percent.  Did I read that correctly?

4   A.   Correct.

5   Q.   However, her processing speed index on the WAIS-IV

6   reflected average abilities in the 50th percentile.  Did I

7   read that correctly?

8   A.   Yes.

9   Q.   And then you wrote, "This depicts some improvement in

10  mental processing speed compared to her previous test."

11  Did I read that correctly?

12  A.   Yes.

13  Q.   You didn't say, as counsel suggested, "This depicts

14  marked improvement," did you?

15  A.   No.  I actually said, "Some improvement."

16  Q.   With regard to Ms. Torjusen's prognosis, you talked

17  with counsel about the prognosis with regard to the brain

18  injury component of Ms. Torjusen's condition, but not with

19  regard to the emotional component, the PTSD, the

20  depression, the anxiety.  What is your prognosis with

21  regard to her ongoing PTSD, anxiety and depression?

22  A.   My clinical impression of Ms. Torjusen is that she is

23  reluctant to engage in, you know, individual

24  psychotherapy, which I think could support her in terms of

25  the diagnoses.  That may be, in part, because of the

1   nature of PTSD.

2   Q.   Have you found with other patients over the course of

3   your work, as well as the literature, that people who have

4   PTSD and have TBI are reluctant or recalcitrant to engage

5   in therapies?

6   A.   Much of the time.

7   Q.   Why?

8   A.   It's very uncomfortable emotionally for them to --

9   Q.   I'm sorry.  Is she to be blamed for that in any way,

10  shape or form?

11          MR. BONVENTRE:  Objection, your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  It is part of the condition.

14  BY MR. PETRU:

15  Q.   Is Emily Torjusen -- is Emily Torjusen to be blamed

16  for the fact that as part of her condition there is a

17  reluctance or difficulty in engaging in any long-term

18  psychotherapy?

19          MR. BONVENTRE:  Objection, your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  No, she is not to be blamed for

22  that.

23  BY MR. PETRU:

24  Q.   She has tried, and hopefully she will try again,

25  correct?

```
 1              MR. BONVENTRE:  Objection, your Honor.
 2              THE WITNESS:  That's my understanding.
 3              THE COURT:  Just a minute.  Objection sustained.
 4   Leading.
 5   BY MR. PETRU:
 6   Q.   Do you hope that she will try again?
 7   A.   To engage in psychotherapy, yes.
 8   Q.   Do you have any reason to believe that the pattern
 9   that has existed for the last four and a half years,
10   however, will not repeat?
11              MR. BONVENTRE:  Objection.
12              THE COURT:  Overruled.
13              THE WITNESS:  Can you repeat that?  I didn't
14   quite hear all of it.
15   BY MR. PETRU:
16   Q.   Based on your neuropsychological background, training
17   and experience, would you expect that because the pattern
18   has been over the last four and a half years to have
19   intermittent therapy which is cut short, that that pattern
20   will repeat?
21   A.   It's hard for me to be definitive.  I don't
22   understand -- I have not spoken to Emily about the reasons
23   for that, why she is reluctant to engage.  I can only
24   surmise that she is reluctant because it is very
25   uncomfortable for her.
```

```
 1                MR. BONVENTRE:  Objection.
 2                THE COURT:  Overruled.
 3                THE WITNESS:  I am saying uncomfortable
 4    psychologically and emotionally because of the nature of
 5    post-traumatic stress disorder.
 6    BY MR. PETRU:
 7    Q.  Based on your experience with patients such as Emily
 8    who have PTSD, anxiety, depression, TBI, would you expect
 9    that it is more probable than not that she will continue
10    to have that pattern with therapy, start it and stop it,
11    based on your training?
12                MR. BONVENTRE:  Objection.
13                THE COURT:  Basis.
14                MR. BONVENTRE:  Speculative.
15                THE COURT:  Overruled.
16    BY MR. PETRU:
17    Q.  You can answer.
18    A.  That would be my opinion.
19    Q.  And that pattern is consistent with the patients you
20    have been following over the years in your practice,
21    correct, in a similar situation?
22    A.  Yes.  That's correct.
23                MR. PETRU:  Let me check my notes.  I think I'm
24    done.  Thank you.  That's all I have.  Appreciate your
25    patience.
```

1            MR. BONVENTRE:  No further questions, your Honor.

2            THE COURT:  All right.  Thank you, Doctor.  You

3    are excused.

4            THE WITNESS:  Thank you.

5            THE COURT:  The plaintiff may call your next

6    witness.

7            MR. LEVY:  Your Honor, the next witness is

8    Daniel Healy.  He is appearing on Zoom as well.

9            THE CLERK:  He is not in the waiting room.

10           MR. LEVY:  He will be there in a second.  I just

11   told him.  There he is.

12           THE CLERK:  Mr. Healy, can you hear us?

13           THE WITNESS:  Yes.  Can you hear me?

14           THE CLERK:  Yes.  You can turn your video on.

15           THE COURT:  Good morning, Mr. Heally.  If you

16   would raise your right hand, the oath of witness will be

17   administered.

18                       DANIEL HEALLY,

19       having been sworn under oath, testified as follows:

20           THE COURT:  All right.  Thank you.

21       Mr. Levy, you may proceed.

22           MR. LEVY:  Thank you, your Honor.

23                       DIRECT EXAMINATION

24   BY MR. LEVY:

25   Q.  Good morning.  What is your name?

```
1    A.    David Daniel Heally.

2    Q.    Where do you live?

3    A.    Vancouver, Washington.

4    Q.    And how old are you?

5    A.    Twenty-four years old.

6    Q.    What do you do for a living?

7    A.    I do construction information and streaming.

8    Q.    Did you say "and streaming"?

9    A.    Yeah.

10   Q.    What do you mean by that?

11   A.    I stream video games on Twitch now.

12   Q.    Do you know Emily Torjusen?

13   A.    I do.

14   Q.    I want to talk to you about your relationship with

15   Emily, and talk to you about some of the changes, if any,

16   you have noticed since the crash.  Is that okay?

17   A.    Yeah.

18   Q.    When did you meet Emily?

19   A.    I met her in my sophomore year of high school.

20   Q.    And how did you become friends?

21   A.    We met at a play for a mutual friend.

22   Q.    You met at a play?

23   A.    Yeah.  And we became friends via the mutual friend.

24   We belonged to the same friend group.

25   Q.    And did Emily enjoy going to plays in high school?
```

A.   Yeah.   We went to a couple to support our friend
Astrid.

Q.   Were you in the same grade as Emily?

A.   Yes, we were.

Q.   What was Emily like when you first met her?  Please
describe her.

A.   She was cheerful, easygoing, fun to be around,
sometimes quiet.   Just more adventurous, just more
cheerful and happy.

Q.   What kind of stuff did you like to do with Emily,
what kind of activities?

A.   We usually went on a lot of hikes and many study
sessions, doing homework, going out to go see some movies
over time.   Went to see plays with our mutual friends.

Q.   Were you close friends in high school?

A.   Yeah, I think so.

Q.   Did you stay friends after you both graduated high
school?

A.   Yes, we did.

Q.   And where did you go to college?

A.   I went to Washington State University, the Vancouver
campus.

Q.   And where did Emily go to college?

A.   She went to the University of Washington up in
Seattle.

1  Q.   And during Emily's time in Seattle, before the crash,

2  did you ever have a chance to go and visit her?

3  A.   Yes, I did go up there once to go see a concert, and

4  we stayed at Emily's apartment.

5  Q.   Did you have a good time with Emily on that trip?

6  A.   Yeah, it was a good time.  We spent the night,

7  hanging around in the park.

8  Q.   Is she easy to get along with?

9  A.   Yes, very easy to get along with.

10 Q.   I want to change gears and talk to you about the

11 train crash.  How did you find out that Emily was in the

12 train crash?

13 A.   I called her after she had -- she was out of the

14 hospital, and she told me about the incident.

15 Q.   Did she tell you about the incident in detail?

16 A.   Yeah, fairly graphic detail.

17 Q.   Did she become emotional when she told you that

18 story?

19 A.   Yeah.  She started choking up.  It sounded like she

20 was being pretty emotional about it.

21 Q.   And you could hear that over the phone?

22 A.   Yeah, I could hear it.  Yeah.

23 Q.   Prior to the crash, had you known Emily to be

24 somebody who would get choked up or cry often?

25 A.   No, not really.  I have never seen her get emotional

 1   in the past.

 2   Q.   What did she tell you about the crash --

 3            MR. YATES:   Hearsay.

 4            THE WITNESS:   She told me --

 5            THE COURT:   Just a minute.

 6            MR. LEVY:   It goes to the effect on the listener.

 7            THE COURT:   What is the purpose?

 8            MR. LEVY:   Effect on the listener.

 9            THE COURT:   I'm sorry.   What did you say?

10            MR. LEVY:   Effect on the listener.   It is not for

11   the truth.

12            THE COURT:   Overruled.

13   BY MR. LEVY:

14   Q.   So what did she tell you about the crash?

15   A.   She told me how she was in the car and she felt all

16   of a sudden she was falling and falling over.   She told me

17   how she was pinned down and couldn't move, and she felt

18   like she was bleeding, and there was dirt falling on her

19   face.   She said it was a come-to-God moment, and started

20   praying, was incredibly worried she was going to die, an

21   overall traumatic experience.

22   Q.   Did she say anything to you about wanting to ride a

23   train?

24   A.   Yeah.   In high school --

25   Q.   Go ahead.

1        MR. YATES:  My objection is hearsay.

2        THE COURT:  I'm sorry.

3        MR. YATES:  I have a hearsay objection to the

4   last question.

5        THE COURT:  I am going to sustain the objection.

6   BY MR. LEVY:

7   Q.   Before the crash, did Emily like trains?

8   A.   Yes, she did.  She said it was on her bucket list to

9   jump a train, be a bum on a train.  She had done it in the

10  past.

11  Q.   After the crash, did you have a chance to see Emily

12  again in person?

13  A.   Yes.  We hung out several times after the crash,

14  spent a lot of time together.

15  Q.   Tell me about the first time you saw her after the

16  crash, how did she look?

17  A.   I remember her looking rough, kind of scarred,

18  hollow, disheveled look.  It looked -- it looked like it

19  changed her.  She was depressed and disheveled.

20       THE COURT:  I am having trouble hearing you.  I

21  think it is your audio.  I don't know if you can turn down

22  your mic a little bit.

23       THE WITNESS:  Is that better?

24       THE COURT:  It seems about the same.  If you

25  speak slowly, it might overcome the audio --

```
 1    BY MR. LEVY:
 2    Q.   Do you remember the question?  I would like to hear
 3    your answer again.  I can ask you again, if you like.
 4    A.   Ask me again, please.
 5    Q.   We were talking about the first time you saw Emily
 6    after the crash.  And I asked you if you could please
 7    describe how she looked at that time.
 8    A.   I remember being with her a couple of months after
 9    the crash, I think.  She looked like she was roughed up a
10    bit, and she looked disheveled and stressed out and
11    (inaudible) like she was (inaudible) -- it really was a
12    trying experience with her.
13              THE COURT:  Excuse me.  Would it help, Dara, can
14    we turn down the volume?
15              THE CLERK:  It is on his end.
16              THE COURT:  I figured it was.
17              MR. LEVY:  Daniel, did you turn down the volume
18    on your microphone?
19              THE WITNESS:  I will turn it down.
20              MR. LEVY:  Maybe turn it down a little bit.
21    Maybe don't get so close to the microphone.  That might
22    help, too.
23              THE WITNESS:  Is this better?
24              MR. LEVY:  It is better.
25              THE COURT:  Again, can you sit a little bit
```

1    further away.

2    BY MR. LEVY:

3    Q.   Let's give it a shot.   You mentioned she looked

4    disheveled.   I think you said she continued to look

5    disheveled in the subsequent times you saw her; is that

6    correct?

7              MR. YATES:   Objection.   Misstates the testimony.

8              THE COURT:   Overruled.

9    BY MR. LEVY:

10   Q.   You can go ahead --

11   A.   Should I go on?

12        Whenever she would talk about it, she would get a

13   thousand-yard-stare look and then just -- multiple times

14   we spent time together, it looked like she had a lot of

15   anxiety regarding the train accident, a lot of stress.   I

16   guess (inaudible) --

17             THE COURT:   We are not doing well with your

18   audio.   What is your proposal here, if the court reporter

19   can't take down what is being said?

20             MR. LEVY:   Understood.   Do you have any

21   headphones, Daniel, you can pop in?

22             THE COURT:   I might add, I am having difficulty.

23             MR. YATES:   So am I.

24             THE CLERK:   I have the mics turned down all the

25   way.

1        THE COURT:  Do we have a number that he can call

2   in?

3        MR. LEVY:  There is --

4        THE COURT:  Let's take our noon recess and see if

5   we can improve on this.  One option, Mr. Heally, might be

6   for you -- if you have a cell phone to call into the phone

7   number that we should have there as part of the Zoom.

8      We will take our noon recess.  We will return at

9   1:20.  Don't discuss the case.

10        MR. LEVY:  Daniel, please stay here.  I will work

11   with you to get the audio sorted out.

12      (At this time, the jury exited the courtroom.)

13        THE COURT:  We will see if we can improve on

14   this.

15      (Recessed.)

16

17

18

19

20

21

22

23

24

25

```
 1                              AFTERNOON SESSION

 2                              MARCH 31, 2022

 3            THE COURT:  We have Mr. Heally back and

 4    apparently with somewhat better audio.  We will see.

 5    Bring in the jury.

 6         (The following occurred in the presence of the jury.)

 7            THE COURT:  Everyone, please be seated.  We will

 8    resume, Mr. Levy, and see how this goes.

 9            MR. LEVY:  Thank you, your Honor.

10    BY MR. LEVY:

11    Q.  Welcome back, Mr. Heally.  Before we broke for lunch,

12    I had asked you a question about how Emily looked the

13    first time you saw her after the crash.  Do you recall

14    that?

15    A.  The whole thing was she was disheveled and what I

16    would call hollow, and looking a little bit roughed up,

17    some scarring, I remember vaguely from the first time I

18    saw her.

19    Q.  I think you also mentioned that she looked like she

20    had a thousand-yard stare.  Is that what you said?

21    A.  Yeah.  That's what I would associate with the hollow

22    look, like a thousand-yard stare, trying to remember that

23    and --

24    Q.  Now, was that thousand-yard stare something you

25    noticed consistently in Emily since the crash?
```

1   A.   No.   Before the crash, I have never really seen that

2   kind of expression from her.   But post-crash, I would say

3   I would see it more often now.

4   Q.   Based on your observations, has Emily's personality

5   changed since the crash?

6   A.   She is faster to anger, more grumpy.

7   Q.   Can you give me some examples of Emily's anger?   Can

8   you give me some examples of Emily's anger you have

9   noticed after the crash?

10  A.   Yeah.   I would say she -- a good example, she gets

11  frustrated very easily, quicker to cut people off.   For

12  example, like sometimes I would crack jokes that would

13  normally be okay.   She would say "stop it" or tell me to

14  stop saying these kind of jokes, or stop cracking wise,

15  the usual, that kind of thing.   But cutting off friends

16  and things like that.

17  Q.   And in the example you just gave of when you said a

18  joke that she didn't like, how did she react to that?

19  A.   She would get quiet -- she would be quiet, kind of

20  look up and say, "Don't make jokes like that," or "Don't

21  talk -- don't dig more into topics like this or I will cut

22  you off."   "Don't make me cut you off," I remember is what

23  she said exactly at one point.

24  Q.   Talking about cutting people off, do you have any

25  knowledge -- do you know people that Emily has cut off

1    since the crash?

2    A.   Yeah, I know a couple of friends from my school that

3    she cut off.

4    Q.   Can you give me some names?

5    A.   There's Jocelyn Dougherty, Hanna Hague,

6    Abigail Hughes, Astrid DeBois, me maybe, I think.

7    Q.   And Jocelyn was her best friend?

8    A.   Yeah.  She was also a roommate up in Seattle.

9    Q.   And was Hanna the person that she was riding the

10   train with that derailed?

11   A.   I don't know if Jocelyn was there, but I know Hanna

12   was there.

13   Q.   And these people that you just listed, including

14   yourself, these are all long-term friendships that she cut

15   off?

16          MR. YATES:  Leading.

17          THE WITNESS:  Yes, those are long-term

18   friendships.

19   BY MR. LEVY:

20   Q.   These are people that Emily knew very well from high

21   school?

22   A.   Yes, I would say so.  We were all very close back in

23   high school.  Class of 40 people, so we pretty much knew

24   everybody and were all friends.

25   Q.   But now Emily has cut them off?

1    A.    What did you say?  Sorry.

2    Q.    But now Emily has cut them off; is that correct?

3    A.    Yeah.  Well, as far as I know, yeah.  I haven't -- I

4    don't really talk to those people these days.

5    Q.    When is the last time you talked to Emily?

6    A.    Last time was almost a year ago.

7    Q.    Tell the jury the circumstances of the last

8    interaction you had with Emily.

9    A.    The last time we -- she was about to go to the Middle

10   East, so she wanted to spend some time in the area before

11   her next trip.  And then she wanted to go on a hike, go on

12   a walk and stuff.  And I needed to go grocery shopping at

13   Costco.  So we went to Costco together, and then I really

14   didn't want to go on that hike.  I told her that we could

15   do this, go get coffee, and we didn't go on the hike,

16   which I don't think she was too happy about.  That was the

17   last -- and she said that -- she didn't want to go get

18   coffee.  She said fine.  I haven't spoken to her since.  I

19   tried reaching out to her but she never responded.

20   Q.    Did she make herself unreachable?

21   A.    What did you say?  Sorry.

22   Q.    She made herself unreachable; you are no longer able

23   to get in touch with her?

24              MR. YATES:  Objection.  Leading.

25              THE COURT:  Sustained.

BY MR. LEVY:

Q.   Did she make herself unreachable?

A.   Yeah, I would say so.

Q.   So after being --

A.   Sorry.

Q.   So after being friends for nine years, she cut you out of her life?

MR. YATES:  Objection.  Leading.

THE COURT:  Sustained.

THE WITNESS:  Do I answer the question?

BY MR. LEVY:

Q.   Have you tried to get in touch with her since that day?

A.   Yeah, I have.  I have tried calling her and sending her messages and texts, but she never responded to them.

Q.   Have you had any contact with Emily's mom since the crash?

A.   What did you say again?  I'm sorry.

Q.   Have you had any contact with Emily's mother since the crash?

A.   Yes.  She has called me twice.  The first time I don't remember, the second time she was looking for Emily because she had not heard from her in a couple of days.

Q.   Can you tell me more about that?

MR. YATES:  Objection.  Hearsay.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  That call -- do you want me to

 3    elaborate on the call?

 4    BY MR. LEVY:

 5    Q.  Yes, please.

 6    A.  So she had gone on a trip to Arizona and was out

 7    hiking.  The morning of the trip she told her mom she was

 8    going for a hike up in the mountains, and then she didn't

 9    reach back out to her mom for quite a few hours.  So her

10    mom tried calling me, seeing if I knew what she was doing

11    or how her hike was going, or if -- or if I had heard from

12    her or had any updates.  I told her no, I hadn't been in

13    contact with her.  I knew she was in Arizona.  I didn't

14    know she was on a hike at that time.  Her mom was worried

15    and wondered what was going on.

16    Q.  Did you eventually talk to Emily about that?

17    A.  What did you say?

18    Q.  Did you eventually talk to Emily about that trip to

19    Arizona?

20    A.  Yeah.  She eventually got ahold of me because I left

21    her a message, because I told her her mom reached out to

22    me.  When she eventually made it back to civilization, she

23    gave me a call and told me not to worry about it.  She

24    also reached out to her mom and went on her way.

25    Q.  Did she tell you she got lost on the mountain?
```

```
 1                  MR. YATES:  Hearsay.

 2                  THE COURT:  Sustained.

 3                  THE WITNESS:  What did you say?  Sorry.

 4      BY MR. LEVY:

 5      Q.  I will move on to a new question.  I am wondering why

 6      you are willing to testify here today, even though Emily

 7      cut you off over a year ago?

 8                  MR. YATES:  Objection.

 9                  THE COURT:  Basis?

10                  MR. YATES:  Relevance.

11                  THE COURT:  Overruled.

12      BY MR. LEVY:

13      Q.  You can go ahead.

14      A.  What was the question again?  I'm sorry.

15      Q.  Emily cut you off a year ago, but you are willing to

16      testify here today, and I'm asking you why?

17                  MR. YATES:  Objection.

18                  THE COURT:  Overruled.

19      BY MR. LEVY:

20      Q.  Go ahead.

21      A.  Well, I still care about her.  She is a friend of

22      mine that I have known for nine years.  We went to high

23      school together.  We pretty much grew up together.  High

24      school was a very weird time for both of us.  So I just

25      know the accident affected her, and I just wanted to help
```

1  and put my two cents out there because I am probably one

2  of the few people she has talked to recently -- it has

3  been about a year, not recently -- that was actually there

4  before the accident and after the accident.

5          MR. LEVY:  Thank you, Mr. Heally.  No further

6  questions.

7                    CROSS-EXAMINATION

8  BY MR. YATES:

9  Q.  Good afternoon, Mr. Heally.  Can you hear me all

10  right?

11  A.  Yeah, I can hear you.  You cut out here and there.

12  Q.  My name is Andy Yates.  I am one of the lawyers

13  representing Amtrak in the case.  I just have a few

14  questions for you this afternoon.

15      If I understand your testimony, after you and

16  Ms. Torjusen graduated from high school, you saw her one

17  time before the derailment; is that true?

18  A.  Yeah.  Well, between high school and her being in

19  college and the derailment, I have only seen her one time.

20  Q.  And it has been a year since you have had any contact

21  with her, true?

22  A.  Yeah.  About a year.  She went over to the Middle

23  East.

24  Q.  So you haven't had any contact with her since she has

25  returned to Cairo, Egypt this most recent time; is that

1   true?

2   A.   Yeah.  I haven't been in any contact with her.

3   Q.   Before your testimony just now, when was the last

4   time you had contact with somebody on her legal team?

5   A.   Monday, that there was going to be testimony time.

6   Q.   When is the first time you were contacted by somebody

7   from her legal team?

8   A.   What did you say?  Sorry.

9   Q.   When is the very first time that you heard from

10   somebody on Ms. Torjusen's legal team?

11   A.   Three or four months ago, as far as I remember.  I

12   don't remember when that exactly was.  It was quite a few

13   months ago.  I will shut the door.  Sorry.

14   Q.   That's okay.  Between this first contact with

15   Ms. Torjusen's legal team three or four months ago and

16   this Monday, have you had any other contact with them?

17   A.   Yeah.  I have had two calls with -- with the guy who

18   was asking me questions and the guy he was working under.

19   Q.   Mr. Levy and Mr. Petru?

20   A.   Yeah.

21   Q.   And how long did you spend talking with them?

22   A.   About -- the first call was around -- I don't

23   remember, like half an hour maybe.  Twelve, ten minutes,

24   half an hour.  The next call was a little bit more than

25   that.  I told them about how I knew Emily in high school,

1   and all that and basically more in depth at that time.

2   Q.   Have you had any other conversations besides those

3   with Mr. Levy or Mr. Petru?

4   A.   I forgot.  I did talk to them -- was it yesterday? --

5   to go over more about when I was supposed to come up to

6   testify, because this was the first time I --

7   Q.   What is your best estimate of how long you spent

8   talking with them yesterday?

9   A.   Like 20 or 30 minutes.

10  Q.   So from the time that they first contacted you until

11  you testified today, you have spent about two hours

12  talking with Mr. Torjusen's legal team?

13  A.   If I were to add it all up, I would say it was closer

14  to an hour and a half.  I wouldn't say two hours.

15          MR. YATES:  Thank you very much, Mr. Heally.  I

16  don't have any other questions.

17          MR. LEVY:  No further questions.

18          THE COURT:  Thank you, Mr. Heally.  You may be

19  excused.

20          THE CLERK:  You may be excused, sir.

21          MR. LEVY:  Thank you, Mr. Heally.  You can hang

22  up now.

23          THE COURT:  Next witness.

24          MR. LEVY:  The plaintiff calls Patty Torjusen.

25          MR. PETRU:  For the Court's benefit, we are done

```
 1   with the technology, everybody's benefit.
 2           THE COURT:  Good afternoon.  If you would step
 3   forward in front of the bench here, the oath of witness
 4   will be administered.
 5                         PATTY TORJUSEN,
 6       having been sworn under oath, testified as follows:
 7           THE COURT:  Thank you.  Please have a seat here
 8   at the witness chair.
 9                       DIRECT EXAMINATION
10   BY MR. LEVY:
11   Q.   Good afternoon, Ms. Torjusen.
12   A.   Good afternoon.
13   Q.   If you could speak up a little bit.
14   A.   Can you hear me better?
15   Q.   Yeah, that's much better.  Thank you.
16        Ms. Torjusen, where do you live?
17   A.   Ridgefield, Washington.
18   Q.   Is that just north of Vancouver?
19   A.   Correct.
20   Q.   And how long have you lived in Ridgefield?
21   A.   Thirty -- 28 years.
22   Q.   You are Emily Torjusen's mother, correct?
23   A.   Correct.
24   Q.   What is Emily's birth date?
25   A.   August 13th, 1997.
```

```
 1   Q.   How old is she today?

 2   A.   Twenty-seven.

 3   Q.   We have brought you here today --

 4   A.   Twenty-four.  I'm sorry.  Twenty-four.  I'm nervous.

 5   Q.   Okay.  We brought you here today so you can tell the

 6   jury about Emily and talk about any changes you have

 7   observed in Emily since the crash.  Okay?

 8   A.   Um-hum.

 9   Q.   Are you married?

10   A.   Yes.

11   Q.   To whom are you married?

12   A.   Wayne Torjusen.

13   Q.   And is that Emily's father?

14   A.   Correct.

15   Q.   When did you get married?

16   A.   In 1990.

17   Q.   And after you got married, did you start a family?

18   A.   Correct.

19   Q.   And how many children do you have?

20   A.   Two.

21   Q.   What are their names and ages?

22   A.   Vanessa is 27 and Emily is 24.

23   Q.   And were you a stay-at-home mother to your two

24   children?

25   A.   Correct.
```

```
 1   Q.   Let's talk about Emily's childhood.

 2   A.   Okay.

 3   Q.   Where did Emily grow up?

 4   A.   Ridgefield, Washington.

 5   Q.   Did she grow up in the same home?

 6   A.   Correct.

 7   Q.   How involved were you as a mother in Emily's life?

 8   A.   Very involved.  Since I stayed at home, I did a lot

 9   of school activities, drove them to school, you know,

10   helped them participate in soccer and sports and

11   after-school activities, ballet, violin.  We were close,

12   spent a lot of time together.

13   Q.   What schools did Emily attend, starting with

14   elementary school and going up through high school?

15   A.   She attended Firm Foundation Christian School in

16   Battleground, Washington, and followed that through to Cam

17   Academy in Battleground, Washington.  And she finished

18   high school at iTech Prep in Vancouver.

19   Q.   And what year did she graduate from high school?

20   A.   2016.

21   Q.   Did Emily have a group of childhood friends?

22   A.   Yes, she did.

23   Q.   And can you describe what Emily's childhood

24   friendships were like?

25   A.   Right.  Well, she was a pretty typical teenager, with
```

1    a close band of girlfriends.  There was probably a core

2    group of five or six friends that hung out together a lot,

3    you know, spent weekends at each other's houses, did a lot

4    of school activities together.  Like if one was in a

5    concert, they would all go, you know, to be there to

6    support each other.  They did clubs together at school.

7    Q.  And this core group of friends that you are

8    describing, was this group together from middle school and

9    then they stayed friends through high school?

10   A.  Yes.

11   Q.  And did you know this group of friends?

12   A.  Yeah, fairly well.  Yeah, parents, we knew them as

13   well.

14   Q.  I want to talk a little bit about your family

15   activities.  When Emily -- during Emily's childhood, did

16   your family go on trips together as a family?

17   A.  Yeah.  We enjoyed camping, like Mount Rainier, the

18   coast.  We took a trip to Hawaii together.  We watched TV

19   together at night, and watched movies and ate popcorn.  We

20   would go to church on Sunday, you know, did -- we did do a

21   lot together as a family.  Get hay in the summer, things

22   like that.

23   Q.  Get hay.  Do you have horses?

24   A.  Yes, we have horses.

25   Q.  And you said "these activities together."  Did you

1   mean you would do these activities, the four of you?

2   A.   Yes.  And we ate dinner together.  You know, just

3   family stuff.

4   Q.   How often during Emily's childhood would you have

5   dinner together as a family?

6   A.   We ate dinner together every night.

7   Q.   That was a ritual?

8   A.   Yes.

9   Q.   Now, before the crash, would you please describe for

10  the jury what your relationship was like with Emily as a

11  mother?

12  A.   We had a good relationship.  You know, we spoke on

13  the phone together quite a lot.  She would tell me about

14  her life.  She had a job.  She would tell me about her

15  work, her friends, her school, you know, what was going on

16  at school.  They -- I did a lot of the driving, you know,

17  to here and from places she would go.  I knew where she

18  was, you know, knew about her life.

19  Q.   Did you ever travel just one-on-one with Emily?

20  A.   We did take a trip in 2017, the summer, to Japan.  We

21  went to Japan together.  I think it was twelve days or

22  something, and traveled around on bullet trains from

23  Japan, Tokyo, Kiroro.  It was a great trip together.  We

24  got to see something new, just the two of us.

25  Q.   And how did you two get along on that trip?

1    **A.   It was a good trip.  It was fun.  It was enjoyable.**

2    **You know, it was a good bonding experience.  I try to**

3    **appreciate being a stay-at-home mom, appreciate my**

4    **children.  I feel that is one of the privileges of being**

5    **with them.  I wanted to take advantage of it.**

6    **Q.   I think you said some of this before.  Before the**

7    **crash, did Emily share details of her life with you?**

8    **A.   Yeah.  Yeah.  I think I knew everything that was**

9    **going on.**

10   **Q.   What sort of details would she share with you?**

11   **A.   About her work.  She worked as a dishwasher in**

12   **several places.  She would talk about the dishwashing**

13   **business, how they were treated.  She talked about the**

14   **cooks at the job.  She talked about her school life.  She**

15   **was very involved in school.  She was on the yearbook.**

16   **She won many awards in school.  She was very -- a good**

17   **student, very good student.**

18   **Q.   And would she tell you about trips that she would go**

19   **on?**

20   **A.   With her friends you mean?**

21   **Q.   Yeah.**

22   **A.   Yeah.  I knew where she was going and stuff.**

23   **Q.   I want to ask you about Emily's relationship with her**

24   **dad.  What was the relationship with her dad like before**

25   **the crash?**

1   A.   They had a good relationship.  They liked to stay up

2   late and watch movies together, and then kind of talk

3   about the movies, like debate about them.  They both had a

4   big interest in staying up late and talking about the

5   movies, where I would go to bed early and not be in that.

6   He did hikes with her.  He was also on crew, so they had

7   shared a similar interest with the crew team.  They

8   were -- had a good relationship.

9   Q.   What's your husband like?  How would you describe his

10  personality?

11          MR. BONVENTRE:  Objection.  Relevance.

12          THE COURT:  Overruled.

13  BY MR. LEVY:

14  Q.   You can go ahead.

15  A.   Well, Wayne, I would say he is quasi military.  He

16  worked on ships.  He went to a military school.  You know,

17  he is a guy's guy.  That's how I would describe him.

18  Q.   And how would Emily handle Wayne's personality before

19  the crash?

20  A.   She was tolerant, you know.  We all just were calm.

21  He made his point.  We never really rebuttaled (sic) that

22  much.  There were tiffs.  It wasn't like perfect.  But

23  things were always just kind of -- might have happened,

24  and two minutes later it was all better.  I can't think of

25  anything like a major anything that happened early with

```
 1   the kids and their father.
 2   Q.  What about Emily's relationship with her sister
 3   Vanessa, what was that like before the crash?
 4   A.  They are very devoted to each other.  I would say
 5   they are very different.  They enjoy -- you know, it was
 6   kind of a close-knit family.  We did do a lot of things
 7   together.  It was a good relationship.
 8   Q.  After Emily graduated from high school in 2016, what
 9   did she do?
10   A.  She got accepted into the University of Washington.
11   Q.  And how did she -- how did she get up to Washington,
12   to Seattle?
13   A.  For school starting?
14   Q.  Yeah.
15   A.  Yeah, we brought her up.  We drove her up.  She was
16   in one of the big dorms.  It was a triple, so she was with
17   three girls up there, and we moved her in.  We saw her
18   pretty frequently, you know, maybe monthly.  She would
19   come down and see us, we would go up there and see her.
20   Q.  And you said "we brought her up there," is that you
21   and Wayne?
22   A.  Yes.  Yes.  Yeah.
23   Q.  During her freshman year, would Emily come home for
24   holidays?
25   A.  Yes.  Yeah.  Yeah.
```

1    Q.   And would she come home for birthdays?

2    A.   Yeah.  Yeah.

3    Q.   And you said that you and Wayne would go up and visit

4    her in Seattle, too?

5    A.   Right.  I think there was parents' day, other events

6    that we would go see her.  She brought -- over the

7    holidays, I know that first freshman year she had some

8    international students that she was really close with, and

9    she brought them down, and they spent the holidays with

10   us.  She was, you know, making friends up there.

11   Q.   I want to talk to you about your observations of what

12   Emily was like before the crash.  How would you describe

13   Emily before the train crash?

14   A.   Well, she was always a joy to us, you know, our

15   child.  She was pretty easygoing.  I think she had a

16   strong presence of mind, wasn't easily flustered about

17   things.  She had a stable personality.  I think people

18   were attracted to her, kind of a calm person to be around,

19   someone you would like to hang out with and stuff.

20   Q.   How about Emily's physical health?

21   A.   She had good physical health, yeah.  You know, she

22   could hike and bike and row, all those things.

23   Q.   How was her mental health before the crash?

24   A.   She had stable mental health.

25   Q.   I understand that growing up there was an instance

1    when you took her to a therapist; is that correct?

2    A.   Yeah.  I could speak to that.  It was a time in her

3    life where a lot of the kids had transitioned out of the

4    junior high and went to a different high school.  They

5    transferred to a different high school.  And we had not

6    gotten our boundary exception in early enough, so she

7    wasn't able to get in that freshman year.  And so a lot of

8    kids had left and she was kind of left behind at the old

9    school.  And so we noticed, you know, that she was not --

10   she was unhappy, and we were concerned.  So we took her,

11   to be proactive, to a counselor in Vancouver.  I think she

12   might have had two sessions.  And it didn't seem like

13   anything that she was going to do was going to work for

14   her.  And it did clear up.  It was just a short-term

15   thing.  I think it was just a loss -- finding her place in

16   the old school.  And when she did get the boundary

17   exception, she rejoined at iTech, out of Cam, and things

18   got better.

19   Q.   What was Emily's social life like before the train

20   crash?

21   A.   I would say a pretty typical teenage social life.  It

22   was very important to her, you know, hung out with her

23   friends a lot.

24   Q.   Did Emily enjoy physical activities before the crash?

25   A.   Yeah.

1   Q.   Which activities did she participate in?

2   A.   Well, we all liked hiking and kayaking.  Well, we had

3   horses.  She rode horses a little bit.  Not really much on

4   the horses and stuff.  Bike riding, walking.  We live

5   on -- in rural Clark County, so there was a lot of places

6   for walking.

7   Q.   What about any other hobbies?  Did she play an

8   instrument?

9   A.   Yeah, she was more like the musical type with the

10  violin.  She did ballet, and she did art.  She wasn't much

11  a drama person.  I would say she was more heavy on the

12  arts end of things than like sports things.

13  Q.   Did she enjoy writing?

14  A.   Yes, she was always a good writer.  Yeah.

15  Q.   I want to change gears and talk to you now about

16  December 18th, 2017, the day of the train crash.  Do you

17  recall that morning?

18  A.   Yes, I do.  Um-hum.

19  Q.   Was Emily on that Amtrak train that morning?

20  A.   Yes, she was --

21  Q.   And why was Emily heading towards Vancouver on the

22  train that morning?

23  A.   Well, she was heading home for Christmas -- or the

24  holidays.  I know she had worked the night before at

25  Shultzy's pizza, and she was getting -- so we were

```
 1   concerned, because she had worked that night before, about
 2   her getting on the train on time, because it was a really
 3   early train.  My husband texted her "be sure to wake up
 4   and get down there on time."  We were all looking forward
 5   to the Christmastime.  You know, I think we were going to
 6   go see the Nutcracker, bake cookies.  She liked the
 7   holidays, enjoyed being home for Christmas, was looking
 8   forward to coming home.  But we made sure she was on the
 9   train on time, got there.
10   Q.  And after Wayne texted her, were you watching the
11   news that morning?
12   A.  Yes.  Yeah.  And that's when we heard, oh, breaking
13   news, Amtrak 501 accident over in Dupont, Washington.  And
14   we see the train wreck on the TV news.  We were confused,
15   is that the same train?  What train?  We were concerned,
16   panicking at that point.
17   Q.  What happened next?
18   A.  Then I heard -- my phone rang, and I immediately ran
19   and got the phone.  I heard from Kevin.  It was Kevin who
20   called.  He says, "I am here with your daughter.  She is
21   here."  I was glad to hear she wasn't dead.  I heard her
22   screaming "mommy, mommy, mommy" hysterically in the
23   background.  I was thankful he was -- someone had found
24   her.  He said he was taking her to the triage.
25   Q.  Did you talk to Emily that morning on the phone?
```

1   A.   That's the first time I heard her voice that morning.

2   Q.   And what did she say to you when you talked to her?

3   A.   Well, he just kind of gave her the phone, and she was

4   "mommy, mommy," inconsolable, hysterical.  I was saying,

5   "Hon, I am on my way.  I am coming to be with you."  She

6   was just -- wasn't really -- she didn't really say

7   anything.  I was just thankful to hear her voice on the

8   other side, and someone who found her and was taking her

9   to get treatment.

10  Q.   After you received that phone call, what did you do?

11  A.   I immediately got in the car and went up to Olympia,

12  Saint Peter's in Olympia.

13  Q.   And when you got to the hospital, can you please

14  describe what Emily's condition -- how she looked when you

15  first saw her?

16  A.   Yeah.  I walk in and she is in some room.  She is

17  just laying flat.  It was like on a gurney.  There were no

18  doctors around or anything, and she was still.  It was

19  like comatose, just laying there.  I didn't know if I was

20  supposed -- I didn't want to disturb her, so I just

21  quietly went and sat by her side and held her hand, just

22  said, "Mommy is here, honey," and called her "baby."  She

23  didn't have any clothes on.  It was like stripped with a

24  sheet over her.  The back of her head -- she is laying on

25  that blue paper or whatever.  It was just like a massive

1    pool of blood.  Her hair was all caked out onto it.  Her

2    face had abrasions, cuts, lacerations all over.  She was

3    just -- I was just petrified.  You know, I just sat there

4    quietly looking at her, not knowing -- I didn't want to

5    disturb her.  I didn't really know what her condition --

6    what was going on at that point, if she was in a coma or

7    she was -- what was going on.

8    Q.   Ms. Torjusen, did she acknowledge your presence?

9    A.   No.

10   Q.   Was Emily admitted to the hospital at some point

11   after you arrived?

12   A.   Yes.  She was admitted to the hospital, under

13   observation for concussion.

14   Q.   And how long did Emily stay in the hospital?

15   A.   She was there two nights.  We were there two nights.

16   Q.   Can you describe for the jury what Emily's condition

17   was like over the next couple of days when she was at the

18   hospital?

19   A.   They had the room very quiet.  The lights were low.

20   It was very -- you know, no TV on, no commotion.  It was

21   just kind of a quiet place.  Doctors were kind of coming

22   in and out.  She was just barely with it, barely there,

23   just kind of not a lot of conversation going on.  I was

24   there kind of by her side, her presence.

25   Q.   And were you holding her hand?

1   A.   Yeah.   Yeah.

2   Q.   Was she interacting with you at that time?

3   A.   Very minimal.   It wasn't like we were really talking

4   about anything.   I was just trying to keep her calm and

5   listen to what the doctors were saying and find out more

6   about what was going on with her condition.

7   Q.   Ms. Torjusen, you previously have told me that you

8   and Emily got into an argument in the hospital.   Can you

9   tell the jury what happened between you and Emily at the

10  hospital?

11  A.   Yeah.   On the -- it was the third day.   She was

12  getting released on the third day.   And like anyone, you

13  want to get out of that place, hate the hospital.   Nobody

14  wants to be in the hospital.   And one of the neurosurgeon

15  doctors had made it a point for her in order to get

16  released, she had to take a shower, because she still had

17  that caked bloody hair all stuck all over into her head.

18       So I remember that that's what the doctor said, a

19  condition of release would be to go and be able to take a

20  shower, get cleaned up.   And so she just wanted to get out

21  of there, agitated about being in the hospital.   And I

22  just said, the doctor said that we have to get -- take a

23  shower in order to do that.   And she got very irate with

24  me, was very upset.   I think -- I believe she was yelling

25  at me, you know, "Just get me out.   I just want to get

1    out.  Let's just go.  We don't have to do that.  I will do

2    that when I get home," whatever.

3         It got very disruptive.  The staff -- hospital staff

4    came down the hall, because we were at the end of the

5    hall, came into the room and were saying, "Don't get her

6    upset.  Don't get the patient upset.  You are getting too

7    much commotion."  And they told me to go down into the

8    cafeteria for a while.

9         So I did go down to the cafeteria.  And then later

10   on, I don't know how much time passed, I did come back up.

11   It seemed like she had taken the shower by that time, you

12   know, things were progressing.  So we were able to get

13   discharged that day.

14   Q.   Had you ever seen Emily act like that before?

15   A.   Not like that, no.

16   Q.   Were you surprised by that?

17   A.   Yes.  Yeah.  It seemed like a reasonable thing.  And

18   she was just acting unreasonable, not thinking correctly.

19   Q.   What was your understanding of Emily's diagnosis at

20   discharge?

21           MR. BONVENTRE:  Objection, your Honor.

22           THE COURT:  Overruled.

23   BY MR. LEVY:

24   Q.   You can go ahead.

25   A.   That she had a concussion, that she had some other --

1   clavicle problems with her shoulder, her clavicle fracture

2   or something like that.  She had some stitches in her

3   forehead.  At that point, the cuts and bruises -- her face

4   was getting really swollen up and black and blue all over,

5   that whole thing.  That was what they told me was her

6   condition.

7   Q.   Did anyone give you any instructions on discharge for

8   the kind of care that Emily would need when she went home?

9   A.   Right.  It was just very low stimulus, not a lot of

10  visitors, not a lot of commotion.  So we kept her room

11  very dark and stuff.  Yeah.  We were prepared to keep

12  things very quiet.

13  Q.   Where did you take Emily after she was discharged?

14  A.   Home.

15  Q.   And what was Emily's condition on the drive home?

16  Did you notice anything different than typical?

17  A.   Yeah.  I mean, her arm was like in a sling.  She

18  looked very uncomfortable.  I know she was uncomfortable

19  in the car, the movement of the car, being in a car.

20  Q.   How could you tell that?

21  A.   It was like grabbing, clutching for extra safety

22  devices besides the seatbelt and everything like that.

23  Q.   What about her energy level?

24  A.   She was very low energy.  I think she was -- it was

25  good getting her home.  I felt she would -- it would be

```
 1   good for her to be home.
 2   Q.   So where did Emily stay in the first couple of weeks
 3   after the crash?
 4   A.   Yeah.  Well, it was her Christmas break, so she
 5   stayed at home, mainly up in her room.  We kept it very
 6   sedate.  I think I checked on her.  I just didn't disturb
 7   her a lot.  I would bring her some food.  She didn't
 8   really eat a lot.  She was not hungry.  Kind of kept
 9   things quiet.  I would go and visit her.  I think she was
10   having some troubles resting, even though she seemed very
11   fatigued, very sleepy.  I think it was uneasy rest.
12   Q.   Did you notice any irritability in Emily during those
13   first couple of weeks?
14   A.   Yeah.  She was having a hard time coping and healing
15   and just traumatized by what had happened.
16   Q.   During those first couple of weeks when she was at
17   home, did you take Emily to see any doctors?
18   A.   Correct.  Right.  We followed through with Dr. Spohr,
19   which is her family physician, was her pediatrician and
20   then grown-up doctor, just to follow through on her
21   progress, and to kind of set, you know, a baseline with
22   her improvement.  We followed through and --
23   Q.   Did you take her to Dr. Spohr because of your concern
24   about the post-concussive symptoms?
25   A.   Yes.
```

 1   Q.  And eventually Emily went back to school in Seattle,

 2   correct?

 3   A.  Yes.  Yes.

 4   Q.  How did you feel about that decision at the time?

 5   A.  I did not think it was a good decision.  I wanted her

 6   to take the semester off.

 7   Q.  Why is that?

 8          MR. BONVENTRE:  Objection, your Honor.

 9          THE COURT:  Basis?

10          MR. BONVENTRE:  Ms. Torjusen is not a party in

11   the case.  Her feelings, respectfully, are not --

12          THE COURT:  Overruled.

13          THE WITNESS:  I didn't want her to go back.  I

14   thought it was too much for her to handle shortly after

15   the accident.  I mean, I think classes started January

16   3rd.  So it was a short break.  I just wanted her to rest

17   and stay home and rehabilitate.  Our core doctors were

18   down in the area.  I don't know anybody in Seattle who

19   could watch -- take care of her up there.  I thought it

20   was just way too early.

21   BY MR. LEVY:

22   Q.  How did she get back to Seattle?

23   A.  We drove her up there.

24   Q.  You and Wayne?

25   A.  Wayne and I took her up there.  She had an apartment.

1    That is kind of what she was saying, she had an apartment

2    with her friends, so she couldn't leave her roommate

3    stranded.  She had already signed up for her classes.

4    Q.   Do you recall the next time you saw Emily in

5    Vancouver or Ridgefield?

6    A.   That would be spring break, would be like March.  She

7    was up there the rest of January and February up in

8    Seattle trying -- you know, trying to maneuver and get

9    around and handle -- cope with classes and everything.

10   Q.   And during her visit down to Ridgefield in the spring

11   of 2018, did Emily have any neuropsychological testing

12   with Dr. Scovel?

13   A.   Yes.  Yes.

14   Q.   And were you involved in any way in getting Emily to

15   see Dr. Scovel?

16   A.   Yes.  I had heard things about her having panic

17   attacks up in Seattle.  I was worrying about her being up

18   there with trauma symptoms, things going on in her life.

19   I was trying to be proactive and seek some help for her,

20   getting some testing.  We went to Dr. Spohr, the family

21   physician again.  I asked for a referral from her, because

22   you just don't get in to these people.  You have to get a

23   referral.  So we did that.  Tried to get that done in that

24   spring break week.

25   Q.   Did my law firm play any role in Emily seeing

1    Dr. Scovel in 2018?

2    A.   I don't think we signed on -- it is Emily, she didn't

3    sign on with you guys until April or end of March.  No.

4    Q.   I want to talk to you about changes with Emily since

5    the train crash.  Have you noticed any changes in Emily

6    since the train crash?

7    A.   Yes.

8    Q.   Can you tell the jury what you have noticed?

9    A.   Emily is a very, very short fused, easily upset.  My

10   relationship with her is very fragile, I would describe

11   it.  I am very careful not to upset her.  I don't ask her

12   a lot of questions.  I just -- I listen -- you know,

13   listen to her, try to be supportive.  She has a very quick

14   trigger.  She gets very upset very easily.  It's like

15   walking around on eggshells with her.

16       I feel like I have lost my daughter.  She is not the

17   family member she once was.  She is not the person I once

18   knew.  It's a different type of relationship.  I still

19   want to have a relationship.  I strive to keep a

20   relationship with her, but I am afraid that she could

21   easily just not associate with me anymore.  So I don't

22   want that to happen.  I think I bend over backwards to

23   kind of keep things on an even keel with her.

24   Q.   How often do you talk to her now?

25   A.   Well, not much.

1   Q.   How often, approximately?

2   A.   Well, lately I will text her, "I would like to talk

3   to you."  And then sometimes I don't hear back, so then I

4   call and, you know, leave a message.  And then I don't

5   hear back, and then I might call the next day, and I don't

6   hear back.  Eventually, she does get back to me.  I would

7   say maybe once a month, something like that.  I mean, she

8   has been living overseas.  It would be nice to have

9   FaceTime or whatever they do, Skype, whatever.  None of

10  that.  I think I have gotten one picture from her.  I

11  think I got a picture of her at Christmas.  I really don't

12  know what -- yeah.  Not a lot going on.

13  Q.   What about her relationship with her father, how has

14  that changed since the crash?

15  A.   She has not really spoken with her father since like

16  March.

17  Q.   March of what year?

18  A.   March of 2017.

19  Q.   March of 2017?

20  A.   The accident was in December.  She came home for the

21  spring break, 2018.  I'm sorry.  March of 2018 for the

22  spring break.  They had an argument.  She couldn't stand

23  being in the house any longer.  So I had to take her to

24  the bolt bus so she could go back to Seattle.  Really

25  since then, they have not communicated much.

1    Q.   You shared with me a story where Emily wanted to use

2    a kayak, and she had a confrontation with her dad.  Can

3    you share that story with the jury?

4    A.   Well, you know, she was home briefly with the COVID.

5    She came home to live with us.  We were all trying to get

6    along, because there was nowhere else for her.  She was

7    with us.  It kind of like was a two-part story.  It

8    started out she bought a little rubber raft and she wanted

9    to do a float trip down the Lake River, which is near us.

10   My husband told her not to go on the Lake River with a

11   little rubber raft.  And she disobeyed him or didn't

12   listen to him.

13   Q.   What were the weather conditions that day?

14   A.   Yeah, well, it was like early -- mid-March -- after

15   March.  Probably the first of April.  And it was not nice

16   weather.  And the raft is a cheap blowup raft.  I don't

17   think she had any safety -- he is very safety oriented

18   from his days on the ship.  She didn't have any safety

19   vest, things like that.

20   Q.   Do you know why Wayne didn't want her to go on the

21   kayak?

22   A.   He was afraid she would get hypothermia.

23   Q.   Because he didn't want her to go on the kayak, did

24   that lead to a fight between the two of them?

25   A.   The raft was a short fight.  And then the big blowup

1  was shortly after that.  She wanted to borrow his kayak,

2  and he said no.  It's his kayak, he didn't want her to

3  borrow it.  He said no.  That was the big blowup.  She

4  yelled and screamed about that.

5  Q.  Emily stopped talking to her dad because he didn't

6  want her to use his kayak?

7  A.  That's correct.  You know, it seems like a little

8  thing people would normally get over, patch up, but she

9  just refuses to talk to him.

10  Q.  You mentioned before that one of the changes that she

11  has had since the accident is she has a short fuse.

12  A.  Um-hum.

13  Q.  Can you give the jury an example of her having a

14  short fuse?

15  A.  Well, the most recent one, you know, before she left

16  for overseas, she had collected all these plants in her

17  apartment.  She would get them on Craigslist or something.

18  She had quite a plant collection.

19  Q.  How many plants do you think she had?

20  A.  It had to be over a hundred.  Seriously, over a

21  hundred plants.  And I kind of saw -- I never saw her

22  apartment until very later on, where she was living up

23  there.  And I said, oh, they are kind of nice.  I never

24  said I would take care of her plants for her.  Maybe a

25  couple of them or something.  But we went away one

1   weekend, and when we came back right before she left, she

2   had filled her entire bedroom with these plants.  And she

3   is like, "Oh, mom, you can take care of these while I'm

4   gone."  And I said, "No, I'm not going to take care of the

5   plants.  It's just too many plants.  I'm not taking care

6   of them."  And she opened her bedroom window from the

7   second floor and just started tossing these plants out the

8   second story window onto the deck below, and the pottery

9   things were breaking, and there was dirt and plants --

10  tons of plants on the deck below.  And I tried to say,

11  "Well, maybe five.  I will take care of five."  But I

12  didn't want anything more to go wrong.  So I just kind of

13  left and let all the plants go out the window.

14      And then she -- we had a child's playhouse, and she

15  spray-painted all kinds of crap inside the child's

16  playhouse.  That was the night before she left.  So she

17  didn't allow me to take her to the airport to say

18  good-bye.  Her sister drove her to the airport, the first

19  part of June.

20  Q.  Did you ever observe Emily behaving like that before

21  the crash?

22  A.  No.  No.  No.

23  Q.  What about Emily's relationship with her sister

24  Vanessa today, what's the state of that?

25  A.  They don't communicate.  There is no communication

1    between the two of them.

2    Q.   Have you noticed any changes in Emily's social life

3    since the crash?

4    A.   I don't think she has any -- she is not in touch with

5    anybody she knows.  I think she has burned a lot of

6    bridges, said things that might have caused problems with

7    people.  She just doesn't communicate with them anymore.

8    Q.   Since the crash, have you been concerned about

9    Emily's safety?

10   A.   Yes.

11            MR. BONVENTRE:  Objection, your Honor.

12   Relevance.

13            THE COURT:  Relevance?  Overruled.

14            THE WITNESS:  I have been concerned about her

15   safety when she -- after she had the explosion with my

16   husband, she moved out.  It was COVID or whatever, and

17   she -- I didn't know where she moved to.  I never saw it.

18   But she took a cushion, like a cushion from a lounge chair

19   for outside, put it in her car and moved up to Kelso.  It

20   was later on, months later, I did see it.  It was not a

21   very nice place.  It was like a month by month, very

22   transient housing, you know, cockroaches, the whole thing.

23   I was worried about her living situation there.

24   BY MR. LEVY:

25   Q.   Did she have a bed?

1    **A.**   No.   No.   I felt bad about that.   We had a mattress.

2    Anyway, she had like a cushion.   And then during her -- up

3    in Kelso, she was working on a campaign.   I found this out

4    later.   There was nothing -- anyway, she was like car

5    camping in Aberdeen and Grays Harbor area at the beach,

6    staying overnight while she was working the campaign down

7    there, which I don't feel is safe.   Even just leaving the

8    country to Egypt and COVID and all this just doesn't seem

9    safe to me.

10   **Q.**   You testified that before the crash Emily shared

11   details of her life with you.   Is that still the case

12   today?

13   **A.**   No.   I don't know much about her life.   I think I

14   have seen things on LinkedIn about her.   I don't know.

15   **Q.**   Have you ever had a conversation with Emily about her

16   future?

17   **A.**   I don't know if she really knows what is going on

18   with her future.

19         MR. BONVENTRE:   Objection, your Honor.

20   Speculation.

21         THE COURT:   Overruled.

22         THE WITNESS:   I don't think she had a plan in

23   Cairo.   I know she found someone to live with in Cairo on

24   Craigslist, and then she didn't have a job there.   So she

25   just moved there with no plan.   Yeah, I don't know if

```
 1    that's the future.  I --
 2    BY MR. LEVY:
 3    Q.  Are you concerned about your relationship with Emily?
 4    A.  Yeah.  You know, I continue to be there.  I don't
 5    want to -- I don't want to lose her.  I don't feel -- it
 6    has been a big family disruption.  We are not the -- we
 7    don't get together for any holidays or anything anymore.
 8    I do love her very much and want to be -- you know, have
 9    her in my life.  I am willing to bend over backwards, do
10    what I have to do to have her stay in my life.
11              MR. LEVY:  Thank you, Ms. Torjusen.  No further
12    questions.
13              MR. BONVENTRE:  I just have a very few questions,
14    Ms. Torjusen.
15                        CROSS-EXAMINATION
16    BY MR. BONVENTRE:
17    Q.  Good afternoon, ma'am.  Just a very few questions.
18    My understanding is that your daughter, Emily -- can I
19    refer to her as Emily while we are asking questions?
20    A.  Um-hum.
21    Q.  Emily went back to college January 3rd after the
22    incident, after the train accident; is that correct?
23    A.  Yes.
24    Q.  And so she was up in college.  Did you drive her; is
25    that what you said?
```

```
 1   A.   My husband and I drove her back up here.

 2   Q.   And then you didn't see her until sometime in March,

 3   several -- three months later?

 4   A.   Right.  Well, yeah, a month and a half or so.

 5   Q.   From January to March?

 6   A.   Yeah.

 7   Q.   You mentioned something about in high school you had

 8   wanted Emily to go to therapy, correct?

 9   A.   She did go twice.

10   Q.   And then you said after two visits she stopped, I

11   think your words were, because it wasn't her thing,

12   correct?

13           MR. LEVY:  Objection.  Misstates testimony.

14           THE COURT:  Sustained.

15   BY MR. BONVENTRE:

16   Q.   Did you say she stopped -- I think your exact words

17   were she didn't want any part of it; is that correct?  I

18   believe that's exactly what you said.

19   A.   I don't think she was getting anywhere with it.

20   Q.   Do you recall -- she didn't like therapy, correct?

21   A.   I don't think she felt she had to be there for the

22   reasons that we thought she should be there.

23   Q.   So you disagreed with her on that issue in high

24   school?

25   A.   I was trying to be proactive, but if he wasn't
```

1    addressing something she needed, she didn't go, no.  I

2    can't force her to go.

3    Q.  So you had mentioned about Emily's relationship with

4    her father -- currently with her father.  And I am trying

5    to be respectful.  Ma'am, would it be fair to say that her

6    father, being from the military, I believe you said he is

7    very disciplined, was very much a disciplinarian?

8    A.  No, I wouldn't say he's a disciplinarian.

9    Q.  How would you describe him?  He had certain rules he

10   wanted followed; is that fair to say?

11   A.  No, I wouldn't say that.

12   Q.  You said they had some tiffs before; is that correct?

13   A.  Not many, no.

14   Q.  Did they have any disagreements?

15   A.  I'm certain throughout her 18 years at home there was

16   probably some disagreements, but they were always handled

17   appropriately.

18   Q.  You said -- when you had heard about the accident,

19   you immediately went to the hospital; is that correct,

20   obviously?

21   A.  Yeah, I drove up there.

22   Q.  I take it you picked up your husband so that he could

23   go with you?

24   A.  No.

25   Q.  He did not go with you?

1   **A.**   No.   Because we have 20 acres, we have two horses,

2   and animals.   Just to drop everything -- it was better

3   that one of us go.

4   **Q.**   So is it correct then Emily's dad did not go to the

5   hospital to see her when she was in the hospital?

6   **A.**   No, he was not there.

7   **Q.**   He did not go to the hospital?

8   **A.**   No, he did not go to the hospital.   And I will tell

9   you, those rooms were so small.   There was no place for

10   two people.

11   **Q.**   So he stayed home, I believe you said with the

12   property and the horses, and you went to the hospital; is

13   that correct?

14   **A.**   Yes.

15           MR. BONVENTRE:   I have nothing further.   Thank

16   you very much, ma'am.

17           MR. LEVY:   Nothing further, your Honor.

18           THE COURT:   Thank you.   You may step down.

19           MR. PETRU:   Your Honor, at this time we are going

20   to call Emily Torjusen.

21           THE COURT:   Good afternoon, Ms. Torjusen.   If you

22   would step forward in front of the bench, you will be

23   sworn.

24                   EMILY TORJUSEN,

25      having been sworn under oath, testified as follows:

```
1              THE COURT:  Please have a seat here at the
2    witness chair.
3                       DIRECT EXAMINATION
4    BY MR. PETRU:
5    Q.   I am going to try to make this as easy as possible.
6    I know this is difficult.  Your mother shared a lot about
7    your early life, so I'm not going to go over a lot of
8    those details.  I wanted to ask you about a few things
9    that she talked about.  As a kid, you were in ballet?
10   A.   Yes.
11   Q.   And played the violin?
12   A.   Yes.
13   Q.   Did you enjoy those things?
14   A.   Yeah.  I wasn't very good, but, yeah.
15   Q.   You were in crew?
16   A.   Yes.
17   Q.   That was in high school?
18   A.   Yes.
19   Q.   And you, as a family, liked to go camping?
20   A.   Yes.
21   Q.   Did you enjoy that?
22   A.   Yeah.
23   Q.   How would you describe your feeling as part of the
24   family unit with your mother and father and your sister
25   before the crash?
```

1   A.   I felt like we were a pretty typical family.

2   Q.   Do you miss that?

3   A.   I think -- yes, of course, I miss them.

4   Q.   You went with your mother to Japan in the summer of

5   2017 before the crash.  And one of the things that she

6   shared with us is that you and she checked out Japan, went

7   all over the place, and you took the bullet train.  I

8   would like to ask you about your childhood feelings about

9   trains.  What did trains mean to you before December 18,

10  2017?

11  A.   I loved trains.  I loved riding on trains.  I loved

12  watching trains.  I thought they were very cool.

13  Q.   Daniel shared with us a little while ago one of the

14  things -- I think he said that one of the things on your

15  bucket list -- I don't know if it was his bucket list --

16  was to hop a train, ride trains?

17  A.   Yes.  I wanted to be a hobo briefly, ride a train,

18  yes.

19  Q.   I'm not sure if I heard this right.  I think he said

20  he never did, but you did at one point.  Did you ever hop

21  a train or was that just a fantasy?

22  A.   Me and my friends, we were down by the train tracks,

23  and we were -- you know, we did briefly touch a train and

24  everything.  But it was not like an adventure like that.

25  I don't know what he said.

1    Q.   Up until the accident, you had a love affair with

2    trains?

3    A.   Yeah, I thought they were very cool.

4    Q.   Did you trust that Amtrak was going to give you a

5    safe ride?

6              MR. BONVENTRE:   Objection, your Honor.

7              THE COURT:   Overruled.

8              THE WITNESS:   I had -- I really enjoyed riding

9    Amtrak.   I was going to the University of Washington, and

10   it was very easy for my family to pick me up in Vancouver.

11   I always, whenever I could, took the train down and back,

12   because I loved looking out the window watching the

13   scenery.   I preferred it much more than to a bus.   Yes, I

14   had complete faith in Amtrak.   I had even gone from

15   Seattle down to San Francisco with a group of friends

16   before.   It was a lot of fun.   I really trusted them.   I

17   wanted to travel all over America, honestly, on Amtrak.

18   BY MR. PETRU:

19   Q.   There have been reports from Dr. Scovel, Dr. Spohr,

20   Dr. Crossen about difficulties that you have now with

21   public transportation, not just trains, but trains, buses,

22   planes.   What happens when you have to take public

23   transportation now?

24   A.   I am very easily startled by any shaking or if it

25   hits a pothole on a bus, that scares me.   If I took the

1   Link in Seattle going into the tunnel into the dark,

2   hearing the rattling noises, this would terrify me.  I

3   would have to listen to music.  So I avoided it.  If I

4   take a plane, I am frightened that if an accident happened

5   before, it could happen again.  So transportation changed

6   a lot for me after the accident.

7   Q.   Do you trust any transportation now?

8   A.   I think the safest I feel is if I am in a car.

9   Besides that, no, I feel very conscious of the very

10  possibility of an accident in any other transportation.

11  Q.   Because you know the reaction you have when you are

12  on a bus, a train, or a plane, how do you prepare yourself

13  to do it when you feel you have to?

14  A.   I always listen to music, because I don't want to

15  hear anything that might scare me.  I usually sit very far

16  away from other people, because I am prone to crying, and

17  it is very embarrassing.

18  Q.   But you do it, you use public transportation?  Why do

19  you do it if you have that kind of reaction?

20  A.   When I was studying in Seattle, there is really no

21  way around taking the bus.  I didn't have a car.  So this

22  was my only means of transportation really.  And then when

23  I was studying in France, I didn't know that the train

24  system was really the only way to get around, but that was

25  the case.  So if I wanted to go places, that was how I got

```
 1   around.
 2   Q.   Dr. Crossen spoke with us yesterday about talking to
 3   you during the time that he was counseling you on helping
 4   you work to get on the trains.  Do you remember that?
 5   A.   Yes.
 6   Q.   Was that helpful?
 7   A.   Sometimes -- it has always been a struggle since
 8   then.
 9   Q.   Still a struggle now?
10   A.   Yes.
11   Q.   You came here from Egypt.  You live in Egypt now,
12   right?
13   A.   Yes.
14   Q.   And in order to do that, you needed to take a plane
15   to come home, to come here?
16   A.   Um-hum.
17   Q.   Was that difficult?
18   A.   Yes.  I cried most of the way.
19   Q.   When you started at the University of Washington,
20   initially, did you have an idea in mind as to what you
21   wanted to study and what you wanted to be?
22   A.   I rather foolishly planned on becoming a
23   neuroscientist.  But my first quarter at UW I realized
24   this was something I was really not prepared for.  So by
25   my second quarter, I experimented, I took classes that I
```

1    thought I might be interested in.  And I was lucky to have

2    kind of two international roommates at the time.  I met a

3    lot of people from abroad.  And it kind of sparked an

4    interest in learning about the Middle East, about Europe,

5    other countries, which is kind of how I fell into my

6    majors.

7    Q.   Were those the students who your mother just shared

8    with us you brought a couple of foreign students down to

9    Ridgefield down to the family spread?

10   A.   Yes, for Thanksgiving.  I wanted them to experience

11   an American Thanksgiving.

12   Q.   As a consequence of getting to know these folks and

13   deciding that neuroscience and you probably weren't the

14   best fit, what did you decide you wanted to study?

15   A.   I knew I was very passionate about learning Arabic,

16   and that led me to kind of specialize in international

17   studies of the Middle East, as well as Middle Eastern

18   languages and civilizations, as well as a political

19   science major.

20   Q.   Where did your passion or desire to learn Arabic come

21   from?

22   A.   When I first came to the UW, I wanted to make a

23   friend, and so I enrolled in a language exchange program.

24   I thought I would be paired with someone from France or

25   Norway, and they paired me with a girl from Saudi Arabia.

```
1    She was very sweet.  She wanted to teach me Arabic.  The
2    more she taught me, the more I wanted to learn the
3    language.  It kind of became a goal for me that this was
4    something I really wanted to learn.
5    Q.  When you first got to UW before the crash, were you
6    able to makes friends easily?
7    A.  Yes.  Can you repeat the question.
8    Q.  Sure.  Before the crash, at UW, were you able to make
9    friends easily?
10   A.  Yes, I would say so.
11   Q.  In high school you had a good circle of friends.
12   Your mom talked about them.  I know you weren't here, but
13   it was a small school, 40 in the middle school or high
14   school, and there was a core group who were your buds?
15   A.  Yeah, I had some very good friends.
16   Q.  Let me ask you about that now.  Unfortunately, you
17   are not close to them anymore, are you?
18   A.  No.
19   Q.  What happens to you, Emily?  Why have you lost
20   contact with these people who were so close to you back
21   then?
22   A.  I think I'm much more sensitive and irritable about
23   certain things.  And when a problem arises, when someone
24   does something and -- I kind of have an outburst or I
25   don't how to handle it, they say something hurtful, my
```

1    first reaction really is to run away.  So I usually cut

2    off contact with people, and I leave it like that.

3    Q.   Is that why you are in Egypt?

4    A.   Yes.

5    Q.   You are obviously very bright.  You have been dealing

6    with this for four and a half years.  You understand -- do

7    you understand what has happened to your brain?

8    A.   I am not a neuroscientist, so no.  But I do recognize

9    that I have changed in a lot of ways.

10   Q.   Have you tried -- do you try to stop the impulses or

11   try to stop the behaviors or try to stop the thoughts when

12   they flood?

13   A.   I do.

14   Q.   How do you do that?  How do you try?

15   A.   The best way that I can, because if I get angry it is

16   just kind of -- it's like you get a ball rolling, there is

17   no stopping it, it just keeps building and building.  I

18   try to minimize my exposure to situations where I could

19   get mad, where I could, you know, get very irritated like

20   that, very stressed out.

21   Q.   Looking back at the last four and a half years, have

22   you cut yourself off from opportunities and activities

23   that you might otherwise do for fear of alienating people

24   or not controlling yourself?

25   A.   Yes.

Q.   What sorts of things would you say you have given up
for that reason?

A.   I am not very good at social activities.  I have not
gone to a lot of parties, or even when I was working I
was, you know, supposed to go to a lot of social events.
I would briefly make a one-minute appearance, and then run
away, because I was very afraid I might start saying
something and not be able to stop myself from saying
something that would cause trouble for other people, or I
would get into an argument with someone, and it would just
blow up.  I do my best to kind of keep to myself when it
comes to things like that.

Q.   Still now?

A.   Yes.

Q.   I need to talk a little bit about December 18th,
2017.  What do you remember -- what do you first remember
about that early morning?

A.   I remember I think we were running late, and so we --

Q.   We?  You and Hanna?

A.   Yes.  Hanna was my friend from high school.  We both
lived in the same area.  We were going home for the
Christmas holidays, and I had gotten us the earliest
tickets down to Vancouver that I could find.  When we
arrived at the station, I was really surprised because
there were people in suits and business attire, and they

1    were handing out lanyards.  That's when I realized it was

2    the first run on this line, and I was very excited.  I

3    thought it was very cool.  I was going to keep my lanyard

4    and everything.

5    Q.   Did you notice anything unusual besides getting a

6    lanyard?  Was it a badge or a lanyard or a badge and a

7    lanyard?

8    A.   Like a plastic card with a tie around it, you could

9    wear it around your neck.

10   Q.   So you got the plastic card with the tie around your

11   neck.  There were people in suits.  Did you notice

12   anything unusual about that morning?

13   A.   It was very early.  I didn't know they had lines that

14   ran that early, but I was thankful because I thought we

15   could get in early in the morning to surprise our family.

16   There were quite a few people as well.

17   Q.   Were you excited about going home for Christmas?

18   A.   Yes, I was looking forward to seeing my family.

19   Q.   What was your relationship with Christmas before

20   then, with the month of December before that?

21   A.   I really like making cookies, getting presents for

22   people, seeing the Christmas tree, going to the

23   Nutcracker, all that traditional stuff people do.

24   Q.   At some point, did a film crew or a camera crew get

25   on the train you were on?

**A.   Yes.  We were sitting in a train car, and I realized that there was some man, you know, doing a newscast with his cameraman in the aisle.  I didn't hear what he was saying, but I was like, okay, so the news is capturing this moment.**

**Q.   Do you remember anything about the run -- you got on at King Street station in Seattle, right?**

**A.   Yes.**

**Q.   Do you remember anything about the run from King Street down to Tacoma, besides it was early?**

**A.   I actually made Hanna switch seats with me because I wanted to look out the window.  I was watching the sun come up.  We were talking about Archie comics or something.**

**Q.   Am I wrong, or did one of you or both of you go to a play the night before?**

**A.   Yes, I got us tickets to a play called Howl's Moving Castle.  I was very excited to see that play.**

**Q.   Is that something you enjoyed doing, going to plays, seeing music, live events?**

**A.   Yeah, I really loved concerts, plays, things like that.**

**Q.   And you organized going to the play with Hanna?**

**A.   Yes.  Yeah, I did.**

**Q.   Have you gone to plays or concerts since the**

accident?

A.   I think I briefly went to one or two concerts, but the noise and the lights were very painful for me.  I didn't enjoy the experience at all.  So I don't go to concerts anymore.  I usually don't have the -- I don't like to go to plays alone, so I usually don't have the occasion to go there.

Q.   So you are on the train with Hanna, you made her switch seats with you so you could look out the window, which is what you like to do, you got to Tacoma.  What do you remember after leaving the Tacoma station?

A.   I was looking at my phone.  I was listening to some music, and I think Hanna -- she nudged me, and I looked up and I noticed that the train car and the rubber dividers, they were violently shaking.  And I didn't know what was going on.  The next thing I remember was something metallic kind of just headed at me.  That was it.

    When I woke up, it was pitch black.  I couldn't see anything at all.  And I heard people around me screaming and crying.  I was just in the dark.  I tried to move my legs.  I tried to move them, but I couldn't.  And I thought that my legs had been cut off.  I heard someone saying the train had been derailed.  So I thought that I didn't have any legs and I wouldn't be able to walk or run or swim or anything again.

1       But then I was able to move my foot a little, so I
2   knew I thought I had legs, or at least I thought I still
3   had the feeling of them.  And then I knew -- I thought,
4   where is Hanna?  And I knew she had been sitting beside
5   me.  So I thought -- I thought she had died.  I thought
6   that was her body pinning me down.

7       I was trying to get up, but I couldn't.  Every time I
8   moved, dirt kept falling in my mouth and my eyes and I
9   couldn't see anything.  And I was starting to get very
10  hysterical.  I was freaking out.  I thought I was dying.
11  I heard someone saying "EMTs are coming."  But I just
12  couldn't calm down.  I just couldn't -- it was like
13  something snapped inside of me.  I think I was saying the
14  Lord's prayer over and over and over again until someone
15  started to speak to me.

16      I couldn't see anything at all, but I heard this man
17  saying something.  He was saying he had been there to take
18  photos of the train, and he asked what my name was.  I
19  told him, "I am Emily."  He said he was Kevin.  I think he
20  moved something, and I saw this little portal of light.
21  And he put -- he held me -- he held my hand.  And he told
22  me he had a daughter, and he was trying to calm me down,
23  but I was just very hysterical.  You know, he said, "The
24  EMTs are coming.  It's going to be okay."  I kept shouting
25  the Lord's prayer over and over again until someone, it

1    must have been Kevin, kind of got in the dirt beside me

2    and tried to push whatever was pinning me down.  And I

3    tried to pull myself out, but I couldn't.  I couldn't move

4    my shoulder.  I was at an angle.  I had to wiggle my way

5    out.  I felt my shoes fall off my feet.  I know they led

6    me over to the EMT tent, but I couldn't see anything.  I

7    could only see the ground.

8    Q.   Is what you just shared with us now an image that

9    comes back to you with any frequency?

10   A.   Yes.

11   Q.   Can you stop it?

12   A.   No.

13   Q.   How frequent does it happen?

14   A.   If I'm in Cairo, there is a very old Metro system.

15   And if it goes in the tunnel and the car is shaking, I

16   just keep thinking about it, being in the dark, and people

17   screaming, and not being able to move.  So it comes back

18   frequently if I am riding transportation.

19   Q.   Do you dream about it?

20   A.   I dream about trains.  I dream about violent

21   accidents, people getting killed or injured or hurting

22   themselves.

23   Q.   Does that happen now?

24   A.   It has been happening all week.

25   Q.   Besides this week, I know that the pressure and the

 1   stress of having to try this case and be here is

 2   overwhelming, but before this week, last month, last year,

 3   in the last four and a half years, are those dreams that

 4   come to you with any regularity or frequency?

 5   A.   I would say about weekly.

 6            THE COURT:  Would this be a good place to take a

 7   break?

 8            MR. PETRU:  Yes, your Honor.

 9            THE COURT:  Fifteen minutes.  Please do not

10   discuss the case.

11         (Recessed.)

12            THE COURT:  Bring in the jury.

13         (The following occurred in the presence of the jury.)

14            THE COURT:  All right.  Everyone, please be

15   seated.  You may resume, Mr. Petru.

16            MR. PETRU:  Thank you, your Honor.

17   BY MR. PETRU:

18   Q.   Emily, we left you, you got extricated from where you

19   were pinned in the dirt, and were you taken to a triage

20   area.  What do you remember from that portion of the day?

21   A.   I remember I talked to several people, but I couldn't

22   see their faces.  I think it felt like I kept -- I was

23   looking at the ground.  I only remember seeing the ground.

24   I had asked Kevin, the man who found me, to call my

25   mother.

1   Q.   Excuse me for interrupting.  How did you find Kevin

2   again?  How did he find you?

3   A.   I thought he brought me to the triage area, but maybe

4   he left and came back.  I talked to a sheriff at some

5   point and I think someone else.

6   Q.   But you remember talking to Kevin in the triage area?

7   A.   Yes.

8   Q.   What did you talk to Kevin about?

9   A.   I asked if he could call my mother.  I think people

10  were saying that we would all be brought to different

11  hospitals, and I wanted him to call her and tell her what

12  had happened and where I was going.

13  Q.   Do you remember that -- let me see if I can refresh

14  your recollection, because you did share some of this in

15  your deposition.  Who was going to pick you up at the

16  train station?

17  A.   My mom, or my family, both of them.

18  Q.   You don't remember forgetting your dad's cellphone

19  and calling the house?

20  A.   I don't know anyone's cell phone number.  I know my

21  home phone number.

22  Q.   Do you remember the call with your mother on the

23  phone?  Do you remember that at all or just the fact that

24  it happened?

25  A.   I didn't recall that I ever spoke to her on the

1    phone.

2    Q.   What happened after the triage area?  What did they

3    do with you next?

4    A.   I was given a shot to kind of sedate me, and they put

5    me on some sort of board to lock in my neck so that it

6    wouldn't be jostled around in case I had a neck injury.

7         The next thing I remember, I woke up in the hospital

8    and they were cutting off my clothes to look for injuries.

9    Q.   What, if anything, do you remember about your three

10   days in the hospital?

11   A.   I remember that I was -- the first day my mother was

12   on the way, and they wanted to clean me up before my

13   mother came and saw me.  They said I looked like

14   Freddy Krueger, so they were washing my face and trying to

15   get the blood off of it.  I hadn't seen myself at all, so

16   I didn't know how I looked.

17        My mom came, and she was in the room with me, but I

18   couldn't really move, or I was supposed to call the nurses

19   to help me to the bathroom or move or anything like that.

20   I was in a lot of pain.  And I was kind of going in and

21   out of consciousness.  Doctors would come in and kind of

22   look at me and check things, and then leave.

23        At one point, I think I was there -- yeah, three

24   days.  At one point, I think I told my mother I wanted to

25   leave, I wanted to go.  And she was saying, no, I had to

1    stay to make sure that I was okay.  And I was becoming

2    very, very upset, and very upset, and the nurse came in

3    and told my mother that she had to go because I was

4    getting -- it was dangerous for me to become so upset.  My

5    heart or something.

6    Q.  Do you have any idea why you got so upset?

7    A.  I think I hated to feel so weak.

8    Q.  When you were released, you went home.  Tell us about

9    the two weeks or so you were at home?

10   A.  For a while, I kept waking up very early in the

11   morning, around 6:00 in the morning or so.  I didn't know

12   why.  I was pretty hideous.  I had two black eyes, I had a

13   cut into my forehead and another cut here.  So those

14   required stitches.  And I had a chipped tooth.  And my

15   shoulder -- my collarbone had been broken, so I was in a

16   sling.  So I wasn't really seeing anybody.

17   Q.  Did you have any nausea or headaches?

18   A.  Yes.  I just kind of laid in bed for the majority of

19   the time.  I had some severe headaches.  I didn't really

20   want to go out into the light.  I just stayed in my room.

21   Not much of a holiday, honestly.

22   Q.  Do you remember seeing Dr. Spohr?

23   A.  Yes, I did go see Dr. Spohr.

24   Q.  Do you remember a discussion with Dr. Spohr about

25   whether or not you should go back to school?

**A.   Yes.   She warned me that she had had patients before**
**who had this type of injury, kind of a concussion, and**
**that they found it extremely difficult to go back to**
**school to study, to concentrate, to look at screens, all**
**of these things.   She thought it would be best if I took**
**time off from school to recover, because she was worried**
**my GPA would fall if I went back.**

**Q.   Did your mother or anybody else express the same**
**thought, that you should probably take time off and**
**recuperate?**

**A.   Yes, my mother definitely felt that way.   I think my**
**father did, as well.   Most of my family agreed with**
**Dr. Spohr, that I should stay there and try to get better.**

**Q.   But you wanted to go back, right?**

**A.   I did.   I had a feeling that if I took this time off,**
**I would never go back to college, I would never try to do**
**anything again.   I kind of felt like I needed to really**
**push myself to move.**

**Q.   So you did push yourself?**

**A.   I did.**

**Q.   When you got back up to school, with the broken**
**clavicle, you had your arm in a sling, were Dr. Spohr's**
**words borne out?   Was it hard?**

**A.   It was extremely difficult.**

**Q.   Share with the jury the kind of difficulties you**

1    encountered in January and February of 2018 when you went

2    back to school?

3    A.   I was very alone, and every class I went to, because

4    it was winter, I would have to, you know, try to take off

5    my backpack and then take off my jacket, you know, and get

6    all my books out.  And this was a whole process.  At the

7    end of every class, I had to do the same thing over and

8    over again.  I had to ride the bus.  And I was very scared

9    to do that.  And it was often very crowded, so I would be

10   standing there trying to hold the bar with my arm in a

11   sling.  It was very irritating on my collarbone to have

12   any sort of backpack, anything putting pressure on it at

13   all.  But how do you go to class if you -- if that's the

14   case.  You have to bring your books with you.

15       I was trying to study Arabic.  It was my second

16   quarter of Arabic at the time.  And I was very worried

17   that it would not go well.  I was very worried about what

18   Dr. Spohr had said.  So I was -- I applied for a

19   disability program at UW.  It encompasses a wide range of

20   disabilities, but including concussions.  So I asked her

21   for a letter so that I would be able to have more time to

22   take my tests, complete assignments.  I routinely went to

23   my teacher at the time to get extra help outside of class

24   so that I could make up for my -- I was struggling with

25   memorizing things.

```
 1        I had to write the letters out with my hand so that I
 2   could kind of build muscle memory, because just seeing the
 3   letters, the words, wasn't enough.  In general, all my
 4   classes kind of required a computer screen, so I had to
 5   take breaks because of continual headaches.
 6   Q.   It was hard?
 7   A.   Yes.
 8   Q.   But you got through it?
 9   A.   Yes, I did.
10   Q.   And academically, in fact, all the way through
11   academically you did well, didn't you?
12   A.   This was I think because Dr. Spohr had given me a
13   prescription for Concerta, which kind of helped me focus.
14   Despite all the distractions and the pain, I was able to
15   really concentrate when I needed to.  I think if I had not
16   had that prescription, the quarter would have gone very
17   differently.
18   Q.   Did you like having to take the medication?
19   A.   No, I hate medication.
20   Q.   You hate medication?
21   A.   I hate taking pills.  I am kind of stubborn about
22   that.
23   Q.   How many semesters did you utilize the dispensation,
24   that is the disability dispensation to get additional time
25   for tests and assignments?
```

1   **A.**   I believe it was for two quarters.  And the next

2   year, I wasn't at the school itself.

3   **Q.**   So in the winter of 2018, the spring of 2018, you got

4   the dispensation, and then in the summer you were doing

5   some fieldwork, correct?

6   **A.**   Yes.  Correct.

7   **Q.**   So you didn't need it?

8   **A.**   No, I did not.

9   **Q.**   In fact, was there any other time after the spring

10   and -- winter and spring quarters of 2018 that you were

11   actually back on campus prior to COVID?

12   **A.**   There was the fall quarter of 2019, I was at the UW

13   campus.

14   **Q.**   When you were back at the UW campus in the fall of

15   2019, how did it go?  Did you get special dispensation at

16   that time?  Did you still have it?

17   **A.**   No, I did not.  But I had a very, very difficult

18   quarter.  I quickly realized things were not going well at

19   all.  And I sought out help from various people, like from

20   health practitioners, to try to save my -- me from what

21   was going on at the time.

22   **Q.**   Was there a program at the UW that you were able to

23   utilize to help get through it?

24   **A.**   No.  I didn't apply for the special program, because

25   by that point, by the time I realized how badly everything

1  was going, it was pretty far into the quarter.  It was

2  pretty much too late to go and reapply.  It didn't come to

3  mind.

4  Q.  In one of her reports, Dr. Spohr, I believe it was,

5  indicated that you lost a semester at some point, you had

6  to drop out.  Is that an accurate report?  Did she get

7  that right?

8  A.  I think technically no, on my transcript that is not

9  what it shows.  What happened was, when I came back from

10  my exchange in France, where I went thinking I was going

11  to improve my Arabic studies and, you know, going to Egypt

12  where I thought I would really be able to improve a lot

13  when it came to Arabic, when I came back that quarter I

14  was not able to place in the level I should have been at.

15      I took this very hard.  I felt like a failure.  And

16  so I had to drop out of my Arabic class, and I didn't take

17  any Arabic for that full year.

18  Q.  Did you talk to Dr. Spohr about that?  Is that what

19  you explained to her?

20  A.  I believe so.  It was my annual exam.  So I think I

21  was just telling her how the year had gone for me since my

22  last visit, which I believe was immediately after I had

23  come back.

24  Q.  Speaking of Arabic, it was implied here by others

25  that you are proficient in Arabic.  Are you proficient in

Arabic?

A.   Is a three-year-old proficient?  I am not proficient

in Arabic.

Q.   Have you found to your expectations that your ability

to learn Arabic stayed as it was prior to the crash, or

did you have some difficulties afterwards?

A.   I believe I have had a lot of difficulties with

Arabic.  To be sure, it is a difficult language, but I

have not been able to memorize things the way that I would

hope.  Things don't stick with me the way I would like.  I

have honestly not spoken Arabic, I think, since November.

I haven't stayed in any classes, which was my intention.

But I haven't been able -- mostly given up on it at this

point.

Q.   Even though you are living in Cairo, you are not

speaking Arabic?

A.   I do not speak it at all.

Q.   Staying in the academic realm, share with the jury,

if you will, what your own expectations are for yourself,

or what they were for you as a student?  What is the

Emily Torjusen standard of academics?

A.   My family raised me to get very good grades, to do

the best I possibly could.  I feel very lucky to have been

able to go to the University of Washington.  And I wanted

to do my best in every single class.  So when it came to

1   an assignment, when it came to a test, of course I want

2   the best grade I can get.  I don't fool myself into

3   thinking it is 100 percent every time, but I want to get

4   as close to that as I can.

5       For me, if I know that I have done well academically,

6   then I can feel satisfied.  But in large part, I never

7   feel satisfied with my schoolwork, with any work that I

8   do.

9   Q.  After the crash, did you have to spend more time

10  cutting out -- spend more time on your assignments, on

11  your writing, on your studying than previously had been

12  the norm for you?

13  A.  I had huge struggles with concentration since the

14  crash.  It is a constant annoyance, because I will sit

15  down, and I have an assignment I know I have to do, I have

16  to do, I want to do it, I am ready to do it, but five

17  minutes into working on it, I am cleaning my room, I am

18  making dinner, I am putting my clothes away, anything.  I

19  just jump from one thing to another thing to another

20  thing.  Sometimes I jump from one assignment to another

21  assignment, so I end up doing pieces of each, but never

22  fully concentrating on one at a time.  So it takes a long

23  time for me to get something done, especially when I was

24  in school taking multiple classes.

25  Q.  Did it affect your sleep?

1  **A.**   Yes.   I had a lot of difficulties with my sleep,

2  especially when I came back in the fall quarter of 2019.

3  I would start falling a sleep when I was trying to work on

4  things, but then when it came time for me to actually go

5  to bed, I was lying awake paralyzed with the fear I was

6  going to fail and I didn't complete this.   So I would try

7  to stay up and try to finish it.   I was constantly sleep

8  deprived, but also unable to fully do the assignment.   It

9  was a vicious cycle.

10  **Q.**   Did it affect your ability to care for yourself in

11  terms of eating and exercise?

12  **A.**   Yes.   It has been very difficult to have, I guess,

13  one of those life-styles where you are able to have a

14  social life and care for your body and, you know, care for

15  your mind as well.   I am kind of someone who over the

16  years has had to focus on work, focus on that, and there

17  is no room for much else.   Of course, I enjoy walking in

18  the sunshine and things like this.   In order to get the

19  things I want done, to prioritize the things that are most

20  important in my life, I have to focus on them as much as I

21  can.

22  **Q.**   How much of a struggle is it for you on a daily

23  basis?

24  **A.**   On a daily basis, I would say -- I am never

25  satisfied.   I will -- I get to work and I will stay there

 1   late into the evening, keep working on something even if

 2   it is over the deadline.  If I don't feel like it is

 3   enough, if I don't feel like I have said everything that

 4   needs to be said, I have to keep working on it.  It is not

 5   finished.  I am never very satisfied with the work that I

 6   do.

 7   Q.   Since you mentioned work, I am going to follow where

 8   you are going rather than follow my outline.  What is your

 9   work now?

10   A.   Technically speaking, I am the CEO of a small

11   start-up in Egypt, which kind of deals with the

12   publications about businesses in the United States.  All

13   of our work is done in English.  I manage four people.

14   And I'm not a very good manager, at that.  I am really

15   just a CEO in title, because I am an American, and the

16   work we do is about the U.S.  I am a native English

17   speaker.  So in terms of qualities, I am kind of the best

18   that they have at this very small organization.

19   Q.   You say you have four people who report to you.  What

20   do those people do?  What are their jobs?

21   A.   We have one writer.  We have one video editor.  We

22   have one social media person.  And we have a YouTube host.

23   Q.   What does the writer do?  What are they supposed to

24   be doing?

25   A.   What they are supposed to do is research a company

1    and create a comprehensive article using good English

2    outlining the positives and negatives of that company.

3    Yeah, that's it.

4    Q.   And what is your relationship to their work?

5    A.   More often than -- almost all the time, I am not

6    satisfied with their work.  This is a constant issue.  I

7    cannot -- I have tried to teach them how to do research,

8    how to improve their English, how to write more formally.

9    This has never really succeeded.  I almost always rewrite

10   their work entirely because I want it done the right way.

11   It has to be done the right way, and people are unable to

12   do that.  And this has caused a lot of friction in our

13   organization.

14   Q.   Has there been turnover?

15   A.   A lot of turnover.

16   Q.   Are you responsible for that?

17   A.   I have fired many people.

18   Q.   Are you concerned about being able to keep your job?

19   A.   No, because, quite frankly, I am the best they have.

20   At a different organization, this would not be the case.

21   But in Egypt, this is --

22   Q.   Your mother shared with us, and you touched upon it

23   earlier, outbursts, not being able to control frustration

24   or anger.  Before the crash, did you have any problems

25   controlling what you said to friends, to professors, to

1  parents, to strangers?  Were you able to comport yourself

2  appropriately in public?

3  A.  I would say so.  I was really quite shy.  I barely

4  ever spoke to people.

5  Q.  How frequently now do you find yourself in a

6  situation where you feel that uncontrollable reaction,

7  where you know you are going to go off?

8  A.  I almost always say more than I intend, and I leave

9  berating myself because I feel like a fool, I can't

10  control what I'm saying.  That's not -- that's not good as

11  an adult.

12      When it comes to outbursts of anger, I get very -- it

13  starts as something -- it could be something small, but

14  then I just go from zero to 100 straight away, and I am

15  just screaming at another person for no good reason.  I

16  can't really stop myself once I get started.  It just

17  takes over.

18  Q.  I understand that, and that has been a pattern that

19  you have lived with, you see, you know is there, you try

20  to avoid situations or keep it under control.  My question

21  is:  How often does it happen in the last -- say on a

22  monthly basis, weekly basis, where one of those episodes

23  happens in your life?

24  A.  An extreme outburst, like screaming at someone,

25  probably twice a month, or at least once a month.  But

1    something where I just out of nowhere start snapping at

2    people, getting very angry at them, very irritated, very

3    short-tempered, demanding things from them, that probably

4    is more on a weekly basis in my personal life and my work

5    life.

6    Q.   Speaking of your personal life, you currently have a

7    partner?

8    A.   Um-hum.

9    Q.   And you are living with him, correct?

10   A.   Yes.

11   Q.   Do you snap at him and have those kinds of issues

12   with him?

13   A.   All the time.  He has said to me that he is afraid to

14   say things to me because of how I am going to react.

15   Q.   How does that make you feel?

16   A.   I feel terrible.

17   Q.   He obviously understands -- I don't know if it is

18   obvious.  Have you shared with him what has happened to

19   you about the crash, about the changes, about the areas

20   that you can't control?

21   A.   Yes.  But I don't think, you know, he fully -- he

22   doesn't fully get it.  He understands PTSD, he has seen

23   people die in his own life, so this is something he can

24   understand the trauma, a terrible accident.  But when it

25   comes to our disagreements, it's very difficult for him to

1  forgive me.

2  Q.   Based on your reports of problems that you were

3  having in January and February, into March of 2018, your

4  mother arranged to have you evaluated neuropsychologically

5  with Dr. Scovel.  Did you understand why she wanted you to

6  be evaluated?  Did you understand it then?

7  A.   Did I understand it then?  I understood that -- to

8  me, I was acting very strange, even for me I felt very

9  different as a person.  I was speaking uncontrollably.  I

10  was having very strange reactions to things, crying very

11  often at things I never would have, not really being able

12  to have a nice medium emotion.  So I figured it was

13  something like this, or worrying about the effects of

14  PTSD, being scared on the buses, et cetera, anxiety.

15  Q.   And you were tested by her in 2018, and again in

16  2020.  Did you give your maximal effort on the testing

17  that she administered directly and through her assistant?

18  A.   Yes.

19  Q.   One of the issues that has been noted is the anxiety

20  about decisions, inability to decide things, choices.  How

21  has that manifested with you?  Can you give us an example

22  on simple decisions and how hard they are sometimes?

23  A.   Yes.  Grocery shopping has always been a weird

24  struggle since the accident.  I will go into a grocery

25  store, and I will have planned out everything I want to

1   get.  But the moment I'm in the aisles, I am staring at

2   all these different types of cheese, all these different

3   kinds of cereals, and I can't make a decision.  I have no

4   idea what to get.  I am thinking about the price, the

5   quality.  It drives me nuts.  So I will stand in an aisle

6   for minutes unable to decide something.  And I have left

7   grocery stores often without getting anything, because at

8   this point it is just what do I even do.  So usually I

9   will just eat the same thing over and over.  I am not very

10  picky about food.  It's fine.  I can make the same thing

11  again and again.

12  Q.   Before the accident when you went -- you lived in an

13  apartment with Jocelyn, correct?

14  A.   Yes.

15  Q.   We don't have to go into it, one of your friends who

16  is not part of your circle anymore.  When you and she

17  lived together before the accident, did you go grocery

18  shopping?

19  A.   Yeah, we would go grocery shopping together.

20  Q.   Would you be adventuresome and try different things?

21  A.   Yeah, we did.

22  Q.   Was that ever a problem for you to go to a grocery

23  store before?

24  A.   No.

25  Q.   How about other shopping, clothes, books, anything

1  else?

2  **A.**  No, I never had difficulty deciding what I wanted.

3  **Q.**  In addition to groceries, do you have difficulties

4  with clothes or books or any other kind of shopping where

5  a decision has to be made?

6  **A.**  In general, I don't like shopping because it requires

7  a lot of decision-making.  The same thing with eating out,

8  I don't like to go to a restaurant, because I struggle to

9  make a decision about what is the right thing to get.

10  Hopefully, I will order the same thing as someone else or

11  ask someone to order for me.  Sometimes, I will ask the

12  waiter, you know, what is the best thing, and whatever

13  they say it is, I will get that instead.

14  **Q.**  In the last four and a half years, you have had

15  therapies -- aborted therapies with Elizabeth -- I keep

16  doing that.  I don't know why.  Elizabeth Scovel

17  probably -- with Emily Smith, and then with Dr. Crossen,

18  John Crossen, and then with a Rita Costelich, I think her

19  name is.  And then with Dr. Crossen, you did an evaluation

20  again, and actually with Dr. Johns.  What happens to you

21  when you're in therapy, when you have found somebody and

22  you start seeing them?  What happens to those

23  relationships?  Can you share with us why it doesn't last

24  very long?

25  **A.**  I am pretty hesitant to see any medical professional,

1   because I hate telling them what happened.  They have very

2   strange reactions to saying, oh, I was in the train

3   accident.  So when I try to seek out some sort of therapy,

4   some sort of help, I find it very difficult to tell them

5   what I am going through, and their reaction is usually not

6   what I hope or what I anticipate, or somehow I always have

7   conflict with it.

8        The more I talk about the things that are going in my

9   life, the more I am thinking about how bad, how annoying

10  these things are, the bad memories associated with them,

11  all the things that are going wrong.  So it is much easier

12  for me to just not talk to someone about it.

13       When I really hit rock bottom, where I really feel

14  like I can't -- I need someone's help, then I seek someone

15  out, and the cycle begins again.  I just can't make it

16  past this.  So I will always end up leaving.

17  Q.   I want to go back just a little bit to your work.

18  How long -- what is the name of the company you work for

19  in Cairo?

20  A.   It's called Geek Labs.

21  Q.   Geek Labs?

22  A.   Yes.

23  Q.   How long have you worked for Geek Labs?

24  A.   I first started there halfway through July as a

25  content writer.

```
1   Q.   Actually, your partner is associated with Geek Labs,
2   as well, right?
3   A.   Yes.
4   Q.   Does that make it difficult when you have
5   disagreements or fights and are working together?
6   A.   Yes, it does.
7   Q.   Have you had any other work while you have been
8   working at Geek Labs?
9   A.   Yes.  When I first arrived in Cairo, I was initially
10  teaching at sort of an English language center in a
11  different area of the city.
12  Q.   What happened with that employment?
13  A.   I was exhausting myself.  I was really unable to keep
14  up with both jobs with the work involved in both, and I
15  didn't have any time to relax at all.  And it was really
16  affecting my work at Geek Labs, which was a full-time job
17  as opposed to the part-time job with the language center.
18  So my boss there told me I really should quit.  And I
19  preferred my job at Geek Labs.  I really enjoyed my work
20  there.  And I decided, okay, fine, I will.  But I was a
21  coward.  I am really bad at telling people no.  I didn't
22  know how to say it.  I told him my mother had been in an
23  accident and I needed to go back to the U.S.  I said this
24  to him in an email.  He wanted me to continue doing some
25  classes until I left, but I knew if I went in they would
```

1    know that my mother wasn't in an accident.  So I felt very

2    ashamed.  I just didn't go, I didn't reply or anything.

3    Q.   And then that guy started stalking you?

4    A.   Yes.  He showed up at my workplace, Geek Labs, which

5    is very far away from his center.  He demanded back some

6    of the equipment.  And that was fine.  I delivered it to

7    him.  Then he contacted my boss at Geek Labs and sent him

8    a long message about all the bad things I had done.  He

9    called him, and they had a long conversation.  My boss at

10   Geek Labs explained, okay, what she did is definitely

11   wrong, but don't you think this is too much at this point.

12   And then he made a tweet -- a long thread explaining what

13   happened, and tagged multiple people.  I think he found

14   them on my LinkedIn or something.  I only saw it because

15   someone I used to know sent me an email saying this person

16   is saying this stuff, I wouldn't worry about it.

17       I didn't know what to do.  I was very scared.  I was

18   like why?  And he continued to take it further and

19   further.  He started really seeing -- he released the

20   address that my family lives at, the name of my mother, my

21   sister.  He tried to contact my mother, tagged her or

22   something on Facebook.  It was getting very extreme.  In

23   the end, my boss at Geek Labs confronted him and it was

24   stopped.

25   Q.   All because you couldn't find a graceful way to tell

```
 1    the guy you can't do the work any more at the language
 2    school, so you fibbed?
 3    A.   I did.  And it was wrong.
 4    Q.   Do you know why you did it?
 5    A.   I'm very bad at saying -- I don't know.  I was
 6    ashamed, or I just couldn't face him, I guess.
 7    Q.   I want to go back a little bit to your academic
 8    track.  You went back to UW in January for the winter
 9    quarter of 2018, spring quarter of 2018.  What did you do
10    next academically?
11    A.   I'm sorry.  Can you repeat that?
12    Q.   What did you do next academically?
13    A.   After the spring quarter of 2018?
14    Q.   Yes.
15    A.   Well, winter -- spring quarter of 2018.  Well, I did
16    go home.  I spent I think a few months at home with my
17    family until I left in August.  That didn't go very well.
18    I had some serious arguments with most of my family
19    members.
20    Q.   In August, you went to study in Monton, I think it is
21    called?
22    A.   Yeah, Monton, France.
23    Q.   M-O-N-T-O-N?
24    A.   Um-hum.
25    Q.   Why Monton?  Did UW have an exchange program with
```

1    Monton or give you credit to go there?

2    A.   They did.   It was one of the recommended places.   And

3    I was hoping to find a place that would help me improve --

4    like learn Arabic faster.   That was really my goal.   And

5    they don't really allow exchanges to the Middle East.   But

6    this was a school that specialized in Middle Eastern

7    languages, politics of the Middle East.   It seemed like a

8    very perfect fit considering what I was studying.

9    Q.   And Monton is located in the very southeast of

10   France, correct?

11   A.   Yes.

12   Q.   How close is it to Italy?

13   A.   It is a 30-minute walk to the border.

14   Q.   Did you walk to Italy?

15   A.   I did.

16   Q.   It has been reported that you even went shopping in

17   Italy?

18   A.   I bought my groceries there because they were

19   cheaper.

20   Q.   Was that your shopping excursion to Italy?

21   A.   Yes.

22   Q.   How far is Monton from Monte Carlo?

23   A.   Monaco is a two-hour walk along the beach.   I took

24   that walk with -- you know, to enjoy the water.

25   Q.   So when you had a chance to go for a walk along the

1  beach, that's where you walked?

2  A.   Yes.   I didn't do it all the time, but the only

3  Starbucks in the area was in Monaco, so I would go there

4  to get coffee.

5  Q.   That is a great thing for somebody from the

6  University of Washington to advertise.   Right next to

7  Italy and France to get some Starbucks.

8  A.   Yes.

9  Q.   I guess you can't take the Starbucks out of the girl.

10  You were in Monton in the fall quarter of 2018?

11  A.   Yes.

12  Q.   And then I think the history is that you applied for

13  an internship or some program in Cairo, correct?

14  A.   I did.

15  Q.   Tell us about that.   First of all, let me go back.

16  Tell us about what it was like to be in Monton, and

17  whether or not any of the symptoms or problems that you

18  had been experiencing as a result of the crash went on the

19  plane with you, and you took them over to Europe with you?

20  A.   I rather foolishly thought this would be a chance for

21  me to put it behind me and, you know, recover.   But I was

22  very depressed.   I had a lot of issues.   I was living

23  alone and very isolated at the time.   My workload was a

24  lot less, but I was still studying Arabic.   I was still

25  very much struggling with it.

1          I talked to Dr. Crossen about this a lot.  It was

2    kind of my chief concern.  I had come all the way there

3    just to get better, and I wasn't at all.  I would ask for

4    a private one-on-one with my Arabic teachers.  I would

5    just burst out crying uncontrollably.  And I didn't know

6    why.  I was -- it was very difficult.  So it didn't really

7    go the way I had planned.

8    Q.   This wasn't a vacation on the French Riviera, was it?

9    A.   No.

10   Q.   Tell us about the internship or the program in Cairo

11   then in the winter -- the end of the year of 2018.

12   A.   Yes.  Yes, during I guess it was the summer of 2019,

13   I went to a language school in Cairo.  It's called Ahlan

14   Arabic Centre, and I had applied to be an intern there,

15   which basically meant you helped with a few administrative

16   tasks, and you got a discount on Arabic classes and they

17   would give you some housing for one month.  So it was my

18   attempt to make up for the time I had lost, because the

19   school in France was not what I had hoped it would have

20   been in terms of Arabic.  So I felt like I was at a

21   deficit and I wanted to make up for it.  So I spent the

22   summer there interning with the school.

23   Q.   I think we might have miscommunicated here.

24   A.   I'm sorry.

25   Q.   It's all right.  I thought you were in Monton

1    starting in August of 2018, and then sometime while you

2    were still overseas during that period of time, you went

3    to Cairo for three weeks?

4    A.   Yes, I did.

5    Q.   A semester for a program?

6    A.   Yes, I did.  That's how I first heard about the

7    school.  The school in France was kind of advertising a

8    winter educational trip to this language center for a

9    group of students to kind of take group classes together

10   at a discount.  And I had never actually been to an

11   Arabic-speaking country.  So I thought this would be a

12   good opportunity.  So I went there and took three weeks of

13   classes with a group of students from the same university.

14   Q.   Did you feel -- was part of your motivation for doing

15   that a sense that perhaps if you stayed overseas and

16   didn't come back, you might avoid some of the demons that

17   had been haunting you here?

18            MR. BONVENTRE:  Objection.  Leading.

19            THE COURT:  Sustained.

20   BY MR. PETRU:

21   Q.   Let me rephrase it.  Was one of the reasons why you

22   stayed and went to Cairo then, to avoid coming back here?

23   A.   In the summer of 2019?

24   Q.   No, in --

25   A.   In the winter?

1   Q.   The end of 2018, beginning of 2019, the first time

2   you went to Cairo.

3   A.   Yes.  I didn't want to come back.  I felt like I had

4   left things on a very ugly note with my family, and things

5   were not going very well with my friends at that point.

6   So I felt like I really didn't have much to come back to

7   anyways.

8   Q.   You went back to Monton and finished up in May

9   of 2019, and then rather than coming back, you went from

10  there to Egypt, correct?

11  A.   Correct.

12  Q.   And you were there until September?

13  A.   Correct.

14  Q.   And then finally in September of 2019, a year after

15  you left, you came back to Washington?

16  A.   Yes.

17  Q.   Did you have an anticipation or an expectation that

18  things might be different after you spent a year away in

19  terms of family, friends, interactions, behaviors?

20  A.   I was looking forward to seeing my friends and my

21  family, but I was very conscious that if I was around them

22  too much, things would probably not go too well.  When I

23  first came back, I only stayed with my family for two days

24  before I had to go to Seattle to start my classes.  Yeah.

25  Q.   That was the semester when you went back to Seattle

1    to start your classes where you had difficulty in Arabic

2    and had to drop that class or that part of the class, not

3    the whole semester, correct?

4            MR. BONVENTRE:  Objection.  Leading.

5            THE COURT:  Overruled.

6            THE WITNESS:  Yes, that was the same quarter.

7    BY MR. PETRU:

8    Q.   How did it go with your friends and family when you

9    were back in Seattle for the fall quarter of 2019?

10   A.   I didn't speak much to my family.  And initially,

11   things were okay.  I had lost contact with Hanna at that

12   point.  We had a very not good falling out.

13   Q.   Let's go back to that.  This is while you were still

14   in Europe, it was in December, I believe, 2018, and you

15   were in London, and it was the anniversary of the crash.

16   A.   Yes.

17   Q.   What happened?  Hanna was the woman who was with you

18   on the train?

19   A.   Yes.

20   Q.   Was there, and you went to visit her in London?

21   A.   Yes, I did.

22   Q.   She was studying there.  What happened?

23   A.   I was pretty distraught or frazzled.  I don't know

24   how to describe it.  When I found her, I found her

25   immediately on December 18th, that's when I arrived in the

1    UK.  And I wanted to talk about the accident.  She didn't.

2    She didn't want -- she didn't have much to say about it at

3    all.  We were together for maybe one week in the UK before

4    I showed her where I was living in France.  And then I

5    left her there actually to go to Egypt.  We had planned it

6    all out.  I thought the trip had gone well, but I had

7    heard from our mutual friend that she was kind of

8    describing me as crazy, that I had -- wouldn't stop

9    talking about the accident.  She thought I should get over

10   it.

11        I was very hurt by that, because she had been there

12   with me.  I kind of thought if anyone could understand, it

13   would have been her, but that wasn't the case.  So I did

14   cut her off.  I did not -- I blocked her on everything and

15   have not spoken to her since.

16   Q.  The old adage, just get back on the horse or just

17   pick up your life or just forget about it and move on,

18   have people told you to do that?

19   A.  I have heard many weird things people said, oh, well,

20   you will be stronger for it, or don't you wish there had

21   been a video camera in the train car with you during the

22   accident.  I don't think they know what they are talking

23   about.

24   Q.  Your experience is that it haunts you?

25   A.  Yeah.  It's very painful for me.

1  Q.   We were talking about the fall quarter 2019 when you

2  were back.  You said you were going to look up some old

3  friends and hoping to rekindle some relationships.  How

4  did it go?

5  A.   I was still friends with two main people in my life

6  who had stayed in touch with me when I was in Egypt.  I

7  had a very rough time in Egypt, actually, so I was relying

8  on people over the phone to be talking to me.  And when I

9  came back, at first things seemed okay with my friends.

10  But by the end of the quarter when I went down with

11  Jocelyn, who had been my roommate when the crash had

12  happened, actually, to our hometown, we came back on the

13  same bus together, and I received a message from my friend

14  at the time saying, "I don't want to ever see you again.

15  I don't want to speak to you anymore.  I don't want to

16  have anything to do with you."

17      I had been trying to plan -- like get tickets to an

18  event that she liked.  Because I was bothering her about

19  what day are you free, this stuff.  When she said that --

20  I mean if someone doesn't want to know you, then you can't

21  force yourself on them.  So, yeah, I never contacted her

22  again after that.  But I had asked Jocelyn, because they

23  had spoken together during that time together in our

24  hometown, I said, "Did she say anything?"  She said no.  I

25  kind of had a bad feeling, but I thought at least I'm

1    still friends with Jocelyn.

2        And a few days later, she mentioned she had been

3    talking with this girl, Abigail, and that -- I didn't know

4    what was happening, I had a bad feeling, but the result of

5    it was that on December 31st, the last day of the year of

6    2019, I had been planning to jump in a lake with her.

7    That was a tradition we had.  And when I called her, she

8    kind of told me -- Abigail told me, you said all these

9    things.  I had said some hurtful things during the time

10   after the train accident.  I was very alone.  She was my

11   roommate at the time, but her father had died a week after

12   the accident, so we were both very much hurting and in

13   very dark, painful places.  I had said hurtful things.

14   And it was bad.  So she was very resentful about this.

15   She said hurtful things as well.  And so I hung up the

16   phone.  I blocked her on everything and haven't really

17   spoken to her since then.

18   Q.  So, Emily, you have not only gotten to a place where

19   you apparently have said things to friends that have

20   caused them to shut you out, but you have also been hurt

21   and shut your friends out?

22            MR. BONVENTRE:  Objection.  It's leading.

23            THE COURT:  Overruled.

24            THE WITNESS:  Yes.

25   BY MR. PETRU:

1    Q.   Staying in the same month, December 2019, a year

2    after you and Hanna were in London, where were you on

3    December 18th, 2019, on the two-year anniversary of the

4    crash?

5    A.   On December 2019?

6    Q.   I'm sorry.  December 18th, 2019, the two-year

7    anniversary.

8    A.   Yes.  I had found where the accident -- the

9    derailment had occurred.  So I went to the site.  I went

10   there and just kind of wanted to see where it all had

11   happened.  I was very moved.  I was crying.  Someone had

12   put up a cross there to commemorate the people who had

13   died and kind of the investigation overall.  I just wanted

14   to, I don't know, remember what had happened.

15        There is this golf course nearby.  I went in there, I

16   had -- I had I think three shots of vodka to commemorate

17   the three people that had died.  It was just a weird

18   tradition I did.

19   Q.   Every year on the anniversary, do you think about it

20   or do something, or if you are in town -- have you been

21   back more than once on December 18th to the site?

22   A.   Yes.

23   Q.   And when you are not here, do you do something

24   wherever you are?

25   A.   Yes.  Usually the month of December is very bad for

1  me.  I'm thinking about the accident.  I'm very emotional.

2  I'm kind of all over the place.  So on the actual day of

3  the accident, I really prefer to be alone.  I just kind of

4  want to sit somewhere and cry, just, I don't know -- I

5  don't want to be around people and try to have a happy day

6  with them when there is something like that on your mind.

7  Q.  In 2020, you did some externship work, university

8  credit, but you weren't going to campus, correct?

9  A.  In 2020?

10  Q.  I think those are the years.

11  A.  Yes.

12  Q.  Didn't you get an internship at the State Capitol and

13  was working at the State Capitol?

14  A.  Yes, the winter quarter of 2020, I was doing a

15  legislative internship at the State Capitol, correct.

16  Q.  And after that you worked on a campaign, correct?

17  A.  Yes.

18  Q.  And after that you took a short break, and then went

19  to Egypt?

20  A.  No.

21  Q.  I'm off a year.  I'm off a year.  Four and a half

22  years is a long time to cover.

23  A.  Exactly.

24  Q.  Sorry about that.  It was in December of 2020, if I'm

25  not mistaken, after the campaign that you worked on, you

1   took a break and went by yourself to Phoenix?

2   A.   Yes, in December of 2020 I went to Phoenix.

3   Q.   What happened when you were in Phoenix?  What did you

4   do?

5   A.   Go ahead.

6   Q.   What did you do?

7   A.   Yes.  Yeah, I didn't want to spend Christmas or New

8   Year's with my family, and I didn't really have anyone

9   else to spend it with, so I thought I should just --

10  rather than stay home alone, go someplace else.  So for

11  some reason, I went to Phoenix.  I went hiking quite a

12  bit.  And this kind of led to -- very poorly planned trip.

13      On my last day there, I kind of went out to something

14  called the Deception Mountains.  It looked very nice.  I

15  knew there was a hike, but I didn't know much about it, I

16  guess.  So by the time I finally arrived at 1:00 p.m. and

17  started the hike, I was hoping I would see markers on the

18  trail.  And honestly, the hikes are very different from

19  Washington's, so I got miserably and utterly lost.  I was

20  very turned around.  And it had been nightfall.  I had

21  just a few granola bars and one bottle of water at that

22  point.  And I became very lost.  I didn't get out of there

23  until 1:00 a.m. actually.  And it was a miracle I made it

24  to my flight.

25  Q.   Were there other circumstances like that that you

1    took risks, made decisions that put yourself in an unsafe

2    situation that Emily Torjusen before this crash would

3    never have done?

4              MR. BONVENTRE:  Objection, your Honor.

5              THE COURT:  Basis?

6              MR. BONVENTRE:  Lack of foundation, Judge.

7              THE COURT:  Overruled.

8              THE WITNESS:  I would say that I am more reckless

9    in the way that I don't -- I'm not very good at planning

10   for things.  I will just kind of on a whim decide to do

11   something, and then before I know it, I realize I am very

12   ill-prepared for whatever I decided to do.  This can lead

13   to some kind of desperate situations.  I have been very

14   lucky throughout my life where I get out of it.

15   BY MR. PETRU:

16   Q.  Did you take that kind of risk, poor planned,

17   impulsive excursions that put you in harm's way, prior to

18   the crash?

19   A.  No.  I was a very thoughtful person.  I planned well.

20   I knew what I was doing more often.

21   Q.  Do you find -- you are aware of the fact that you

22   have these impulses and you do things on impulse, and that

23   you take risks.  Why don't you control it?  What do you do

24   to try to control it to eliminate that risk in your

25   ongoing life?

A.   I think at this point, I have kind of realized the best thing for me is to kind of have a more simple life, stick to the things that I know, you know, not venture out into things I don't know very well, stick with people who know what they are doing, because I don't, and things like this.

Q.   Is that -- how does that affect you if there is something you might want to do but you are concerned about it and then you don't do it?  Do you feel like you are taking opportunities from yourself or depriving yourself of certain aspects of normal life?  How do you -- how do you justify that in your own mind?

        MR. BONVENTRE:  Objection.  Leading.

        THE COURT:  Overruled.

        THE WITNESS:  I feel like I am trying to be realistic.  I realize that there are some things that I struggle with, that I am probably never going to really master, going to get better at.  So the best thing for me now that I am an adult and I am responsible for myself is to try to protect myself in this way.

BY MR. PETRU:

Q.   Do you still find that you have symptoms of the head injury?  For example, are there periods where you have attention or concentration problems now?

A.   Yes.  I still struggle with concentration.  I kind of

1    have a wide range of tasks that I feel like I need to do

2    throughout the day, and I never really get them done.  I

3    kind of jump around from one thing to another to another,

4    and I feel like I never do any of them the right way, the

5    quality way.  It is more a half of this, half of that.  I

6    get headaches still, especially if I get very angry or

7    stressed out.

8    Q.   Share with us, if you will, the frequency with which

9    you get a headache.  We are going to talk about headaches

10   for a moment.  How often do you get a headache without

11   regard to its nature or severity?

12   A.   Probably three times a week.

13   Q.   Are they the same when you get headaches or are they

14   different?

15   A.   What do you mean?

16   Q.   In location.

17   A.   In location?  I feel like it kind of depends on what

18   caused the headache.  I will sometimes have a headache

19   behind my eyes, or my ear, or in the back of my head.

20   Q.   What is the range of severity of your headaches?

21   A.   It can start as something very sharp, but usually it

22   kind of fades into a pulsing sort of pain.

23   Q.   Do the headaches ever get to the level that you have

24   to stop what you are doing, just stop for the day and take

25   a break or go to a quiet room or something like that?

```
 1    A.   No.   I will take ibuprofen.   No, my work shouldn't

 2    suffer because of a headache.

 3    Q.   You just soldier through it, as it were?

 4    A.   Yes.

 5    Q.   Do you get any nausea still?

 6    A.   Yes.

 7    Q.   And what circumstances do you get nauseous?

 8    A.   It is hard to say.   I will be nauseous very often,

 9    but I don't know -- especially now, I don't know if that

10    is because of the food I eat or if it is just a feeling.

11    If I feel nervous about something, I do feel nauseous.   I

12    do feel nauseous regularly.

13    Q.   I should have been more specific.   There was nausea

14    you had early on after the incident where you had

15    headaches, nausea, balance issues, problems that were part

16    of the symptoms associated with the concussion?

17    A.   Um-hum.

18    Q.   Do you get that kind of nausea anymore or is it a

19    different thing now?

20    A.   I believe it is different now.   I have poorer

21    balance.   I kind of sometimes fall, or I have trouble

22    catching my balance when I am walking.   I have the

23    headaches more often.

24    Q.   Let's talk about balance for a second.   Prior to the

25    crash, did you have any balance problems?
```

1    A.    No.   I had very good balance.

2    Q.    Balance as in ballerina?

3    A.    A very bad ballerina.

4    Q.    Bad ballerina.   Share with the jury the kinds of

5    problems you have associated with balance in your

6    experience since the incident?

7    A.    I don't know.   Sometimes, you know, you get up from a

8    chair and you find yourself kind of leaning more to one

9    side so you have to shift your leg over to catch yourself,

10   or you find yourself walking down the street, and you are

11   kind of tilted, so you have to kind of catch yourself with

12   your other foot.   It is not severe, but it is noticeable,

13   to me at least.

14   Q.    Have you fallen?

15   A.    Have I fallen?   Sometimes.   Like getting up out of

16   bed in the morning when I was straightening the bed sheets

17   and everything, I kind of fell to one side, but I caught

18   myself.

19   Q.    Do you have a reaction to news reports, articles

20   about transit crashes, for example?   It was a couple of

21   weeks ago now, maybe last week, there was the crash in

22   China, the airplane crash.   Do those kinds of reports

23   affect you at all?

24          MR. BONVENTRE:   Objection, your Honor.

25   Relevance.

```
 1                    THE COURT:  Overruled.
 2                    THE WITNESS:  Yes.  I think it is a reminder.  I
 3       mean, particularly every time Amtrak has a crash.  But any
 4       time transit, in general, I have seen airplane accidents,
 5       bus accident, things like this, it is a reminder that the
 6       world is a very unsafe place now.  I don't feel safe at
 7       all knowing this.  And it feels -- it affects me
 8       emotionally.  I am reminded of what happened to me and so
 9       many other people.
10       BY MR. PETRU:
11       Q.   When it affects you emotionally, does it shut you
12       down for a period of time until you can regather?
13       A.   I am say I become withdrawn.  I am contemplating
14       something that most people don't understand.
15       Q.   It might be obvious from your answers, but do you
16       feel like you are the same person you were before
17       December 18th, 2017?
18       A.   No.
19       Q.   Do you have any shoulder pain anymore?
20       A.   I work long hours at a desk, so it does affect me.
21       It kind of becomes a stabbing pain throughout my shoulder.
22       You know, sometimes I become stressed out, worried about
23       something, and then I also notice that it occurs.
24       Q.   We talked a while ago about your relationship, you
25       have a partner currently.  Before the incident, before the
```

1   crash when you thought about your life unfolding, I

2   understand that one of the things you thought you would do

3   that you wanted to do was to work in the foreign service,

4   the State Department, working for the country in some

5   capacity, correct?

6   A.   Yes.

7   Q.   What happened to those dreams and plans?

8   A.   Now I realize that those are probably unrealistic.

9   Q.   Why do you feel they are very unrealistic?

10  A.   Given who I am, I am probably not a good fit for

11  something like this, which requires a lot of a person,

12  someone -- you require a security clearance in most cases,

13  and that is something I think is very unlikely I would

14  ever obtain.

15  Q.   Would you hire yourself for that job?

16         MR. BONVENTRE:  Objection, your Honor.

17         THE COURT:  Sustained.

18  BY MR. PETRU:

19  Q.   Before the crash, how did you envision that your life

20  would unfold besides getting a job with the State

21  Department?  What did you see in the near or the distant

22  future for Emily Torjusen as a 20-year-old, in terms of

23  how your life would unfold?

24  A.   I had hoped, you know, to get a master's degree, to

25  learn Arabic, to become fluent in it, do something related

| | |
|---|---|
| 1 | to the Middle East, work in politics, and then, you know, |
| 2 | have a family.  I didn't want to really die alone.  I had |
| 3 | always hoped that once I would be maybe even a professor |
| 4 | in college.  I was very optimistic. |
| 5 | Q.   Do you see yourself having a family? |
| 6 | A.   Now?  I think it is unlikely. |
| 7 | Q.   You have something you brought with you that you keep |
| 8 | wherever you go, from the crash.  What is it? |
| 9 | A.   I was wearing a watch the day of the accident. |
| 10 | Q.   Do you have it with you? |
| 11 | A.   I do. |
| 12 | Q.   May I have it? |
| 13 | MR. PETRU:  Your Honor, this has been identified |
| 14 | as Exhibit 37, I think.  For purposes of -- for |
| 15 | Mr. Torjusen's sake, what I would like to do is show it to |
| 16 | the jury but not have the court receive it, so that she |
| 17 | can keep it. |
| 18 | THE COURT:  Are you offering it into evidence? |
| 19 | MR. PETRU:  I am offering it as demonstrative so |
| 20 | the jury can see her watch. |
| 21 | THE COURT:  All right.  You may do that. |
| 22 | MR. PETRU:  Thank you.  I will circulate it. |
| 23 | BY MR. PETRU: |
| 24 | Q.   Why do you keep that watch? |
| 25 | A.   When they gave it back to me after I left the |

 1   hospital, I looked at it and I really realized I could

 2   have died, like that was it, like my body went through

 3   that.  I went through that.  It is very important to me.

 4   Q.   You keep it in the bag that you were given at the

 5   hospital?

 6   A.   Yes.

 7   Q.   Thank you for sharing it.

 8          MR. PETRU:  Your Honor, would this be a good time

 9   to break?

10          THE COURT:  How much more time do you have?

11          MR. PETRU:  I might have five more minutes.

12          THE COURT:  Let's finish up with your direct.

13   BY MR. PETRU:

14   Q.   You understand the train crash was beyond your

15   control?

16   A.   Yes.

17   Q.   You are not responsible for it?

18          MR. BONVENTRE:  Objection, your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes, I am not responsible for it.

21   BY MR. PETRU:

22   Q.   How has the train crash affected your sense of

23   safety, of being in control of your own life?

24          MR. BONVENTRE:  Objection.  Asked and answered.

25          THE COURT:  Overruled.

1              THE WITNESS:  In most situations, I don't feel

2    very safe.  I feel -- I startle very easily.  I feel like

3    the world is a different place after what I experienced.

4    BY MR. PETRU:

5    Q.   How about in your everyday life?

6    A.   I think I really prefer to be in situations that I

7    can control and situations that I know and am familiar

8    with, and I know what to do and what will happen and how

9    people will react, what's the right thing to do.  When I'm

10   in a situation with something that I don't understand or I

11   find difficult, you know, to deal with, it frightens me.

12   I don't really have a logical response to it.

13   Q.   Is it hard living that way?

14   A.   I think it is harder for other people to deal with

15   me.  And it's hard for me to be alone like that.

16           MR. PETRU:  Thank you.  Those are all the

17   questions I have, your Honor.

18           THE COURT:  All right.  Jurors, we are at the end

19   of our trial day.  I am going to ask you to return

20   tomorrow at 9:00.  Have a restful evening, and remember

21   not to discuss the case.

22       (At this time, the jury exited the courtroom.)

23           THE COURT:  You can step down.  After

24   Ms. Torjusen, where are we at?

25           MR. PETRU:  We have the stipulation that we have

```
 1    agreed upon that needs to be read.  And then we will rest,

 2    assuming that we have all the evidence in that we have

 3    identified.

 4              THE COURT:  Assuming --

 5              MR. PETRU:  We have to verify.  I always have the

 6    tag line that I want to make sure we have the evidence in

 7    that we have identified.

 8              THE COURT:  We will certainly do that.  You will

 9    have an opportunity to review that with Dara.  I think we

10    can discuss at the completion of the trial the final

11    instructions, because -- I will have them given to you

12    tonight, a set that I am proposing.  So before you leave,

13    I will arrange for that.

14              MR. PETRU:  Thank you, your Honor.

15              MR. BONVENTRE:  Before we leave tonight, before

16    we leave the courtroom tonight?

17              THE COURT:  Yes.  We will be in recess.

18              MR. BONVENTRE:  Is it your intention we are going

19    to sum up as well?

20              THE COURT:  Yes.  I don't know how much time you

21    intend to cross-examine.

22              MR. BONVENTRE:  I could guess, Judge, but it will

23    be around an hour, give or take.

24              THE COURT:  I believe we will be able to begin

25    the closing before noon and submit it to the jury.
```

1          MR. PETRU:   Thank you, your Honor.

2          MR. BONVENTRE:   Thank you, your Honor.

3       (Recessed.)

4

5

6

7                    C E R T I F I C A T E

8

9

10   I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13

14

15   */s/ Barry Fanning*

16   BARRY FANNING
     COURT REPORTER
17

18

19

20

21

22

23

24

25