1          **UNITED STATES DISTRICT COURT**

2      **WESTERN DISTRICT OF WASHINGTON AT TACOMA**

3    _____

4                                    )
     EMILY TORJUSEN,                 )  3:18-cv-05785-BHS
5                                    )
     Plaintiff,                      )  Tacoma,
6                                    )  Washington
     v.                              )
7                                    )  April 1, 2022
     NATIONAL RAILROAD PASSENGER     )
8    CORPORATION d/b/a AMTRAK,       )  Jury Trial
                                     )
9              Defendant.           )  9:00 a.m.

10   _____

11            **VERBATIM REPORT OF PROCEEDINGS**
          **BEFORE THE HONORABLE BENJAMIN H. SETTLE**
12             **UNITED STATES DISTRICT JUDGE**
     _____

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings stenographically reported and transcript
25        produced with computer-aided technology

```
 1

 2                          APPEARANCES

 3

 4

 5     For the Plaintiff:     ANTHONY S. PETRU
                              SCOTT H. LEVY
 6                            Hildebrand McLeod & Nelson LLP
                              350 Frank H. Ogawa Plaza
 7                            Fourth Floor
                              Oakland, California
 8
                              JOSEPH ANDREW GRUBE
 9                            Breneman Grube Orehoski PLLC
                              1200 Fifth Avenue
10                            Suite 625
                              Seattle, Washington
11

12     For the Defendant:     JOHN A. BONVENTRE
                              Landman, Corsi Ballaine & Ford
13                            One Gateway Center
                              Fourth Floor
14                            Newark, New Jersey

15                            ANDREW GORDON YATES
                              Lane Powell, PC
16                            1420 Fifth Avenue
                              Suite 4200
17                            Seattle, Washington

18

19

20

21

22

23

24

25
```

```
1                          EXAMINATION INDEX

2

3    EXAMINATION OF:                                          PAGE

4      EMILY TORJUSEN      CROSS-EXAMINATION                     6
                           BY MR. BONVENTRE.
5
                           REDIRECT EXAMINATION                 54
6                          BY MR. PETRU

7

8

9                           EXHIBIT INDEX

10

11   EXHIBITS ADMITTED                                       PAGE

       Exhibit A7                                              9
12     Exhibit A41                                            36

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                  MORNING SESSION

 2                                  APRIL 1, 2022

 3    (The following occurred outside the presence of the jury.)

 4          THE COURT:   I understand there are some matters

 5    you wish to take up before we bring in the jury.

 6          MR. PETRU:   Yes, your Honor.   I am responsible

 7    for this.   The Court recalls that we have a stipulation,

 8    and I indicated yesterday that was going to be read after

 9    Ms. Torjusen's -- at the completion of her testimony.

10       In reviewing it, No. 9, which reads, "Amtrak has

11    agreed to pay plaintiff's past medical expenses related to

12    the derailment, so those expenses are not in dispute in

13    this case," is inaccurate.

14       Amtrak has advised us that they are not going to pay

15    Dr. Filler's charges for the work that he did in 2018, and

16    they refuse to pay that.   So from our perspective, they

17    have failed to uphold their part of the bargain.

18       We propose eliminating No. 9 altogether, making no

19    mention of medical one way or the other because they have

20    not agreed to that.

21          MR. BONVENTRE:   Amtrak has agreed to pay --

22    that's accurate.   Amtrak has agreed to pay everything

23    other than Dr. Filler, for the clear reason that

24    Dr. Filler didn't provide medical treatment.   He was

25    retained by counsel for purposes of litigation.   So Amtrak
```

1    will not pay that.

2         I would be happy for counsel to modify the

3    stipulation that Amtrak has agreed to pay for all medical

4    expenses except Dr. Filler.  That is perfectly fine with

5    Amtrak, and that would be accurate.

6         THE COURT:  That is an accurate statement.  I

7    don't know that it helps Amtrak, in which they are

8    excluding your expert here.

9         MR. PETRU:  Your Honor, the other aspect of this

10   is that we made the tactical decision as trial counsel not

11   to introduce the past medical bills or expenses.  And as a

12   consequence, those medical bills which have been paid by

13   insurance will not be paid by Amtrak.  Whether they have

14   agreed to do it, had we introduced the medical expenses

15   is -- it renders their offer moot.  So because medical

16   expenses aren't introduced, the reality is that the

17   medical expenses have been paid by insurance, not by

18   Amtrak, A.  B, they refuse to pay Dr. Filler.  So this is

19   an inaccurate statement.  And I don't think it is

20   appropriate for us to give the jury inaccurate

21   information, which really, frankly, is not relevant.

22         THE COURT:  Well, this is a little bit

23   disturbing, because at the pretrial conference this issue

24   came up, and I was assured that this was an issue that

25   would be resolved.  So I believe that the answer is going

```
 1    to have to be that no such stipulation will be entered
 2    here, which means the argument can be stated to the jury
 3    by Amtrak or by plaintiff that medical bills are not in
 4    issue in this case.
 5              MR. PETRU:  Thank you, your Honor.
 6              MR. BONVENTRE:  Thank you, your Honor.
 7              THE COURT:  Is there anything else?
 8              MR. PETRU:  I'm sorry.  No, your Honor.
 9              THE COURT:  Is your client --
10              MR. PETRU:  Let me get her.
11         (The following occurred in the presence of the jury.)
12              THE COURT:  Good morning, jurors.  We are ready
13    to begin our trial day.
14         Ms. Torjusen, if you would resume your seat at the
15    witness chair.
16         Mr. Bonventre, I believe this is your witness.
17              MR. BONVENTRE:  Thank you, sir.
18                          CROSS-EXAMINATION
19    BY MR. BONVENTRE:
20    Q.   Good morning, Ms. Torjusen.
21    A.   Good morning.
22    Q.   Ms. Torjusen, I am going to ask you some questions
23    this morning.  How would you like me to address you?
24    Ms. Torjusen?  Emily?  What makes you most comfortable?
25    A.   Emily is fine.
```

1  Q.   Emily, I am going to ask you some questions this

2  morning.  You may have already been told, I tend to speak

3  quickly.  And if I am speaking too quickly or you think I

4  am mumbling or you can't follow my questions, please tell

5  me.  Okay?

6  A.   Okay.

7  Q.   Thank you.

8       Emily, are you currently residing in Cairo, Egypt?

9  A.   Yes.

10 Q.   And when did you move back to Cairo?

11 A.   I arrived there at the end of June, in June.

12 Q.   Of 2021?

13 A.   Yes.

14 Q.   And when had you left Cairo to come back to the

15 United States, the first time?  I'm sorry.  I apologize.

16 A.   I first left Cairo to come back to the United States

17 in September of 2019.

18 Q.   And at that point, you resumed your studies at

19 University of Washington, correct?

20 A.   Correct.

21 Q.   And my understanding is you began your studies at

22 University of Washington in 2016; is that correct?

23 A.   Correct.

24 Q.   And specifically, your first semester would have been

25 in autumn of 2016?

```
 1    A.   Yes.
 2    Q.   Just for my and the jury's edification, UW, is that
 3    quarters?
 4    A.   Yes.
 5    Q.   Semesters or trimesters?
 6    A.   It is a quarter system.
 7    Q.   So in a typical school year, would you have four
 8    quarters or three?
 9    A.   I mean, typically you do autumn, winter and spring,
10    and you can take summer quarter as well.
11    Q.   Got you.  And there were occasions when you actually
12    took courses during the summer, correct?
13    A.   Yes.
14    Q.   A7 just for the witness.
15         Emily, can you see what's in front of you on the
16    screen?
17    A.   Yes.
18    Q.   And just take a look at what has been marked as
19    Defense Exhibit A7 -- A7-A.  Emily, is that your
20    transcript at the University of Washington?
21    A.   Yes.
22         MR. BONVENTRE:  Judge, I would move that into
23    evidence at this time.
24         MR. PETRU:  No objection.
25         THE COURT:  A7 is admitted.  It may be published.
```

```
 1          (Exhibit No. A7 admitted.)
 2   BY MR. BONVENTRE:
 3   Q.   So Emily, I just want to ask you some questions about
 4   your course work at the University of Washington and your
 5   grades and things like that, okay?
 6   A.   Okay.
 7   Q.   The first -- would it be correct that the first
 8   quarter of courses that you took following the accident on
 9   the train would have been the winter of 2018?
10   A.   Correct.
11   Q.   And could you tell the jury what courses you took at
12   UW in the winter of 2018?
13   A.    I took Elementary Arabic, a class called Near Eastern
14   Gateway, Intermediate Studies of the Near East, and Modern
15   Political Thought.
16   Q.   That was 18 credits?
17   A.   Yes.
18   Q.   And you completed all 18, correct?
19   A.   Yes.
20   Q.   Elementary Arabic, is that a language course?
21   A.   Yes.
22   Q.   What's Near Eastern Gateway?  What was the subject
23   matter of that course, Emily?
24   A.   It was a required introductory overview of some of
25   the general histories of the Middle East.
```

1   Q.  And you said Modern Political Thought?

2   A.  Yes.

3   Q.  Was that the Middle East or Western thought, or what

4   was that, do you recall?

5   A.  It was mostly political theory, like the basis of

6   American democracy.

7   Q.  Your taking Arabic arose, my understanding is, at

8   some point -- I forget the expression you used

9   yesterday -- I don't know if you fell in love with it,

10   became entranced with Arabic and Middle Eastern history;

11   is that fair to say, at some point?

12   A.  I became interested in it, yes.

13   Q.  And -- that's become a passion, I believe is the word

14   you used yesterday; is that correct?

15   A.  Yes.

16   Q.  And your studies were, therefore, for the remainder

17   of your time at University of Washington were geared

18   towards those types -- what your passion was; would that

19   be fair to say?

20   A.  Yes, it was my interest at the time.

21   Q.  And that's -- the Middle East and Arabic language and

22   things like that, that's one of the reasons why you went

23   to Cairo back in 2019, correct?

24   A.  Yes.  My goal was to learn Arabic, yes.

25   Q.  And your passion for Middle Eastern history and

1  civilization and language is one of the reasons why you

2  are in Cairo now, correct?

3  A.   No.

4  Q.   You chose Cairo not because you are interested in

5  Middle Eastern?

6  A.   I went there to study Arabic and also because that

7  was the best place for me at the time.

8  Q.   That first semester after the -- after the train

9  accident, your GPA was 3.53, correct?

10  A.   Let me look.  My cumulative GPA?

11  Q.   No, your GPA for that quarter.

12  A.   Let me look at it.

13  Q.   Do you see where it says, "attempted 18, earned 18,

14  GPA"?

15  A.   Yes, I see it, 3.53, yes.

16  Q.   And that earned you the dean's list, correct?

17  A.   Yes.

18  Q.   Extraordinarily, the first quarter after this

19  accident, this horrific accident you went through, you

20  actually made the dean's list, correct?

21          MR. PETRU:  Move to strike the first word of the

22  question.

23          THE COURT:  Granted.

24  BY MR. BONVENTRE:

25  Q.   You made the dean's list the first quarter after the

 1    accident, correct?

 2    A.   Correct.

 3    Q.   And then you studied in the spring of 2018; is that

 4    correct?

 5    A.   Yes.

 6    Q.   And what courses did you take in the spring of 2018?

 7    A.   I took Elementary Arabic, an international studies

 8    class that was called Cultural Interactions, and then

 9    something called Intermediate Studies, which was part of

10    the Near Eastern faculty, and a polysci class related to

11    the simulation of the U.S. Congress.

12    Q.   And that semester, you earned a 3.69; is that

13    correct?

14    A.   Correct.

15    Q.   And again made the dean's list, correct?

16    A.   Yes.

17    Q.   And then in the autumn of 2018, do you see that, on

18    the next page?  I'm sorry.  Do you have that, Emily, on

19    the next page?

20    A.   Yes.

21    Q.   And in the autumn of 2018, your GPA was 3.93,

22    correct?

23    A.   Yes.  Correct.

24    Q.   And, again, dean's list, correct?

25    A.   Yeah.

1  Q.  Just so the jury understands, it's 3.93 out of 4 is

2  the highest you could possibly get, correct?

3  A.  Correct.

4  Q.  And the winter of 2019, you earned a GPA of 3.88,

5  correct?

6  A.  Correct.

7  Q.  And on the dean's list again, correct?

8  A.  Correct.  All of this was while I was studying

9  abroad.

10 Q.  And you earned a 3.88 while you were studying abroad,

11 correct?

12 A.  For which quarter?  Oh, for the winter 2019, correct.

13 Q.  '19.  I'm sorry.  Correct.

14 A.  Correct.

15 Q.  And then in the spring of 2019, you earned a 3.75,

16 correct?

17 A.  Correct.

18 Q.  And that was with a GPA of 3 point -- excuse me, that

19 was also the dean's list, correct?

20 A.  Correct.

21 Q.  And you did not take any courses in the summer of

22 2019, correct?

23 A.  I can't see on the screen.

24 Q.  I'm sorry.  You did not --

25 A.  No, I did not take a summer quarter, no.

1   Q.  And that's because -- at that time, and we will

2   discuss that later, you were living in Cairo, Egypt,

3   correct?

4   A.  Correct.

5   Q.  And you were not earning credits for school during

6   that time, correct?

7   A.  No, I was not.

8   Q.  And in the winter of 2020, you were back in the

9   United States; is that correct?

10  A.  Correct.

11  Q.  Actually, I apologize.  Before that, the autumn of

12  2019, you were back in the United States at UW?

13  A.  Yes, correct.

14  Q.  And your -- what courses did you take that semester

15  or that quarter?

16  A.  I took something called Advanced Readings.  It was an

17  international studies class, something related to the

18  political economics of developing countries, I think,

19  which was another international studies class, a senior

20  seminar for the Near Eastern faculty, and an Introduction

21  to Political Economy.

22  Q.  I apologize.  The seminar was a senior seminar on

23  what, Emily?

24  A.  For the Near Eastern languages and civilizations, the

25  NEL faculty at the University of Washington, this was

```
 1    their senior seminar.
 2    Q.   And that semester -- autumn of 2019, you earned a
 3    3.9, correct?
 4    A.   Correct.
 5    Q.   And once again made the dean's list, correct?
 6    A.   Correct.
 7    Q.   And in the winter of 2020, you again earned a 3.9,
 8    correct?
 9    A.   Yes.  While I was doing my internship at the
10    Washington State Capitol, I received credit for the
11    internship, which I received a 3.9 GPA for.
12    Q.   And what was that internship?  You were at the State
13    Capitol of Washington, correct?
14    A.   Correct.
15    Q.   And were you working with legislators in the Capitol?
16    A.   I was an intern for legislators.
17    Q.   I'm sorry?
18    A.   Yes, I was an intern for legislators.
19    Q.   The next was the spring of 2020.  What courses did
20    you take in the spring of 2020?
21    A.   I took something called the Making of the 21st
22    Century, which was an international studies class, and an
23    international studies class called Special Topics of the
24    Middle East, another international studies class called
25    Industry and the States, and a polysci class called Global
```

1    Crime and Corruption.

2    Q.   And you achieved a 3.62 GPA, correct?

3    A.   Correct.

4    Q.   And, again, made the dean's list, correct?

5    A.   Correct.

6    Q.   And in the summer of 2020, you achieved a GPA of 3.7,

7    correct?

8    A.   Correct.

9    Q.   And, again, made the dean's list?

10   A.   Yes, for an intensive intermediate Arabic class.

11   Q.   What was the class you were taking?  I'm sorry?

12   A.   It was an intermediate Arabic class.

13   Q.   Does it say -- what does it mean that it is an

14   intensive intermediate Arabic class?

15   A.   It means that it was the summer quarter.  They offer

16   a class to help people catch up if they have -- they are

17   trying to complete a level of Arabic that they haven't

18   completed yet.

19   Q.   And you earned a 3.7, correct?

20   A.   Correct.

21   Q.   And again made the dean's list?

22   A.   Correct.

23   Q.   Is it accurate that you made the dean's list the rest

24   of the time you were at the University of Washington?

25   A.   I can't see.

1  Q.   Do you recall?  I don't have the most recent

2  transcript.  Do you recall?

3  A.   I actually do not recall, but possibly.

4  Q.   What was your major?

5  A.   My final major which I graduated with?

6  Q.   Yes.  Do I understand you had three majors?

7  A.   I did.

8  Q.   That's pretty unusual having three majors, would you

9  agree?

10         MR. PETRU:  Objection.  Foundation.

11         THE COURT:  Sustained.

12 BY MR. BONVENTRE:

13 Q.   There were lots of students at the University of

14 Washington, correct?

15 A.   Yes.  It's a big school.

16 Q.   Not everyone at the University of Washington

17 graduates with three degrees, correct?

18 A.   I had three majors, yes.

19 Q.   Three majors.  I'm sorry.  I apologize.  Three

20 majors, correct?

21 A.   Correct, I don't think everyone does that.

22 Q.   In fact, it is pretty rare; is that fair to say?

23         MR. PETRU:  Objection.  Foundation.

24         THE COURT:  Sustained.

25

1    BY MR. BONVENTRE:

2    Q.   What were the three majors you graduated with?

3    A.   It was political science, international studies, and

4    Near Eastern languages/civilizations.

5    Q.   And what is the study of Near Eastern languages and

6    civilizations?

7    A.   It's the study of the Middle East.  If you want to

8    learn a Middle Eastern language, this would be a good

9    major for someone pursuing that.

10   Q.   What are the types of things that you studied?

11   A.   Arabic and some required classes related to the

12   history of the region.

13   Q.   All right.  Thank you.

14        Now, Emily, I just want to talk a little about your

15   travels, beginning with your summer semester.  Do I

16   understand that in the -- is it the summer of 2018, that

17   you went to France?

18   A.   In August of 2018, yes.

19   Q.   And was that to do with the term abroad?

20   A.   Yes.  The year began very early on, earlier than UW,

21   so I went there in August to arrive on time.

22   Q.   Maybe I misunderstood.  I apologize.  Did you go

23   early to see the area or actually the course work was

24   starting early?

25   A.   Yes, the course work started early.

```
 1    Q.   Got you.   Did you go with anyone?

 2    A.   No.

 3    Q.   And where was -- where was the school or the courses

 4    you were taking in France?

 5    A.   It was in a small town called Monton.

 6    Q.   Is it fair to say that is in the south of France?

 7    A.   Yes.

 8    Q.   And is it fair to say that's a pretty gorgeous place?

 9    A.   Yes, it is very pretty there.

10    Q.   You have actually written an article about Cairo in

11    which you mention how gorgeous that part of the world is;

12    is that fair to say?

13    A.   Yes, it is known for its beauty.

14    Q.   And it is apparently very close to the border -- the

15    northern border of Italy; is that correct?

16    A.   Yes.

17    Q.   And it is, I guess, fairly close to Monte Carlo,

18    because I understand you actually walked to Monte Carlo;

19    is that correct?

20    A.   Yes, it is adjacent to Monaco.

21    Q.   So while you were in France, were you working at a

22    particular institution or organization or studying at a

23    particular institution or organization?

24    A.   I was enrolled at the university there as an exchange

25    student.
```

1   Q.   Is there something called the Po Institute, P-O

2   Institute?

3   A.   It is called Sciences Po.  That's the name of the

4   university.

5   Q.   What is it called?

6   A.   Sciences Po.  That's the name of the university.

7   Q.   Do you speak French, by the way?

8   A.   I do not.

9   Q.   And does the university have a particular, for lack

10  of a better -- specialty or focus?

11  A.   Political science.

12  Q.   And is it political science just in general, is it

13  specified for any particular region?

14  A.   They have various campuses.  The one at which I was

15  at was focused on the Middle East.

16  Q.   So, again, following up on what your studies and

17  passions were at the time, is that why you chose --

18  A.   In order to complete my majors, I needed to go to a

19  university which offered the classes which would meet the

20  required classes for my majors, yes.

21  Q.   While -- there was some discussion of this yesterday,

22  so I just want to follow up.  Do I understand that -- was

23  it an expensive town?  Is that fair to say?

24  A.   France, I guess -- it has been a while, but, yeah, I

25  found it expensive there, yeah.

```
 1    Q.   And, actually, you would walk sometimes to go to
 2    Italy to buy your groceries, correct?
 3    A.   Yeah.  I was eating rice mainly, so I was trying to
 4    be frugal.
 5    Q.   My point was, you would -- part of your routine would
 6    be to buy your groceries in Italy, correct?
 7    A.   Yes.
 8    Q.   And sometimes you would walk; is that correct?
 9    A.   Yeah.
10    Q.   And sometimes you would take the train; isn't that
11    correct?
12    A.   Yeah.
13    Q.   And how often would you buy groceries in Italy?  How
14    often, once a week, more or less?
15    A.   No.  Maybe once or twice a month.
16    Q.   While you were in -- did I hear right, there would be
17    times when you would actually walk to Monte Carlo to get
18    coffee; is that correct?
19    A.   There is a very nice walk connecting the town of
20    Monton to Monte Carlo.  It is about a two-hour walk.  I
21    would go there.  Monte Carlo had the only Starbucks in the
22    area, so it was a nice space to study.
23    Q.   And you did that walk pretty frequently?
24    A.   No.
25    Q.   Did you do it more than once?
```

1   A.   I think in total I did it two times, maybe three.

2   Q.   And it would be a walk along the beach, is that my

3   understanding?  Or at least partially along the beach?

4   A.   Yeah, part of it was along the beach.

5   Q.   Did you ever take the train to go to Monte Carlo or

6   Monaco?

7   A.   I believe I went there once for that purpose, but the

8   train would pass through Monaco to go to Nice or any other

9   destination in France.

10  Q.   Did you go to those other destinations?

11  A.   I had to go to Nice to get to the airport, so, yes.

12  Q.   Did you ever go to Nice other than going to the

13  airport?

14  A.   I think once I went there to walk around and see it.

15  Q.   Did you travel anywhere else in France while you were

16  doing your summer semester?

17  A.   While I was doing my exchange year there, I once went

18  to Paris for a few days to see it.

19  Q.   How did you get to Paris?

20  A.   I actually took a bus.

21  Q.   Did you take a bus or a train?

22  A.   Bus.

23  Q.   Did you go to Paris once or more than once?

24  A.   Yeah, it was just once.

25  Q.   And did you travel anywhere else in France, other

```
1    than Nice and Paris?

2    A.   I went to a place called -- I am going to butcher it.

3    It's like Marce.  I went there to get my visa to go to

4    Egypt.  And I visited a town called Leon.  And I think

5    another town farther out to see some mountains.  And I

6    think that was about it.

7    Q.   While you were in France, my understanding is you

8    went hiking on many occasions; is that correct?

9    A.   Monton was a pretty small town, but it had some nice

10   hikes in the area, so I went hiking.

11   Q.   And fairly often, correct?

12   A.   Yeah, probably once a month.

13   Q.   You had your deposition taken, do you remember,

14   Emily, in this case?

15   A.   My deposition?  I remember I gave a deposition.

16   Q.   Did you have a chance to look at it before you came

17   in yesterday to court?

18   A.   Yes, I reviewed it before.

19   Q.   And do you recall testifying that you took about

20   twelve hikes while you were in France?  Does that sound

21   about right?

22   A.   Probably, yeah.

23   Q.   And were these hikes in different parts of France or

24   the same town?

25   A.   Mainly just around Monton, yeah.
```

1    Q.   And how would you get to that town?

2    A.   How would I get to Monton?

3    Q.   Is that the town you were living in?

4    A.   That's where I was living, yeah.

5    Q.   I'm sorry.  I apologize.  So I understand from

6    yesterday's testimony you also traveled to London; is that

7    correct?

8    A.   Yes.

9    Q.   How did you get to London, by train or by plane?

10   A.   By plane.

11   Q.   And how long did you stay in London?

12   A.   When I was there with Hanna, I think we were there

13   maybe a week, maybe a week and a half.

14   Q.   Do I take it by that answer there were other times

15   you were in London?

16   A.   I came there once for basically a two-day trip.  It

17   was a very short period of time, two, three days.  That

18   was about it.

19   Q.   Were you with someone or by yourself?

20   A.   I was by myself.

21   Q.   And how did you get there?

22   A.   I took a plane.

23   Q.   And was that pleasure or something related to school?

24   A.   No, I just wanted to kind of see London.

25   Q.   And the first trip to London -- the trip to see Hanna

```
 1   was obviously pleasure, too, to see a friend, correct?
 2   A.   Yes.  Correct.
 3   Q.   Did you have the opportunity while you were doing
 4   your term abroad to visit any other countries?
 5   A.   Yes.
 6   Q.   Where else did you visit?
 7   A.   I did take a fall trip with two people I had met at
 8   the university.  We went to kind of the Balkan countries,
 9   because the U.S. dollar was strong there.  So I think I
10   visited -- I visited Sarajevo, which is in Bosnia.  And
11   then I visited -- we kind of went through Croatia and into
12   Slovenia.
13   Q.   How did you get to those countries, and how did you
14   get from one of those countries to the next?
15   A.   Well, first we flew into Bosnia, and then we took
16   buses and occasionally trains to get from one place to
17   another.
18   Q.   And for how long did you -- I just went blank.  I
19   apologize.  For how long were you visiting the Balkan
20   countries?
21   A.   It was about one week, I think.
22   Q.   Okay.  And you said this was in the fall of 2018?
23   A.   Correct.
24   Q.   Anywhere else that you visited while you were doing
25   your term in France?
```

A.   I was lucky enough to receive kind of a scholarship

to do some research, just like a small project in Turkey.

You had to apply for it.  And they help subsidize your

plane ticket.  So I was in Istanbul for about one week.

Q.   You said you flew to Istanbul?

A.   Correct.

Q.   Did you enjoy Istanbul?

A.   I was there for research.

Q.   Were you able to see any of the city while you were

there for a week?

A.   I was kind of conducting interviews with people, so I

saw where they were living.  That was nice.

Q.   Anywhere else that you visited while you were in

France?

A.   To the best of my knowledge, no.

Q.   Did you go to any other parts of Italy, for example?

A.   I took my flight to Cairo from the Milan airport,

because it was cheaper, so I passed through there.

Q.   Did you spend any time in Milan?

A.   No.

Q.   Did you visit Germany or any other European countries

while you were over there?

A.   That is correct, I did go to Germany at the end of my

time.  It was in May.

Q.   Where in Germany did you go?

```
 1   A.   I went to what is this -- I think I flew into

 2   Wachendorf, and then I visited someone I knew who had been

 3   a nanny in Seattle in a small town in Germany,

 4   Monchengladbach.

 5   Q.   You spent a week there, you said, or two weeks?  How

 6   long did you spend there?

 7   A.   I think in total it was about a week.

 8   Q.   Were you able to go to Spain, Portugal?

 9   A.   No.

10   Q.   How about Switzerland or anything like that?

11   A.   No.

12   Q.   So at some point after you completed your studies and

13   your traveling while you were in France, you next went to

14   Cairo; is that correct?

15   A.   Yes, in I think the end of may.  I went to Cairo at

16   the end of my academic year.

17   Q.   Just so the jury knows, what amount of time did you

18   actually spend in that town, which I cannot pronounce, I

19   apologize, in France?  How much time did you spend there?

20   A.   So I was there from September to May, so September,

21   October, November, December, January, February, March,

22   April, May.  So about nine months.

23   Q.   About nine months.  Okay.  Do I understand it when

24   you went -- had you been to Cairo -- I apologize, Barry.

25   I will withdraw that.
```

1    Had you been to Cairo before this trip to Cairo in

2  2019?

3  A.   Before I left in May, I had gone there -- basically,

4  kind of a school trip to do a group class study at a

5  language institute in Cairo.  It was organized through the

6  university, and there was a discount on group classes at

7  that school.  So I went with several other students from

8  that university to study at the language institute for

9  about -- in total about three weeks, I believe, on our

10  winter break.

11  Q.   I am a little slow on the uptake.  Just so I

12  understand, you visited Cairo for three weeks while you

13  were doing your semester -- your term abroad in France; is

14  that correct?

15  A.   While I was on my exchange year in France, I took my

16  winter break -- instead of taking a vacation, I went and

17  enrolled in classes at the language institute in Cairo.

18  Q.   You went with a couple of other students, you said?

19  A.   It was a group discount.  So if there were enough

20  students willing to go, we were able to enroll in a class

21  together.

22  Q.   So when you went to Cairo in 2019, you had at least

23  been there once before for those three weeks, correct?

24  A.   Correct.

25  Q.   And do I understand when you were in Cairo, you were

1    living with a family?

2    A.   Which time?  The summer?

3    Q.   I apologize.  You are absolutely right.  In 2019, I'm

4    sorry.

5    A.   Yes.  In the summer of 2019, I was -- in exchange for

6    room and board, I was an at-home tutor for an Egyptian

7    family.  I tutored their children in English.

8    Q.   I may have asked this.  If I did, I apologize.  What

9    was the time frame you were in Cairo in 2019?

10   A.   I believe I arrived at the very end of May, and I

11   left at the very end of September.

12   Q.   So about four months?

13   A.   Yeah.

14   Q.   And this was not for school credits, this was -- you

15   wanted to go to Cairo, correct?

16   A.   I went there to learn Arabic.

17   Q.   You were living -- did you know this family that you

18   lived with before you lived with them?

19   A.   Not really.

20   Q.   And they had -- do I understand they had two teenage

21   kids that you were teaching, or am I wrong about that?

22   A.   They had a very sweet 13-year-old daughter, a

23   16-year-old son who was studying for the SATs, they had

24   two sons enrolled in college.

25   Q.   I apologize.  Were they Americans living in Cairo or

1  were they Egyptians?

2  A.   They were Egyptians.

3  Q.   And my understanding from one of your articles that

4  you have written, upon arrival in Cairo you founded -- I

5  believe the word you called it, unmatched exhilaration; is

6  that correct?

7  A.   I have never really seen a desert before.  So when I

8  saw it, I thought I was -- it was pretty spectacular.

9  Q.   And you actually -- just so the jury understands, you

10  actually wrote an article about your time in Cairo, and

11  would it be fair to say, your love of Cairo?

12  A.   My friend, she does a magazine called UW Voyage for

13  the University of Washington, and they were doing a piece

14  on people who had done exchanges abroad.  She asked me to

15  write about my experience, with a focus on sustainability.

16       So I wrote this article for them.  I also submitted

17  it to this kind of online organization, which I'm sure is

18  how you found it.

19  Q.   And when you submitted -- and the article was about

20  Cairo, correct?

21  A.   Correct.

22  Q.   And when you say "sustainability," what does that

23  mean?

24  A.   To be honest, Cairo is kind of a trash heap.

25  Q.   There is a lot of garbage, I guess, is that the right

```
 1    word?
 2    A.   They have a problem with littering, with garbage,
 3    with disposing of trash.
 4    Q.   Was one of your articles about the need to -- plans
 5    to clean up the city?
 6    A.   No.
 7    Q.   What was the article about?
 8             MR. PETRU:  Objection.  Relevance, your Honor.
 9             THE COURT:  Overruled.
10             THE WITNESS:  I wrote mainly about -- it is
11    sad -- okay.  There is a group of people living in Cairo
12    who collect the trash.  They find trash in the streets.
13    They live in a trash heap, and they grind down the
14    different types of trash, and they compact it, and they
15    sell it to make a living.  This is their waste disposal
16    system.
17    BY MR. BONVENTRE:
18    Q.   You were commenting upon that in the article,
19    correct?
20    A.   Correct.
21    Q.   But I believe the conclusion of the article was
22    something to the effect of, don't just judge Cairo by
23    that, it is actually wonderful in many other ways,
24    correct?
25    A.   Correct.
```

1   Q.   While you were in Cairo, my understanding is you did

2   take the train in the city; is that correct?

3   A.   Occasionally, yes.

4   Q.   And I believe you described it in your deposition as

5   an old metro system, correct?

6   A.   It is very old.

7   Q.   Were you able -- did you have the opportunity to

8   travel within Egypt during that period in 2019 that you

9   were in Cairo?

10  A.   No.

11  Q.   When did you come back to the United States?

12  A.   In September of 2019.

13  Q.   And that's when you resumed your studies at the

14  University of Washington, correct?

15  A.   Correct.

16  Q.   You went back to Cairo where you are currently living

17  in 2021, correct, last year?

18  A.   Correct.

19  Q.   When did you -- do you have a more specific date in

20  2021?

21  A.   In June of 2021.

22  Q.   And you are still residing there now, correct?

23  A.   Correct.

24  Q.   Prior to going to Cairo, did you visit another

25  country?

1   A.   Correct.

2   Q.   And was that Romania?

3   A.   Correct.

4   Q.   And because I'm horrible with geography, where is

5   Romania compared to Egypt?

6   A.   Me too.  I don't know.  I know it's in Europe.

7   Q.   Is Romania in Eastern Europe?

8   A.   Yeah.

9   Q.   I take it you obviously flew from Seattle to Romania?

10  A.   Correct.

11  Q.   How long did you stay in Romania?  For about a month,

12  correct?

13  A.   A few weeks, yes.

14  Q.   The trip to Romania was for pleasure?  You wanted to

15  see Romania, correct?

16  A.   Correct.

17  Q.   By the way, were you alone or were you traveling with

18  anyone?

19  A.   I was traveling -- there was someone I knew from

20  Sciences Po.  And we had stayed in touch throughout COVID.

21  So I asked if it would be possible to see Romania, and

22  they said, sure.

23  Q.   And did you travel around Romania?

24  A.   We visited a few different areas, kind of the tourist

25  sites, Dracula's castle.

1   Q.   What areas did you visit?

2   A.   We visited an area that is very foresty.  It has the

3   Dracula castle, and then another area along the coastline.

4   Q.   Was it a good time?

5   A.   It was nice.

6   Q.   And then from Romania you went back to Cairo,

7   correct?

8   A.   I hadn't -- yes.  The purpose was to go to Cairo.

9   The first stop was Romania, and then went to Cairo.

10  Q.   And other than for this trial, have you been back to

11  the United States since you went to Cairo in 2021?

12  A.   No.

13  Q.   Have you -- have you taken the old metro in Cairo

14  since you returned in 2021?

15  A.   Initially, I was living in an area that was kind of

16  in the middle of the city.  So in order to go to work, I

17  had to take the metro.

18  Q.   Have you had the opportunity to travel within Egypt

19  since you have been to Cairo in 2021?

20  A.   No.

21  Q.   Have you traveled anywhere else while you have been

22  in Cairo, Egypt?

23  A.   No.

24  Q.   Thank you.  Just briefly on the issue of -- I know

25  you told us about when you would take a train in Europe

1    and Egypt and everything.  When you have been back in the

2    United States, particularly when you were back in Seattle

3    at school, you were taking buses and the Link, correct?

4    A.   I took buses.  I avoided the Link at all costs.

5    Q.   You did take it from time to time; is that fair to

6    say?

7    A.   Probably total two times, three times.

8    Q.   Emily, can you see what is marked A41?

9    A.   Yes.

10   Q.   Is that your LinkedIn?

11   A.   Yes.

12   Q.   Could you tell the members of the jury what LinkedIn

13   is?  I know what it is, but not very well.  Others may

14   not.  What is LinkedIn?

15   A.   It is a professional platform for finding a job.

16   Q.   And you fill it out, or whatever the right word is,

17   you populate it with information; is that correct?

18   A.   It is basically your CV.

19   Q.   You are the one who puts the information in?

20   A.   Correct.

21   Q.   So is this your LinkedIn -- is that called a page?

22   LinkedIn page?  Is that what it would be called?

23   A.   Yes.

24           MR. BONVENTRE:  I offer into evidence A41, your

25   Honor.

```
 1              MR. PETRU:  No objection.
 2              THE COURT:  A41 is admitted and may be published.
 3         (Exhibit No. A41 admitted.)
 4   BY MR. BONVENTRE:
 5   Q.   So, Emily, I just want to go over your CV as you
 6   called it and some of your experiences, okay?
 7   A.   Okay.
 8   Q.   You don't need a break or anything, do you?
 9   A.   I'm fine.
10   Q.   You're fine.
11              MR. PETRU:  Is that a question?
12              MR. BONVENTRE:  I apologize, Judge.  I'm sorry.
13   BY MR. BONVENTRE:
14   Q.   The first thing is your experience, and it says that
15   you are partly working full time at Geek Lab Holdings or
16   Labs Holdings; is that correct?
17   A.   Correct.
18   Q.   That's your current provider in Cairo, correct?
19   A.   Correct.
20   Q.   And you are the chief executive officer, correct?
21   A.   Correct.
22   Q.   And that was from September -- you became the CEO in
23   September of last year, correct?
24   A.   Correct.
25   Q.   And you said you have about four people reporting to
```

1    you?

2    A.    Yeah.

3    Q.    Was there a time when it was six?

4    A.    We have a lot of turnover, yeah.

5    Q.    And prior to that, you were a content writer,

6    correct?

7    A.    Correct.

8    Q.    Meaning you would write articles?

9    A.    I would create content, correct.

10   Q.    And are you familiar with something called the Night

11   Beyond?

12   A.    This was one of their brands, platforms.

13   Q.    You actually wrote some, as you say, content for the

14   Night Beyond, correct?

15   A.    Correct.

16   Q.    Let me ask you this:  Would it be fair to say many of

17   the articles that you wrote were about serious substantive

18   conversations -- topics.  The material in the Night Beyond

19   was a little less -- a little more cultural, would that be

20   fair to say, sort of American culture?

21   A.    I wrote what I was told to write.

22   Q.    Was one of the things you were told to write was an

23   article about ten movie sequels that ruined the original?

24   A.    I believe that was one of the requested topics.

25   Q.    And in July of 2021 -- actually, let me step back for

1    a second.  I apologize.  The article that you wrote about

2    Cairo, did that article -- and was published -- did that

3    article include photographs you had taken in Cairo?

4            MR. PETRU:  Objection.  Relevance, your Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  I believe the one I had done for --

7    when I originally submitted it to the UW Voyage magazine,

8    I included some photos I had taken.

9    BY MR. BONVENTRE:

10   Q.   Thank you.  I didn't mean to jump around like that.

11   I apologize.  So you did write -- one of the things you

12   wrote for the Night Beyond was "Ten Movie Sequels That

13   Ruined the Original," correct?

14   A.   Correct.

15   Q.   And this was on July 20th of 2021?

16   A.   I have no idea.

17   Q.   Can you switch to A36 just for Emily?  Emily, do you

18   see Defendant's A36?

19   A.   Yeah.

20   Q.   And is that the article that you wrote, "Ten Movie

21   Sequels that Ruined the Original"?

22   A.   Yeah.

23   Q.   And that's July 20th, 2021?

24   A.   Yeah.

25   Q.   And did you pick those movies?

1          MR. PETRU:  Objection.  Relevance, your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yeah.  They kind of just said this

4    is the topic.  And to be honest, I have never watched most

5    of these movies.

6    BY MR. BONVENTRE:

7    Q.  Did you write this article?

8    A.  Yeah.

9          MR. BONVENTRE:  Judge, I would offer A36 into

10   evidence.

11         MR. PETRU:  Objection, your Honor.  Relevance.

12   We discussed this previously.  It's 41 pages, your Honor.

13         THE WITNESS:  How is it 41 pages?  I wrote a very

14   short article.

15         MR. PETRU:  I'm just objecting.

16         MR. BONVENTRE:  Judge, respectfully, it is her

17   work that she published.

18         THE COURT:  I think you can ask about it, but we

19   are not going to have it in evidence.

20         MR. BONVENTRE:  All right, sir.  That's fine.

21   Thank you, your Honor.

22   BY MR. BONVENTRE:

23   Q.  Could you go to the last page of that article,

24   Page 11?  So that article was eleven pages long, or ten

25   and a half pages; is that fair to say, Emily?

```
 1    A.    Huh?

 2    Q.    You said 41 pages.  It is actually ten and a half

 3    pages long, correct?

 4    A.    I see.  This is a culmination -- I see.

 5    Q.    Is that correct, this article is about ten and a half

 6    pages?

 7    A.    I guess, yes, is it.

 8    Q.    Would you say that this was sort of lighter fare than

 9    what you were doing in some of your articles, would that

10    be fair to say, articles about Yemen or Cairo?

11    A.    I didn't choose the topic.

12    Q.    I understand that.  Would this be lighter fare than

13    the other articles you wrote?

14    A.    Yeah, it is about movies.

15    Q.    And then one of the other articles you wrote for the

16    Night Beyond -- the next page, was "Eight Refreshing Foods

17    to Beat the Heat and Keep You Hydrated"; is that correct?

18    A.    Yes.

19    Q.    And you picked a bunch of foods that you thought

20    people might like to eat when it is hot and dry?

21    A.    I looked online and found foods and vegetables with

22    the highest concentration with water.

23    Q.    And you wrote a nine-page article; is that fair to

24    say?

25    A.    Including photos, yes.
```

Q.   And this is your article written on July 21st of 2001
(sic), correct?

A.   Yes, correct.

Q.   You discussed things like a fruit pizza, and avocado
salad, and it is tabouli -- is that how you pronounce
it -- tabouli salad?

A.   I don't know.

Q.   You don't know about the article you wrote?

A.   I wrote it in July.  I looked up some recipes online.

Q.   Go to the next one.  Did you also write an article
about how to start your career in modeling?

A.   I was asked to write an article about how to start a
career in modeling.

Q.   And you wrote that on July 23rd, correct?

A.   Yes.

Q.   That also had photographs and things like that,
correct?

A.   Yes, it had some very large photographs.

Q.   The next one.  And you also wrote an article
called -- next page, "Online Shopping:  An Addiction Or
Just Boredom?"  Did you write that article, as well?

A.   I did.

Q.   And that was four pages, does that sound about right?

A.   With pictures, yes.

Q.   And did you write an article called "Five Book

1    Releases We Can't Wait To Get Our Hands On"?

2    A.   Yes.

3    Q.   And did you list those five books and discuss those

4    books?

5    A.   I had not read these books.  I looked at reviews

6    online and wrote a synthesis about them.

7    Q.   And the books included -- never mind.  And then you

8    wrote another article in July of 2021 called "The Refugee

9    Olympic Team," correct?

10   A.   Yeah.  I believe the Tokyo Olympic games were going

11   on, so I was asked to write about this.

12   Q.   And that's a four-page article --

13   A.   With photos, yes.

14   Q.   So if I can go back to your -- so prior to -- you

15   have your LinkedIn, can you see that, Emily, A41?

16   A.   Yes.

17   Q.   After the discussion about Geek, prior to that you

18   worked as a contact writer, is that -- I apologize, I will

19   mispronounce this -- Al Fusaic?  Is that how you pronounce

20   that?

21   A.   It is call Al Fusaic.  It is a volunteer

22   organization.  You can write just content related to the

23   Middle East, submit just -- whatever you feel like, book

24   reviews, et cetera.

25   Q.   You were doing that while you were working at Geek

1    Labs, correct?

2    A.   I believe I started Al Fusaic in July before I

3    started working at Geek Labs.  I have not really done much

4    with it.

5    Q.   And then one of the articles that you wrote for that

6    group was the Cairo story that we have been talking about,

7    correct?

8    A.   I did not write it for Al Fusaic.  I wrote it

9    previously and submitted it to them.

10   Q.   So you submitted it to Al Fusaic, that's why it is in

11   your LinkedIn that you filled out, correct?

12   A.   Yes.

13   Q.   Did you also submit something called Omani?

14   A.   In order to qualify as like a volunteer with their

15   organization to submit articles, you had to write a piece

16   about one of the ancient tribes or groups in the Middle

17   East.  So they assigned me the Omani.  And I wrote like a

18   broad overview of their -- the tribal history, I guess.

19   Q.   And what is Omani?

20            MR. PETRU:  Objection.  Relevance, your Honor.

21            THE COURT:  Overruled.

22            THE WITNESS:  There is a country in the Middle

23   East called Oman.  And so it is kind of about the ancient

24   civilization that gave birth to what is the country of

25   Oman today.

```
 1    BY MR. BONVENTRE:
 2    Q.   And that was -- you wrote about that?
 3    A.   Yes.
 4    Q.   All right.  Prior to that -- actually, at the same
 5    time, it indicates that you were working at the Jasmine
 6    Language Training Center part-time?  Do you see that?
 7    A.   Yes.
 8    Q.   So you were doing that at the same time with Al -- I
 9    apologize, Al Fusaic and Geek Labs, at least partially at
10    the same time, correct?
11    A.    I was in training at the Jasmine Language Center
12    throughout July and I think into August.  I was there
13    part-time.  And meanwhile, I had submitted roughly two
14    articles to Al Fusaic in the same period of time.
15    Q.   And this was also while you were a content writer at
16    Geek Labs, correct?
17    A.   Yes.
18    Q.   And prior -- I think we talked briefly, you worked
19    full time from January 2021 to April of 2021 in Olympia,
20    in the State Senate, correct?
21    A.   No.  I was working remotely from Kelso, Washington.
22    Q.   And you were an aide, correct?
23    A.   Yes, I was a session aide.
24    Q.   Previous to that, in 2020, that's when you had been
25    doing your internship with the Washington State
```

1    Legislature, correct?

2    A.   In the winter of 2020, I had been an intern at the

3    Washington State Legislature.

4    Q.   And that was, obviously, back in the United States,

5    correct?

6    A.   To be clear, when I was a session aide, I was in

7    Kelso, Washington.  And in the winter of 2020, when I was

8    an intern, I was also in Olympia.  I was in Olympia then.

9    Q.   Another part of your LinkedIn page, if that's the

10   right phrase, was you were a data transcriber for a

11   Slavonic journal project, from July of 2017 through March

12   of 2020, correct?

13   A.   This was kind of a volunteer.  There is a group in

14   Washington that is trying to transcribe the journals of an

15   old sailor who was in kind of the Middle East region.  You

16   are given pieces of his journal and you like, roughly --

17   like a few pages of it, and then you are trying to read

18   his handwriting and type what you see.  I did that -- kind

19   of -- it was very easy to do, so I did that once in a

20   while for them.

21   Q.   And you did it for almost three years?

22   A.   Yeah.  They would give me some pages and I would

23   write what I saw.

24   Q.   And you were -- it says that you were a language

25   assistant at the American Center of Cairo.  Do you see

1    that?

2    A.   Can you show me exactly where this is?

3    Q.   Sure.  Absolutely.  I think it is the next page.

4    Just to speed this along, do you remember being at the

5    American Center in Cairo from September of 2019 to

6    February of 2020?

7    A.   There is like a volunteer internship where remotely I

8    was asked to write some questions about U.S. holidays,

9    cultural things, a few simple questions to aid them in

10   their conversation circles at the American Center of

11   Cairo.  I just did this for a few months from the United

12   States.  I was never interacting with any of the people

13   actually at that organization.

14   Q.   And your description here is that you created

15   dialogues about American culture for Egyptians?  Is that

16   what you have in here?

17   A.   Yes, I created questions and answers sometimes, yeah.

18   Q.   And you also did an internship from January -- for

19   2019, an internship at Gulf State Analytics, correct?

20   A.   Yes.

21   Q.   And 2019 through December.  So this would have been

22   in the time frame when you were studying in France and

23   also traveling to Cairo, correct?

24   A.   Yes.  I started it when I was in France.  I had very

25   little to do, so I wanted to find a new opportunity.  So I

1   applied to find an internship.  I was given basically

2   three topics to try to write about and research during my

3   internship with them.

4   Q.  And it said you prepared background information and

5   analysis for several current event pieces.  Duties

6   included coordinating on regional topics, revising

7   articles and participating in the writing process to

8   prepare articles for publication in coordination with a

9   senior analyst.  That's what you wrote?

10   A.  It's a very fancy way of saying I would do background

11   research on a specific topic.  I would bring it to an

12   actual -- you know, expert on the topic.  They would

13   correct me.  We would go and rewrite it, and rewrite it

14   together, until it was co-authored.

15   Q.  And one of the articles that you co-authored was an

16   article called "Yemen's Fragile Peace Talks," correct?

17   A.  Correct.

18   Q.  And what was the subject of that article?

19        MR. PETRU:  Objection.  Relevance, your Honor.

20        THE COURT:  Overruled.

21        THE WITNESS:  I don't know if you know about the

22   trouble the country of Yemen has been going through.  But

23   I believe it was on the peace talk processes at that time.

24   And I kind of put together some background research for it

25   before Theodore Karasik eventually kind of authored it for

1    us.

2    BY MR. BONVENTRE:

3    Q.   It also says that you wrote an article about, quote,

4    "Understanding Egypt's Role In Libya's Civil War,"

5    correct?

6    A.   I did not write it.  I co-authored it with Georgia

7    Cafiero.

8    Q.   I take it the topic of that article is Egypt's role

9    in Libya's civil war?

10   A.   Correct.

11   Q.   It also indicates, if I am correct, while you were --

12   as a language assistant at the American Center of Cairo,

13   and Gulf State Analytics, you were also at the Ahlan

14   Arabic Centre of Cairo; is that correct, in 2019, as well?

15   A.   No.  These are conflicting time periods.  For

16   instance, I left Ahlan -- when I went to Egypt, this is

17   where I was an intern at.  I was at the language

18   institute, which is called the Ahlan Institute of Cairo,

19   kind of an administration assistant.  I didn't start with

20   this virtual public service thing through the VSF program

21   as a language assistant for the American Center of Cairo

22   until September of 2019, which at that point I had left my

23   internship in Cairo.  But meanwhile, I had been writing

24   these three articles during the one-year period with Gulf

25   State Analytics.

1    Q.   So there was overlap?

2    A.   With Gulf State Analytics?   Correct.

3    Q.   And your duties at the Ahlan Arabic Center of Cairo

4    included maintaining and promoting social media, welcoming

5    new students, processing paperwork, documenting student

6    information, so forth and so on, correct?

7    A.   Correct.

8    Q.   And this was also the time, was it not, that you were

9    acting as a private tutor?

10   A.   I needed a place to live, so I had chosen the private

11   tutorship.   This was where I was living.   So during the

12   day, I was working as the administrative assistant and

13   taking classes, and during the evenings I was the tutor

14   for this family.

15   Q.   So it says here "private tutor."   Again, I am going

16   to butcher this, so I apologize, Al Shorouk, Egypt?

17   A.   Yes.   It's a part of Cairo.   There is kind of like

18   segments.   So, yes, the family lived in Al Shorouk.

19   Q.   So you were living with the family and teaching their

20   children --

21   A.   I was tutoring them in English, yes.

22   Q.   And you were also a private tutor at this other

23   place?

24   A.   No.

25   Q.   It is the same thing?

1    A.    No.

2    Q.    Why don't you tell me what it is?

3    A.    For sure.  I was living with this family, and during

4    the evenings I was tutoring their children in English.

5    During the days, I would take a bus to the Ahlan Arabic

6    Center where I was helping them with students' paperwork,

7    and I was taking classes with them.  That was the

8    period -- this is how I spent the summer of 2019.

9    Q.    Also, I noticed you worked in 2018 as a human

10   resources intern at the Oregon -- is it Borgen project?

11   A.    Yes.

12   Q.    B-O-R-G-E-N project?

13   A.    I was an intern -- human resources intern with the

14   Borgen project.  It's a group in Seattle.

15   Q.    And what is the Borgen project?

16   A.    Basically, they are trying to -- let me try to

17   remember.  They kind of deal with international poverty.

18   And part of it is they write -- is trying to raise

19   awareness about legislation that can help address issues

20   like famine, you know, proper distribution of humanitarian

21   aid, so that it is -- so it actually has meaningful

22   impact.

23   Q.    Thank you.  Going back to the time -- excuse me, when

24   you were an exchange student in France, were you also a

25   member of an environmental group in France?

1   A.   There is, you know, a student club.  I picked up

2   trash off of the beach I think two times with them.  I

3   think we like made some potluck dinner.

4   Q.   Did you indicate -- so you included beach cleanups

5   and sustainability projects?

6   A.   We were -- this is embarrassing, but we were dumpster

7   diving for food that would have been going to waste.  This

8   was the sustainability project.  We were making food out

9   of food that otherwise would have been thrown out.

10  Q.   Using it for -- giving it some use, I take it?

11  A.   Yeah.

12  Q.   Thank you.  And what's the Sciences Babble

13  Association?

14  A.   It was kind of a student club, but received funding

15  from the school.  This is how I was able to go to Istanbul

16  to do my research project.

17  Q.   And that was also while you were in France, correct?

18  A.   Correct.

19  Q.   Emily, I just have a very few other questions, okay?

20  A.   Okay.

21  Q.   You discussed yesterday some issues I believe you had

22  with your dad.  Do you recall that?

23  A.   No.

24  Q.   You don't recall that?

25  A.   I don't know exactly what issues I was saying.  Can

1   you be more clear?

2   Q.   Do you have any issues -- are you speaking with your

3   dad right now?

4   A.   No.

5   Q.   Is it -- would it be fair to say, respectfully,

6   Emily, that you told Dr. Scovel you have had problems with

7   your dad, long-standing problems with your dad?

8   A.   He is my father.  You know, he was -- I would do

9   something wrong, and we would have an argument about it,

10  but it would always be resolved.

11  Q.   Did you tell Dr. Scovel that you had long-standing

12  problems with your dad before the Amtrak train accident?

13  A.   Without seeing the paperwork, I would say, yes, we

14  have always had arguments, issues, disagreements.

15  Q.   At some point, you saw a therapist, Emily Smith?  Do

16  you remember that?

17  A.   Yeah.

18  Q.   I believe you saw Ms. Smith on one occasion, correct?

19  A.   Correct.

20  Q.   And I believe you said in your deposition that you

21  didn't continue to see her because you didn't get along

22  with her and you didn't like her name?

23  A.   I was having a very hard time when I was living in

24  Seattle at that point.  And I was hoping to seek out

25  someone that I could kind of vent to and explain my

1  situation.  I found her, I went to one session with her,

2  and it felt very -- I was looking for more guidance, and

3  it was just kind of like speaking to a wall.  And I felt a

4  little uncomfortable with the fact that her name was

5  Emily, as well.

6  Q.  You saw Dr. Crossen in 2018.  Do you remember that?

7  A.  I believe I saw him, yes, in August of 2018.  Yes.

8  Q.  And then you saw him again in 2021, correct?

9  A.  I continued with him while I was in France up until

10 December of 2018.

11 Q.  And then there was a gap for three years, and you saw

12 him again in 2021, correct?

13 A.  Yes.

14 Q.  And he testified that you asked -- you asked him to

15 write a report and send it to your attorney; is that

16 correct?

17         MR. PETRU:  Objection.  She wasn't here.

18 BY MR. BONVENTRE:

19 Q.  I want you to assume that Dr. Crossen testified that

20 you asked him to write a report and send it to your

21 attorney; is that correct?

22 A.  I'm sorry.  I don't understand the question.

23 Q.  Did you ask Dr. Crossen to write a report and send it

24 to your attorney in 2021?

25 A.  Yes.  I asked him to write, you know, his thoughts

1    about it and send it to my attorney, correct.

2          MR. BONVENTRE:  Thank you, ma'am.  I really

3    appreciate it.  Thank you very much.

4                    REDIRECT EXAMINATION

5    BY MR. PETRU:

6    Q.  Emily, just to be complete, you stay very busy?  You

7    try to stay very busy, correct?

8    A.  Correct.

9    Q.  Does that help you?

10   A.  Yeah.

11   Q.  To be thorough, in your LinkedIn page, there are a

12   couple of volunteer things that you did that weren't

13   commented on.  In March of 2017 to July 2017, when you

14   were in school before the crash, you were a research

15   intern for the Institute for Research and Education on

16   Human Rights, correct?

17   A.  Correct.

18   Q.  And do you remember what you did there?

19   A.  I was mainly learning.  I was kind of writing about

20   hate crimes, I guess, and learning about the tensions in

21   the United States.

22   Q.  In January of 2019, you volunteered for the Red Cross

23   of Monaco as a migrant camp volunteer, where you worked to

24   help prepare and distribute supplies for asylum seekers

25   temporarily located at the camp.  The duties included

1   helping create their resumes, teaching basic English,

2   correct?

3   A.   Correct.

4   Q.   You like to help others when you can?

5   A.   I do.

6           MR. PETRU:  Those are all the questions I have.

7           MR. BONVENTRE:  Nothing, your Honor.

8           THE COURT:  Thank you.  You may step down.

9           MR. PETRU:  Your Honor, we have a stipulation of

10  admitted facts that I would like to read into the record.

11          THE COURT:  All right.  A stipulation is an

12  agreement between the parties about facts that you will

13  accept as proven and true.

14          MR. PETRU:  Ladies and gentlemen, the following

15  facts are admitted by the parties:  One, on December 18th,

16  2017, Plaintiff Emily Torjusen was a passenger on Amtrak

17  Cascade Train 501.

18      Two, on that date, Defendant Amtrak Cascades

19  Train 501 was traveling southbound from Seattle,

20  Washington towards Portland, Oregon.

21      Three, Amtrak Cascades Train 501 had a lead

22  locomotive, a power rail, ten passenger cars, a baggage

23  railcar, and a rear locomotive.

24      Four, at approximately 7:33 a.m. on December 18th,

25  2017, Amtrak Cascades Train 501 traveled on the Point

1    Defiance Bypass section of the Lakewood subdivision, a

2    section of track over which Amtrak had operating rights.

3         Five, there is a descending grade approaching the

4    curve on the Lakewood subdivision that crosses over

5    Interstate 5 at track milepost 19.8.

6         Six, the curve located at milepost 19.8 has a speed

7    limit of 30 miles per hour.  Amtrak Cascades Train --

8    excuse me.

9         Seven, Amtrak Cascades Train -- I'm sorry.  I

10   butchered that.  Let me do that again.

11        Six, the curve located at milepost 19.8 had a speed

12   limit of 30 miles per hour.

13        Seven, Amtrak Cascades Train 501 was traveling

14   approximately 78 miles per hour when it entered the curve.

15        Eight, Amtrak Cascades Train 501 derailed through the

16   curve, and Plaintiff Emily Torjusen was a passenger aboard

17   the train during the derailment.

18        Thank you, your Honor.

19             THE COURT:  All right.  Any further witnesses,

20   Mr. Petru?

21             MR. PETRU:  No, your Honor.

22             THE COURT:  Any rebuttal witness?

23             MR. BONVENTRE:  No, your Honor.

24             THE COURT:  All right.  Jurors, we have completed

25   the evidentiary portion of this trial.  I will be giving

1    you final jury instructions, but I am going to ask you to

2    return at 11:00, at which time I will give you those jury

3    instructions.  That will be followed by closing argument

4    by counsel for both parties here.

5         It's not quite time yet to speak with one another

6    about this case.  That will be coming soon.  But please

7    don't talk about this case with one another or anyone

8    else, and we will see you at 11:00.  I think it is still a

9    nice day outside.

10        (At this time, the jury exited the courtroom.)

11             THE COURT:  All right.  Everyone, please be

12   seated.  The jury instructions and verdict form that I

13   have developed were sent out by email last evening.  I am

14   prepared to hear about any concerns, objections.

15   Instruction No. 14 was a placeholder for stipulated facts.

16   Here, it seems that there is not a written stipulation.

17   So the general instruction on stipulations, much as the

18   way I gave it to the jury, can go into 14 here, the model

19   instruction on stipulations.

20        So I will hear from plaintiff concerning this set of

21   instructions and verdict form.

22             MR. LEVY:  Your Honor, are you going to read the

23   stipulated facts that Mr. Petru just read?

24             THE COURT:  I haven't been provided it.

25             MR. LEVY:  Can we provide those to you?

```
 1                THE COURT:  If you do, that can be incorporated
 2    in Instruction 14.
 3                MR. LEVY:  Okay.  We would ask that that be done.
 4                THE COURT:  If you would email that to -- I
 5    believe it was Tiff Sealy that forwarded it to you last
 6    night.  If you would send that, we can cut and paste that
 7    stipulation into No. 14.
 8                MR. LEVY:  Thank you, your Honor.
 9                MR. BONVENTRE:  Judge, I don't know that it is
10    necessary.  We literally just read them.  You are going to
11    charge the jury at 11:00.  Do we need to repeat that
12    again?
13                THE COURT:  You have an objection, but I see no
14    prejudice for doing so.
15                MR. BONVENTRE:  Thank you, your Honor.
16                THE COURT:  Other issues?
17                MR. LEVY:  No, your Honor.
18                MR. BONVENTRE:  Amtrak had one, Judge, on charge
19    No. 16.  I think we have had this discussion before, your
20    Honor.  Your Honor used the word "disability."  We would
21    object to that word.  I think it is pain and suffering and
22    loss of enjoyment of life.  "Disability," respectfully, I
23    believe has a very particular meaning.  And I would object
24    to the use of the word "disability."
25                THE COURT:  It is part of the general damages
```

```
 1    statement there, the model instruction.  Mr. Levy.
 2             MR. LEVY:  We think it is entirely appropriate.
 3    There has been evidence of mental disability in this case.
 4    Disability applies to physical or mental.  We think there
 5    has been a lot of evidence supporting that instruction for
 6    disability.
 7             THE COURT:  I agree.  So the objection is noted
 8    but overruled.
 9         Anything else?
10             MR. BONVENTRE:  Nothing, your Honor.
11             THE COURT:  We will get these in final form.  I
12    probably gave them more time than we needed, but I wanted
13    to be sure.  The instructions will probably take 20, 25
14    minutes for me to read.  How much time for closing
15    argument?
16             MR. PETRU:  I could start off by saying I don't
17    know.  I expect that my close -- my opening close will be
18    about an hour.
19             MR. BONVENTRE:  I would expect the same.  Judge,
20    so I am clear, it is plaintiff, defendant, plaintiff?
21             THE COURT:  Correct.
22             MR. BONVENTRE:  Mine would be an hour, as well.
23             THE COURT:  An hour?  You are splitting the hour?
24             MR. PETRU:  I am not talking about splitting it.
25    I don't know what he is going to say.  What I have
```

```
1    anticipated and prepared, I think will take about an hour.

2    And then I would anticipate that if he is going to be an

3    hour, I would probably be no more than 15 minutes in

4    rebuttal.

5              THE COURT:  You need to keep it close to the same

6    amount of time.  I am not putting anyone on a clock.

7              MR. PETRU:  Let's say then -- just to be

8    conservative, let's say I will take an hour and a half

9    total, even though I don't think I will.  If he needs an

10   hour and a half total, that's fine.

11             THE COURT:  Let's make it an hour and 15 minutes.

12   I don't mean to split hairs and so forth.  We need to get

13   this to the jury.  What I will do is probably -- after I

14   read instructions, I will probably give them an early

15   lunch.  It will only be an hour and a half.  We will

16   probably be returning around 1:00 instead of 1:30.

17             MR. BONVENTRE:  Is it the Court's intention to

18   give them the case this afternoon?

19             THE COURT:  Yes.

20             MR. PETRU:  Will the Court allow them to

21   deliberate into the evening?

22             THE COURT:  No.  The day will end at 4:30.  Dara

23   will inquire around 4:15 of them, and ask them if they are

24   at all close, do they think -- in which case I will extend

25   beyond 4:30 some, but not very long.
```

1          MR. PETRU:  Thank you, your Honor.

2          MR. BONVENTRE:  Thank you, sir.

3          THE COURT:  We will get the final instructions to

4    you so that you can be sure they are in proper form here.

5          MR. BONVENTRE:  Thank you, your Honor.

6       (Recessed.)

7       (The following occurred in the presence of the jury.)

8          THE COURT:  Please be seated, everyone.  I'm

9    going to go over these final jury instructions with you.

10   You have been provided a copy of that, so you can follow

11   along with me.  We will be breaking probably close to

12   11:30.  Then we will take still an hour-and-a-half lunch

13   break, but return back probably around 1:00 for you to

14   here closing arguments.

15      (Court's instructions to the jury were reported and

16   not transcribed.)

17      (At this time, the jury exited the courtroom.)

18          THE COURT:  All right.  We will see everyone at

19   1:00.

20      (Lunch recess.)

21

22

23

24

25

```
 1                              AFTERNOON SESSION
 2                              APRIL 1, 2022
 3              THE COURT:  Before we bring the jury in, Dara
 4     already got a question in, not in written form, in which a
 5     person wanted to know what noneconomic damages are.  I
 6     think the best way to handle that is just for the
 7     attorneys to in your argument clarify what noneconomic
 8     damages are.
 9              MR. PETRU:  Are we entitled to know which juror
10     asked the question?
11              THE COURT:  She can tell you.  No, I don't think
12     so.  I will think about that.
13              MR. PETRU:  Wouldn't we normally see the
14     question?
15              THE COURT:  Normally, we get a question that
16     comes from the juror foreperson, although any juror can
17     ask a question.
18              THE CLERK:  He said "we."
19              THE COURT:  That means they are discussing it; is
20     that what you're saying?
21              MR. PETRU:  That's a good point.
22              THE COURT:  How many times have I admonished
23     them?
24          (The following occurred in the presence of the jury.)
25              THE COURT:  Everyone, please be seated.
```

1        Jurors, you will recall I indicated to you at the

2   outset, because the plaintiff has the burden of proof,

3   plaintiff has the first opportunity to present evidence

4   and, here, to present closing argument.  When he is

5   completed, then counsel for Amtrak will address you.

6   Mr. Petru has the opportunity to make the final argument

7   after that.

8            MR. PETRU:  Good afternoon.

9        Whenever a passenger boards a train, they put their

10  trust in the train company that they will be able to go on

11  their journey safely to their ultimate destination.  A

12  train company has an obligation to take every precaution

13  to ensure that the journey and the passenger is safe.

14       On December 18th, 2017, Emily Torjusen placed her

15  trust and her life in Amtrak's care.  Amtrak failed.  And

16  as a result, their train flew off the tracks at 78 miles

17  an hour, careening through the air and crashing to the

18  ground.

19       What was left in the aftermath were destroyed tracks,

20  twisted rail, wrecked cars, wrecked engines.

21       Amtrak has fixed the track, Amtrak has restored the

22  bridge, Amtrak has replaced the cars, Amtrak has replaced

23  their engines.

24       But there was wreckage that Amtrak did not fix, the

25  catastrophic and permanent damage they did to an innocent

20-year-old woman, whose daily actions, whose outlook on life, and whose ability to enjoy both the small and the large things in life in a carefree manner was completely shattered.

As Amtrak's train flew off the track at 78 miles an hour, so did Emily Torjusen.

Amtrak's response, as you heard in their opening statement, is to be fair and reasonable, to use your common sense.  You will hear those later.  Ladies and gentlemen, those are buzzwords to convince you to give them a discount, so they don't pay the entirety and the enormity of what they have caused and will cause to this young lady.

They don't want to fully compensate her for the overwhelming harms and losses she has suffered, or for the unimaginable harms and losses she is certain to suffer to some degree or another for the next 58 years.

Just this morning, just a couple of hours ago, Amtrak had an opportunity to examine Emily Torjusen.  They had an opportunity to find out more details about her traumatic brain injury and how it affects her, they had an opportunity to find out about the depth and the scope of her PTSD.  They had an opportunity to explore her depression, her anger, her anxiety, and her fears.  Amtrak could have asked her about the triggers, how they happen,

1    how she works to control them, what happens when she feels

2    it clicking and she can't turn off the switch, why she

3    cries spontaneously on buses and planes, why she cries

4    spontaneously for no reason at all, how, when, why, or how

5    she loses her inhibition.  They could have asked all those

6    questions and probed the evidence as to what damage she

7    has and the nature of the damage, but they chose not to.

8         Instead, we spent an hour this morning asking her

9    about her grades.  We know that her brain is damaged in

10   part, but not in whole.  We know that she hasn't lost her

11   intellect.  We know that she hasn't lost her ability to

12   write.  She has admitted that.  The doctors have admitted

13   that.  That is not the issue in the case.  The issue isn't

14   what remains, the issue is what was lost, how it was lost,

15   and why it was lost.

16        Instead, Amtrak asked her questions about an

17   assignment to write an article on modeling.  They spent a

18   lot of time talking about an article on food that she was

19   assigned to write, an article about the movies that she

20   was assigned to write as part of her job.  Ladies and

21   gentlemen, she can write.  She did make it through school.

22        But as Dr. Scovel told you, as Dr. Spohr told you, as

23   Dr. Crossen told you, despite attempts by Amtrak's

24   attorneys in cross-examination, those functions were not

25   impaired.  It's initiating them, it's how she goes about

1  doing them, it's the attention and distraction she has

2  had, but not the innate ability to do those things.

3       Why do we spend time talking about what she knows --

4  what we know she still can do?  And the answer is simple.

5  The answer is because their defense in this case is to

6  distract you from the harm, to distort the evidence, and

7  to deceive you about what your role is and what her

8  damages are.

9            MR. BONVENTRE:  Objection, your Honor.

10           THE COURT:  Overruled.

11           MR. PETRU:  They could have brought in experts to

12  tell you that Emily does not suffer from PTSD.  They could

13  have brought in experts to tell you that Emily does not

14  have brain damage.  They chose not to.

15       Why not?  Because the testimony you heard from all

16  the witnesses is true and correct and unimpeached, from

17  Dr. Crossen, from Dr. Spohr, from Dr. Filler, from

18  Dr. Scovel, and from Emily herself, about the impact and

19  effect these injuries have had on her.  In fact, the

20  diagnoses that were shared by the treating physicians with

21  you, as reflected in their opinions and in their charts,

22  are 100 percent consistent with each other.

23       So instead, Amtrak criticized the providers for not

24  sending or requesting each other's reports.  We spent a

25  lot of time, did your office send it, did you get it, why

```
 1    not, what's your protocol?  But let's unpack that.  Let's
 2    really unpack that.  If Dr. Scovel didn't send her report
 3    to Dr. Spohr right away, or if Dr. Crossen didn't get
 4    Dr. Scovel's report, or if Dr. Filler's report didn't get
 5    to Dr. Spohr until her deposition, it certainly got to
 6    Dr. Scovel before her second examination, and they didn't
 7    see each other's report, isn't that further clear,
 8    unrebuttable evidence that the diagnoses that these
 9    independent treating physicians determined on their own,
10    which happens to jibe 100 percent, is nothing other than
11    entirely correct?  And it is.
12         The testimony that you heard from Dr. Crossen,
13    Dr. Scovel were that Emily's PTSD and her TBI have
14    resulted in permanent damage, that more probably than
15    not -- we will discuss burden of proof later on -- it is
16    more probable than not that they will affect her and stay
17    with her the rest of her life.  Dr. Scovel indicated I
18    think it was ten to 25 percent of those people who
19    suffered cognitive injury will have it for the rest of
20    their life.  Some are fortunate, they are lucky, they
21    recover.  Others are unlucky.
22         Amtrak admitted they are responsible for the crash,
23    but they never admitted that Emily continues to suffer
24    from PTSD, TBI, anxiety or depression as a result of their
25    crash.
```

1      Listen carefully to their summation after I am done

2   and see if now, after all the evidence is in, after all

3   the evidence has been received, that they finally admit

4   the reality that Emily Torjusen today, on April 1st, 2022,

5   continues to suffer from the effects of their crash in

6   terms of reduced mental capacity as defined by Dr. Scovel,

7   PTSD, depression, and anxiety.

8      Rather than bring in evidence -- Amtrak could have

9   and didn't -- they chose to vigorously examine the

10  witnesses.  Those were the words used: "I am going to

11  vigorously examine the witnesses."  Why?  Why did they do

12  that?  There is an adage in the law.  The adage in the law

13  is pretty straightforward.  What you do as jurors, what

14  you are going to do as jurors is take the facts, take the

15  evidence, take the law which his Honor has read to you,

16  which you have in your packet, and your obligation, your

17  duty as jurors, is to take the facts and take the law,

18  evaluate them together to be able to determine what your

19  verdict should be.  Fair.  That's your job.

20     The adage goes like this:  If you don't have the law,

21  pound the facts.  If you don't have the facts, pound the

22  law.  But if you have neither the facts nor the law, pound

23  the table.  What we got for the last three days was a lot

24  of table pounding.

25     What they really did was personally attack me, Scott,

1    our former colleague, now judge, Carol Bosch, Dr. Filler,

2    to some extent Dr. Crossen.  Why did they attack us?  What

3    were they arguing?  What were they suggesting?  That we

4    somehow -- Emily should not be compensated because we were

5    doing our jobs, because we had communications with them,

6    because we told them when trial was coming, that we wanted

7    to know what their opinions were going to be so we can

8    prepare to make opening statements, to provide the

9    evidence, to bring it to you?  Is there something wrong

10   with a lawyer communicating with witnesses he or she knows

11   are going to come to trial?  I think there is something

12   wrong if the lawyer doesn't do that.  But somehow by

13   deceiving and twisting and distorting what really

14   happened, they are suggesting that Emily shouldn't be

15   compensated because she hired lawyers.

16       What do they criticize for us -- us for?  In addition

17   to us, they criticized Dr. Scovel, Dr. Filler,

18   Dr. Crossen, Dr. Spohr for not sharing the reports.  That

19   doesn't change the diagnosis.  That doesn't change the

20   treatment.  And most importantly, that doesn't change what

21   happened and is happening to Emily Torjusen.

22       A good example -- a good example, by the way, is

23   Dr. Filler.  Yes, we worked with Dr. Filler and asked him

24   to prepare a PowerPoint, a PowerPoint to help explain to

25   you the very technical and very complicated tool that he

1    helped invent called the DTI, a tool which coincidentally

2    the original patent was owned by the State of Washington.

3    He prepared the PowerPoint so you could understand what it

4    was that he was able to get out of evaluating the DTI to

5    actually look into Emily Torjusen's brain.

6         In cross-examination with Dr. Filler here, not one

7    question, not a single question, not even half a question,

8    not even a question that was objected to, not a single

9    question was asked of Dr. Filler about his opinions and

10   his conclusions based on his work with Emily Torjusen.

11   Not one.

12        Instead, in their constant attempt to distract and

13   distort and deceive, they talked about how much money he

14   makes.  He makes a fair amount of money.  He is one of the

15   world's leading expert in this technology.  If you want to

16   know what is happening in somebody's head after they have

17   had a brain injury, you can go to somebody like

18   Dr. Filler.  There aren't very many of them.

19        Amtrak certainly could have done it if Amtrak really

20   wanted to know what was going on inside her head.  But

21   instead of hiring him, bringing him in here, they

22   criticize him for making money as part of his work.  That

23   doesn't change the quality of his work.  That doesn't

24   change his opinions and conclusions.  It's an attack on

25   him.  I find that to be disingenuous.

1    Remember in opening statement counsel for the

2  railroad tried to tell you that the DTI exam, the very

3  tool that Dr. Filler used and explained to you, was

4  rejected by some group they called the American Academy of

5  Radiology.  And I quote from counsel:  "We know that the

6  tests he claims are so wonderful have been rejected by the

7  American Academy of Radiology.  Okay?  That's what the

8  evidence is going to demonstrate, ladies and gentlemen."

9    That was his promise to you.  First of all, the

10 American Academy of Radiology does not exist.  Dr. Filler

11 said so.  We looked it up.  There ain't no so such thing.

12   Second of all, they didn't bring any evidence in to

13 show that there is anybody who is qualified, who

14 criticizes the DTI test -- technology, standards,

15 platform, operation.  Again, they want you to be deceived.

16   In opening counsel also talked about CT scans, and

17 explained to you in his opinion that the CTs are the gold

18 standard, and that Emily Torjusen had a normal CT, so she

19 must be fine.  He failed to mention the truth, and that is

20 that a CT scan is the gold standard not for detecting

21 brain injury, but for detecting whether somebody has a

22 brain bleed, a hematoma, a hemorrhage, a skull fracture.

23 It is used in an emergency room in triage to see whether

24 or not you have to get a neurosurgeon in then and there to

25 save somebody's life from a head injury resulting in a

1    hemorrhage or a skull fracture.  It is not the gold

2    standard in any way, shape, or form for determining

3    whether somebody has a head injury, a mild traumatic brain

4    injury, or moderate traumatic brain injury as a result of

5    blunt force trauma.

6         Emily didn't have a fracture to the skull.  She

7    didn't have a brain bleed.  She suffered a TBI.

8         Dr. Filler explained to you that the vast majority --

9    in fact, virtually all people who suffer traumatic brain

10   injuries, concussions, have normal CT scans.  CT scans

11   don't show it.

12        The way that this was presented to you, Amtrak

13   actually admitted in opening statement that Emily suffered

14   a concussion.  They said the fancy name for that to make

15   it sound worse, TBI.  That is actually the common term

16   used in contemporary medical science, TBI.  But they

17   suggested to you her symptoms already improved when she

18   was discharged.  Then, frankly, they outrageously

19   suggested that Emily was getting better until the lawyers

20   got involved.  Again, another attack on Scott and me and

21   Carol.  It is preposterous, ladies and gentlemen.  This is

22   what was said.

23        Already on discharge those symptoms --

24             MR. BONVENTRE:  Objection.  I thought what

25   lawyers say is not evidence, Judge.

 1              THE COURT:  I'm sorry.

 2              MR. BONVENTRE:  Objection.

 3              THE COURT:  The basis again?

 4              MR. BONVENTRE:  He is reading from my opening.

 5    Is that the evidence in the case?

 6              THE COURT:  Overruled.

 7              MR. PETRU:  In opening, counsel for the railroad

 8    said, "I will be held accountable for everything that was

 9    in my opening statement."  He said, at the end of the case

10    he will bring to you all of the things I promised to

11    produce that we didn't produce, all of the evidence we

12    were going to show we didn't show.

13         What is good for the goose is good for the gander.

14    He promised and told you when Emily Torjusen was

15    discharged from Saint Pete's she was already recovering,

16    and, quote, "Within two or three days of the accident, the

17    hospital, before the lawyers got involved, indicates that

18    the post-concussive symptoms were already improving."

19    That's what he said.

20         Now, let's give a real timeline to this.

21    Emily Torjusen, after she was released from the hospital,

22    went home and had headaches, had nausea, had problems

23    associated with concussive syndrome.  She saw Dr. Spohr

24    who saw the same thing, who recommended she not go back to

25    school.

1      Emily shared with you that she couldn't bear doing

2  that.  If she didn't go back to school, then she thought

3  she would never go back to school.  Good for her.  It

4  might not have been the best thing to do, but good for

5  her.

6      She went back to school, and Dr. Spohr was right, she

7  continued to have problems.  She had problems with

8  concentration, she had problems with memory, she had

9  problems with organization.  She would start doing

10 something and got interrupted.  She couldn't finish her

11 homework.  She stayed up at night.  She had sleep

12 problems.  She fought like hell to get it done.  And good

13 on her, she got it done, but she paid a big price for it.

14      By the time the spring break came around, before the

15 lawyers were involved, they had lawyers, she didn't have a

16 lawyer, but before the lawyers were involved, in spring

17 break, her mother, recognizing the problems, went to

18 Dr. Spohr and said, "Could you please refer her to have a

19 neuropsychological examination because I am concerned

20 about her."  And she went and had that neuropsychological

21 evaluation before the lawyers were involved.

22      And what did that neuropsychological evaluation

23 reveal?  That she had a significant post-concussive

24 syndrome, with memory problems, visuospatial problems,

25 concentration problems, processing, mental processing

1    problems, physical processing problems.  It was a serious

2    and very concerning evaluation and report, before the

3    lawyers were involved.

4        His suggestion to you is that Emily Torjusen is here

5    because of us.  Emily Torjusen is here for one reason and

6    one reason only:  She has been badly damaged by Amtrak and

7    she is entitled under the law to just compensation for

8    what they did to her.  Don't blame us.  Blame yourselves.

9        The truth of the matter is that Dr. Scovel's

10   evaluation clearly showed the brain injury, consistent

11   with the symptomology.  Dr. Filler's evaluation, which

12   they don't like, they would rather that was hidden so this

13   is a purely hidden injury so you don't see the

14   ramifications of it, clearly showed Emily's damage.

15       I hope this works.  Some of the evidence that you saw

16   is called demonstrative evidence.  That means it was shown

17   to you with a witness to help explain the witness's

18   testimony.  This is one of those pieces of demonstrative

19   evidence.  That means in the jury deliberation room you

20   won't have this.

21           MR. BONVENTRE:  Objection, your Honor.  I

22   apologize for interrupting counsel.  This is not in

23   evidence.

24           THE COURT:  He just said that.

25           MR. BONVENTRE:  I understand that.  We can refer

```
 1    to things --
 2              THE COURT:  It is demonstrative evidence.  It was
 3    discussed with the jury.  It is not going to the jury
 4    room.
 5              MR. BONVENTRE:  Thank you, your Honor.
 6              MR. PETRU:  Dr. Filler explained to you the
 7    different disciplines.  He explained to you the history of
 8    concussion.  He explained to you what happened to
 9    Emily Torjusen's brain.  I won't show it to you now, but
10    we had another demonstrative video showing the coup
11    contrecoup injury.  When the head is hit, the brain goes
12    to the other -- from side to side, and it broke down
13    showing the axons, the actual nerves and cells and how
14    they function.  That is demonstrative to help show you how
15    fine and detailed the damage is and, correspondingly, how
16    fine and detailed the tool is to see the damage.
17         He explained to you the difference between -- is this
18    being published?  No.  I'm sorry, folks.  Thank you very
19    much.  I appreciate it.  Just showing the original slides
20    again.
21         He explained to you the difference in technologies
22    between the head CT, the brain MRI, and the brain DTI.
23         And then he went specifically to the findings for
24    Emily Torjusen.  And he found just evaluating the empiric
25    data from her brain imaging that there were tract losses
```

| | |
|---|---|
| 1 | in the frontal lobe.  And he explained to you that based |
| 2 | on the mapping -- and brain mapping is one of his |
| 3 | specialties -- tract losses in this area caused increased |
| 4 | anger and irritability, which Emily has to this day, and |
| 5 | problems with multitasking, which Emily has to this day. |
| 6 | He went on and showed you where there was a severely |
| 7 | narrowed supracallosal cingulum due to injury.  And he |
| 8 | explained to you injury to the left supracallosal cingulum |
| 9 | causes depression, anxiety and PTSD. |
| 10 | He took a brain scan, without Dr. Scovel's analysis, |
| 11 | looked at it, and told you that the probability is that |
| 12 | these areas are damaged as a result of trauma, and that |
| 13 | these areas control these very specific functions. |
| 14 | It is not a coincidence that Emily Torjusen has the |
| 15 | problems that Dr. Filler anticipated she would have based |
| 16 | on the brain scanning.  She does. |
| 17 | This is a larger version of it.  I always have a |
| 18 | problem getting out of this one.  I apologize.  I will |
| 19 | figure it out in a second. |
| 20 | What Dr. Filler shared with you is DTI imaging, this |
| 21 | particular process, is not some maverick, untested, |
| 22 | unsupported test, this wonderful test that he described to |
| 23 | you that is not supported and was criticized.  It is |
| 24 | actually used by the United States government.  And it is |
| 25 | the tool that the United States military uses when any of |

1    its servicemen or women are found to have suffered or

2    potentially suffered brain injury.  It's the tool that is

3    used widely around the world, and specifically by the U.S.

4    Army.

5         With regard to Dr. Scovel, counsel brazenly misquoted

6    Dr. Scovel numerous times --

7              MR. BONVENTRE:  Objection, your Honor.

8              THE COURT:  Overruled.

9              MR. PETRU:  -- in an attempt to misrepresent her

10   findings.  This was just yesterday.  But it's important to

11   remember what she wrote and how it was read to her and

12   represented to her and, more importantly, how it was

13   misrepresented.

14        Counsel said in one of his questions, "And in 2018,

15   you thought she could fully recover, correct?"  When that

16   isn't what she said.

17        What she said was that she was "hopeful that Emily

18   would be able to recover."  She did not categorically

19   state that she would recover.  Dropping a word, ignoring a

20   word changes meaning.  Again, distort, deceive.

21        I am going to go through these.  I was hoping to show

22   them.  If you will give me half a minute, I will see if I

23   can get it to work.

24        This is from the 2018 report from Dr. Scovel.  This

25   was in her conclusion.  She wrote, "In consideration of

1    the findings of empirical testing measures used for this

2    evaluation, it appears Ms. Torjusen struggles with tasks

3    that require elements of visual and auditory attention,

4    memory and processing speed.  Although, Ms. Torjusen is

5    endowed with high cognitive reserve and intellectual

6    ability, it is believed that the consequence of the

7    12/18/2017 accident correlates with impingements to more

8    important realms of cognitive functions, making it more

9    effortful for Ms. Torjusen to process information at

10   premorbid levels.  As well, another element of testing

11   revealed Ms. Torjusen's high degree of generalized

12   distress in multiple areas pertaining to her mental health

13   as evinced through her personality and emotional

14   assessment as part of this neuropsychological evaluation."

15        She shared this with you in her direct examination

16   and then again in cross-examination when it was suggested

17   that the problems she had should have prevented her from

18   being able to complete school, prevented her from being

19   able to write.  And she explained, as in the middle

20   sentence there, "Her high cognitive reserve and

21   intellectual ability is believed" -- I will shorten words

22   here -- "making it more effortful." "Making it more

23   effortful."

24        That is consistent with what Emily testified to, that

25   when she came back to school, things were harder, it took

```
 1    longer, she had to work more hours.

 2          What she did not do was give up.  What she had to do

 3    and still has to do is make up by working harder, working

 4    longer, putting more effort into it.

 5          Counsel suggested that Dr. Scovel said, "Well, these

 6    kinds of injuries could last up to a year."  That's not

 7    what she wrote.  The bottom sentence where it says,

 8    "However, sometimes symptoms can persist for a year or

 9    more."  Counsel dropped off the "or more" in his question

10    when he said, "You wrote that these symptoms could last up

11    to a year."  But that's not what she said.  She indicated

12    to you as a neuropsychologist in the testing she does it

13    is unethical and improper to take part of the information

14    and ignore the rest.

15          What I think you saw, ladies and gentlemen, was an

16    attempt to take part of the information and ignore the

17    rest.

18          In 2020 -- in the testing in 2020, there was

19    discussion about executive function.  Counsel suggested

20    that the executive function problems were gone.  This is

21    the organization, the planning.  What actually Dr. Scovel

22    wrote in the second sentence under "executive function"

23    was, "On TMTB, results placed her in the extremely

24    impaired range, completing this measure in 94 seconds,

25    which was less than the 10th percentile."
```

1    Under "attention and concentration," the same test,
2    this was in 2020, this was the paragraph counsel ignored.
3    Totally ignored the -- can you see my arrow here?  The
4    sentence that says -- right here, "Subjective endorsements
5    on the Brown ADD scales found that Ms. Torjusen believes
6    she has significant impairments in many spheres of
7    attentional processing."

8    So they took the two parts of the attention deficit
9    analysis where she did better, and ignored the one where
10   she didn't.  That's not fair.  And if nothing else, this
11   process should be fair.

12   The same with regard -- I will do both of these
13   together to save time.  Under "visuospatial constructional
14   processing," counsel ignored the sentence -- the second
15   sentence that says, "Her WAIS-IV design subtest also fell
16   in the low range, one standard deviation between the
17   normal compared to her age-matched cohort."

18   The first sentence on speed of mental processing,
19   "Ms. Torjusen's score on the TMTA denoted extremely
20   impaired abilities in processing speed, less than the 10th
21   percentile."

22   She went on to indicate that in the second test,
23   2020, Ms. Torjusen had some improvement in cognitive
24   function.  No question about that.  That's great.  It
25   wasn't cured.  The brain injury didn't go away, but there

1   was some improvement.  But concomitantly, she noted that

2   in her testing, Emily's test results with regard to the

3   emotional stress she was under, the torment, didn't get

4   better, but was actually worse.  And she explained how and

5   why it was worse, which is why in her second diagnosis in

6   2020, the first diagnosis was major depressive disorder,

7   the second was anxiety disorder, the third was

8   post-traumatic stress disorder, and the fourth was

9   post-concussive disorder.

10          What happened was in 2018 the testing showed more

11  problems early on with the concussion, with the TBI, and

12  then in 2020, it was the emotional component that took

13  priority.  Not that the TBI went away, but the emotional

14  component was so significant that it became the first

15  diagnosis.  You can't ignore that.

16          By parsing out one sentence and ignoring the rest,

17  you can deceive.  We aren't here to deceive you.  Our job

18  is to inform you and provide you with the tools that you

19  need.

20          Let's talk about therapy.  You will be hearing talk

21  about therapy later on.  I asked Dr. Scovel yesterday

22  point blank whether somebody such as Emily Torjusen, 24

23  years old, with TBI, with PTSD, depression and anxiety,

24  whether she is to be criticized in any way, shape, or form

25  for the difficulties that she has had and expressed in

1    going to psychotherapy.  And Dr. Scovel said, "No, not at

2    all.  Not at all.  In fact, that is the norm, particularly

3    with young people, that's the norm.  They generally will

4    go to a few sessions, and then after a while the reminder

5    of what happened, the emotional and psychological impact

6    of going to therapy is greater than the benefits of

7    therapy, and they stop."  And that's exactly what has

8    happened with Emily Torjusen.

9         Why would they suggest to you that she is to be

10   criticized or to be blamed -- I imagine that they will --

11   for not going to therapy?  They do that because they don't

12   want you to focus on what is really important in this

13   case, and that is what has happened to her.  They don't

14   want you to focus on her traumatic brain injury.  They

15   don't want you to focus on her PTSD, her depression or her

16   anxiety.  They don't want to compensate her for what they

17   have done.

18        These are the things that they do not want you to

19   compensate her for: her loss of control, her nightmares,

20   her isolation, her periodic loss of focus and

21   concentration and organization, her dangerous risk-taking,

22   her loss of friends, her alienation from her family, her

23   fear of saying or doing the wrong thing resulting in grief

24   and sadness, her loss of joy, her anxiety, her depression,

25   her indecision, her fear of alienating coworkers or other

1   people whom she volunteers, her uncontrollable fear when

2   she is riding a bus, a train, or a plane, her spontaneous

3   crying, her fear of not finding and keeping a true and

4   lasting love, her fear of not being able to have her own

5   family, her loneliness for the last four and a half years,

6   and for the future that she sees as her fate.

7        They prefer that the brain injury remain hidden, but

8   we showed it to you.  They prefer that the PTSD be ignored

9   by talking about articles on modeling or food or movies.

10  They didn't ask a single question about the horrific

11  event, the day, where they did this to her on

12  December 18th, 2017.  Not one single question about that

13  day.  They want to distract you from why we are really

14  here.

15       You saw the power of that yesterday.  You saw the

16  power of her trauma, her torment yesterday.  But it wasn't

17  just yesterday.  Weekly she experiences it.  Something

18  triggers it, the memory goes back, the emotions come and

19  she relives it.

20       You saw the power of that trauma on an innocent

21  bystander, on Kevin Jeffers, four and a half years later.

22  He wasn't on the train.

23       They tried to suggest to you that Emily is fine

24  because she has gotten good grades and a job and can write

25  well.  Well, we knew that.  That isn't the problem.  The

1    problem is her brain.  The problem is her function.  The

2    problem is her emotional balance.

3        Because she is so smart, the doctors told you that

4    people who have high intelligence are more keenly aware of

5    the effect of brain injury, of dysfunction, executive

6    function, more keenly aware of the emotional consequences

7    of an injury like this.  Because they are more keenly

8    aware of it, it has a greater impact on their emotional

9    being.

10       She is not to be criticized for her intellect, but

11   because of her intellect, her experiences are that much

12   more profound.  As Dr. Scovel explained to you yesterday,

13   because of her age when this happened, it was more

14   impactful than it might have been on somebody who was 20

15   or 30, or in my case 40-plus years older.  But you take

16   your plaintiff as you find her.  You take the victim as

17   you find them.

18       Amtrak did this to a 20-year-old girl whose brain was

19   still forming, whose life was in front of her, and the

20   consequences of that are unique to her.  And that's how it

21   has to be evaluated.

22       She also has the fear, the risk of what happens if

23   she hits her head again.  What happens if she is in

24   another accident and has another brain injury.  The

25   cumulative effect is terrible, is unthinkable.  And she

1   has to be careful in her activities to avoid any situation

2   where she could have another concussion.

3        Intellect, intelligence, the ability to write do not

4   represent a lack of a significant emotional injury or a

5   brain injury.  All we have to do is look at history to

6   know that there have been geniuses who have been

7   horrifically tormented.

8           MR. BONVENTRE:  Objection.

9           THE COURT:  Overruled.

10          MR. PETRU:  Whether it is a Van Gogh or a

11  Hemingway, or a Kurt Cobain --

12          MR. BONVENTRE:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. PETRU:  People can still function well in a

15  particular and narrow area despite having brain injury,

16  despite having the sequelae of PTSD, depression and

17  anxiety.  Do not be fooled that her work ethic and her

18  intellect means that she doesn't have these problems.

19       Your job in this case is to evaluate the evidence, to

20  balance the evidence and apply it to the law.

21       I have three jury instructions I want to talk to you

22  about.  One is called burden of proof.  This is

23  distinct -- those of you who have been on a criminal jury,

24  we talked about this in jury selection -- this is distinct

25  from a criminal case.  In a criminal case, if these are

1   the scales of justice, the party with the burden of proof

2   has to prove their case beyond a reasonable doubt, where

3   the weight of the evidence is so great that there is not

4   even a doubt against it.

5         In a civil case, the burden of proof is called a

6   preponderance of the evidence, which means the scales of

7   justice just have to be more heavily weighed on behalf of

8   the point or the issue that has to be proven than that

9   opposed to it.  So it is not beyond a reasonable doubt.

10  It is just by a preponderance of the evidence.

11        Looking at it another way, in criminal cases if the

12  defense shows a doubt or proves a doubt, that's an out.

13  That's an out for the defendant.

14        In a civil case like this, proving a doubt is not an

15  out.  You don't have to be convinced beyond all doubt of

16  Emily's injuries and the consequences of it that she has

17  or will have.  All you have to be convinced of is it is

18  more probable than not.

19        I submit to you, ladies and gentlemen, they didn't

20  bring one scintilla of evidence, not even the weight of a

21  piece of paper, to tip the scales against the evidence

22  that we brought.  In this case, quite candidly, we have

23  proven Emily's damages beyond a reasonable doubt, but we

24  didn't have to.

25        The task that you will have is to evaluate Emily's

1   damages not just for the last four and a half years but

2   for the next 58 years.  Emily is 24 years old.  And under

3   the jury instruction you have, she has another 58 years to

4   live.  Virtually six decades.

5        So the question is what is a truly fair and

6   reasonable amount which will compensate Emily for all

7   these damages?  We have to look not just at the last four

8   and a half years, but at the next 58 years.  Fifty-eight

9   years, with all due respect looking around this courtroom,

10  I think Emily will be the only one who will be here in 58

11  years.

12       At the age of 20, the world was her oyster.  She was

13  bright, a sophomore year in college, she had specific

14  goals then.  She was going to serve her country in the

15  State Department.  She was going to study Arabic.  She had

16  a goal.  She had dreams.  Eventually, she wanted to get a

17  master's degree.  At some point, she wanted to have a

18  family.  But from what you've seen, what I've seen, she

19  would have balanced family and work.  She would have done

20  it all, but it has been lost.

21       So let's take a look at 58 years, just to make sure

22  we understand the perspective and the enormity of your

23  task.  Fifty-eight years from now, stay with me here, is

24  the year 2080.  2080.  Fifty-eight years ago was 1964.

25  The Civil Rights Act hadn't been passed yet.  The

 1    Beatles -- some people might have heard of the Beatles,

 2    but not many.  There wasn't Spotify, no CDs, no cassette

 3    tapes.  There weren't even eight-track tapes back then.

 4    There were 45s, for those of you who remember 45s.  They

 5    certainly didn't have cellphones, computers, the social

 6    media stuff.  We couldn't have done this technology in the

 7    courtroom.  There was no Vietnam, no Watergate.  It's a

 8    long, long time ago.

 9         One of your tasks is to make sure your verdict

10    survives a long, long time into the future.

11         In evaluating her injuries and her damages, we have

12    to bear in mind that these are injuries that are with her

13    24/7, sometimes just below the surface, sometimes

14    percolating above the surface, sometimes blowing through

15    the surface, but they are there.  They are on a boil.

16    There are no substitutes.  There is no time off.  There is

17    no vacation.  There are no rest days.  There are no

18    holidays.  24/7.

19         Which brings us to the next question at hand:  What

20    is the appropriate compensation for the extensive harms

21    and losses that Emily Torjusen has and will suffer?  You

22    have an instruction on that.  It is your Instruction 16.

23    I am going to highlight the middle, but remind you that

24    you have to be convinced that the evidence supports this,

25    more probable than not.  It's our burden.

1        But what you are to do is evaluate the disability and

2   the loss of enjoyment of life experienced by Emily in the

3   past and with a reasonable probability will be experienced

4   in the future.

5        I asked each and every witness who testified, the

6   doctors, whether their opinions are based on a reasonable

7   degree of medical, scientific, psychological probability,

8   and they are.

9        You are to evaluate the mental, physical, and

10  emotional pain and suffering experienced by Emily Torjusen

11  in the past, and with reasonable probability will be

12  experienced in the future.

13       Let's break it down.  Easy part.  She had a broken

14  clavicle.  It has healed.  It gives her occasional

15  soreness.  It was quite problematic at first after the

16  crash and for the next few months, particularly the first

17  quarter when she went back to UW.  She needs to be

18  appropriately compensated for that.  Whatever you think is

19  fair, we will accept.

20       The two major areas of injury however, the PTSD, the

21  TBI, need to be broken down both in the past and the

22  future.  So there are really four things: brain injury in

23  the past, brain injury in the future, PTSD, anxiety;

24  depression in the past, PTSD, anxiety and depression in

25  the future.

1        Let's look at the TBI first.  Emily was knocked out

2    by a blow to her head when her train car left the track at

3    78 miles an hour.  The blow resulted in damage to her

4    brain.  The damage is captured on the DTI and has been

5    revealed in Dr. Scovel's testing, both in 2018 and again

6    in 2020.

7        In 2020, Dr. Scovel opined that there are residual

8    elements of slower mental processing, mild problems with

9    visuospatial relationships that may exist and remain.  She

10   also shared with you the one area of attention and

11   concentration where Emily suffers, as well as -- I think I

12   mentioned the processing already.

13       Dr. Scovel shared with you that there has been

14   improvement in some areas two and a half years after the

15   incident, but she still has problems associated with how

16   she does things, essentially.  That's the executive

17   function problems, the attention and concentration

18   problems, getting started, getting organized.  Once she is

19   able to get over those hurdles, once she pushes herself

20   past it, she can write.  She can do those intellectual

21   things she is so good at, but it is that much harder for

22   her to get to it.

23       You -- these are what we call noneconomic damages.

24   This whole case is noneconomic damages.  There is not an

25   economist who can come in and testify as to the reasonable

1  value of PTSD, anxiety or depression.  There is not a

2  formula or matrix to look up.  These are noneconomic

3  because there is not a quantifiable number that is

4  assigned to it.  The verdict which you reach has to be

5  reached by your own evaluation of the evidence,

6  understanding the nature and the severity of the harms,

7  the duration of the harms and, most importantly, how it

8  affects Emily Torjusen.  Those are the things that you

9  have to look at.

10      You may disagree, but we believe for the last four

11  and a half years, for the brain injury that Emily

12  suffered, an amount of $2 million would be fair to balance

13  out that harm.

14      That specifically addresses issues of focus.  She has

15  had to take Concerta just to get through school, her

16  attention and concentration problems, the anger and the

17  outbursts associated with her brain injury.

18      Insofar as the loss of friends and relationships is

19  controlled by the brain injury, that would be included as

20  well, but that also is a ramification of the PTSD, the

21  depression and the anxiety.  There is a little crossover.

22      As for the amount of money that would fully and

23  reasonably compensate Emily for the next six decades, the

24  next 58 years for the brain injury, we believe that

25  $5 million would be a fair and reasonable amount to

1   compensate her for the next 50 years of going through life

2   with a brain injury, which is still there and, based on

3   the testimony, will be there with her forever.

4        Which brings us to the PTSD, the emotional side of

5   this.  The appropriate amount we believe that would fully

6   and fairly compensate Emily for the incredible emotional

7   pain and suffering that she has suffered and will suffer,

8   we believe that $4 million is appropriate for the last

9   four and a half years, and $10 million is appropriate for

10  the next 58 years.

11       Let me break that down.  I know it is a lot of money,

12  but there is a reason for it, because there is a lot of

13  harm.  First of all, the moment of the crash itself,

14  December 17th, 2018, Emily was sitting by a window in a

15  train, one of her favorite things to do in her entire

16  life.  Her friend Hanna shook her, shook her shoulder.

17  Emily looked up.  She saw a train violently shaking.  She

18  saw the rubber between the cars moving incorrectly,

19  wrongly.  She saw a shiny metal object coming at her.  And

20  then she woke up with her face in the dirt.  She was

21  thinking that she lost her legs, thinking that she would

22  die, thinking that Hanna's dead body was lying on top of

23  her legs pinning her.  She found herself crying to God,

24  screaming, screaming the Lord's prayer over and over, not

25  knowing if she would see her family again, not knowing if

```
 1    she would walk again, not knowing if she would live.

 2         That trauma, that trauma for a 20-year-old girl in

 3    and of itself needs to be fully, completely and adequately

 4    accounted for in your verdict.  We think that that trauma

 5    in and of itself has a balance, has a value of $2 million

 6    for her.

 7         However, that experience repeats itself constantly.

 8    How do you account -- as a jury, how do you account for

 9    the fact that that trauma keeps repeating?  Do you count

10    the number of days?  Do you count the number of weeks?  Do

11    you calculate the number of times that she finds herself

12    on a bus crying?  Does she find -- do you calculate how

13    much time she spent on an airplane knowing that that plane

14    can crash, listening to music so she doesn't think about

15    it if she can help herself, knowing that she is unsafe?

16    Each time she is on a bus that hits a pothole, it takes

17    her back.  Each time she goes through a tunnel, it takes

18    her back.  Each time she sees a news report about an

19    Amtrak crash or a plane crash or another transportation

20    crash, it takes her back, each time she is retraumatized

21    and has been for the last four and a half years.

22         In addition to that, what is the value of friendship?

23    Friends are cherished.  Friends give us enormous value.

24    Taking a friend away is a loss of that value.  You

25    calculate the value for each one of her friends, her
```

 1   childhood friends who she has cut off, or they have cut

 2   her off because of her behavior.  And if so, how much do

 3   you value each lost friendship.

 4       Sadly, she has alienated and has been alienated from

 5   her father and her sister.  That's a loss.  How do you

 6   compensate somebody for a loss like that?  I'm not sure

 7   how you do.  But I know one thing, that your oath as

 8   jurors requires you to determine an appropriate

 9   compensation for each one of those losses.  Not to do it,

10   sadly, is not to do justice.  So you have to figure out a

11   way to calculate that.

12       Do you look at her lost dream of serving the country

13   in the State Department?  Sure you do.  How do you

14   evaluate it?  But you must.  What is the cost of knowing

15   that your plan of eventually starting a family is a lost

16   dream?  Not a plan, but a lost dream.  The fear of not

17   being able to make close friends now, not get too close to

18   people because you know that people can't work out or

19   won't work out or there will be a problem.  Her fear and

20   concern about keeping a loving relationship.  She is in a

21   relationship now, but you saw her, there is a lot of

22   trepidation and fear about that, going through life

23   knowing that you may and probably will, based on your own

24   understanding of yourself, lose those relationships is a

25   factor that you have to consider and account for in your

verdict.

Those are only some of the losses that Emily has suffered and continues to suffer.

What's the cost of knowing that those around you are constantly walking on eggshells?  What's the emotional expense of avoiding situations just because you do not trust your own instincts and your own reactions, so you control and try to control or govern yourself or take yourself out of situations because you know that you can't control your own reactions?

All of these things comprise and make up the mental, the physical, the emotional pain and suffering that Emily has experienced in the past, and with reasonable probability will experience in the future.

For the past, the last four and a half years, in addition to the $2 million for what they did to her on that day, what she experienced on that day, we believe another $2 million would be fair compensation for the last four and a half years.

The next 58 years, all of these factors continue to invade and impact and affect Emily Torjusen.  The only evidence you have heard -- the only evidence that you have heard concludes that those factors will continue to impact Emily for the next 58 years, to the year 2080.

Justice requires that you compensate her and you know

 1   that when you leave the jury room, she will be compensated

 2   not just in 2022, but she will be appropriately

 3   compensated in 2030, in 2035, 2040, in 2060, 2070, and

 4   2080.  It's a large number because it is a huge amount of

 5   time.  And it is a huge amount of permanent damage.

 6        Merely because these types of harms are difficult to

 7   calculate does not mean that they must not be calculated.

 8   In fact, because they are difficult to calculate, we have

 9   you.

10        I want you to listen very carefully to the

11   defendant's arguments when they get up here.  They will

12   say "this is too much."  They will say "be fair and

13   reasonable."  They will say "use your common sense."  They

14   will say that "we threw up a large number because we only

15   want a fraction of it."  None of that is true.  We looked

16   at all of these factors for Emily and tried to figure out

17   what it means for her for the next 58 years, and the last

18   four and a half years.

19        Listen to them and see whether or not they break down

20   each one of these categories and give you a correct and

21   accurate assessment of the impact that it had on Emily,

22   and a correspondingly correct and reasonable number for

23   each of those impacts on her.  See if they value in

24   dollars and cents the loss of a friend, the loss of a

25   dream, the loss of the ability to control, the value of a

1  nightmare, the value of a flashback, how that has impacted

2  her, her chosen isolation from her friends and family in

3  Cairo because it is too much to bear here.

4      Let's look at this from the other side. This was a

5  horrific train wreck. Amtrak, as I said at the beginning,

6  had an enormous amount of damage to its tracks, its

7  bridge, its railcars, its baggage car and its engines. In

8  addition, the track was shut down. It lost considerable

9  revenue.

10      If this wreck was not Amtrak's fault, Amtrak did

11  nothing wrong, but rather was the responsibility of some

12  third party, somebody drove into the bridge and broke the

13  bridge and the train careened off and all these people

14  were hurt, including Emily, and they lost all their

15  equipment, Amtrak would have every right to come into this

16  courtroom, but rather than sit at this desk, but sit at

17  this desk on behalf of Amtrak and ask a jury like you to

18  make Amtrak whole, to make sure that Amtrak got

19  compensated for every penny of their twisted rail, broken

20  track, damaged cars, broken bridge, lost engines, lost

21  revenue. And if whoever was sitting at that table didn't

22  want to pay it, they have every right to come to a jury to

23  do it and take it to court. I will be the first person to

24  stand up and say that is their right. Good for them.

25  That's their right. That's our system of justice. Every

1    penny that is lost requires a penny of compensation.

2         The problem -- the problem here is that it is not

3    easy to calculate penny for penny.  It is not easy to

4    calculate damage to the psyche, damage to friendships,

5    damage to your soul.  It is not easy to do.

6         But unlike the Bible, where you take an eye for an

7    eye, Amtrak doesn't have a psyche or a soul that could be

8    equally damaged to Emily.

9              MR. BONVENTRE:  Objection.

10             MR. PETRU:  Nobody does.  Amtrak is a person in

11   this.  I am not saying that because they are a

12   corporation.  If it was a person who did this to Emily, we

13   wouldn't go and destroy them emotionally and

14   psychologically.  That's not what American justice does.

15   American justice says:  Look at the harms.  The greater

16   the harm, the greater amount of compensation that is

17   necessary to balance that out.

18        Just because Emily's damage is to her psyche, to her

19   brain, not to her pocketbook, doesn't mean that you will

20   discount one penny of her damage, and that's going to be a

21   hard ask.  But we are going to ask you to do it.

22        You're here to evaluate what this wreck did to

23   Emily Torjusen.  Some of you might think, how would you

24   have reacted, how would this have impacted you.  That is

25   not the standard.  You are not to put yourself into

1   Emily's place.  The standard is to understand Emily and
2   understand the effect and the impact that this had on that
3   20-year-old girl.

4       Emily has worked exceptionally hard to stay on the
5   horse or to get back on the horse.  She worked her butt
6   off in school.  Her grades show it.  She worked hard at
7   volunteering, hard at keeping busy, hard at finding a
8   landing spot.  But in the wake of all that work, she still
9   has brain damage, she still has the emotional sequelae of
10  PTSD, anxiety and depression.

11      What she has done is struggled, struggled to stay as
12  close to where she could possibly be to maximize her
13  residual abilities as best as she can.  Don't criticize
14  her for that.  Don't let the deception, the deceit, the
15  distortion substitute what she has been able to accomplish
16  for what she has lost.

17      We are not asking you to compensate her for what she
18  has done.  We are asking you to compensate her for what
19  she has lost and for how hard she has had to work to get
20  to what she has done.

21      All of the doctors told you that her grades, her job
22  and her travel do not conflict, do not contradict and do
23  not undermine the diagnoses.  Don't let them fool you by
24  suggesting that because she can travel and has traveled,
25  even though it is so hard for her, that the damages aren't

1    as severe as the doctors have prescribed.  If that was the

2    case, they could have brought in a witness to say so, an

3    expert.  They didn't.

4         I want to show you one last exhibit, if I can find

5    it.  What we are talking about here is a whole person.

6    And we are made up of so many different components:

7    thoughts, emotions, strengths, weaknesses, friends, love.

8    In the middle on this diagram we used with Dr. Crossen, we

9    have our physical condition, we have our cognitive

10   abilities, and we have our emotional state.  As

11   Dr. Crossen explained to you, when you have damage in

12   these areas, particularly in multiple areas -- and here

13   although the physical is not significant at this point,

14   the emotional and the cognitive is very significant, that

15   damage in those areas affects everything else in your

16   life: recreational, social, work, self-image and meaning,

17   self-image and meaning.

18        Emily is the victim of a badly distorted

19   psychological and emotional state, cognitive state, which

20   has affected and will continue to affect every aspect of

21   her being.

22        Ladies and gentlemen, I will have an opportunity to

23   respond to counsel's arguments on behalf of Amtrak.

24   Please listen to his argument and see whether they

25   accurately make an attempt, even an attempt, to include

1    each of the aspects of Emily's harm in detail that I

2    discussed, or rather just say it is too much, be fair and

3    reasonable, give us a discount.  Thank you.

4              THE COURT:  We are going to take a ten-minute

5    recess here to give everyone a chance to stretch and take

6    a break.  Be back in ten minutes.  Please do not discuss

7    the case.

8         (At this time, the jury exited the courtroom.)

9              THE COURT:  Mr. Petru, you used most of your hour

10   and 15 minutes.  I certainly will give you rebuttal.  Try

11   to keep it reasonably terse.

12             MR. PETRU:  I will, your Honor.  I appreciate the

13   latitude.

14             MR. BONVENTRE:  Can I be heard briefly, Judge?

15             THE COURT:  All right.

16             MR. BONVENTRE:  I would move for a mistrial, your

17   Honor.  I repeatedly had personal attacks, despite the

18   fact that there were motions filed by both parties:  No

19   personal attacks.  I made initial objections.  Despite

20   that, the Court allowed plaintiff's counsel to continue to

21   make direct attacks: deceitful, deceiving.  I am moving

22   for a mistrial.  It was inflammatory.  It was unfair.  It

23   was extraordinarily unprofessional and it violated the

24   Court's own order.

25             THE COURT:  You did make one objection.  If you

1    had made more, the Court would have intervened there and

2    not drawn attention to it.  I did -- use of the word

3    "deception" is not the best way to approach this.  But I

4    am certainly not going to grant your motion for a mistrial

5    here.  I'm sure that Mr. Petru has taken offense at some

6    of the ways in which maybe you have violated the order by

7    impugning the law firm and the way in which this case

8    proceeded in employing experts and so forth.  That motion

9    is going to be denied.  But in the rebuttal I don't think

10   "deception" -- of course, what's the difference between

11   "deception" and "distortion"?  I just think you can avoid

12   using the term.

13          MR. PETRU:  I will, your Honor.

14          THE COURT:  We will be in recess.

15       (Recessed.)

16          THE COURT:  Before we bring the jury in,

17   Mr. Petru, I am concerned about the word "deceiving."

18   That is impugning the character of opposing counsel here.

19   I think it would be appropriate -- it is your choice.  It

20   would be appropriate for you in your rebuttal to say:  By

21   using the word to "deceive," I did not mean to impugn the

22   character of counsel.

23          MR. PETRU:  And I didn't, your Honor.  I will do

24   that.  I will do that.

25          THE COURT:  All right.

1              (The following occurred in the presence of the jury.)

2              THE COURT:  All right.  Everyone, please be

3    seated.  Mr. Bonventre.

4              MR. BONVENTRE:  Thank you, your Honor.  Good

5    afternoon, ladies and gentlemen.  Wow, so much for fair

6    and reasonable.

7              There was a statement that I am going to come up here

8    and use a, quote, buzzword: "fair and reasonable."  That

9    is a buzzword.  It also happens to be the law:  Fair and

10   reasonable.  That's the law: fair and reasonable.  It is

11   not a buzzword.  It's not something that a defense lawyer

12   uses to distract.  It is the law.

13             Your obligation, and you have it right in front of

14   you, some of you have it on your laps in the charge, is

15   fair and reasonable.  And the numbers that you heard are

16   neither fair, they are not reasonable, they are absurd.  A

17   fraction of that is absurd.

18             So now I'm going to spend time -- actually, oh, I

19   don't know, talking about the evidence in the case.

20   There's an idea.  Instead of attacking counsel, I am

21   actually going to talk about the evidence in the case.  I

22   am actually going to talk about Emily's life, and what

23   Emily is doing.  That's what I'm going to talk about: the

24   evidence.  I'm going to talk about Emily's life, because

25   that's what we are here to talk about.  Emily's life, the

1   reality of Emily's life.

2       So I'm not going to waste an hour attacking my

3   adversary or my co-counsel there.  I am going to talk

4   about the evidence in the case, and I am going to base it

5   upon the evidence in the case dispassionately,

6   objectively.  That's what we are here to talk about.

7       So first let me thank all of you very, very much.  I

8   also would like to thank the Court for putting up with me,

9   and I would like to thank all of you, and particularly

10  Barry for putting up with me.  It is very difficult, I

11  know, for Barry to follow me with his transcriber there.

12      I want to thank the Court, I want to thank Barry, I

13  want to thank my co-counsel and my adversary but, most of

14  all, I want to thank all of you.  I want to thank you for

15  the past week, I guess it is -- yeah, four days.  I'm

16  sorry.  Being with me feels like a week, I'm sure.  But it

17  has been the past four days.  I want to thank all of you

18  for your time and attention that you were clearly giving

19  this case.  I hope in my vigorous cross-examination of

20  certain witnesses, I hope, I hope, certainly that was my

21  goal, was not to offend you or the witness, for that

22  matter.  But I hope we found some kernels of truth on

23  cross-examination, even maybe more so on direct

24  examination when a lawyer is asking a witness that has

25  been prepared by them.  Cross-examination, respectfully,

1    in my opinion, is just a really fundamental way to

2    understand what the truth is.  And that's your job, to

3    interpret and decide what the truth is and give an award

4    that is fair and reasonable and not absurd.

5         So let's talk about the evidence.  I want to talk

6    about reality, the actual reality.  I don't want to

7    compare words versus deeds, words versus actions, words

8    versus the actual reality of what occurred after this

9    train accident.

10         So let's talk about reality, if we can for a moment.

11   Before I say that, let me make it clear, as I said in

12   opening, Emily should be compensated.  This was a horrific

13   accident.  It shouldn't have happened.  It should never

14   have happened to anyone.  It shouldn't have happened to

15   Emily.  And she should be compensated, period, end of

16   statement.  Her compensation should be fair and

17   reasonable.  Not a penny less, and not a penny more.  Fair

18   and reasonable.  And that's going to be up to you to

19   decide what is fair and what is reasonable. And, of

20   course, it is based on the evidence in the case.

21         And I want to talk about what actually occurred, what

22   the objective evidence shows about what occurred, what

23   Emily's injuries are, and what her current position in

24   life is, because we heard a lot of things.  The

25   description we heard was basically someone who is locked

1    up in a room without windows and not living any life at

2    all.  And frankly, folks, that is just not accurate.  I

3    believe this morning -- I hope I was able to present

4    through cross-examination an accurate picture of exactly

5    what Emily's current life is, and what it has been for the

6    past four and a half years.  It's not distraction, it's

7    not distortion, it's reality.

8         So let's talk about reality, if you wouldn't mind,

9    for a couple of minutes.

10        The reality is that Emily was injured.  And those

11   injuries were the clavicle injury; healed.  There was

12   complaints about the shoulder; healed.  There was a scar

13   or lacerations, I apologize, that had three stitches;

14   healed.  There was something about a lung contusion, which

15   healed before she even left the hospital.  There was a

16   concussion, which she absolutely, positively suffered a

17   concussion.  Amtrak does not need to hire a doctor for

18   $20,000 to tell you that Emily suffered a concussion.  Of

19   course she did.  She suffered a concussion.  And for a

20   duration after that she had post-concussive syndrome and,

21   frankly, has made a very remarkable recovery.  And we are

22   going to talk about the evidence that demonstrates that.

23   And she also suffered from either anxiety or depression or

24   post-traumatic stress disorder, whatever you want to call

25   it.  There is absolutely, of course, an emotional

1    component to Emily's injury.  Of course there is.

2         This was a horrible accident she went through, and of

3    course there was an emotional component to her injury.

4    And she should be compensated for that and for all the

5    other injuries.

6         So let's talk about reality.  So after the incident,

7    Emily is taken to the hospital.  And she is in the

8    hospital until the 20th.  So she is in the hospital for a

9    couple of days.  And as the witnesses indicated, the

10   hospital records indicated that her symptoms were

11   improving.  Just a fact.  That's reality.

12        And in the hospital records, it was indicated that

13   the post-concussive syndrome could last weeks to months.

14   That's just the reality.

15        So she goes home with her family, with her mom, and

16   her dad, and then she sees Dr. Spohr.  She sees Dr. Spohr

17   within a couple of days, I believe the 22nd of December.

18   So three or four days after the incident she sees

19   Dr. Spohr.

20        And Dr. Spohr does an examination, and Dr. Spohr --

21   Emily tells Dr. Spohr that she wants to go back to school.

22   So Emily goes back to school with a note from the doctor

23   to give her more time.  She goes back to school within two

24   weeks of the incident.  Let me repeat:  She goes back to

25   the University of Washington, and extraordinary school,

1    and two weeks after the accident she is back at the

2    University of Washington.  She is back taking very

3    complex, serious courses, and she is making the dean's

4    list.  So let me just repeat:  Within a few weeks of this

5    incident, she is back in college getting extraordinary

6    grades.

7         Let me just make this clear.  Emily is an

8    extraordinary individual, clearly.  She is obviously very

9    intelligent.  She is extremely articulate.  She is

10   obviously very driven.  She obviously has a plan.  And she

11   is a very hardworking, driven individual, and her

12   accomplishments since this incident in the past four years

13   have been nothing short of extraordinary.

14        I'm sure her parents are and should be very, very

15   proud of her.  What she has accomplished is extraordinary.

16   What she has accomplished is also the reality of the

17   world.  This is Emily.  And she has been able to

18   accomplish all of these things.  And when you go back and

19   deliberate, ladies and gentlemen, we need to actually deal

20   in reality, what actually is the life that Emily is

21   leading.

22        So within two weeks, she is back at college at the

23   University of Washington.  That semester, the first full

24   semester after this incident, Emily earns a GPA of 3.5 --

25   3.53 actually.  And she takes classes like Arabic and

1    other classes which are way above my pay grade.  And she

2    does extraordinarily well and makes the dean's list.  That

3    is highly relevant as to the level of symptoms she was

4    having when she was back in school just a few weeks after

5    this incident.

6         Now, does that mean she had no symptoms, was having

7    no symptoms of the post-concussive, she wasn't having any

8    emotional -- of course she was.  She had just gone through

9    something that was horrible.  Of course she was having

10   symptoms.  Of course she was.  But we have to look at the

11   context.  We have to look at everything.  And what it

12   tells us is, despite the symptoms, she was able to get a

13   3.53.

14        This is also very interesting, and I don't want this

15   to be misinterpreted by you folks on the jury.

16   Ms. Torjusen clearly loves her daughter, clearly is proud

17   of her daughter.  So this is not a criticism of

18   Ms. Torjusen, what I'm about to say.

19        The plaintiff goes back to school in January.

20   Ms. Torjusen does not see her until three months later on

21   spring break in March.  She doesn't go visit her.  Again,

22   this is not a criticism.  But any of us who are parents

23   know we are always worried about our kids.  We are worried

24   about them if they sneeze much less if they are involved

25   in an accident and have a concussion.  Three months go by,

1  she does not visit her.  Does it that mean she is a bad

2  mother?  No.  Just the opposite.  I am sure she is a

3  wonderful mother.

4      What does it tell you about the perception of how

5  serious the condition is, if your child was in this

6  incident, had a concussion and went away to school, just a

7  couple of hours away and you didn't visit her for three

8  months?  Again, that is not to criticize her at all.

9  Please, it is just the opposite.  It is an indication of

10  what the family thought and what Ms. Torjusen -- Emily

11  thought, excuse me, was going on.  Please understand when

12  I'm saying that.  This is reality.

13      So Emily sees Dr. Spohr on the 22nd, goes back to

14  school.  She does not see a medical doctor until seven and

15  a half months later.  Let me repeat:  She sees Dr. Spohr

16  on December 22nd.  The next doctor that she sees, other

17  than perhaps -- the next doctor that she sees, that's

18  correct, is Dr. Spohr seven and a half months after the

19  incident.

20      We have to use common sense.  Common sense was sort

21  of made fun of on counsel's summation.  Please use your

22  common sense.  Please use your everyday common sense.

23      There is a visit to the doctor on the 22nd of

24  December, and not another visit to the doctor for seven

25  and a half months.  What does common sense tell you about

1   what that means about the symptoms Emily was having or not

2   having?  Common sense tells us that if the symptoms were

3   that bad, Emily would have seen a doctor more than

4   seven -- quicker than seven and a half months later.

5        There is very little treatment in this case, folks.

6        Anyway, seven and a half months later, Emily is back

7   at the doctor.  The reason she is there is for a checkup,

8   because now seven months after the accident, seven months

9   after she was in the hospital for a couple of days, Emily

10  is going to do a term abroad in a foreign country in

11  France.  Within seven -- within seven months of the

12  accident, she is going to France by herself, whether it is

13  a term abroad or exchange student, I forget.

14       What does that tell you about how -- the severity of

15  the symptoms?  If seven and a half months later she goes

16  to the doctor, the -- I asked Dr. Spohr specifically -- by

17  the way, I didn't criticize Dr. Spohr at all.  Dr. Spohr

18  is a terrific doctor.  Absolutely 100 percent.  Dr. Spohr

19  is a terrific doctor who cares about her patient.

20       Seven and a half months later, Dr. Spohr is told that

21  Emily is going to France.  Dr. Spohr doesn't object.

22  Dr. Spohr doesn't say:  Your symptoms are too severe, you

23  shouldn't go to a foreign country.  Dr. Spohr doesn't say:

24  You know, you may not be able to take medication, you

25  shouldn't go.

1           She goes with Dr. Spohr's blessing.  Again, common

2   sense and reality.  What does that tell you about the

3   severity of the symptoms when she saw Dr. Spohr seven and

4   a half months later and before she went to France?

5           And, by the way, seven and a half months later when

6   she saw Dr. Spohr, Dr. Spohr tells us that the plaintiff

7   is not complaining of lightheadedness.  The plaintiff is

8   not complaining of dizziness.  The plaintiff is not

9   complaining of balance problems.  The plaintiff -- Emily

10  does not have depressive symptoms.  And her headaches are,

11  quote, infrequent.  Those are the facts.  And that is what

12  Dr. Spohr testified to seven and a half months after this

13  incident: no lightheadedness, no dizziness, no balance

14  problems, no depressive symptoms, and infrequent

15  headaches.

16          Now, my recollection of the testimony does not

17  control.  Yours controls.  Your testimony -- your

18  recollection of the testimony controls.  But that was the

19  testimony, folks.  That was the status of Emily's

20  post-concussive syndrome.

21          It was at this visit that Emily tells Dr. Spohr that

22  her attorneys would like her, Emily, to go to California

23  to get this DTI test.  Dr. Spohr did not order the DTI.

24  Dr. Spohr testified that she would never have ordered the

25  DTI.  Dr. Spohr testified that she didn't get the DTI for

1    two and a half years.

2         The point about the DTI is, according to Dr. Spohr,

3    it had literally nothing to do with her treatment of

4    Emily.  Nothing.  She didn't get it for two and a half

5    years.  She was never sent it.  It was sent to the

6    lawyers, not to the treating doctor.  Ask yourself what

7    does that tell you about the value of the DTI?  There is

8    no contesting that Emily had a concussion.

9         And by the way, speaking of the DTI, we are told by

10   Dr. Filler, who apparently is barely making ends meet at

11   15, $20,000 a clip, and his company is barely making a

12   profit even though it is making millions and millions of

13   dollars, Dr. Filler tells us you can take another DTI to

14   show the progress and the improvement.  That is never

15   done.

16         What we do know is when Dr. Scovel sees Emily in 2020

17   she says, and I quote, that the improvement was, quote,

18   her words, not mine, "significant."  Not "there was some

19   improvement," "The improvement was significant."

20         In any event, so Emily goes off to France, and she is

21   staying in apparently a very beautiful place in the south

22   of France.  And good for her.  Isn't that terrific that

23   she is doing a term abroad in France and Europe?  Isn't

24   that fantastic?  I'm sure she earned it and good for her.

25   That's terrific.

1   What does she do while she is in the south of France?

2   She does not, as was implied, stay in a room and do

3   nothing and not talk to anybody.  What is she actually

4   doing?  What is the reality of the situation?  The reality

5   of the situation is she is taking long walks, and

6   extraordinarily long walks apparently, to go to Monte

7   Carlo because she loves coffee and she loves Starbucks.

8   She walks along the beach.  Good for her.  That's

9   terrific.  She gets groceries in Italy because they are

10  cheaper than they are in the French Riviera.  She walks

11  and sometimes takes trains.

12   She also goes on multiple trips, multiple trips.

13  And, again, this is not a criticism.  That's why she is

14  there.  She is there to learn.  She is there to travel.

15  She is there to see Europe.  She is there to see other

16  countries.

17   So what does she do?  She does exactly actually that.

18  She does what any other 20-year-old would do when they are

19  in France, she goes traveling.  She goes to London a few

20  times.  She goes to, I believe, Germany.  She goes to

21  Paris once or twice.  She goes to Italy apparently for

22  shopping.  Apparently, she didn't stop in Italy.

23  Actually, I believe -- and I may be a little confused,

24  because there was a lot of traveling, ladies and

25  gentlemen -- I believe she goes to Bosnia.  And I don't

1    know if that was the first time or the second time.  Back

2    up.  I believe she goes to Bosnia and Croatia.  Good for

3    her.  That's terrific.  And she actually goes to Cairo for

4    three weeks.

5           And a lot this traveling is not alone, but with

6    friends, friends that she had made elsewhere, friends that

7    she had made on this term abroad in France.  There was a

8    comment by someone about inhibition of experiences.  I ask

9    all of you when you are deliberating to think about this.

10   How many 20-year-old -- 24-year-olds do you know just in

11   the four years since this incident, how many 24-year-olds

12   that you know have had the vastness of the experiences

13   that Emily has had?  And I dare suspect you don't know a

14   single 24-year-old, or very few, that have the vastness of

15   experiences that Emily has had since this incident.

16          And she travels by trains.  Let's talk about trains.

17   Are there times when Emily is on a train or a bus that her

18   emotions or her anxiety kicks in?  Of course it does.  Of

19   course it does.  She is on a train and it is shaking.  You

20   bet she is anxious.  Of course she is.  But, folks, she is

21   taking a lot of trains.

22          And we heard a lot of about PTSD and avoidance,

23   avoidance of things that would make you remember the

24   incident, the Amtrak train wreck.  Emily is taking a lot

25   of trains.  She is taking a lot of public transportation,

1   and she has for the past four years.

2        And we are going to hear, well, that is the only

3   method of transport.  Well, Emily, who is an incredibly

4   intelligent, insightful individual, Emily went to France,

5   Emily went to Cairo, Emily chose to go to these various

6   countries, chose to ride the bus, chose to ride trains.

7        In any event, she is doing a lot of things when she

8   is in France.  Again, this is all less than one year after

9   the incident.  She is in France, and she is traveling all

10  over Europe and Eastern Europe.  Terrific.  That is

11  terrific.  But that is part of the reality.  Not the words

12  or the allegations or the complaints.  That's the reality,

13  ladies and gentlemen.

14       So then next Emily decides to go to Cairo for four

15  months.  And Emily apparently has this passion or love for

16  Egypt or all things Arabic, or the language and the

17  civilization.  And she has an interest and a passion.

18  That is wonderful.  What is she doing?  She is pursuing

19  that interest and that passion.

20       So she goes to Cairo where she has been for three

21  weeks while she was in France.  She goes to Cairo, which I

22  think Emily said and would agree is a slightly more

23  chaotic city, I think, than the south of France or than

24  Paris.  She goes to Cairo and she spends four months in

25  Cairo with a family -- with a family she doesn't know, and

1   she goes to Cairo and she learns about Cairo, and she

2   writes about Cairo.  And she takes trains in Cairo.

3        So at some point -- at some point Emily is seen by

4   Dr. Crossen, the psychologist, who you saw testify.

5   Dr. Crossen was referred by attorneys.  And the point of

6   that is:  When Dr. Crossen sees Emily, he already knows

7   there are lawyers and a lawsuit involved.  That's why that

8   is important.

9        So Dr. Crossen does his testing, and Dr. Crossen

10  says, under oath and in his report, that he is hopeful

11  that she will have a continuance -- "continued resolution

12  of her symptoms with therapy."  That's what he said.

13  That's a fact.  That's the reality.

14       He then sees her for either -- five visits I think it

15  is.  I think it is done remotely, and Emily is in France

16  at the time.  And what else do we learn about that --

17  about Dr. Crossen?  In addition, he says he is

18  "optimistic."  His words, not mine.  Not some lawyer

19  trying to deceive or distract.  His words were he was

20  "optimistic she would continue to have a resolution of

21  symptoms."

22       What else do we hear from Dr. Crossen on direct --

23  redirect examination?  So Dr. Crossen tells us this very,

24  very powerful, meaningful, significant story that happened

25  with Emily.  And Emily, because one of the things that is

```
1    claimed is that Emily is irritable now, and she curses and
2    she does things she never ever did before this accident.
3    So we are told about this very -- this vivid memory that
4    Emily was telling Dr. Crossen about when there was a
5    problem in school, and the teacher -- and the teacher was
6    mean to her, and Emily cursed at her and Emily ran out
7    and this was proof that there was still a problem.
8    Dr. Crossen's words, not mine.
9         Just one problem.  Just one problem with that story.
10   That happened before the accident on the Amtrak train.
11   Now, we weren't told that until I got a chance to
12   cross-examine the doctor again.  So on redirect you are
13   told about this powerful, important story you have to
14   remember, how after this accident she snapped at the
15   teacher, she cursed, she left.  Except, guess what, folks?
16   It happened before the train accident ever occurred.  And
17   you didn't find out about that until cross-examination.
18        The plaintiff sees -- at some point the plaintiff
19   sees Dr. Spohr again.  So after Emily is in Cairo and
20   France she final -- she eventually comes back to the
21   United States and she sees Dr. Spohr again.  So she has
22   seen Dr. Spohr on December 22nd, 2017.  She sees Dr. Spohr
23   seven and a half months later before she goes to France.
24   And now she sees Dr. Spohr on September 23rd of 2019.  So
25   we are nearly two years -- almost two years after the
```

1    incident, after the terrible accident.

2        Emily has seen her treating physician a grand total

3    of three times in two years since the accident.  Now, we

4    keep hearing about, well, people with this condition, they

5    don't like to see doctors, or people with this condition

6    don't like to see therapists, people with this condition

7    blah, blah, blah, blah.

8        Let's use our common sense.  If you have severe

9    symptoms, if you have symptoms you go to the doctor.  You

10   go to the doctor that you have been going to since you

11   were young and a child.  In two years after the accident,

12   Emily saw Dr. Spohr, her doctor, her internist, who she

13   trusted -- rightfully trusted a grand total of three

14   times, and only twice after that initial December visit.

15       And what do we find out when she sees Dr. Spohr?

16   Dr. Spohr's examination is completely, totally normal.

17   And in fact, Dr. Spohr tells us that she continues

18   thereafter, when she sees Emily periodically, she

19   continues to do a physical exam; normal every single time.

20   That's what she said: normal, normal, normal.  And she

21   does what's called a review of systems.  A review of

22   systems she told us was complaints.  And she tells us that

23   virtually every time, other than, quote, "infrequent

24   headaches," unquote, that the review of systems is

25   completely normal.  That's just the reality.  That's the

1    fact.  That's what Dr. Spohr said under oath.

2       What we also know is following that on August 26th,

3    so about nine months later, Dr. Spohr is visited or has a

4    conference call with the lawyers who ask her if she would

5    be willing to testify.  And of course, she says yes.  Of

6    course, she is going to testify on behalf of her patient,

7    who she has known forever.  Of course she is.

8       But here is something that also happens that is very

9    interesting.  A month or two before that, June 20th, the

10   plaintiff sees Dr. Scovel again, I believe the

11   neuropsychologist, or both.  I believe she is both.  And

12   Dr. Scovel tells us -- let me interrupt for a second.  I

13   want to apologize to anyone -- I should apologize to

14   Dr. Scovel.  I think I did.  I want to apologize to anyone

15   who thinks I was rude.  My point was not to be rude with

16   any of the witnesses.  I think I gave everyone the heads

17   up in openings that I was going to vigorously

18   cross-examine people.  I hope I didn't offend anyone by my

19   vigorous cross-examination.  And if I did, you can vote in

20   the back that I'm a jerk.  Please don't hold it against my

21   client.  Please just consider the evidence.  I appreciate

22   that.

23      But in any event, Dr. Scovel tells us that there was,

24   quote, not good improvement, "significant improvement."

25   And she also tells us that "her prognosis was better in

1  2020 than in 2018."  Okay.  That's what she said.

2      And in 2018, she had said she was hopeful for a full

3  recovery.  She hoped that Emily would have a full

4  recovery.  And, again, if Emily got appropriate therapy.

5      Which reminds me of another thing.  Emily hasn't gone

6  for much therapy.  It is not a criticism of Emily.  It's

7  just a fact.  Emily has not gone for much therapy.  She

8  just hasn't.  Again, not a criticism.  It's reality.  It's

9  a fact.  She has gone to a couple of people.  Didn't like

10  one person because of their name one time.  She was the

11  one who discharged herself from Dr. Crossen.  Didn't think

12  Dr. Crossen was helping.  That's just a fact, folks.  It

13  is not a criticism, but it is a reality.  Despite all the

14  doctors recommending that she have treatment, and despite

15  all the doctors saying treatment would allow her to

16  recover, she hasn't gone.  And maybe she just doesn't like

17  to go.  Okay.

18      But here is one interesting thing that came up with

19  the testimony from Mrs. Torjusen.  We find out that, in

20  fact, in high school I believe it was, or junior high, I

21  think it was high school, Emily -- Ms. Torjusen was

22  concerned and wanted Emily to see a therapist.  And Emily

23  did.  And -- I don't know what the issue was, but they

24  thought Emily emotionally needed to see a therapist.  And

25  Emily did.  And she did it twice.  And then Emily stopped

1    seeing the therapist.  And I don't recall exactly what the

2    phrase was Ms. Torjusen used, but it was something to the

3    effect of:  It wasn't her thing.  She didn't think it was

4    helpful.  This is before this accident ever happened.

5    Emily goes to a therapist -- she goes once or twice and

6    discontinues and doesn't like it.  Does that sound

7    familiar to the pattern afterwards?

8         I also have to say this, and I say this with all due

9    respect to Mrs. Torjusen.  The description -- the

10   description was that Emily's relationship with her dad was

11   perfect, was hunky-dory before this incident, and now they

12   are not talking.  And that's unfortunate.  But on

13   questioning -- I'm going to just talk about this, because

14   this is what was the testimony.  That wonderful

15   relationship, the day of the accident, the day of the

16   accident Ms. Torjusen hears it and she does what any

17   parent would do, she hops in the car and she runs -- and

18   she drives as fast as she could to that emergency room,

19   because she loves her daughter, she is worried about her

20   daughter and wants to make sure her daughter is okay, and

21   she wants to be at her daughter's side.  And I said to

22   her, "Did you pick up Mr. Torjusen, Emily's dad?"  And her

23   response was, "No, he had to stay with the property and

24   the horses."

25         Now, folks that does not evince evidence of a good

1   relationship between father and daughter.  And more

2   importantly, Emily, to her absolute credit, when she was

3   on the witness stand this morning, said that she had --

4   that she told Dr. -- I am losing it.  She told one of her

5   neuropsychologists that she had longstanding problems with

6   her dad long before this train accident.

7        Think of that in terms of, you know, we heard a lot

8   about Mr. Bonventre is distorting, Mr. Bonventre is

9   deceiving.  Think about those two things and what that

10  tells you.

11       This is pretty extraordinary.  We have a case in

12  which we are told there is a mild brain injury, and then

13  we are simultaneously told that the fact that the person

14  after that gets extraordinary grades is irrelevant.  I

15  mean, this is unbelievable.  Emily's grades are

16  extraordinary.  And they were extraordinary after the

17  train incident.  They are extraordinary.  I mean, each and

18  every semester or quarter -- it's quarters.  I'm sorry.  I

19  mean, it is in evidence.  I encourage you to take a look

20  at her transcript.  It is an extraordinary transcript from

21  an extraordinary young woman, what she did in college.  It

22  is extraordinary, her grades.  And her grades are 3.8,

23  3.9, 3.7, 3.6.  She continuously makes the dean's list,

24  whether she has a dispensation for an extra hour on her

25  tests or when she doesn't have a dispensation.

1       She is not taking basket weaving.  She is taking real

2   courses when she went to college, real, serious, difficult

3   courses and is getting the grades that she was getting,

4   and she graduates with three majors.  Three majors.  And,

5   again, these are not fluff majors.  These are real serious

6   majors.  That is part of the reality, part of this story.

7       In November, the plaintiff -- Emily goes,

8   November 2021, after not seeing Dr. Crossen for three

9   years, she happens to send him an email, "Can I see you?"

10  And, again, folks, this is the truth and the reality and

11  the facts.

12      She goes to Dr. Crossen not for treatment.  She goes

13  for a quote/unquote evaluation, which he does.  And she,

14  Emily, asks Dr. Crossen to send that report to her lawyer.

15  Not to her doctor, to her lawyer.

16      And by the way, in that report Dr. Crossen indicates,

17  like the last time, he is "optimistic for her recovery.

18  She needs some therapy."  That's what Dr. Crossen just

19  said a couple of months ago.  That's what he just said a

20  couple of days ago on the witness stand.

21      Actually, the last -- the last person -- the last

22  time a physician has seen Emily is -- was in May of 2021.

23  That's seven -- my math is off, but ten months ago.

24  That's the last time she saw a doctor, ten months ago. The

25  last time she actually had therapy I think is even longer

than that.

Again, I ask you to use your common sense in looking at the totality of things.  What does that say about whether symptoms exist or the severity of those symptoms?

I also encourage you to look at Emily's LinkedIn page, whatever we call LinkedIn.  It is unbelievable, the things she does, the things she has done, the things she is doing, and the things she is doing at the same time.

We kept hearing about multitasking.  Take a look, this is in evidence, at Emily's LinkedIn.  I wish I had a LinkedIn one-tenth like this.  This is extraordinary. It's extraordinary in the depth and the breadth of her achievements, of her organizations that she has joined, of her volunteering, of her school achievements, of her articles she has written, all at the same time.  I encourage you to look at this, folks.  It's in evidence.

We are going to hear, well, blah, blah, blah.  Ladies and gentlemen, this tells the picture of what Emily is doing with her life right now, and what she has been doing with her life since the incident on the Amtrak train. It's just reality.  It's Emily's own words.  Please take a look at this.

I was somehow criticized for pointing out that Emily writes a lot of articles.  Some of these articles are on incredibly complex topics, Egypt's role in something in

1    the Middle East, what is going on in Yemen.  I mean, it is

2    really complicated stuff.  And good for her that she is

3    doing this.

4         The reason I raise the -- simultaneous to that she is

5    also doing what we would call -- I don't know if we call

6    it fluff or culture or whatever.  She is doing what a

7    23-year-old or 24-year-old or, frankly, a 60-year-old

8    might do, which is writing articles about movies, and

9    writing articles about food, and writing articles about

10   all those kinds of things.  So she is writing articles

11   about serious things, and she is writing articles about --

12   I don't know if you want to say less serious things.  That

13   is not a criticism.  Just the opposite.  It shows you who

14   Emily is and who she has been since the accident.  It is

15   important.  Remember that testimony.

16        By the way, Emily is -- I want to make sure everyone

17   understands.  This is a terrific, pleasant -- my

18   conversation with her, my questioning of her was very

19   important.  If I can say respectively -- respectfully, I

20   think it is important on what you saw on direct

21   examination of Emily and what you saw was my questioning

22   of Emily.  She was very engaged when I asked her

23   questions.  She was telling a story about her articles,

24   telling a story about her organizations, telling a story

25   about her volunteering.  She was energized.  She was

```
 1    smiling.  That is the fact.  That is the reality.  That
 2    has to be a part -- an important part of what you do when
 3    you go in the back and you deliberate.
 4         But please, ladies and gentlemen, take a look at
 5    this.  This is -- this tells quite a story.  I will go
 6    very quickly over Dr. Filler, if it is even necessary.
 7    Dr. Filler has been in a courtroom more than I think
 8    virtually every lawyer on the planet.  Dr. Filler
 9    testified 600 times, 700 times, whatever it was.
10    Dr. Filler is also a lawyer.  Dr. Filler advertises to
11    lawyers he is available to testify, available to come up
12    with these Hollywood-produced films.  I don't know when he
13    has time to be a doctor.  By the way, just think about the
14    number of times that he is in court.
15         Here is what we do know about Dr. Filler.  His tests
16    that were ordered by the attorneys had nothing to do with
17    Emily's treatment or diagnosis.  That's -- that's not what
18    I said.  That's what Dr. Spohr said.
19         Dr. Crossen.  Dr. Crossen saw Emily for evaluation
20    twice in 2018, in 2021, that's the second time when Emily
21    asked.  Both times he indicated he was "optimistic," his
22    words, not mine, "for resolution or recovery of symptoms
23    if she had therapy."
24         By the way, that is a pretty common theme of all the
25    therapists who testified.  Actually, I think Dr. Spohr
```

1    said that too, that to the extent Emily has ongoing

2    emotional symptoms, she should see a therapist.  And she

3    chooses not to.  I am not criticizing.  I am not being

4    mean.  I am simply repeating what the facts are in this

5    case.

6        I talked to you about Dr. Scovel and the treatment

7    that she provided and how she thought in 2020 -- so she

8    last saw the plaintiff in 2020.  Dr. Scovel said there was

9    significant improvement, which makes sense.  That's what

10   all the doctors said would happen, normally there is

11   improvement.  Even she finds improvement.  She says the

12   improvement is significant.  And she says her prognosis is

13   better in 2020 than in 2018.  And I think she also

14   mentions, to the extent Emily has these symptoms, she

15   should see a therapist so help the symptoms get better and

16   resolve.  It's just a fact.  It's just reality.

17       So in closing, and I am going to sit down now, I ask

18   you when you are deliberating, all I ask you is that you

19   be fair and impartial, that you look at the evidence

20   reasonably and fairly and in its entirety, that you look

21   at the reality of what Emily's life actually is.  Because

22   the discussion that you are going to have is what is the

23   quote/unquote "loss of enjoyment of life" that Emily has

24   had and in her life currently.  Unlike what we have been

25   told, it has been a very active life, an extraordinary

1    life for someone her age, of any age.  I ask that you

2    think about that.

3        I ask that you simply give an award, which is your

4    duty, that is fair and that is reasonable, no more, no

5    less.  And I have absolutely no doubt, ladies and

6    gentlemen, that you will do.

7        I normally don't try to impinge on the function of a

8    jury, which is to give a number or suggest a number.  And

9    it is just a suggestion on my part, which, of course, you

10   should feel free to reject.  But based on the

11   reasonableness of the evidence, based on what Emily is

12   doing now, my suggestion is that you give her a total

13   award -- you can break it down however you want, a total

14   award of $750,000.  $750,000.  I believe that is fair.  I

15   believe that is reasonable.  But more importantly, what

16   you decide is what's going to be fair and reasonable.

17       I want to thank all of you very, very much for your

18   time and attention.  Thank you very much.  And have a good

19   afternoon.

20           THE COURT:  Mr. Petru.

21           MR. PETRU:  First of all, I kind of forewarned

22   you what to expect.  And I think that -- before I talk

23   about the substance of counsel's argument, I want to make

24   sure that each and every one of you understand when I used

25   the word "deceive" earlier, I don't intend and don't

1    impugn the character of counsel.  Not at all.  He is

2    actually a fine guy.  It is not about him.  It is not

3    about me.  It's about Emily.

4        I asked during my closing whether you would hear

5    anything specifically about evaluating the nuances and the

6    detail of Emily's brain injury, the nuances and detail of

7    her PTSD, her anxiety and her depression, whether counsel

8    would analyze the effect it has had on her, the loss of

9    friendships.  Didn't do it.  Just threw out a number.

10   Said $750,000, that's a lot for 62 and a half years, for

11   the torment of what happened, and what has been going on.

12   That's not related to what happened to her.

13       We can talk a lot about Emily's success and her

14   accomplishments.  We did.  Emily talked about it.  The

15   entirety of the cross-examination was about it, completely

16   avoiding the damage that she has suffered, intentionally

17   avoiding the damage that she has suffered.  Your task is

18   to evaluate that damage, to look at the loss of

19   friendships, look at the irritability, the anger

20   outbursts, look at the traumatization that she suffered on

21   December 18th, 2017, and suffers from in her nightmares

22   and her visions on a weekly basis, the fact that she is in

23   Cairo specifically to avoid the pain of friends, family

24   and her prior life, because it is so painful for her.  The

25   suggestion that she can't be that traumatized because she

1    uses trains in Europe, or in Cairo.

2        Well, the testimony was that she actually moved

3    across Cairo to be closer to work so she didn't have to

4    take the train, because every day going to and coming from

5    work she was traumatized.

6        The suggestion you heard just a little bit ago she

7    does whatever a normal 24-year-old kid does, and writes

8    about food or movies or modeling, that's not what a normal

9    24-year-old kid does.  This was her job.  She was assigned

10   the task of writing these articles for a blog for her

11   company, and she did it.  She did it by researching on the

12   internet, culling some information about books that she

13   hadn't read or movies she hadn't seen, or modeling she

14   doesn't care about, or food she doesn't eat to do her job.

15   To suggest or imply to you that she shouldn't be

16   compensated for the damage that she has and will suffer

17   because she was doing her job I think is -- well, I

18   don't -- I think it is wrong.  I don't think that's what

19   our jobs are.

20       Again, they go to Dr. Filler and say that Dr. Spohr

21   or Dr. -- I think it was Spohr didn't need the diagnosis

22   from Dr. Filler.  We are not saying that she needed the

23   diagnosis from Dr. Filler.  We are not saying that

24   Dr. Scovel needed the diagnosis from Dr. Filler.  What

25   came from Dr. Filler is confirmation, visual, actual

1    confirmation of the brain damage.

2         Dr. Spohr didn't say that she doesn't -- wouldn't

3    like to have had DTI.  She says that she doesn't order

4    them because there is no facility there that does it.

5    That's what she said.  So you have to remember the

6    context.

7         Counsel talked about Emily, Emily's comportment this

8    morning.  Well, you heard about how people around Emily

9    will walk on eggshells.  And you heard from Emily about

10   how she is careful about interactions with other people,

11   not to set her off.

12        What you saw this morning was a very good

13   cross-examination of somebody who didn't want to talk

14   about the stuff that matters, because he was walking on

15   eggshells.  Didn't want to talk about the trauma, didn't

16   want to talk about the PTSD, didn't want to talk about the

17   loss of friends, how that came to pass.  Didn't want to

18   talk about the nightmares, didn't want to talk about the

19   effect on the buses or on the trains.  He avoided what he

20   knows and we know will set her off.  Now, that's what

21   happens when you walk on eggshells.  It was very carefully

22   and very well done to make sure that he didn't set her

23   off.  That doesn't mean that that is her normal reality.

24   And it is unfair to try to draw those conclusions and put

25   that together.

1       The high school thing, that's my bad.  It was in

2  cross-examination -- redirect examination, they were

3  talking about something, I saw a note from Dr. Crossen

4  about the teacher, and I had forgotten that it was a high

5  school matter.  And he corrected me, counsel corrected me.

6  I make mistakes.  I didn't mean to do it.  But when we

7  asked Dr. Crossen about it, he said that was historically

8  talking about things that were happening to her

9  subsequently.  It was one event back in high school

10  specifically.  If counsel wanted to know about it in

11  detail, he had an hour and a half, as much time as he

12  wanted this morning to ask Emily about it, and chose not

13  to do it.

14       They suggest that we or somebody said that Emily was

15  locked up in a room without windows.  Nobody ever said

16  that.  Why would we say that?  Within two weeks of the

17  incident, despite the recommendation from her physician

18  and from her mother, she goes back up to UW because she

19  knows if she doesn't do that, she will never go back

20  again.  Of course she is going to classes.  Of course she

21  is going to the library.  Of course she is going to the

22  store.  She is not locked up physically, but emotionally

23  she was locked up.

24       The questions about Patty Torjusen, or the comments

25  about Patty Torjusen's testimony suggested that she was

1  not to be believed, implied perhaps she is not telling the

2  truth.  You saw her testimony yesterday.  Was she telling

3  the truth?

4      The fact that Wayne stayed back doesn't mean that he

5  doesn't or didn't care about Emily.  Why didn't counsel

6  ask about the phone calls that Patty had with Wayne, the

7  updates, letting him know what was going on, how long she

8  would be in the hospital, when she is going to come back?

9      Ask Emily about her encounters with Wayne, the

10 relationship they had.  Yeah, she is a very bright young

11 woman, and a father who is pretty regimented, it sounds

12 like, pretty strict.  Guess what?  They would argue.  I've

13 got one of those.  That's normal.  But that's not the kind

14 of falling out that happens without the PTSD, the brain

15 injury, the disinhibition that Emily has suffered.  Not a

16 question about the pots -- throwing pots out the window.

17 Not a question about kayaks.  Not a question about any of

18 the things that Emily talked about that are the difficult

19 side, the traumatic side, the ramifications of the

20 injuries.  Just questions about schoolwork and going to

21 Starbucks and studying, but nothing about what really

22 matters here.

23     I want to remind you, even though horses get beat too

24 often at this time of trial, I want to remind you that

25 Dr. Scovel did her evaluation of Emily in March of 2018.

1    It had nothing to do with counsel, nothing to do with me,

2    nothing to do with Scott, nothing to do with Joe.  It was

3    because there was concern because of Emily's problems, her

4    reported problems.

5         Counsel criticizes Patty Torjusen for not coming up

6    to Seattle between January and March when Emily came home,

7    but never asked about the phone calls, never asked about

8    the communication, never asked Emily about what life was

9    like, what was going on with her during that period of

10   time.  Completely avoided the reality of what was going on

11   with her.

12        He never asked her what happened when she didn't have

13   Concerta, how difficult studying was when she wasn't able

14   to take it, and how it benefited her.

15        If grades were an indication of how severely somebody

16   is impacted by PTSD or by traumatic brain injury, they

17   would have an expert in here explaining it to you.  If the

18   ability to travel was a direct indication of whether

19   somebody has PTSD or suffers the consequences of PTSD or

20   the symptoms of brain injury, they would have an expert

21   come in here and tell you about it.

22        We asked the treaters specifically about whether or

23   not the PTSD or the brain injury would impact her ability

24   to do well in school, to read, to travel.  And they said

25   no, that is not the part of her brain that is affected.

1          So to go back and talk about the things that aren't

2     affected is essentially an attempt to avoid the actual

3     problems that she has.

4          Doctors.  She has brain injury.  She has PTSD.

5     Dr. Spohr testified that Emily was one of those people who

6     did not come to the doctor, did not want to come to the

7     doctor, and it was very infrequent.  Once she was

8     diagnosed with the PTSD, anxiety, depression, Dr. Spohr

9     made the same diagnosis, not just in 2017, but again in

10    2020, 2021 when she saw her.  Same diagnoses.  Carried

11    them forward.

12         There is nothing the GP is going to do.  Emily knows

13    what the problems are.  There is no need to see the

14    doctor.  It is not like she has a broken leg that is still

15    giving her difficulty and she needs to get some shots or

16    treatment.  She has already seen Scovel.  She has seen

17    Crossen, and she knows what is going on.

18         The review of symptoms, Dr. Spohr explained that to

19    you.  When she came in the office and saw the orthopedic

20    for the orthopedic follow up, for the neck and the

21    shoulder, it is just a review of symptoms.  Those doctors

22    don't even go there, don't even fill it out.  The fact

23    that it was silent doesn't mean that Emily wasn't having

24    any difficulties.

25         In short, ladies and gentlemen, when we came in here

```
1    on Tuesday after you were selected to be the jury, we gave

2    you an opening statement telling you what the evidence was

3    going to be.  We produced each and every element of the

4    evidence that we promised to you.  We did it because we

5    knew that those were the tools that you needed to be able

6    to evaluate the past, present and future ramifications of

7    what Amtrak -- what the crash did to Emily Torjusen on

8    December 18th, 2017.  You have those tools.

9         As I indicated to you in my opening close, your job

10   and your responsibility is not to just take a lump sum for

11   everything, but to look very carefully at the PTSD for the

12   last four and a half years, to look at the ramifications

13   of what happened to Emily on that day and what she

14   experienced on that day, and to look at the ramifications

15   that she suffered week in and week out, month in and month

16   out since that time, and how it has impacted her, how it

17   has caused her really to live on the other side of the

18   world.  You have to do that.  That's your job.  And then

19   think about the next 58 years.

20        Similarly, the evidence, the clear, unambiguous

21   evidence and unrebutted evidence is that Emily Torjusen

22   has damage to her brain.  In 2020, when she saw

23   Dr. Scovel, Dr. Scovel did not say it is resolved and she

24   doesn't have cognitive problems.  She said she continues

25   to have processing speed problems, attention problems.  It
```

1    is ongoing.

2         Your award, as I said earlier, needs to contemplate

3    not just the last four and a half years, but the next 58

4    years.  And in ten, 15, 20 years, if we are lucky enough

5    to walk on the street and think about Emily Torjusen, we

6    need to know that your verdict anticipated and covers and

7    is just as good then as it is now.  The damages are

8    huge --

9              MR. BONVENTRE:  Your Honor, this is no longer

10   rebuttal.

11             THE COURT:  Overruled.

12             MR. PETRU:  The damages are huge.  As I indicated

13   earlier, the greater the damages, the more balance is

14   necessary to come up with a fair and just verdict.  It's

15   not $750,000.  That's a disservice.  That's not even close

16   to being justice.  That is unjustice, if there is such a

17   thing.

18        Emily Torjusen trusts that you will take care of

19   justice and make sure that she is fairly, properly,

20   thoroughly compensated, not just for four and a half

21   years, but for the next 58 years.  Thank you very much for

22   your service.

23             THE COURT:  All right.  Jurors, as you know, our

24   court day for you will end at 4:30.  So you have some time

25   go to the jury room there and deliberate.  I told you, you

1    couldn't talk about this case with anyone else or with

2    each other.  But now, of course, that is your

3    responsibility.  So we will await your verdict.

4         (At this time, the jury exited the courtroom.)

5              THE COURT:  It seems unlikely we will see a

6    verdict by 4:30.  I think I indicated to you before that

7    Dara will go in about 4:15 and ask them if they are at all

8    close.  And if they are not, 4:30 will be the end time.

9    If for any reason they were to say we would like a little

10   additional time, then we will do that.  But probably not

11   more than 20 minutes or so.

12        I ask that you be within 15 minutes in the event we

13   get a verdict or I get a question that I need to discuss

14   with you.  So you will be leaving your contact information

15   with Dara, phone numbers.

16             MR. PETRU:  Thank you, your Honor.

17             MR. BONVENTRE:  Thank you, your Honor.

18             MR. PETRU:  I would like to thank the Court and

19   staff.  Having tried more than a handful of cases, it is

20   always a pleasure to go into a courtroom where everybody

21   works together to allow us to put on our cases fairly.

22   And I appreciate the demeanor and the support and the

23   cooperation, particularly Tony Duck.

24             MR. BONVENTRE:  As an attorney who practices

25   generally in New York, Philadelphia and New Jersey, it is

1    quite a pleasure to come here every once in a while.

2              THE COURT:  Well, we are glad to have you all.

3            MR. BONVENTRE:  Thank you, sir.

4            MR. PETRU:  Thank you, your Honor.

5         (Recessed.)

6

7

8                    C E R T I F I C A T E

9

10

11   I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14

15

16   */s/ Barry Fanning*

17   BARRY FANNING
     COURT REPORTER

18

19

20

21

22

23

24

25