```
 1    Q.   And this is your article written on July 21st of 2001
 2    (sic), correct?
 3    A.   Yes, correct.
 4    Q.   You discussed things like a fruit pizza, and avocado
 5    salad, and it is tabouli -- is that how you pronounce
 6    it -- tabouli salad?
 7    A.   I don't know.
 8    Q.   You don't know about the article you wrote?
 9    A.   I wrote it in July.  I looked up some recipes online.
10    Q.   Go to the next one.  Did you also write an article
11    about how to start your career in modeling?
12    A.   I was asked to write an article about how to start a
13    career in modeling.
14    Q.   And you wrote that on July 23rd, correct?
15    A.   Yes.
16    Q.   That also had photographs and things like that,
17    correct?
18    A.   Yes, it had some very large photographs.
19    Q.   The next one.  And you also wrote an article
20    called -- next page, "Online Shopping:  An Addiction Or
21    Just Boredom?"  Did you write that article, as well?
22    A.   I did.
23    Q.   And that was four pages, does that sound about right?
24    A.   With pictures, yes.
25    Q.   And did you write an article called "Five Book
```

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT B
Page 37 of 64

```
 1   Releases We Can't Wait To Get Our Hands On"?
 2   A.   Yes.
 3   Q.   And did you list those five books and discuss those
 4   books?
 5   A.   I had not read these books.  I looked at reviews
 6   online and wrote a synthesis about them.
 7   Q.   And the books included -- never mind.  And then you
 8   wrote another article in July of 2021 called "The Refugee
 9   Olympic Team," correct?
10   A.   Yeah.  I believe the Tokyo Olympic games were going
11   on, so I was asked to write about this.
12   Q.   And that's a four-page article --
13   A.   With photos, yes.
14   Q.   So if I can go back to your -- so prior to -- you
15   have your LinkedIn, can you see that, Emily, A41?
16   A.   Yes.
17   Q.   After the discussion about Geek, prior to that you
18   worked as a contact writer, is that -- I apologize, I will
19   mispronounce this -- Al Fusaic?  Is that how you pronounce
20   that?
21   A.   It is call Al Fusaic.  It is a volunteer
22   organization.  You can write just content related to the
23   Middle East, submit just -- whatever you feel like, book
24   reviews, et cetera.
25   Q.   You were doing that while you were working at Geek
```

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT B**
**Page 38 of 64**

1  Labs, correct?

2  A.  I believe I started Al Fusaic in July before I
3  started working at Geek Labs.  I have not really done much
4  with it.

5  Q.  And then one of the articles that you wrote for that
6  group was the Cairo story that we have been talking about,
7  correct?

8  A.  I did not write it for Al Fusaic.  I wrote it
9  previously and submitted it to them.

10 Q.  So you submitted it to Al Fusaic, that's why it is in
11 your LinkedIn that you filled out, correct?

12 A.  Yes.

13 Q.  Did you also submit something called Omani?

14 A.  In order to qualify as like a volunteer with their
15 organization to submit articles, you had to write a piece
16 about one of the ancient tribes or groups in the Middle
17 East.  So they assigned me the Omani.  And I wrote like a
18 broad overview of their -- the tribal history, I guess.

19 Q.  And what is Omani?

20         MR. PETRU:  Objection.  Relevance, your Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  There is a country in the Middle
23 East called Oman.  And so it is kind of about the ancient
24 civilization that gave birth to what is the country of
25 Oman today.

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 39 of 64**

BY MR. BONVENTRE:

Q. And that was -- you wrote about that?

A. Yes.

Q. All right. Prior to that -- actually, at the same time, it indicates that you were working at the Jasmine Language Training Center part-time? Do you see that?

A. Yes.

Q. So you were doing that at the same time with Al -- I apologize, Al Fusaic and Geek Labs, at least partially at the same time, correct?

A. I was in training at the Jasmine Language Center throughout July and I think into August. I was there part-time. And meanwhile, I had submitted roughly two articles to Al Fusaic in the same period of time.

Q. And this was also while you were a content writer at Geek Labs, correct?

A. Yes.

Q. And prior -- I think we talked briefly, you worked full time from January 2021 to April of 2021 in Olympia, in the State Senate, correct?

A. No. I was working remotely from Kelso, Washington.

Q. And you were an aide, correct?

A. Yes, I was a session aide.

Q. Previous to that, in 2020, that's when you had been doing your internship with the Washington State

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 40 of 64**

1   Legislature, correct?
2   A.   In the winter of 2020, I had been an intern at the
3   Washington State Legislature.
4   Q.   And that was, obviously, back in the United States,
5   correct?
6   A.   To be clear, when I was a session aide, I was in
7   Kelso, Washington.  And in the winter of 2020, when I was
8   an intern, I was also in Olympia.  I was in Olympia then.
9   Q.   Another part of your LinkedIn page, if that's the
10  right phrase, was you were a data transcriber for a
11  Slavonic journal project, from July of 2017 through March
12  of 2020, correct?
13  A.   This was kind of a volunteer.  There is a group in
14  Washington that is trying to transcribe the journals of an
15  old sailor who was in kind of the Middle East region.  You
16  are given pieces of his journal and you like, roughly --
17  like a few pages of it, and then you are trying to read
18  his handwriting and type what you see.  I did that -- kind
19  of -- it was very easy to do, so I did that once in a
20  while for them.
21  Q.   And you did it for almost three years?
22  A.   Yeah.  They would give me some pages and I would
23  write what I saw.
24  Q.   And you were -- it says that you were a language
25  assistant at the American Center of Cairo.  Do you see

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 41 of 64**

1  that?

2  **A.** Can you show me exactly where this is?

3  **Q.** Sure. Absolutely. I think it is the next page.

4  Just to speed this along, do you remember being at the

5  American Center in Cairo from September of 2019 to

6  February of 2020?

7  **A.** There is like a volunteer internship where remotely I

8  was asked to write some questions about U.S. holidays,

9  cultural things, a few simple questions to aid them in

10 their conversation circles at the American Center of

11 Cairo. I just did this for a few months from the United

12 States. I was never interacting with any of the people

13 actually at that organization.

14 **Q.** And your description here is that you created

15 dialogues about American culture for Egyptians? Is that

16 what you have in here?

17 **A.** Yes, I created questions and answers sometimes, yeah.

18 **Q.** And you also did an internship from January -- for

19 2019, an internship at Gulf State Analytics, correct?

20 **A.** Yes.

21 **Q.** And 2019 through December. So this would have been

22 in the time frame when you were studying in France and

23 also traveling to Cairo, correct?

24 **A.** Yes. I started it when I was in France. I had very

25 little to do, so I wanted to find a new opportunity. So I

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 42 of 64**

1  applied to find an internship.  I was given basically
2  three topics to try to write about and research during my
3  internship with them.
4  Q.   And it said you prepared background information and
5  analysis for several current event pieces.  Duties
6  included coordinating on regional topics, revising
7  articles and participating in the writing process to
8  prepare articles for publication in coordination with a
9  senior analyst.  That's what you wrote?
10 A.   It's a very fancy way of saying I would do background
11 research on a specific topic.  I would bring it to an
12 actual -- you know, expert on the topic.  They would
13 correct me.  We would go and rewrite it, and rewrite it
14 together, until it was co-authored.
15 Q.   And one of the articles that you co-authored was an
16 article called "Yemen's Fragile Peace Talks," correct?
17 A.   Correct.
18 Q.   And what was the subject of that article?
19           MR. PETRU:  Objection.  Relevance, your Honor.
20           THE COURT:  Overruled.
21           THE WITNESS:  I don't know if you know about the
22 trouble the country of Yemen has been going through.  But
23 I believe it was on the peace talk processes at that time.
24 And I kind of put together some background research for it
25 before Theodore Karasik eventually kind of authored it for

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT B
Page 43 of 64

1   us.
2   BY MR. BONVENTRE:
3   Q.   It also says that you wrote an article about, quote,
4   "Understanding Egypt's Role In Libya's Civil War,"
5   correct?
6   A.   I did not write it.  I co-authored it with Georgia
7   Cafiero.
8   Q.   I take it the topic of that article is Egypt's role
9   in Libya's civil war?
10  A.   Correct.
11  Q.   It also indicates, if I am correct, while you were --
12  as a language assistant at the American Center of Cairo,
13  and Gulf State Analytics, you were also at the Ahlan
14  Arabic Centre of Cairo; is that correct, in 2019, as well?
15  A.   No.  These are conflicting time periods.  For
16  instance, I left Ahlan -- when I went to Egypt, this is
17  where I was an intern at.  I was at the language
18  institute, which is called the Ahlan Institute of Cairo,
19  kind of an administration assistant.  I didn't start with
20  this virtual public service thing through the VSF program
21  as a language assistant for the American Center of Cairo
22  until September of 2019, which at that point I had left my
23  internship in Cairo.  But meanwhile, I had been writing
24  these three articles during the one-year period with Gulf
25  State Analytics.

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 44 of 64**

1  you be more clear?
2  Q.  Do you have any issues -- are you speaking with your
3  dad right now?
4  A.  No.
5  Q.  Is it -- would it be fair to say, respectfully,
6  Emily, that you told Dr. Scovel you have had problems with
7  your dad, long-standing problems with your dad?
8  A.  He is my father.  You know, he was -- I would do
9  something wrong, and we would have an argument about it,
10 but it would always be resolved.
11 Q.  Did you tell Dr. Scovel that you had long-standing
12 problems with your dad before the Amtrak train accident?
13 A.  Without seeing the paperwork, I would say, yes, we
14 have always had arguments, issues, disagreements.
15 Q.  At some point, you saw a therapist, Emily Smith?  Do
16 you remember that?
17 A.  Yeah.
18 Q.  I believe you saw Ms. Smith on one occasion, correct?
19 A.  Correct.
20 Q.  And I believe you said in your deposition that you
21 didn't continue to see her because you didn't get along
22 with her and you didn't like her name?
23 A.  I was having a very hard time when I was living in
24 Seattle at that point.  And I was hoping to seek out
25 someone that I could kind of vent to and explain my

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 45 of 64**

1   doing them, it's the attention and distraction she has
2   had, but not the innate ability to do those things.
3           Why do we spend time talking about what she knows --
4   what we know she still can do?  And the answer is simple.
5   The answer is because their defense in this case is to
6   distract you from the harm, to distort the evidence, and
7   to deceive you about what your role is and what her
8   damages are.
9                   MR. BONVENTRE:  Objection, your Honor.
10                  THE COURT:  Overruled.
11                  MR. PETRU:  They could have brought in experts to
12  tell you that Emily does not suffer from PTSD.  They could
13  have brought in experts to tell you that Emily does not
14  have brain damage.  They chose not to.
15          Why not?  Because the testimony you heard from all
16  the witnesses is true and correct and unimpeached, from
17  Dr. Crossen, from Dr. Spohr, from Dr. Filler, from
18  Dr. Scovel, and from Emily herself, about the impact and
19  effect these injuries have had on her.  In fact, the
20  diagnoses that were shared by the treating physicians with
21  you, as reflected in their opinions and in their charts,
22  are 100 percent consistent with each other.
23          So instead, Amtrak criticized the providers for not
24  sending or requesting each other's reports.  We spent a
25  lot of time, did your office send it, did you get it, why

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 46 of 64**

```
 1   our former colleague, now judge, Carol Bosch, Dr. Filler,
 2   to some extent Dr. Crossen.  Why did they attack us?  What
 3   were they arguing?  What were they suggesting?  That we
 4   somehow -- Emily should not be compensated because we were
 5   doing our jobs, because we had communications with them,
 6   because we told them when trial was coming, that we wanted
 7   to know what their opinions were going to be so we can
 8   prepare to make opening statements, to provide the
 9   evidence, to bring it to you?  Is there something wrong
10   with a lawyer communicating with witnesses he or she knows
11   are going to come to trial?  I think there is something
12   wrong if the lawyer doesn't do that.  But somehow by
13   deceiving and twisting and distorting what really
14   happened, they are suggesting that Emily shouldn't be
15   compensated because she hired lawyers.
16        What do they criticize for us -- us for?  In addition
17   to us, they criticized Dr. Scovel, Dr. Filler,
18   Dr. Crossen, Dr. Spohr for not sharing the reports.  That
19   doesn't change the diagnosis.  That doesn't change the
20   treatment.  And most importantly, that doesn't change what
21   happened and is happening to Emily Torjusen.
22        A good example -- a good example, by the way, is
23   Dr. Filler.  Yes, we worked with Dr. Filler and asked him
24   to prepare a PowerPoint, a PowerPoint to help explain to
25   you the very technical and very complicated tool that he
```

1  helped invent called the DTI, a tool which coincidentally
2  the original patent was owned by the State of Washington.
3  He prepared the PowerPoint so you could understand what it
4  was that he was able to get out of evaluating the DTI to
5  actually look into Emily Torjusen's brain.
6      In cross-examination with Dr. Filler here, not one
7  question, not a single question, not even half a question,
8  not even a question that was objected to, not a single
9  question was asked of Dr. Filler about his opinions and
10 his conclusions based on his work with Emily Torjusen.
11 Not one.
12     Instead, in their constant attempt to distract and
13 distort and deceive, they talked about how much money he
14 makes.  He makes a fair amount of money.  He is one of the
15 world's leading expert in this technology.  If you want to
16 know what is happening in somebody's head after they have
17 had a brain injury, you can go to somebody like
18 Dr. Filler.  There aren't very many of them.
19     Amtrak certainly could have done it if Amtrak really
20 wanted to know what was going on inside her head.  But
21 instead of hiring him, bringing him in here, they
22 criticize him for making money as part of his work.  That
23 doesn't change the quality of his work.  That doesn't
24 change his opinions and conclusions.  It's an attack on
25 him.  I find that to be disingenuous.

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT B
Page 48 of 64

1    Remember in opening statement counsel for the
2    railroad tried to tell you that the DTI exam, the very
3    tool that Dr. Filler used and explained to you, was
4    rejected by some group they called the American Academy of
5    Radiology.  And I quote from counsel:  "We know that the
6    tests he claims are so wonderful have been rejected by the
7    American Academy of Radiology.  Okay?  That's what the
8    evidence is going to demonstrate, ladies and gentlemen."
9        That was his promise to you.  First of all, the
10   American Academy of Radiology does not exist.  Dr. Filler
11   said so.  We looked it up.  There ain't no so such thing.
12       Second of all, they didn't bring any evidence in to
13   show that there is anybody who is qualified, who
14   criticizes the DTI test -- technology, standards,
15   platform, operation.  Again, they want you to be deceived.
16       In opening counsel also talked about CT scans, and
17   explained to you in his opinion that the CTs are the gold
18   standard, and that Emily Torjusen had a normal CT, so she
19   must be fine.  He failed to mention the truth, and that is
20   that a CT scan is the gold standard not for detecting
21   brain injury, but for detecting whether somebody has a
22   brain bleed, a hematoma, a hemorrhage, a skull fracture.
23   It is used in an emergency room in triage to see whether
24   or not you have to get a neurosurgeon in then and there to
25   save somebody's life from a head injury resulting in a

```
 1    its servicemen or women are found to have suffered or
 2    potentially suffered brain injury.  It's the tool that is
 3    used widely around the world, and specifically by the U.S.
 4    Army.
 5           With regard to Dr. Scovel, counsel brazenly misquoted
 6    Dr. Scovel numerous times --
 7               MR. BONVENTRE:  Objection, your Honor.
 8               THE COURT:  Overruled.
 9               MR. PETRU:  -- in an attempt to misrepresent her
10    findings.  This was just yesterday.  But it's important to
11    remember what she wrote and how it was read to her and
12    represented to her and, more importantly, how it was
13    misrepresented.
14           Counsel said in one of his questions, "And in 2018,
15    you thought she could fully recover, correct?"  When that
16    isn't what she said.
17           What she said was that she was "hopeful that Emily
18    would be able to recover."  She did not categorically
19    state that she would recover.  Dropping a word, ignoring a
20    word changes meaning.  Again, distort, deceive.
21           I am going to go through these.  I was hoping to show
22    them.  If you will give me half a minute, I will see if I
23    can get it to work.
24           This is from the 2018 report from Dr. Scovel.  This
25    was in her conclusion.  She wrote, "In consideration of
```

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT B**
**Page 50 of 64**

1  was some improvement.  But concomitantly, she noted that
2  in her testing, Emily's test results with regard to the
3  emotional stress she was under, the torment, didn't get
4  better, but was actually worse.  And she explained how and
5  why it was worse, which is why in her second diagnosis in
6  2020, the first diagnosis was major depressive disorder,
7  the second was anxiety disorder, the third was
8  post-traumatic stress disorder, and the fourth was
9  post-concussive disorder.
10       What happened was in 2018 the testing showed more
11 problems early on with the concussion, with the TBI, and
12 then in 2020, it was the emotional component that took
13 priority.  Not that the TBI went away, but the emotional
14 component was so significant that it became the first
15 diagnosis.  You can't ignore that.
16       By parsing out one sentence and ignoring the rest,
17 you can deceive.  We aren't here to deceive you.  Our job
18 is to inform you and provide you with the tools that you
19 need.
20       Let's talk about therapy.  You will be hearing talk
21 about therapy later on.  I asked Dr. Scovel yesterday
22 point blank whether somebody such as Emily Torjusen, 24
23 years old, with TBI, with PTSD, depression and anxiety,
24 whether she is to be criticized in any way, shape, or form
25 for the difficulties that she has had and expressed in

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

EXHIBIT B
Page 51 of 64

1  people whom she volunteers, her uncontrollable fear when
2  she is riding a bus, a train, or a plane, her spontaneous
3  crying, her fear of not finding and keeping a true and
4  lasting love, her fear of not being able to have her own
5  family, her loneliness for the last four and a half years,
6  and for the future that she sees as her fate.
7        They prefer that the brain injury remain hidden, but
8  we showed it to you.  They prefer that the PTSD be ignored
9  by talking about articles on modeling or food or movies.
10 They didn't ask a single question about the horrific
11 event, the day, where they did this to her on
12 December 18th, 2017.  Not one single question about that
13 day.  They want to distract you from why we are really
14 here.
15       You saw the power of that yesterday.  You saw the
16 power of her trauma, her torment yesterday.  But it wasn't
17 just yesterday.  Weekly she experiences it.  Something
18 triggers it, the memory goes back, the emotions come and
19 she relives it.
20       You saw the power of that trauma on an innocent
21 bystander, on Kevin Jeffers, four and a half years later.
22 He wasn't on the train.
23       They tried to suggest to you that Emily is fine
24 because she has gotten good grades and a job and can write
25 well.  Well, we knew that.  That isn't the problem.  The

1  value of PTSD, anxiety or depression.  There is not a
2  formula or matrix to look up.  These are noneconomic
3  because there is not a quantifiable number that is
4  assigned to it.  The verdict which you reach has to be
5  reached by your own evaluation of the evidence,
6  understanding the nature and the severity of the harms,
7  the duration of the harms and, most importantly, how it
8  affects Emily Torjusen.  Those are the things that you
9  have to look at.
10         You may disagree, but we believe for the last four
11  and a half years, for the brain injury that Emily
12  suffered, an amount of $2 million would be fair to balance
13  out that harm.
14         That specifically addresses issues of focus.  She has
15  had to take Concerta just to get through school, her
16  attention and concentration problems, the anger and the
17  outbursts associated with her brain injury.
18         Insofar as the loss of friends and relationships is
19  controlled by the brain injury, that would be included as
20  well, but that also is a ramification of the PTSD, the
21  depression and the anxiety.  There is a little crossover.
22         As for the amount of money that would fully and
23  reasonably compensate Emily for the next six decades, the
24  next 58 years for the brain injury, we believe that
25  $5 million would be a fair and reasonable amount to

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT B
Page 53 of 64

```
 1   compensate her for the next 50 years of going through life
 2   with a brain injury, which is still there and, based on
 3   the testimony, will be there with her forever.
 4          Which brings us to the PTSD, the emotional side of
 5   this.  The appropriate amount we believe that would fully
 6   and fairly compensate Emily for the incredible emotional
 7   pain and suffering that she has suffered and will suffer,
 8   we believe that $4 million is appropriate for the last
 9   four and a half years, and $10 million is appropriate for
10   the next 58 years.
11          Let me break that down.  I know it is a lot of money,
12   but there is a reason for it, because there is a lot of
13   harm.  First of all, the moment of the crash itself,
14   December 17th, 2018, Emily was sitting by a window in a
15   train, one of her favorite things to do in her entire
16   life.  Her friend Hanna shook her, shook her shoulder.
17   Emily looked up.  She saw a train violently shaking.  She
18   saw the rubber between the cars moving incorrectly,
19   wrongly.  She saw a shiny metal object coming at her.  And
20   then she woke up with her face in the dirt.  She was
21   thinking that she lost her legs, thinking that she would
22   die, thinking that Hanna's dead body was lying on top of
23   her legs pinning her.  She found herself crying to God,
24   screaming, screaming the Lord's prayer over and over, not
25   knowing if she would see her family again, not knowing if
```