EXHIBIT C

**EXHIBIT C**
**Page 1 of 25**

1

2

3

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT TACOMA**

4

5

6

7

8

9

| | |
|---|---|
| EMILY TORJUSEN, | ) 3:18-cv-05785-BHS |
| | ) |
| Plaintiff, | ) Tacoma, |
| | ) Washington |
| v. | ) |
| | ) March 31, 2022 |
| NATIONAL RAILROAD PASSENGER | ) |
| CORPORATION d/b/a AMTRAK, | ) Jury Trial |
| | ) |
| Defendant. | ) 9:00 a.m. |

10

11

12

13

**VERBATIM REPORT OF PROCEEDINGS**
**BEFORE THE HONORABLE BENJAMIN H. SETTLE**
**UNITED STATES DISTRICT JUDGE**

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings stenographically reported and transcript
produced with computer-aided technology

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT C**
**Page 2 of 25**

1  others who have had post-concussive or TBI symptoms?

2  A.   Yes.   Any form of brain injury.   But, yes.

3  Q.   And it was specifically consistent with the area of

4  the brain where the DTI found there to be damage, correct?

5  A.   Right.   The frontal area of the brain is primarily

6  responsible for that.

7  Q.   What effect does the fact that Ms. Torjusen has

8  difficulty with emotional regulation have on how you would

9  expect she conducts her life?   How does that impact

10  somebody like her?

11  A.   I think it might make her more inhibited to engage in

12  certain pursuits.

13  Q.   Why would she be inhibited to engage in certain

14  pursuits?

15  A.   Well, I think she will want to avoid certain

16  experiences, certain opportunities perhaps.

17  Q.   Is living -- is living a life in a world where you

18  avoid opportunities, avoid things that might otherwise

19  bring you pleasure or joy, something that is difficult for

20  an individual?

21  A.   Right.   I think she may not feel confident in

22  handling herself in some professional relationships and

23  social relationships.   She may avoid attending conferences

24  or other educational opportunities.   Her whole path --

25  life path may be altered.

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 3 of 25

A.   Yes.   My understanding of what I wrote doesn't mean

that those are majors.

Q.   Well, I want you to assume there has been testimony

in the case that she graduated -- Ms. Torjusen graduated

with three majors in those areas.   Okay, Doctor?

A.   Okay.

Q.   The fact that she was able to graduate with those

three majors with dispensation for only one quarter and

get extraordinarily high grades, is that relevant and

significant to you as a neuropsychologist?

A.   I think that is -- says something remarkable about

her, yes.

Q.   And could it in fact say something about her

improvement since you saw her initially in March of 2018?

A.   Yes.   As I stated in my 2020 report, that I believed

she was doing better cognitively relative to 2018 when I

saw her.

Q.   Actually, Doctor, you testified in a deposition in

this case, correct, Doctor?

A.   I did.

Q.   And you described her improvement from 2018 to 2020

as, quote, significant, correct?

A.   Yes.   I remember using that.

Q.   So the jury understands, when you saw her two years

later, her improvement was significant, correct?

——Barry L. Fanning, RMR, CRR - Official Court Reporter——
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 4 of 25

```
 1    A.   Yes.   On a cognitive level.

 2    Q.   And in fact -- let me go back to that.   When you

 3    first saw -- actually, let me ask another thing.   You

 4    indicated that someone like -- someone with Emily's

 5    diagnosis might be, quote, "inhibited to engage in certain

 6    pursuits and experiences."   Is that what you said?

 7    A.   During my testimony today?

 8    Q.   Yes, Doctor.

 9    A.   Yes.

10    Q.   Were you just saying that in general or are you

11    saying -- is it your position that Ms. Torjusen has, in

12    fact, inhibited -- been inhibited in engaging in pursuits

13    and experiences?

14    A.   You are coming across in a little bit of a mumbled

15    way.

16    Q.   I'm sure I am.   Were you making that statement in

17    general or were you saying that Ms. Torjusen has limited

18    her pursuits and experiences?

19    A.    I was doing both.   I was speaking generally.   We were

20    talking about, I believe, at that point in time her

21    psychological/emotional condition.   And so I was --

22    Q.   Go ahead.

23    A.   With somebody that has anxiety, depression and

24    post-traumatic stress disorder, but also, you know, Emily,

25    with those disorders.
```

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 5 of 25

```
 1                MR. PETRU:  Objection.  Compound.

 2                THE COURT:  Overruled.

 3                THE WITNESS:  I think a person like Emily has a

 4     lot of abilities, just innately.  She has a lot of drive

 5     to pursue these things.  I don't find it that surprising.

 6     Somebody that goes to the University of Washington and

 7     is -- probably from the get-go when she was a freshman, I

 8     would imagine, started taking coursework in Arabic.  I

 9     know that was very important to her.  And she struck me as

10     a person that has a lot of desire to travel and to engage

11     in those sorts of pursuits.  So it doesn't surprise me.

12         I do think that somebody that has those drives to do

13     that may find themselves compromised, given Emily's

14     experience that she has had regarding the accident.

15     BY MR. BONVENTRE:

16     Q.  Doctor, would it be fair to say that you would need

17     to know what her life experiences have been and what her

18     actual pursuits have been before you could tell a jury

19     that they have been in any way inhibited?

20     A.  Well, I know that she has been inhibited.  We only

21     had a brief conversation when she was living in Cairo.

22     But she told me she was actually having such a struggle on

23     public transportation that she was thinking of relocating

24     where she was residing so that she could be closer or

25     wouldn't have to take the public transportation that she
```

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 6 of 25

1   was taking to her employment situation.

2   Q.   Okay.  Doctor, that wasn't my question.

3   A.   All of that is she is inhibited.

4   Q.   Doctor --

5           THE COURT:  Just a moment.  You are talking over

6   the witness who is giving an answer.

7       You may proceed.

8           THE WITNESS:  My definition of inhibited, that

9   would be an example of how I define inhibition.

10  BY MR. BONVENTRE:

11  Q.   Would that definition also include what Ms. Torjusen

12  was doing in terms of traveling, writing, employment,

13  organizations and things like that?

14  A.   I don't know -- you know, your line of questioning is

15  difficult for me, because I don't know what she would have

16  been doing had she not been -- had this experience.

17  Q.   So how do you know she is inhibited -- excuse me.  I

18  apologize.

19          MR. PETRU:  Your Honor, if the witness could be

20  allowed to finish her answer before another question is

21  asked, or an interruption.

22          THE COURT:  I have admonished --

23          MR. BONVENTRE:  I apologize, Judge.  There is a

24  delay sometimes, and I don't know if the Doctor is

25  finished.

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 7 of 25

1     THE COURT:  You can pause long enough to find

2  out.

3     MR. BONVENTRE:  Yes, sir.

4     THE WITNESS:  Speaking to your question about

5  whether or not I would describe her as inhibited.  In that

6  situation, I would describe her as inhibited.  I am not

7  familiar with these other pursuits that she is having.  I

8  am glad that she is able to have those experiences, but we

9  can't -- in my mind, we can't know what else she would be

10  accomplishing and pursuing had she not been -- had this

11  experience.

12  BY MR. BONVENTRE:

13  Q.  Well, you don't know that one way or the -- you don't

14  know one way or the other, is that fair to say, Doctor?

15  A.  When I last saw Emily and then when I followed up

16  with her on the phone after that, it sounded, at least

17  what she was conveying, that she was having some

18  experience -- she was reluctant to engage in certain

19  things because of the trauma she had suffered.

20  Q.  When you first saw --

21  A.  I am forming my opinion based upon what I know and

22  understand about her.

23  Q.  When you first saw the plaintiff on March 14th of

24  2018, you received some medical records, correct?

25  A.  Yes.

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 8 of 25

1   Q.   Yes, Doctor.

2   A.   That is directed at me?

3   Q.   Yes.  They can persist for a year, even longer than a

4   year, correct?

5   A.   Correct.

6   Q.   Thank you.  But you were hopeful in that very first

7   visit there would be a full recovery if she had therapy,

8   correct?

9   A.   What do you mean by "therapy"?

10   Q.   What did you mean by it when you said you were

11   hopeful she would have a full recovery?  Did you indicate

12   that in your report?

13   A.   I said, "Hopefully with conscientious adherence to

14   sound medical -- sound health practices, rehabilitative

15   treatment and medical compliance she may -- Ms. Torjusen

16   may fully recover from the detrimental consequences."

17   Q.   Okay.  Thank you.  Now, could you go to your

18   examination in June of 2020.

19   A.   Okay.

20   Q.   Just so I understand it, you redid the tests that you

21   had done in 2018; you redid them in 2020, correct?

22   A.   Many of them.

23   Q.   Excuse me.  In fact, you found she had made

24   significant progress, correct?

25   A.   Not in all spheres, but some.

_Barry L. Fanning, RMR, CRR - Official Court Reporter_
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
_1717 Pacific Ave - Tacoma, WA 98402_

**EXHIBIT C**
**Page 9 of 25**

1    Q.   Right.   You indicated that "she had regained many of

2    her cognitive abilities," correct?

3    A.   It seems -- based upon prior -- the prior evaluation,

4    yes.

5    Q.   And, Doctor, we talked a minute ago about -- you

6    indicated in 2018 you thought with appropriate treatment

7    and health and all that stuff, you thought she could fully

8    recover?  Do you remember you said that a couple of

9    minutes ago?

10          MR. PETRU:  Misstates the testimony, your Honor.

11          THE COURT:  Just a moment.  I have an objection.

12   The objection is overruled.

13          MR. BONVENTRE:  Thank you, your Honor.

14          THE WITNESS:  I felt that it was a possibility,

15   yes.

16   BY MR. BONVENTRE:

17   Q.   That she could, quote, "fully recover," you said that

18   in 2018, correct?

19   A.   I did.

20   Q.   And at your deposition, following your testing in

21   2020, you said under oath you thought her prognosis was

22   even better now after 2020, correct?

23   A.   Compared to 2018 when I saw her, her cognitive

24   abilities had improved.

25   Q.   That wasn't my question.  Did you testify under oath

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 10 of 25

1   that the prognosis in 2020 was even better than the

2   prognosis in 2018?

3   A.   I don't know about prognosis.

4   Q.   Doctor, do you recall testifying at a deposition?

5   A.   Yes.

6         MR. BONVENTRE:  Just one moment, your Honor, to

7   get to the point.  I apologize.

8   BY MR. BONVENTRE:

9   Q.   Doctor, did you indicate in your deposition in 2020

10   that your prognosis for her was better than when you saw

11   her in 2018?  Do you recall saying that?

12   A.   I am looking at the definition -- excuse me.  I am

13   looking at the deposition.

14         THE COURT:  If you -- excuse me.  I'm sorry.

15   Would you refer to the page number and the date of the

16   deposition.

17         MR. BONVENTRE:  Yes.  Absolutely, your Honor.

18   BY MR. BONVENTRE:

19   Q.   You were deposed, Doctor, on November 19th, 2020,

20   correct?

21   A.   Yes.

22   Q.   And on Page 57 and 58 you were asked about your

23   prognosis; do you recall that?

24   A.   Give me time to get that.

25   Q.   Please.

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 11 of 25

1   **A.**   Okay.  At the bottom I was asked, "And what is your

2   prognosis for Ms. Torjusen?"  Is that what you are

3   referring to?

4   **Q.**   Yes.

5   **A.**   "Following the June 2020 evaluation."

6   **Q.**   And did you indicate that your prognosis for her was

7   better than when you saw her in 2018?

8   **A.**   Yes.

9   **Q.**   And in 2018 --

10  **A.**   I saw --

11  **Q.**   And in 2018 you thought she could fully recover,

12  correct?

13           MR. PETRU:  Objection.  Misstates the testimony.

14           THE WITNESS:  I was hopeful.

15  BY MR. BONVENTRE:

16  **Q.**   Hopeful.  Thank you.

17  **A.**   And I -- I would like to give a little more detail,

18  if I may.

19  **Q.**   Okay.  Certainly.  Go ahead.

20  **A.**   In 2018, I had been given the referral from

21  Dr. Spohr's office to do a medical evaluation.  And in my

22  report, I like to conclude after I -- in my conclusions,

23  my last paragraph, I like to provide information to the

24  patient that they can do -- that will benefit -- be

25  beneficial to them.  And I like to -- in Ms. Torjusen's

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT C**
**Page 12 of 25**

1          MR. BONVENTRE:  Objection, your Honor.

2          THE WITNESS:  That's my understanding.

3          THE COURT:  Just a minute.  Objection sustained.

4     Leading.

5     BY MR. PETRU:

6     Q.   Do you hope that she will try again?

7     A.   To engage in psychotherapy, yes.

8     Q.   Do you have any reason to believe that the pattern

9     that has existed for the last four and a half years,

10    however, will not repeat?

11         MR. BONVENTRE:  Objection.

12         THE COURT:  Overruled.

13         THE WITNESS:  Can you repeat that?  I didn't

14    quite hear all of it.

15    BY MR. PETRU:

16    Q.   Based on your neuropsychological background, training

17    and experience, would you expect that because the pattern

18    has been over the last four and a half years to have

19    intermittent therapy which is cut short, that that pattern

20    will repeat?

21    A.   It's hard for me to be definitive.  I don't

22    understand -- I have not spoken to Emily about the reasons

23    for that, why she is reluctant to engage.  I can only

24    surmise that she is reluctant because it is very

25    uncomfortable for her.

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 13 of 25

```
 1                    MR. BONVENTRE:  Objection.
 2                    THE COURT:  Overruled.
 3                    THE WITNESS:  I am saying uncomfortable
 4       psychologically and emotionally because of the nature of
 5       post-traumatic stress disorder.
 6       BY MR. PETRU:
 7       Q.   Based on your experience with patients such as Emily
 8       who have PTSD, anxiety, depression, TBI, would you expect
 9       that it is more probable than not that she will continue
10       to have that pattern with therapy, start it and stop it,
11       based on your training?
12                    MR. BONVENTRE:  Objection.
13                    THE COURT:  Basis.
14                    MR. BONVENTRE:  Speculative.
15                    THE COURT:  Overruled.
16       BY MR. PETRU:
17       Q.   You can answer.
18       A.   That would be my opinion.
19       Q.   And that pattern is consistent with the patients you
20       have been following over the years in your practice,
21       correct, in a similar situation?
22       A.   Yes.  That's correct.
23                    MR. PETRU:  Let me check my notes.  I think I'm
24       done.  Thank you.  That's all I have.  Appreciate your
25       patience.
```

─Barry L. Fanning, RMR, CRR - Official Court Reporter─
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

**EXHIBIT C**
**Page 14 of 25**

1   Dr. Scovel in 2018?

2   A.   I don't think we signed on -- it is Emily, she didn't

3   sign on with you guys until April or end of March.  No.

4   Q.   I want to talk to you about changes with Emily since

5   the train crash.  Have you noticed any changes in Emily

6   since the train crash?

7   A.   Yes.

8   Q.   Can you tell the jury what you have noticed?

9   A.   Emily is a very, very short fused, easily upset.  My

10  relationship with her is very fragile, I would describe

11  it.  I am very careful not to upset her.  I don't ask her

12  a lot of questions.  I just -- I listen -- you know,

13  listen to her, try to be supportive.  She has a very quick

14  trigger.  She gets very upset very easily.  It's like

15  walking around on eggshells with her.

16      I feel like I have lost my daughter.  She is not the

17  family member she once was.  She is not the person I once

18  knew.  It's a different type of relationship.  I still

19  want to have a relationship.  I strive to keep a

20  relationship with her, but I am afraid that she could

21  easily just not associate with me anymore.  So I don't

22  want that to happen.  I think I bend over backwards to

23  kind of keep things on an even keel with her.

24  Q.   How often do you talk to her now?

25  A.   Well, not much.

_Barry L. Fanning, RMR, CRR - Official Court Reporter_
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
_1717 Pacific Ave - Tacoma, WA 98402_

**EXHIBIT C**
**Page 15 of 25**

1  Q.  Up until the accident, you had a love affair with

2  trains?

3  A.  Yeah, I thought they were very cool.

4  Q.  Did you trust that Amtrak was going to give you a

5  safe ride?

6      MR. BONVENTRE:  Objection, your Honor.

7      THE COURT:  Overruled.

8      THE WITNESS:  I had -- I really enjoyed riding

9  Amtrak.  I was going to the University of Washington, and

10  it was very easy for my family to pick me up in Vancouver.

11  I always, whenever I could, took the train down and back,

12  because I loved looking out the window watching the

13  scenery.  I preferred it much more than to a bus.  Yes, I

14  had complete faith in Amtrak.  I had even gone from

15  Seattle down to San Francisco with a group of friends

16  before.  It was a lot of fun.  I really trusted them.  I

17  wanted to travel all over America, honestly, on Amtrak.

18  BY MR. PETRU:

19  Q.  There have been reports from Dr. Scovel, Dr. Spohr,

20  Dr. Crossen about difficulties that you have now with

21  public transportation, not just trains, but trains, buses,

22  planes.  What happens when you have to take public

23  transportation now?

24  A.  I am very easily startled by any shaking or if it

25  hits a pothole on a bus, that scares me.  If I took the

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 16 of 25

```
 1   Link in Seattle going into the tunnel into the dark,
 2   hearing the rattling noises, this would terrify me.  I
 3   would have to listen to music.  So I avoided it.  If I
 4   take a plane, I am frightened that if an accident happened
 5   before, it could happen again.  So transportation changed
 6   a lot for me after the accident.
 7   Q.   Do you trust any transportation now?
 8   A.   I think the safest I feel is if I am in a car.
 9   Besides that, no, I feel very conscious of the very
10   possibility of an accident in any other transportation.
11   Q.   Because you know the reaction you have when you are
12   on a bus, a train, or a plane, how do you prepare yourself
13   to do it when you feel you have to?
14   A.   I always listen to music, because I don't want to
15   hear anything that might scare me.  I usually sit very far
16   away from other people, because I am prone to crying, and
17   it is very embarrassing.
18   Q.   But you do it, you use public transportation?  Why do
19   you do it if you have that kind of reaction?
20   A.   When I was studying in Seattle, there is really no
21   way around taking the bus.  I didn't have a car.  So this
22   was my only means of transportation really.  And then when
23   I was studying in France, I didn't know that the train
24   system was really the only way to get around, but that was
25   the case.  So if I wanted to go places, that was how I got
```

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 17 of 25

1    Q.   What sorts of things would you say you have given up

2    for that reason?

3    A.   I am not very good at social activities.  I have not

4    gone to a lot of parties, or even when I was working I

5    was, you know, supposed to go to a lot of social events.

6    I would briefly make a one-minute appearance, and then run

7    away, because I was very afraid I might start saying

8    something and not be able to stop myself from saying

9    something that would cause trouble for other people, or I

10   would get into an argument with someone, and it would just

11   blow up.  I do my best to kind of keep to myself when it

12   comes to things like that.

13   Q.   Still now?

14   A.   Yes.

15   Q.   I need to talk a little bit about December 18th,

16   2017.  What do you remember -- what do you first remember

17   about that early morning?

18   A.   I remember I think we were running late, and so we --

19   Q.   We?  You and Hanna?

20   A.   Yes.  Hanna was my friend from high school.  We both

21   lived in the same area.  We were going home for the

22   Christmas holidays, and I had gotten us the earliest

23   tickets down to Vancouver that I could find.  When we

24   arrived at the station, I was really surprised because

25   there were people in suits and business attire, and they

1    and create a comprehensive article using good English

2    outlining the positives and negatives of that company.

3    Yeah, that's it.

4    Q.   And what is your relationship to their work?

5    A.   More often than -- almost all the time, I am not

6    satisfied with their work.  This is a constant issue.  I

7    cannot -- I have tried to teach them how to do research,

8    how to improve their English, how to write more formally.

9    This has never really succeeded.  I almost always rewrite

10   their work entirely because I want it done the right way.

11   It has to be done the right way, and people are unable to

12   do that.  And this has caused a lot of friction in our

13   organization.

14   Q.   Has there been turnover?

15   A.   A lot of turnover.

16   Q.   Are you responsible for that?

17   A.   I have fired many people.

18   Q.   Are you concerned about being able to keep your job?

19   A.   No, because, quite frankly, I am the best they have.

20   At a different organization, this would not be the case.

21   But in Egypt, this is --

22   Q.   Your mother shared with us, and you touched upon it

23   earlier, outbursts, not being able to control frustration

24   or anger.  Before the crash, did you have any problems

25   controlling what you said to friends, to professors, to

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 19 of 25

1  parents, to strangers?  Were you able to comport yourself

2  appropriately in public?

3  A.   I would say so.  I was really quite shy.  I barely

4  ever spoke to people.

5  Q.   How frequently now do you find yourself in a

6  situation where you feel that uncontrollable reaction,

7  where you know you are going to go off?

8  A.   I almost always say more than I intend, and I leave

9  berating myself because I feel like a fool, I can't

10  control what I'm saying.  That's not -- that's not good as

11  an adult.

12      When it comes to outbursts of anger, I get very -- it

13  starts as something -- it could be something small, but

14  then I just go from zero to 100 straight away, and I am

15  just screaming at another person for no good reason.  I

16  can't really stop myself once I get started.  It just

17  takes over.

18  Q.   I understand that, and that has been a pattern that

19  you have lived with, you see, you know is there, you try

20  to avoid situations or keep it under control.  My question

21  is:  How often does it happen in the last -- say on a

22  monthly basis, weekly basis, where one of those episodes

23  happens in your life?

24  A.   An extreme outburst, like screaming at someone,

25  probably twice a month, or at least once a month.  But

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 20 of 25

```
 1   something where I just out of nowhere start snapping at
 2   people, getting very angry at them, very irritated, very
 3   short-tempered, demanding things from them, that probably
 4   is more on a weekly basis in my personal life and my work
 5   life.
 6   Q.   Speaking of your personal life, you currently have a
 7   partner?
 8   A.   Um-hum.
 9   Q.   And you are living with him, correct?
10   A.   Yes.
11   Q.   Do you snap at him and have those kinds of issues
12   with him?
13   A.   All the time.  He has said to me that he is afraid to
14   say things to me because of how I am going to react.
15   Q.   How does that make you feel?
16   A.   I feel terrible.
17   Q.   He obviously understands -- I don't know if it is
18   obvious.  Have you shared with him what has happened to
19   you about the crash, about the changes, about the areas
20   that you can't control?
21   A.   Yes.  But I don't think, you know, he fully -- he
22   doesn't fully get it.  He understands PTSD, he has seen
23   people die in his own life, so this is something he can
24   understand the trauma, a terrible accident.  But when it
25   comes to our disagreements, it's very difficult for him to
```

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 21 of 25

1   Q.   Actually, your partner is associated with Geek Labs,

2   as well, right?

3   A.   Yes.

4   Q.   Does that make it difficult when you have

5   disagreements or fights and are working together?

6   A.   Yes, it does.

7   Q.   Have you had any other work while you have been

8   working at Geek Labs?

9   A.   Yes.  When I first arrived in Cairo, I was initially

10  teaching at sort of an English language center in a

11  different area of the city.

12  Q.   What happened with that employment?

13  A.   I was exhausting myself.  I was really unable to keep

14  up with both jobs with the work involved in both, and I

15  didn't have any time to relax at all.  And it was really

16  affecting my work at Geek Labs, which was a full-time job

17  as opposed to the part-time job with the language center.

18  So my boss there told me I really should quit.  And I

19  preferred my job at Geek Labs.  I really enjoyed my work

20  there.  And I decided, okay, fine, I will.  But I was a

21  coward.  I am really bad at telling people no.  I didn't

22  know how to say it.  I told him my mother had been in an

23  accident and I needed to go back to the U.S.  I said this

24  to him in an email.  He wanted me to continue doing some

25  classes until I left, but I knew if I went in they would

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

EXHIBIT C
Page 22 of 25

1  crash when you thought about your life unfolding, I

2  understand that one of the things you thought you would do

3  that you wanted to do was to work in the foreign service,

4  the State Department, working for the country in some

5  capacity, correct?

6  **A.**  Yes.

7  **Q.**  What happened to those dreams and plans?

8  **A.**  Now I realize that those are probably unrealistic.

9  **Q.**  Why do you feel they are very unrealistic?

10  **A.**  Given who I am, I am probably not a good fit for

11  something like this, which requires a lot of a person,

12  someone -- you require a security clearance in most cases,

13  and that is something I think is very unlikely I would

14  ever obtain.

15  **Q.**  Would you hire yourself for that job?

16         MR. BONVENTRE:  Objection, your Honor.

17         THE COURT:  Sustained.

18  BY MR. PETRU:

19  **Q.**  Before the crash, how did you envision that your life

20  would unfold besides getting a job with the State

21  Department?  What did you see in the near or the distant

22  future for Emily Torjusen as a 20-year-old, in terms of

23  how your life would unfold?

24  **A.**  I had hoped, you know, to get a master's degree, to

25  learn Arabic, to become fluent in it, do something related

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT C**
**Page 23 of 25**

```
 1   to the Middle East, work in politics, and then, you know,

 2   have a family.  I didn't want to really die alone.  I had

 3   always hoped that once I would be maybe even a professor

 4   in college.  I was very optimistic.

 5   Q.   Do you see yourself having a family?

 6   A.   Now?  I think it is unlikely.

 7   Q.   You have something you brought with you that you keep

 8   wherever you go, from the crash.  What is it?

 9   A.   I was wearing a watch the day of the accident.

10   Q.   Do you have it with you?

11   A.   I do.

12   Q.   May I have it?

13           MR. PETRU:  Your Honor, this has been identified

14   as Exhibit 37, I think.  For purposes of -- for

15   Mr. Torjusen's sake, what I would like to do is show it to

16   the jury but not have the court receive it, so that she

17   can keep it.

18           THE COURT:  Are you offering it into evidence?

19           MR. PETRU:  I am offering it as demonstrative so

20   the jury can see her watch.

21           THE COURT:  All right.  You may do that.

22           MR. PETRU:  Thank you.  I will circulate it.

23   BY MR. PETRU:

24   Q.   Why do you keep that watch?

25   A.   When they gave it back to me after I left the
```

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT C**
**Page 24 of 25**

1          MR. PETRU:   Thank you, your Honor.

2          MR. BONVENTRE:   Thank you, your Honor.

3      (Recessed.)

4

5

6

7                  C E R T I F I C A T E

8

9

10   I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13

14

15   */s/ Barry Fanning*

16   BARRY FANNING
     COURT REPORTER
17

18

19

20

21

22

23

24

25

*Barry L. Fanning, RMR, CRR - Official Court Reporter*
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
*1717 Pacific Ave - Tacoma, WA 98402*

**EXHIBIT C**
**Page 25 of 25**